*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12/11/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  12-cr-140-01-PB
            v.                  *  January 9, 2013
                                *  9:00 a.m.
LISA BIRON                      *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 2
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE PAUL J. BARBADORO
AND A JURY

Appearances:

For the Government:   John P. Kacavas, U.S. Attorney
                      Helen Fitzgibbon, AUSA
                      53 Pleasant Street
                      Concord, NH 03301

For the Defendant:    James H. Moir, Esq
                      Moir & Rabinowitz, PLLC
                      5 Green Street
                      Concord, NH  03301

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                        I N D E X

2     Opening statement by Mr. Kacavas, page 35
      Opening statement by Mr. Moir, page 48
3

4     Witness              Direct    Cross    Redirect    Recross

5     KEVIN WATSON
      By Mr. Kacavas        51                  116
6     By Mr. Moir                     88
      BRANDON ORE
7     By Mr. Kacavas        118                 173
      By Mr. Moir                    157
8     ROBERT HARDY
      By Ms. Fitzgibbon     176
9     By Mr. Moir                    189
      LISA BRIEN
10    By Mr. Kacavas        202
      By Mr. Moir                    211
11    RICHARD NANAN
      By Mr. Kacavas        218
12    By Mr. Moir                    221
      MICHAEL GIBELEY
13    By Ms. Fitzgibbon     224
      By Mr. Moir                    230
14    MICHAEL BIRON
      By Ms. Fitzgibbon     237
15


16    Exhibits                                ID       Evid.

17    Government's Exhibit No. 1A                        68
      Government's Exhibit No. 1B                        70
18    Government's Exhibit No. 1C                        71
      Government's Exhibit No. 2                         72
19    Government's Exhibit No. 3                         75
      Government's Exhibit No. 4                         78
20    Government's Exhibit No. 5                         81
      Government's Exhibit No. 1I                        83
21    Government's Exhibit No. 1H                        85
      Government's Exhibit No. 6                        133
22    Government's Exhibit No. 7B                       136
      Government's Exhibit No. 7C                       137
23    Government's Exhibit No. 7D                       138
      Government's Exhibit No. 7E                       139
24    Government's Exhibit No. 9A                       227
      Government's Exhibit No. 9B                       228
25    Government's Exhibit No. 8                        229

1              THE CLERK:  In the matter of United States of

2    America versus Lisa Biron.  For the record, plaintiff

3    has pre-mark Exhibits 1 through 13B.  The following

4    exhibits not marked for identification are herewith

5    accepted into evidence, there being no objection by

6    opposing counsel, 10A through 10F.  Those exhibits to

7    which objection has been made shall remain marked for

8    identification at this time.  They are 1 through 9 and

9    11 through 13B.

10                     BEFORE THE COURT

11             THE CLERK:  Court is in session and has for

12   consideration a jury trial in United States of America

13   versus Lisa Biron, Criminal Case No. 12-cr-140-01-PB

14             THE COURT:  Counsel wanted to see me?

15             MR. MOIR:  Just a couple of matters, your

16   Honor.  We had a conference in chambers yesterday

17   regarding the 404(b) materials.  I just want to make

18   sure --

19             THE COURT:  Refresh my memory.  Who's the

20   moving party with respect to that?  Are you moving to

21   exclude it or are you moving to admit it?  I can't

22   remember.

23             MR. MOIR:  The government provided a notice to

24   me of 404(b) materials they sought to introduce.  I

25   filed an objection to that, a written objection to that

1    and provided that to the court.  Yesterday the

2    government responded.

3              THE COURT:  Okay, so there isn't a formal

4    motion.  I will then treat your objection as a motion in

5    limine to exclude it and your response as an objection.

6    I indicated in the chambers conference -- well, first

7    let me make clear.  What was represented to me is that

8    the government proffered to me that at least some of the

9    404(b) evidence that it intends to introduce, we're

10   speaking now of marijuana and alcohol use by the minor

11   prior to or at various points in this case, the

12   government represented to me that a significant portion

13   of that evidence will involve efforts by the defendant

14   to encourage the use of marijuana and alcohol by the

15   minor immediately prior to the production of one or more

16   of the images that are at issue in this case.  Is that

17   right, counsel?

18             MR. KAVACAS:  That's absolutely right, your

19   Honor.

20             THE COURT:  All right.  And I indicated my

21   view, tentative view that that did not appear to be

22   404(b) evidence.  To the extent your motion is both a,

23   based on 404(b) and Rule 403, I still think I would have

24   to make a ruling on 403.  But let me just explain.  My

25   thinking is that that evidence, to the extent it

1   involves the, and the government's theory is and the

2   purpose for which it's being introduced, is that it's

3   part of the context in which the images were produced

4   and specifically involved an effort by the defendant to

5   lower the minor's inhibitions to facilitate the

6   commission of the crime, in which case the evidence

7   would not appear to be evidence of other wrongs as

8   defined in the rules of evidence, and instead would be a

9   part and parcel of the criminal act that is indicted,

10  therefore it would not seem to me to be 404(b) evidence

11  at all, I still think I have to evaluate it under rule

12  403, and under the Rule 403 calculus if the evidence is

13  relevant, it's admissible unless the relevant nature of

14  the evidence is substantially outweighed by the danger

15  of something else such as unfair prejudice.

16          In this case it would seem to me that the

17  evidence would be highly relevant, and given,

18  particularly given the nature of the evidence that is

19  going to come in about what was going on when the

20  marijuana and alcohol were being consumed and shortly

21  thereafter, seems to me that there's minimal unfair

22  prejudice that results from admission of the evidence.

23          So I am prepared to rule right now based on

24  the government's proffer, assuming the evidence comes in

25  as the government proffers that it will, that evidence

1    of drug or alcohol use by the minor in the immediate

2    time frame preceding one of the events, one of the

3    charged events is admissible, it's not 404(b), it's

4    admissible, it's relevant, and the relevance is not

5    substantially outweighed by the danger of unfair

6    prejudice or other matter.  And then we will talk about

7    the other evidence in a minute.

8            Did you want to say -- your objection to that

9    ruling is of course preserved for the record.  Is there

10   anything else you want to say about that?

11           MR. MOIR:  Yes.  It has to do with beyond what

12   the court is ruling on here.  In the government's

13   objection it talks about introducing evidence of alcohol

14   and drug use well beyond these specific incidents.

15           THE COURT:  I'm separating the -- I recognize

16   their notice is more broad than that.

17           MR. MOIR:  It is.

18           THE COURT:  I'm only now asking if you have a

19   comment about the specific issue on which I'm proposing

20   to rule right now.  Is there anything else you need to

21   say about that?

22           MR. MOIR:  Not on that, your Honor.

23           THE COURT:  Okay.  So, you're right, the

24   404(b) notice is broader than that and potentially

25   encompasses efforts by the defendant to provide or

1    encourage the use of alcohol or drugs by the victim at

2    any point, and on that I intend to reserve judgment

3    until the evidence is going to be offered.  I've

4    explained to the government that my view is that to the

5    extent that it is unconnected with a specific event,

6    it's harder to make an argument that it's not 404(b)

7    evidence.  It still could be.  I mean, the government

8    could argue, for example, that this is part of the

9    efforts to recruit the victim into this criminal

10   activity that was occurring over a significant period of

11   time and use of alcohol and drugs were part of it, I

12   think that argument becomes somewhat more difficult.

13   The argument about the use in the immediate time frame

14   of the production of the specific acts is in my view a

15   slam dunk and it's not 404(b) evidence.  The more remote

16   in time you get from it, the more I would need to see

17   evidence suggesting that this is part of a pattern of

18   recruitment and continuing activity, and I really can't

19   rule on that without hearing the full context of the

20   evidence.  So, what I'm going to do is instruct the

21   government not to mention that evidence beyond which

22   I've authorized you to do.

23        Do you feel I've given you clear enough

24   instructions on what you're authorized to do?

25        MR. KAVACAS:  I am, your Honor, and I've

1    tailored my opening accordingly.

2              THE COURT:  Okay.  So, no references to drug

3    or alcohol use by the victim in the opening other than

4    to the extent it's connected with a specific event that

5    is one of the crimes charged in the indictment, and, I

6    mean in the immediate time frame so that the minor would

7    be under the influence at the time the crime was being

8    committed.  To the extent that there's evidence of

9    alcohol and drug use by the minor that the government

10   wants to get in later in the trial, they shall not make

11   any reference to it in the opening statement.  They

12   shall not make reference to it in front of the jury

13   until they get my permission to do it.  They should ask

14   to approach sidebar before it comes in.  I will hear the

15   government's proffer and at that time rule on its

16   admissibility, and hear, of course, the defendant's

17   objection before I do so.  And you should instruct your

18   witnesses not to mention drug or alcohol use by minors

19   unless specifically -- about the victim unless

20   specifically asked to, a direct question about it, they

21   shouldn't volunteer it or give an answer that's more

22   expansive than what's called for in which they include

23   that unless I make a ruling that it is authorized.

24              So, in short I am denying the motion in part

25   and reserving judgment on it in part until the evidence

1    is going to be offered so I have a more complete factual

2    record on which to make the 404(b) and 403 assessments.

3    Okay?

4              MR. MOIR:  The other issue would be drug and

5    alcohol use by the defendant in this case.  I would

6    understand that the court's ruling would be certainly

7    somewhat equivalent regarding drug and alcohol use

8    surrounding the incidents that --

9              THE COURT:  Well, I don't know, for example,

10   the -- I would need to know, I would need to -- I don't

11   know right now what that evidence is, but based on the

12   conversations we had in chambers yesterday there's at

13   least some ongoing interaction between the men that are

14   having sex with the victim here and the defendant, and

15   it may be justifiable to allow evidence of drug or

16   alcohol use between the defendant and one of these

17   people who ends up having sex with the defendant to tell

18   the complete story.  But that shouldn't be mentioned in

19   the opening statement.  It's, again, part of that area

20   that I have to hear exactly what it's being offered for,

21   what the nature of the evidence is.  I just can't rule

22   on it without knowing more about the case, and I'll know

23   more as it goes on.

24             MR. MOIR:  I'm just looking to be sure that

25   before any of this evidence is introduced, that we in

1    fact have the opportunity to approach the bench about

2    this.

3              THE COURT:  Yeah, I don't see it -- again,

4    having a glass of wine with somebody is not a bad act,

5    so it's not prejudicial, it's not -- if you're an adult,

6    it's not 404(b) evidence.  Using drugs, illegal drugs is

7    a bad act, and so I, you know, all I can say is it

8    depends.  Don't mention in the opening statement, it

9    doesn't seem to be essential to you to tell the tale in

10   the opening and we will take it up as it goes along.

11             MR. MOIR:  Very good.

12             THE COURT:  Anything else?

13             MR. MOIR:  Not on that issue.

14             THE COURT:  All right.  You have another issue

15   you'd like to take up?

16             MR. MOIR:  Well, there's the second part of

17   404(b), your Honor, where we're dealing with other

18   sexual behavior by the defendant and the alleged victim

19   in this matter.  The state -- the government, excuse me,

20   has indicated, starts right off indicating that they

21   would offer three or four witnesses to talk about

22   certainly the defendant engaged in sexual behavior with

23   them.  This is not the people who are in --

24             THE COURT:  Defendant engaging in sexual

25   behavior with the men who the government alleges later

1    had sex with the victim?

2              MR. MOIR:  No, these are different men

3    entirely, unrelated to the images that are at issue.

4              THE COURT:  Are you intending to get into any

5    of that?

6              MR. KAVACAS:  Your Honor, they are not

7    unrelated, and here's the reason why.  I would like to

8    introduce evidence that the defendant did in deed have

9    sex first with one witness named Brandon Ore.  The

10   witness, Brandon Ore, subsequently began a sexual

11   relationship with the defendant's daughter and the

12   defendant filmed them having sexual intercourse in her

13   home.  In order to provide context for this story, I

14   would like to introduce evidence that she put out a

15   personal ad, met this young man through that personal

16   ad.  The young man came to her home.  She was alone at

17   the time.  They had sex.  She told him next time you

18   come here, bring a friend.  He did that.  And when she

19   -- when he arrived at the defendant's home, she

20   introduced her daughter as her roommate.  The four

21   paired up.  He had sex with the daughter, she had sex

22   with the friend.  This happened with four or five

23   different young men over the next couple of weeks.

24   Eventually --

25              THE COURT:  All right, so, and again, you have

 1  to understand --

 2          MR. KAVACAS:  Yes.

 3          THE COURT:  -- I know what's in the indictment

 4  and what very limited facts you told me about at the

 5  last conference, so let me speak back to you what I

 6  understand you to be saying.

 7          That one of the charged incidents here

 8  involves the production of a video film of the victim

 9  having sex with this person Brandon --

10          MR. KACAVAS:  Ore.

11          THE COURT:  Ore.  And that you need to tell

12  the story of how that came to be.  And the story of how

13  that came to be is that the defendant first came in

14  contact with Brandon Ore because she placed an ad

15  seeking a sexual partner, some kind of relationship or

16  something.  Brandon Ore responded to the ad.  She had

17  sex with Brandon Ore and told him the next time you come

18  back, come with a friend.  Did it go further about

19  having sex with my roommate?

20          MR. KAVACAS:  Not at that time.  She just said

21  bring a friend.  When he showed up at the house, he was

22  surprised to find the defendant -- no, I'm sorry, I take

23  that back.  He was not surprised to find the defendant

24  alone, but when he did show up at the house, she said my

25  roommate is out for the night, it's just us.  And then

1  when he left, she said bring a friend next time.  And

2  that next time --

3        THE COURT:  Did the advertisement involve two

4  people?

5        MR. KAVACAS:  It said something to the effect

6  of two girls, 18 and 33, looking to party.

7        THE COURT:  Oh, okay.  So the first time

8  Ore -- you understand the testimony is Ore came

9  expecting there would be two women, and she said my

10  roommate's out.

11        MR. KAVACAS:  He responded to the ad expecting

12  there would be two women.  But in the e-mail exchange

13  prior to his going to the defendant's home --

14        THE COURT:  My roommate is going to be out.

15        MR. KAVACAS:  Right.

16        THE COURT:  Okay.  And then the testimony

17  would be next time, she said to him next time, bring a

18  friend, with the implication being my roommate will be

19  back.

20        MR. KAVACAS:  Right.

21        THE COURT:  Okay.  And when he did come back

22  again, is that when one of the images was allegedly

23  produced?

24        MR. KAVACAS:  No.  The image was not produced

25  for at least a couple, maybe three weeks later.  But

1   when he came back with that friend, that began a

2   pattern, a narrative that sort of provides texture for

3   this sexual relationship between Brandon Ore and the

4   daughter, and the ability of the defendant to video

5   record that sexual relationship at some point.

6          THE COURT:  All right, and you want to tell

7   that story in the opening statement because it's part of

8   the narrative of how this crime came to occur.

9          MR. KAVACAS:  Your Honor has it right.

10         THE COURT:  Okay.  You object on the grounds

11  that that is not sufficiently tied to the charged

12  offenses here and it's unfairly prejudicial, qualifies

13  as another bad act.

14         MR. MOIR:  And indeed I don't find how that

15  provides the narrative, your Honor.  The government is

16  arguing that this provides a context narrative.  My

17  understanding from the discovery I've received, I don't

18  disagree with much of what Mr. Kacavas says, but Mr. Ore

19  comes over that first time, he engages in sexual

20  relations with the defendant allegedly, and then he

21  comes the next time with a friend.  Mr. Ore then has

22  sexual relations with the daughter, that's my

23  understanding, and they have sexual relations.  I don't

24  see how that furthers, I don't see how that's context.

25  And then he comes back with other friends a number of

1    times.  Apparently they want to introduce the fact that

2    she had three or four different men came there while

3    Brandon Ore is with basically his girlfriend.

4         THE COURT:  Well, again, it's hard for me to

5    make any definitive rulings about it until I know the

6    full contour of the evidence.  But if you go only as far

7    as you've described to me now in your opening statement,

8    I agree with you that that is exactly the kind of

9    evidence that qualifies as context evidence.  It's not

10   404(b) evidence in the traditional sense.  And to the

11   extent it were to be characterized as 404(b) evidence,

12   it would be evidence of a pattern of behavior.  But it's

13   really being offered not for pattern.  It's really being

14   offered for context to say how did this crime come

15   about.  And introducing that evidence seems to me to be

16   vital to the government's ability to tell the story in

17   any kind of way other than a completely truncated and

18   artificial way that would seriously damage the

19   government's ability to put on its case.

20        On the other hand -- so, my instinct is to say

21   at least to the extent we've had this limited proffer by

22   the government, that that too is not 404(b) evidence,

23   it's context evidence that is not subject to Rule

24   404(b).  If it were subject to Rule 404(b) it would be

25   admissible anyway in the nature of the pattern, common

1    scheme or plan type evidence.  But it really better fits

2    not as 404(b) evidence but as context evidence.

3            In any event, if it were 404(b) evidence I

4    think it would be admissible under Rule 404(b), and

5    again, under Rule 403, I think the balancing of

6    probative value and prejudicial effect is that it's not

7    unfairly prejudicial because it's all relevant for

8    purposes other than propensity.  It's for purposes of

9    telling the story of how this happened.

10           So, I don't think that it is unfairly

11   prejudicial.  Now, you said something about the

12   defendant having sex with other men other than Brandon

13   Ore.

14           MR. MOIR:  This is what we're talking about,

15   is other men other than Brandon Ore.

16           THE COURT:  Okay, wait, wait, wait, let me

17   just finish.  I have to distinguish between the

18   defendant having sex with other men other than Brandon

19   Ore on occasions when Brandon Ore is responding to her

20   request to bring somebody, and he brings somebody.  If

21   it's just seven months ago the defendant put an ad on

22   Craig's List and had sex with another man, that kind of

23   evidence is not context.  It's admissible if at all if

24   it's some under 404(b) evidence, and it's quite distinct

25   from what I'm talking about.  So, I would have to hear

1    more from the government before I could say that that

2    evidence is admissible.  I need to have a better

3    understanding of the context.

4           To be clear, to the extent you want to

5    describe in your opening statement how the defendant

6    came into contact with Brandon Ore, that they had sex,

7    what the content of the ad was, to bring someone else

8    with you the next time, what happened when he did come

9    the next time and on those subsequent occasions leading

10   up to the charged event, that that evidence is context

11   evidence, not 404(b).  I want to distinguish, however,

12   incidents of the defendant having sex with other men

13   that don't involve Brandon Ore.

14          MR. KAVACAS:  I have no intention of

15   introducing that kind of evidence.  The friends will be

16   connected to Brandon Ore.  They will have gone to the

17   defendant's home with Brandon Ore to specifically have

18   sex with the defendant while Brandon Ore had sex with

19   her daughter under the same roof.

20          THE COURT:  Well, I've tried to give you the

21   guidance that I can and it will be up to you to insure

22   that you do not stray from the instructions that I've

23   given you in the opening statement.  So, on balance my

24   advice to you is to be somewhat conservative about what

25   you say about these matters in the opening statement.

1    I've authorized specifically alcohol and drug use by the

2    victim at a time immediately preceding or during the

3    commission of one of the offenses charged.  I've

4    authorized evidence of sexual interaction between the

5    defendant and Brandon Ore and the defendant and Brandon

6    Ore and/or others that Brandon Ore brought with him, and

7    sexual contact between the defendant and Brandon Ore and

8    other people Brandon Ore brought with him and the victim

9    leading up to the commission of the charged offense,

10   because that seems to me to be highly relevant context

11   evidence and indeed, I mean, you have to look at context

12   in a commonsensical way.  The government has to tell a

13   story here.  It has to convince the jury beyond a

14   reasonable doubt.  And if I were to start slicing and

15   dicing up the evidence in a way that had the government

16   without explanation suddenly talk about how a man shows

17   up in a room and starts having sex with the, it would

18   severely undermine the government's ability to tell its

19   story, its case, to present its evidence, and I don't

20   believe that's what Rule 404(b) or Rule 403

21   contemplates.  So, I think it's essential to telling the

22   story and I don't think it's unfairly prejudicial.

23           So, but beyond that I think you need to

24   exercise great care about what you do in your opening

25   statement.  You're better off deferring references that

1   might otherwise fall within this category until the

2   evidence comes up, and indeed you know as an experienced

3   trial lawyer that laying every single fact out that the

4   jury is going to hear during the course of the trial is

5   not a productive strategy for a lawyer, so it's in your

6   interest to let the story develop in the jury's mind

7   anyway.  So I don't think I'm unfairly constraining you.

8           So, again, my ruling, to be clear, is I am

9   denying what I've construed as your objection as a

10  motion in limine.  I'm denying your motion to bar the

11  government from producing evidence or making reference

12  to evidence of sex between the defendant and Brandon Ore

13  and the defendant and/or victim and Brandon Ore and

14  other people that Brandon Ore brought with him during

15  the sexual encounters leading up to the charged event.

16  Okay?

17          MR. KAVACAS:  I understand.

18          THE COURT:  Beyond that I have not yet ruled.

19  I defer ruling on it.  Same instruction about don't

20  raise it in your opening statement.  Don't discuss it

21  without first getting my permission.

22          MR. KAVACAS:  Yes, sir.

23          THE COURT:  Anything else?

24          MR. MOIR:  Two items.  One is I would move to

25  sequester Special Agent Gibeley who's been present of

1    course during jury selection.  He may be a witness in

2    this case.

3            THE COURT:  Is he going to be a witness?

4            MS. FITZGIBBON:  Your Honor, if he testifies,

5    if we call him in chief, it will only be if there's no

6    stipulation to the chain of custody of one piece of

7    evidence that Agent Gibeley delivered.  We don't

8    anticipate calling him for any other --

9            THE COURT:  Well, the rule allows you to have

10   a case agent with you at the trial anyway except -- I

11   mean I recognize I have the discretion to keep him out

12   if I think it would be unfair to the defendant.  But if

13   you're telling me at most he's going to be a chain of

14   custody witness, I don't see how that's problematic for

15   the --

16           MS. FITZGIBBON:  Correct, your Honor, we don't

17   anticipate any substantive testimony.

18           MR. MOIR:  My concern is this, your Honor.

19   There's going to be a number of witnesses who are going

20   to be testifying.  I think the government anticipates

21   they may be saying certain things.  I'm sure the court

22   knows that people often deviate from what is

23   anticipated.  It is Agent Gibeley who is the one who

24   interviewed all of these people and memorialized

25   whatever prior interviews there were.  Many of them had

 1   numerous interviews.

 2            THE COURT:  Can the government just give me

 3   the rule that specifically allows a case agent to -- I

 4   haven't used it in a long time, so I don't have it in my

 5   mind.

 6            MS. FITZGIBBON:  Your Honor, Rule 615(c)

 7   refers to a person whose presence a party shows to be

 8   essential to presenting the party's claim or defense.

 9   And it would be the government's position, again, I'm

10   sorry, your Honor --

11            THE COURT:  I maybe then based case law, but I

12   believe there is case law that recognizes that a case

13   agent ordinarily who's helping the government prepare

14   the case shouldn't be subjected to a sequester order,

15   but maybe I am reading -- well, let me ask you this.

16   Will you make a proffer as to what function the agent is

17   going to play if he's allowed to stay in the courtroom?

18            MS. FITZGIBBON:  Yes, your Honor.  Agent

19   Gibeley is obviously extremely familiar with this case.

20   He has been the agent, the government's case agent since

21   the beginning of the case that we took.  He has been a

22   member of the trial team as far as our strategy, our

23   planning.  He is intimately a part of this trial team.

24   I do anticipate him being of assistance to the

25   government.  And again, I don't anticipate him offering

1    any substantive testimony.

2              THE COURT:  All right, I'm going to deny the

3    motion but instruct you that you may renew -- you may

4    move to exclude the witness from testifying if they end

5    up calling him for more than chain of custody purposes

6    and you can demonstrate that it would have potential to

7    be unfair to the defendant if he's allowed to testify on

8    those subjects based on the argument that he somehow

9    gained some familiarity during the course of the trial

10   by sitting here that could allow him to shape his

11   testimony in ways that would be unfair to the defendant.

12   So --

13             MR. MOIR:  That would be my concern, your

14   Honor, because, again, I have not had a chance to speak

15   to any of these witnesses.  I do know they've given

16   numerous statements --

17             THE COURT:  Given the government's proffer to

18   me, it's hypothetical at this point, and I think,

19   frankly unlikely, but, and I do think he's a need to be

20   -- the way the government works is they use the grand

21   jury to some extent, but for the most part they rely on

22   an agent who functions much like a paralegal during the

23   trial phase because he's the one that knows the case

24   better than anyone else, knows the statements, knows the

25   witnesses, and I think there's need to have a government

1   agent at trial and it's something that's routine in

2   courts across the country.

3          So, I understand your point but I'm going to

4   deny your motion to exclude the agent at this time

5   subject to your right, if they try to call the agent to

6   testify to anything more than chain of custody, you seek

7   to exclude the evidence on the basis that the government

8   gained some improper advantage by allowing him to be

9   present during the proceeding.  I'm not implying the

10  ruling on that now, I'm just saying you can raise that

11  with me if it comes up, because I think it's

12  hypothetical and frankly is unlikely to come up.

13         I want to go back to the other issue of this

14  context evidence.  I don't think it makes sense to say

15  it during the opening statement, but I will offer to

16  you, if you choose, and I'll leave it to you to decide

17  whether you want one, I'm happy to give a limiting

18  instruction when the evidence is offered to focus the

19  jury's attention and to tell them expressly this

20  evidence is not evidence of charged misconduct, it is

21  evidence that's being admitted solely for the purpose of

22  allowing the jury to hear the full context in which the

23  government's evidence is presented, and that it may not

24  be -- the jury may not hold these acts against the

25  defendant in determining whether they are guilty or

1    innocent; instead, they may consider the evidence to the

2    extent it's relevant in understanding the context in

3    which the evidence of the charged acts occurred.  I'll

4    leave it to you, but I'm just telling you, I'm willing

5    to give a very strong limiting instruction about any of

6    the evidence that we've been talking about that's

7    subject of the Government's 404(b) notice, whether it's

8    404(b) evidence or not.   So, evidence that the

9    defendant had the victim have sex with this person on a

10   different date in New Hampshire, not charged event, I'm

11   happy to say, you know, you hear evidence about that,

12   that's not one of the charged offenses and you can't

13   find the defendant guilty based on that.  You're being

14   allowed to consider it for a limited purpose of context

15   in which you consider evidence that he committed -- one

16   of the charged offenses was committed.  Do you see what

17   I'm saying?

18             MR. MOIR:   I understand.

19             THE COURT:   You want a limiting instruction,

20   you ask for it, I'll give it.  You don't ask for it,

21   I'll assume you made a tactical judgment that you'd

22   rather not have one.  That's a legitimate tactical

23   judgment a lawyer might make and I would defer to your

24   judgment on that.  But I'm more than willing to offer a

25   very strong limiting instruction about the nature of the

1   evidence.

2             MR. MOIR:  All right, very good.

3             THE COURT:  Anything else?

4             MR. MOIR:  One last thing.  You wanted a

5   reminder, your Honor, regarding the jury selection

6   yesterday and our loss of one of the jurors.

7             THE COURT:  Okay, thank you.  I'll raise that

8   first off.  One last thing, is the government intending

9   to submit a proposed jury instruction?

10             MS. FITZGIBBON:  Yes, your Honor, we hope to

11   do that later today.

12             THE COURT:  All right, but the sooner the

13   better because I'll be working on them here because this

14   is going to be a two-day trial, right, we will probably

15   have closing argument tomorrow.  So I've got to be ready

16   to talk to you about charges, you know, it would be good

17   if I can do it tonight and maybe tomorrow.  Now, I'm

18   working on a charge, but I usually depend on the

19   government because it's my belief that any good

20   prosecutor is going to begin their preparation of the

21   case with the indictment and the charges and carefully

22   go over the elements and carefully tailor how am I going

23   to satisfy this element.  So, if there's anyone who's in

24   a position to have fully understood the elements of

25   these offenses, it's the government in the first

1   instance.  So you're in the best instance to give me

2   instructions.  I have instructions from the defendant

3   and I'm considering those instructions.  I've tried

4   hundreds of cases, but I've only tried one or two of

5   these kinds of cases and I have proposed charges, but I

6   want to be sure I give you good advice on what I'm going

7   to instruct.  So the sooner you can get those in to me

8   the better.  It's ordinarily advisable for the

9   government to have those in before the start of the

10  trial, especially in a short trial so that I can be

11  working on it.

12          MS. FITZGIBBON:  Yes, judge.  We will try for

13  the lunch break today.

14          THE COURT:  Okay, that would be good.  All

15  right, so, are we ready to begin?

16          MR. KAVACAS:  Yes, your Honor.

17          MR. MOIR:  Yes, your Honor.

18          THE COURT:  Okay, why don't we bring in the

19  jury.

20                     BEFORE THE JURY

21          THE CLERK:  Please remain standing and raise

22  your right hand.

23          (Jury duly sworn.)

24          THE CLERK:  Thank you.  You may be seated.

25          THE COURT:  Good morning, members of the jury.

1    Let me give you some general instructions that you can

2    follow during the course of this trial and then we will

3    begin with the evidence.

4              So, I gave you some general instructions

5    yesterday.  I want to reiterate those because it's very

6    important.

7              You need to keep an open mind about this case.

8    You're going to hear evidence sequentially, and the

9    evidence is going to start with evidence from government

10   witnesses.  You can't really make up your mind about

11   guilt or innocence until you've heard all the evidence

12   in the case.  And you can't even make up your mind until

13   you know the law because I'm not going to give you

14   detailed instructions on the law until after the

15   evidence has concluded.  And even then, you need to be

16   keeping an open mind and be willing to listen to what

17   other jurors have to say about the case.  So, you can't

18   really begin to, you can't make up your mind here until

19   you've heard everything.  So, keep an open mind

20   throughout the trial.

21             I have instructed you not to expose yourself

22   to any discussions about the case in the media and to

23   report any information that you inadvertently are

24   exposed to.

25             I've instructed you not to go out and do any

1    investigation of this case yourself.  That's because we

2    have to base decisions here solely on what happens here

3    in the courtroom.  You see I have a court reporter

4    taking down every word that is being said during this

5    trial, and every piece of evidence that's admitted will

6    be kept as a record.  So every -- and my instructions

7    will be recorded, so every single thing you, every input

8    you have to making your decision will be recorded.  To

9    the extent you're out there gathering evidence on your

10   own, we have no record of that.  We don't know whether

11   it's good evidence or bad evidence; whether you've done

12   something proper or improper.  You have to base your

13   verdict solely on what happens here in court.  So, don't

14   go out and try to do any investigation in the matter or

15   of anything about how you do your jury service.

16           I instructed you not to talk to other family

17   members or friends about the case.  I'm going to tell

18   you it's fine during breaks to talk to each other about

19   something funny happened in court or something

20   incidental, but I don't want you to go in and start

21   forming groups and start talking about what did you

22   think of such and such testimony, because everybody

23   needs to hear what you have to think, and I don't want

24   you to be starting to decide the case until you've heard

25   everything.  So don't engage in any discussions with

1    other jurors about the case until you've heard

2    everything, any substantive discussions, okay?  I mean,

3    you're human beings and you may want to talk about what

4    happened in court, but don't discuss the merits of the

5    case and start deliberating until you've heard

6    everything.

7            Don't do any social media involving the case

8    while the case is ongoing.  So, no Facebooking, no

9    Twitter, no any social media of any sort.

10           You will have notebooks in front of you.  I

11   want to give you some instructions about using notes,

12   okay?  First of all, no one has to take a single note.

13   And if you're not comfortable taking notes, don't take

14   notes.  No one will think less of you.  Because your

15   principal job is really to watch what's happening, to

16   listen carefully, and that can be distracting for people

17   who are taking notes.  They get lost in the note taking

18   and they aren't looking up and watching the witness

19   while the witness is testifying.  So, you need to be

20   paying careful attention, so don't let note taking

21   interfere with that primary function of yours.  But if

22   it helps you to take notes, as it does some people,

23   you're free to do that.  You should understand, no one

24   will see your notes but you.  We will collect them each

25   day at the end of the day, put them in an envelope.  At

1    the end of the case they will be destroyed.  No one will

2    ever see those notes, the contents of the notes.  And

3    I'm instructing you, you're not to show your notes to

4    other members of the jury or to read from your notes to

5    other members of the jury in an effort to try to

6    persuade them about what happened.  You can use your

7    memory and your refreshed memory, but I don't want you

8    telling other jurors, well, I wrote down he said this,

9    so that must be the case.  So, use your notes to the

10   extent they help you and don't let note taking distract

11   you from your primary mission, okay?

12          So, a word or two about how the trial is going

13   to unfold.  This will be a fairly short trial.  We have

14   very experienced lawyers on both sides of the case who

15   know how to do their jobs, and I expect the trial will

16   run efficiently and quickly.  We will probably complete

17   the case tomorrow.  I doubt we'll have time for closing

18   argument and instructions today, so we will probably

19   complete the trial at some point tomorrow.

20          We're going to begin with opening statements.

21   The government has the burden of proof here, as I

22   mentioned to you, beyond a reasonable doubt.  So the

23   government will go first and give you a presentation of

24   what it expects the evidence in the case will show.

25   That will be followed by an opening statement from the

1    defendant if the defendant chooses to make an opening

2    statement.

3            What the lawyers say in their opening

4    statements and during the course of the entire trial is

5    not evidence.  An opening statement is kind of a preview

6    of coming attractions.  It's a statement of what they

7    expect the evidence to show, but it's not evidence.  So,

8    if they say something in the opening and there's no

9    evidence of it at the trial, you can't consider that,

10   because it's what the witnesses say, what the evidence

11   shows, and what the reasonable inferences you use

12   drawing from that evidence, using your common sense,

13   called circumstantial evidence, that constitutes the

14   evidence in the case, not what the lawyers say.  Okay?

15           So, they're going to object during the course

16   of the trial.  That's what lawyers do.  Don't hold that

17   against them.  That's for me, though.  So don't be

18   swayed one way or another about what happens with the

19   objection.  If I give you an instruction or ruling -- so

20   I may say objection overruled.  If I say overruled, that

21   means that the objection has no merit and the witness is

22   going to be allowed to answer.  If I say objection

23   sustained, then the witness is not going to be allowed

24   to answer.  Sometimes the witness will answer before I

25   can rule on the objection, and I may grant a motion to

1   strike.  If I say motion granted, the evidence is

2   stricken, you have to disregard that evidence.  Okay?

3          And I may tell you during the course of the

4   trial that evidence can be admitted only for a limited

5   purpose.  Sometimes I allow you to consider evidence for

6   this purpose, but not for that purpose.  And when I do

7   that, you have to follow that instruction.  And I may

8   give you instructions like that during the course of the

9   trial.

10          So, after the opening statements the

11  government will begin calling witnesses.  And the way I

12  work in my court is the government will offer -- ask

13  direct -- will put on its direct evidence.  It will

14  offer, ask a series of non-leading questions to the

15  witness.  And when the direct evidence is completed, I

16  allow cross-examination by the defendant if the

17  defendant chooses to cross-examine.  Of course remember,

18  a defendant in a criminal trial has no burden to produce

19  any evidence, to ask any question.  The burden of proof

20  is always on the government.  The government has to

21  prove guilt beyond a reasonable doubt.  So the defendant

22  doesn't have to ask any questions and you can't hold it

23  against the defendant if the defendant chooses not to

24  ask any questions, but they're free to cross-examine if

25  they want to.

 1              After that I will allow brief redirect by the

 2      government and that usually concludes it.  I don't

 3      usually allow recross or re-redirect except in unusual

 4      circumstances.

 5              So, the government will put on its witnesses

 6      sequentially and then when it rests its case the

 7      defendant will have an opportunity to put on evidence.

 8      The defendant has no obligation to put on evidence.  The

 9      defendant has a constitutional right to remain silent.

10      The defendant need not testify.  If she chooses not to

11      testify, you can't hold that against her in any way or

12      discuss it in your deliberations.  But if they choose to

13      put on evidence, the defense can put on evidence at that

14      point, and it will work the same way, with direct by the

15      defendant, cross by the government, redirect by the

16      defendant.

17              And after we've heard the government's

18      evidence and the defendant's evidence, ordinarily the

19      evidence in the case will be concluded and at that point

20      you will have heard testimony, you may have

21      stipulations, sometimes parties agree on a certain fact,

22      I'll announce it as a stipulatiion and tell you you can

23      consider that fact as if it had been admitted here in

24      court.  So, we will have testimonial evidence, we may

25      have stipulations, there will be physical evidence,

1   exhibits that are moved into evidence, and there is

2   again, circumstantial evidence, evidence that you can --

3   which consists of the inferences that you draw using

4   your common sense and every day experience from the

5   direct evidence in the case.

6           And that's the evidence on which you would

7   have to base your decision.  You have to base your

8   decision on that evidence.  Nothing else.  Nothing that

9   happens outside the courtroom, nothing that isn't

10  evidence.

11          The government will then be given an

12  opportunity to give a closing argument.  The defense

13  will have an opportunity to give a closing argument.

14  And the government will have an opportunity to give a

15  brief rebuttal to the defense closing argument.  And

16  then I'll instruct you on the law and then you will be

17  allowed to begin your deliberations.

18          When you begin your deliberations, I'll give

19  you a written copy of my jury instructions that you can

20  have with you in the deliberation room.  I'll give you a

21  copy of the verdict form.  You'll have copies of the

22  exhibits with you.  And at that point you are free to

23  begin your deliberations towards reaching a verdict in

24  the case.

25          So, those are my general instructions.  Please

1   keep them in mind throughout the trial.  Unless counsel

2   needs to see me with respect to anything else, we're

3   ready to begin with opening statements.  Please proceed,

4   counsel.

5           MR. KAVACAS:  Thank you, your Honor.

6           We did some wrong stuff.  We weren't the best

7   behaved people.  I should have been the mom, not the

8   friend.  That's what the defendant told her 14-year-old

9   daughter in a recorded telephone call following her

10  arrest.

11          But the defendant was neither mom nor friend

12  to her young daughter.  She was instead her pot pusher,

13  her pornography producer and her predator.  She sexually

14  exploited her own child.  She encouraged young men to

15  have sex with her and she captured it on video.  And in

16  the process, the defendant's daughter became an object,

17  a thing the defendant used to create, produce and

18  possess child pornography.

19          Good morning, ladies and gentlemen.  Let me

20  remind you, my name is John Kacavas.  I'm the United

21  States Attorney for the District of New Hampshire.  My

22  trial partner is Assistant United States Attorney Helen

23  Fitzgibbon, and together we represent the United States

24  in this case.  Seated with us at counsel table is the

25  lead investigator in the case, Special Agent Mike

1    Gibeley of the FBI.  And you recall that that's Dena

2    Blanco, and Dena is a paralegal in our office and she

3    will be assisting us during this trial.

4              Now, folks, the video evidence that you're

5    going to see and hear during this trial is graphic.

6    It's difficult to watch.  It's difficult to listen to.

7    But we have to show it to you because this graphic video

8    evidence was created and produced by the defendant

9    herself, and it's proof beyond any reasonable doubt that

10   the defendant is guilty of the eight crimes with which

11   she's charged.

12             And you'll also hear audio evidence created by

13   the defendant herself.  In her own words, shifting blame

14   for these crimes to her 14-year-old daughter.  A young

15   girl whose role model in life was the defendant.  And

16   the defendant should have been the mom.  She should have

17   been the mom when her daughter, and we're going to be

18   referring to her daughter as R.B. in order to protect

19   her privacy during the course of this trial because of

20   her age, the defendant should have been the mom when

21   R.B. met a young man named Kevin Watson in an Internet

22   chat room in early 2012.  At the time, Kevin Watson was

23   19 years old, and he lived just outside of Niagara

24   Falls, Ontario, Canada.  And R.B., she was 13 years old

25   at the time, and she lived with the defendant in

1    Manchester.

2              And after R.B. met Kevin Watson on line, the

3    defendant met Kevin Watson on line.  And the three of

4    them began to engage in sexual activity over the

5    Internet.  And after about a month or two of this long

6    distance relationship, the defendant arranged to meet

7    Kevin Watson in person in Niagara Falls, Ontario, over

8    the Memorial Day weekend in May of 2012.

9              So on Friday, May 25th, the defendant and R.B.

10   flew to Buffalo.  The defendant rented a car and drove

11   to Canada to spend the weekend with Kevin Watson.  Now,

12   the defendant didn't drag R.B. across the border kicking

13   and screaming.  No.  R.B. wanted to go to Canada.  She

14   wanted to meet Kevin Watson.  And she wanted to have sex

15   with him.  But R.B. was 14 years old, having barely

16   celebrated her birthday three weeks earlier.  The

17   defendant, on the other hand, was 42 years old, and she

18   should have been the mom.  And she had her own reasons

19   for traveling to Canada.  You see, she also wanted to

20   meet Kevin Watson.  She also wanted to have sex with

21   Kevin Watson in person.  And she wanted to video record

22   her daughter having sex with him as well.  And we will

23   prove to you beyond a reasonable doubt that the

24   defendant took her daughter to Canada for that very

25   purpose as alleged in Count One of the indictment.  We

1    will prove it to you using the graphic video evidence

2    created and produced by the defendant herself.  And we

3    will prove it to you using the audio evidence created by

4    the defendant herself.  In her own words she told more

5    than one person that she took R.B. to Canada so she

6    could video record her daughter's first sexual

7    experience with a young man.

8            So, after renting a car in Buffalo the

9    defendant drove to Kevin Watson's home, picked him up

10   and then drove to a hotel, the Peninsula Inn, in Niagara

11   Falls, Ontario.  They checked in and dropped their bags

12   and then they left briefly so the defendant could buy

13   some alcohol, some juice and some cigarettes.

14           They returned to the hotel where they started

15   drinking and smoking marijuana.  Marijuana that Kevin

16   Watson brought with him at the defendant's request.  And

17   R.B., the only child in that hotel room, drank alcohol,

18   smoked marijuana, and the defendant did nothing to stop

19   it.

20           She should have been the mom.  Instead, she

21   took out her video recorder, and after having a little

22   trouble with the lens cap on that video recorder, she

23   records Kevin Watson and R.B. on the bed in their

24   clothes.  And as if you needed a reminder that R.B. was

25   a child at that time, you'll see that on the bed next to

1    her, she has a stuffed animal.  A green stuffed turtle.

2           The defendant then trains her video recorder

3    on the small table in front of the bed to show the

4    drinks, the weed, and the hot tub, to use her own words,

5    and then she marvels at the size of their hotel room as

6    she pans across it.  And within minutes, at the

7    defendant's suggestion, Kevin Watson is having sexual

8    intercourse on the bed with R.B., and the defendant is

9    video recording.

10           In this video, which forms the basis for the

11   charge in Count Two of the indictment, R.B. and Kevin

12   Watson are naked from the waist down.  Kevin Watson is

13   on top of R.B. on the bed.  You will see that Kevin

14   Watson is wearing a red shirt and blue hospital booties

15   on his feet.  And he'll tell you that he was wearing

16   these blue hospital booties because he burned his feet

17   walking across a fire not long before this video was

18   taken.

19           And the defendant is video recording this sex

20   act with her video recorder, zooming in and shooting

21   this from different angles.  And in the background you

22   can hear some noise, this music from a group called

23   Machine Gun Kelly, and the defendant chose to play this

24   particular music because it was R.B.'s favorite, and the

25   defendant wanted to commemorate this occasion of her

1    first sexual experience with a young man.

2              She should have been the mom.  Instead she was

3    her daughter's pornography producer.

4              And after she finished video recording R.B.

5    and Kevin Watson having sex, she had sex with Kevin

6    Watson while her child was in the room.  And that's how

7    they spent much of this weekend.  Drinking, smoking

8    marijuana and having sex.

9              Count Three of the indictment is based on

10   another video of Kevin Watson and R.B. having sexual

11   intercourse, and this video was taken by the defendant

12   the following day, Saturday.  And in this video you see

13   R.B. naked from the waist down and she's on top of Kevin

14   Watson who is lying on his back completely naked.  And

15   while the defendant is video recording this sex act, she

16   tells her daughter, you'll hear her tell her daughter,

17   it takes practice, baby, it's not so easy.  That was the

18   defendant's maternal advice to her 14-year-old daughter.

19   It takes practice, baby.

20             She should have been the mom.  Instead she was

21   her daughter's sex coach.

22             Count Four of the indictment is based on yet

23   another video of Kevin Watson and R.B. having sexual

24   intercourse in that hotel room.  This one was also taken

25   that Saturday.  And in this video you'll see that R.B.

1    is on the bed naked from the waist down, on her hands

2    and knees, and Kevin Watson is behind her.  And

3    something occurs during the filming of that video that

4    causes the defendant to laugh out loud at her daughter's

5    expense.  And I don't need to say anything more about

6    that.  You'll see it for yourself on the video.

7              Count Five is based on a digital image, a

8    photograph of the defendant, R.B., and Kevin Watson,

9    lying on the bed in their hotel room.  This photograph

10   was taken from the foot of the bed using the camera's

11   automatic timer.  It was taken on Monday morning before

12   they checked out of their hotel.  And the photograph

13   shows Kevin Watson lying down, exposing his penis,

14   sandwiched between the defendant on the left and R.B. on

15   the right, both of whom are clothed and both of whom are

16   smiling.

17             Now, folks, you're going to see that R.B.

18   appears to be a willing participant in this sexual

19   activity depicted in each of these videos and in that

20   photograph.  She doesn't appear to have been forced to

21   submit to this sexual activity.  She doesn't appear to

22   put up any resistance.  But remember, she was barely

23   14 years old.  Just a young girl whose role model was

24   the defendant.

25             And the defendant should have been the mom.

1           So, after their Memorial Day weekend with

2   Kevin Watson, the defendant and R.B. return home to

3   Manchester.  And again, the defendant should have been

4   the mom, but instead she became R.B.'s roommate.  That's

5   how she introduced her daughter when she met Brandon

6   Ore, an 18-year-old recent high school graduate.

7           The defendant met Brandon through a personal

8   ad she had posted in the casual encounter section of

9   Craig's List, an Internet networking site.  Brandon Ore

10  saw the ad, responded to it.  The ad said something to

11  the effect of two girls, 18 and 33, looking to party.

12          So, Brandon responded and made arrangements to

13  meet the defendant.  The first time he went to her

14  house, she was alone.  She told him her roommate was out

15  for the night.  And that night Brandon Ore and the

16  defendant engaged in sexual intercourse.  And when he

17  left the next morning, she told him, next time you come

18  by, bring a friend.  And as instructed, that's what

19  Brandon Ore did.  He returned to the defendant's home

20  with a friend.  And when they arrived, the defendant's

21  daughter was home.  And she introduced her 14-year-old

22  daughter as her 18-year-old roommate.  And in order to

23  further this deception, the defendant and her daughter

24  refer to themselves by their first names only.  And

25  later that evening Brandon Ore and R.B. left, went to

1  her bedroom and had sexual intercourse, while the

2  defendant took Brandon's friend to her bed.

3          And this repeated a -- this started a pattern

4  that repeated over the next couple of weeks.  Brandon

5  would bring a friend, the four of them would get

6  together, Brandon would pair up with R.B., while the

7  defendant would pair up with Brandon's friend, all under

8  the same roof.  And after two or three weeks, Brandon

9  moved into the defendant's home.  And after he did so,

10  he started to see and hear things that made him question

11  his 18 and 33-year-old roommates.  They started to refer

12  to themselves differently.  The defendant started to

13  refer to R.B. as baby, and R.B. referred to the

14  defendant as mom.  So when Brandon confronted them, they

15  admitted the true nature of their mother/daughter

16  relationship, and eventually the defendant admitted that

17  she was turning 43 years old and that R.B. was only 14.

18          That didn't matter much to Brandon Ore who by

19  then considered R.B. his girlfriend, and it certainly

20  didn't change anything for the defendant.

21          Brandon Ore continued to have sex with R.B.

22  and the defendant continued to permit it.  In fact she

23  encouraged it.  She even suggested that they have sex in

24  the living room in front of her.  So one day while the

25  three of them were sitting on the couches in the living

1   room, the defendant suggested that Brandon and R.B. have

2   sex.  They took her suggestion.  And as they engaged in

3   sexual intercourse on the couch, the defendant stood

4   behind them and video recorded it with her iPhone as

5   alleged in Count Six of the indictment.

6           And in this video Brandon Ore is completely

7   naked and he's on top of R.B., and you can clearly see a

8   silver purity ring on R.B.'s left-hand, and this purity

9   ring is supposed to signify virginity.

10          And in this video you can hear Brandon over

11  some loud music of the television refer to the defendant

12  as mom.  And he turns around and he sees what she's

13  doing and he asks her, are you still recording?  Are you

14  still taking a video?  I thought video time was over.

15  And a few seconds later, the defendant's daughter asks

16  the same thing.  Are you still taking a video?  And the

17  defendant responds to her daughter's question with no.

18  And then you can hear her laughing as she says, well,

19  maybe.

20          The defendant should have been the mom.

21          Now, the defendant not only used Brandon and

22  R.B. to produce child pornography, she also showed

23  Brandon the child pornography she produced in Canada.

24  She told Brandon all about Kevin Watson and about her

25  video recordings of her daughter's sexual encounters

1   with him.  And, one day, sitting in the living room in

2   the presence of her daughter asking her mother not to

3   show this video, the defendant used her laptop and

4   showed Brandon the video of R.B. on a bed in a Canadian

5   hotel room on her hands and knees having sexual

6   intercourse with Kevin Watson.

7          After about two months of living in the

8   defendant's home, Brandon Ore moved out and he turned

9   himself in to the Manchester police.  He reported what

10  he had been doing with the defendant -- I'm sorry, he

11  reported what he had been doing with R.B., a 14-year-old

12  girl, and he reported what he had seen at the

13  defendant's house over those two months, including that

14  Canada video.  And after authorities started

15  investigating, the defendant tried to get Brandon Ore to

16  change his statement to the police, even driving him to

17  the Manchester Police Department to make sure he did.

18  But Brandon didn't change his statement.  In fact, he

19  reported that the defendant tried to get him to lie to

20  the police.

21         Shortly after that the defendant was arrested

22  and her laptop computer was seized and searched.  And

23  the search of that computer revealed that it contained

24  child pornography, including the Canada videos and the

25  video of Brandon and R.B.  But that wasn't the only

1   video -- the only child pornography that that computer

2   contained, and we will prove to you beyond a reasonable

3   doubt that the defendant knowingly possessed that child

4   pornography on her laptop computer as alleged in Count

5   Eight of the indictment.

6              But that laptop computer contained one other

7   video.  The video in which the defendant recorded

8   herself performing oral sex on her own child.  And in

9   this video R.B. is seated on the couch in the living

10  room.  She's holding her underwear aside to expose her

11  genitalia.  And you can clearly see that silver purity

12  ring on her left-hand.  And you can see the defendant

13  digitally penetrating her daughter.  After several

14  minutes of that, the defendant changes position and she

15  performs oral sex on her child.

16             The defendant should have been the mom.

17  Instead, she was her daughter's predator.

18             Again, R.B. appears to be a willing

19  participant in the sexual activity depicted in that

20  video.  She doesn't appear to have been forced and she

21  doesn't appear to put up any resistance.  And as you see

22  these videos, please bear in mind that she was just

23  barely 14 years old.  It's what she knew.  It's what she

24  knew because this young girl's role model was the

25  defendant, and the defendant should have been the mom.

1          Now, we will prove to you beyond a reasonable

2     doubt that the defendant knowingly used R.B. to engage

3     in sexually explicit conduct for the purpose of creating

4     all these videos and for the purpose of creating that

5     photograph as we alleged in Counts Two through Seven of

6     the indictment.  And we will prove to you beyond a

7     reasonable doubt that these images traveled in

8     interstate commerce, either because the defendant took

9     them from Canada where she made them, back here to New

10    Hampshire, or because the defendant used materials that

11    were manufactured outside of New Hampshire and had

12    traveled in interstate commerce, like her iPhone and her

13    laptop.

14          Ladies and gentlemen, the graphic video

15    evidence in this case, evidence created and produced by

16    the defendant herself, speaks for itself.  And the audio

17    evidence created by the defendant also speaks for

18    itself.  It's the defendant in her own words blaming her

19    14-year-old daughter for this.  Saying this is somehow

20    her fault.

21          So at the end of this case, after you've

22    watched these videos, after you've heard the testimony,

23    after you've listened to the defendant's own words,

24    we're going to ask you to set her straight.  We're going

25    to ask that you find her guilty on these eight charges,

1   and by your verdicts, tell the defendant that this isn't

2   her daughter's fault.  Tell her that she should have

3   been the mom.  Thank you, your Honor.

4            THE COURT:  Thank you.  Defendant want to make

5   an opening statement?

6            MR. MOIR:  Yes, your Honor, thank you.

7            THE COURT:  Go ahead.

8            MR. MOIR:  Good morning, ladies and gentlemen.

9   I always find jury selection interesting.  Yesterday

10   when we were here, we had the entire panel here, you

11   were asked to do something a bit of odd.  The judge

12   asked you a number of questions about whether you could

13   be fair.  Basically asked you if you can be fair about a

14   case you knew nothing about.  I think yesterday you knew

15   this involved child pornography.  Now, after hearing Mr.

16   Kacavas's opening statement, you know a lot more.

17            The judge asked you those questions for a

18   reason, though.  And at the end of this case he is going

19   to instruct you in basically the exact same manner.  He

20   is going to tell you that you have to keep your eye on

21   one thing and one thing only.  Has the government proven

22   every element of each offense beyond a reasonable doubt.

23   That's what you're going to have to look at.  That's

24   what the judge is going to instruct you to do.  That is

25   going to be your sworn duty.  Indeed, even the

1  government wants you to do that, because that's how the

2  system works.  That's what the case is about.

3         There's a few things this case is not going to

4  be about.  You're not going to be here to decide whether

5  Lisa Biron should have been a mother.  A good mother, a

6  bad mother, whatever.  These things, as Mr. Kacavas

7  said, are going to speak for themselves.  I think you're

8  going to find them shocking.  I think you're going to

9  find them reprehensible.  You're going to find them

10  despicable.  No question about it.  I've known that

11  since day one.  You know that now.

12         The issue here, though, is not going to be

13  whether Lisa Biron is immoral or depraved.  The issue is

14  going to be, and I'm going to say it one more time,

15  whether the government proves every element of these

16  offenses beyond a reasonable doubt.

17         This is also not about what other things,

18  there could be charges in the state, other federal

19  charges in Canada, things that are not before you.  It's

20  about these charges here.  You see, it's the government

21  that decides which charges to bring.  It's not up to the

22  judge.  It's not up to me.  It's the government.  They

23  said here are the charges that we are bringing.  By

24  bringing these charges they define what has to be proven

25  to you.  They define.

1           So, I'm going to ask you to look at the

2    evidence, listen to the evidence, and then when you get

3    to the end of the case we both have opportunities to

4    speak to you again.  We're going to go very, very

5    carefully through the elements of the offense, of each

6    offense.  We're going to talk about whether the

7    government has met those elements.  Whether they have

8    proven beyond a reasonable doubt.

9           I look forward to speaking to you again at the

10   end of the case.  Thank you very much.

11          THE COURT:  Thank you.  Members of the jury,

12   counsel reminded me this morning and I believe I

13   neglected to mention it, I'll do so now.  You will

14   recall yesterday there was an additional juror among you

15   and that juror is not here today and a new juror was

16   added.  You should understand that that juror did

17   nothing wrong.  It was just a simple matter that for

18   reasons that need not concern you we determined it was

19   appropriate for another juror to take his place.  So,

20   don't infer anything from the fact that one of the

21   jurors was replaced at the beginning of the case.

22          All right, are you ready to call your first

23   witness?

24          MR. KAVACAS:  We are, your Honor.

25          THE COURT:  Please proceed.

1            MR. KAVACAS:  The United States calls Kevin

2   Watson.  I'll ask you to enter the witness box and to

3   remain standing to be sworn, please.

4            THE CLERK:  Please raise your right hand.

5                      KEVIN WATSON

6       having been duly sworn, testified as follows:

7            THE CLERK:  Thank you.  Would you please state

8   your name and spell your last name for the record.

9            THE WITNESS:  Kevin Watson.  K-E-V-I-N

10   W-A-T-S-O-N.

11                  DIRECT EXAMINATION

12   BY MR. KAVACAS:

13       Q.   Good morning, Kevin.

14       A.   Good morning.

15       Q.   I'm going to pour you a glass of water here,

16   cup of water, okay?

17       A.   Thank you.

18       Q.   Now, I'm going to be standing back there to

19   ask you some questions.  And the reason I'm going to

20   stand back there is because I want you to keep your

21   voice up.

22       A.   Okay.

23       Q.   Because if I can hear you back here, then

24   these people can hear you too.

25       A.   Okay.

1        Q.    Kevin, how old are you?

2        A.    I'm 20.

3        Q.    Where do you live?

4        A.    In Ontario, Saint Catherines.

5        Q.    Canada?

6        A.    Canada, yes.

7        Q.    And is that near any place, famous tourist

8    attraction?

9        A.    Niagara Falls on the Ontario side, the Canada

10   side.

11       Q.    And who do you live in Saint Catherines with?

12       A.    With my family.  My mom, my mom's boyfriend

13   and my brother.

14       Q.    Do you work?

15       A.    Yes.  Construction, greenhouses.

16       Q.    Are you presently employed?

17       A.    No, not right now.

18       Q.    How long have you been doing construction?

19       A.    For a couple years now.

20       Q.    What kind of construction do you do?

21       A.    Concrete, water-proofing basements, and

22   repairing foundations.

23       Q.    Okay.  Are you a high school graduate, Kevin?

24       A.    Yes.

25       Q.    When did you graduate from high school?

```
 1        A.    2011.

 2        Q.    Now, do you know the defendant, Lisa Biron?

 3        A.    Yes, I do.

 4        Q.    When did you meet her?

 5        A.    In March 2012.

 6        Q.    Do you see her in the courtroom today?

 7        A.    Yes, I do.

 8        Q.    Would you point her out and describe what

 9   she's wearing?

10        A.    In the black suit to my left.

11        Q.    And do you know the defendant's daughter?

12        A.    Yes.

13        Q.    Let me warn you that we're referring to the

14   defendant's daughter as R.B. during this trial; okay?

15        A.    Yes.

16        Q.    You understand that?

17        A.    Yes.

18        Q.    All right.  When did you meet R.B.?

19        A.    In March 2012.

20        Q.    Okay.  How did you meet her?

21        A.    Through an Internet site called Omego.

22        Q.    Who did you meet first, Kevin, the defendant

23   or the defendant's daughter?

24        A.    The daughter, R.B.

25        Q.    Okay.  And you said that you met her on an
```

1    Internet website?

2        A.    Yes.

3        Q.    What kind of website was this?

4        A.    It's two people literally chatting to webcams

5    and you can type at the same time.

6        Q.    So you use webcams?

7        A.    Yes.

8        Q.    What are those?

9        A.    It's a camera on your computer.

10       Q.    So you can see the other person you're talking

11   to?

12       A.    Yes.

13       Q.    And when you met R.B. in March of 2012, how

14   old were you?

15       A.    Nineteen.

16       Q.    What did you guys chat about?

17       A.    Personal stuff and where we live.

18       Q.    What kinds of personal stuff would you chat

19   about?

20       A.    (No response.)

21       Q.    Did you talk about sex, Kevin?

22       A.    Yes, yes, sex, and other personal stuff about

23   each other.

24       Q.    Okay.  What happened after you started --

25   well, how long was it after you met R.B. that you

1    started chatting about sex?

2        A.    Once we added each other on Skype and talked

3    to each other.

4        Q.    Okay.  You said added each other on Skype.

5    What does that mean, what did you do?

6        A.    It's another chat with two cameras and you can

7    type at the same time.

8        Q.    So you can type and see the other person at

9    the same time?

10       A.    Yes.

11       Q.    And were you talking about sex when you were

12   doing that?

13       A.    Yes.

14       Q.    What else were you doing?

15       A.    Masturbating and talking about personal stuff

16   and what's in each other's countries and just talk about

17   general stuff.

18       Q.    Okay.  I want to get back to the sexual

19   activity.  You were masturbating while you were talking

20   to R.B., Skyping with R.B.?

21       A.    Yes.

22       Q.    For purpose of simplicity I'm going to call it

23   sex text.

24       A.    Yes, okay.

25       Q.    So you had sex text with R.B.?

1        A.    Yes.

2        Q.    Was she masturbating when she was talking to

3    you?

4        A.    Yes.

5        Q.    Okay.  How long did you and R.B. have Skype

6    sex before you met the defendant?

7        A.    A couple weeks after.

8        Q.    You met the defendant a couple weeks after you

9    met R.B.?

10       A.    Yes.

11       Q.    Okay.  What happened when you met the

12   defendant?

13       A.    We started to Skype sex also.

14       Q.    What did that entail, you were doing what?

15       A.    Masturbating.

16       Q.    What was the defendant doing?

17       A.    Masturbating to Skype sex.

18       Q.    Okay.  Now, when you were having Skype sex

19   with R.B., was it just you and R.B.?

20       A.    At first it was, yes.

21       Q.    And then when you started having Skype sex

22   with the defendant, was it just you and the defendant?

23       A.    Sometimes it was and sometimes it wasn't.

24       Q.    Okay.  When it wasn't, what was happening?

25       A.    It would be me and R.B.

```
 1        Q.   All right, and did -- so it was you and R.B.
 2   Skype sexting?
 3        A.   Yes.
 4        Q.   You and the defendant Skype sexting?
 5        A.   Yes.
 6        Q.   Was there ever any other arrangement in which
 7   you all were Skype sexting?
 8        A.   (No response.)
 9        Q.   Did you ever Skype sex with the defendant and
10   R.B. in the same room?
11             MR. MOIR:  Objection, your Honor.  Leading,
12   your Honor.
13             THE COURT:  Overruled.
14        A.   Yes.
15        Q.   Did you hear my question?  I'm going to ask it
16   again.  Listen, okay?
17        A.   All right.
18        Q.   Did you ever Skype sex with R.B. and the
19   defendant when they were in the same room using the same
20   webcam?
21        A.   Oh, okay, yes.
22        Q.   How often did that happen?
23        A.   More than once in a day or -- yes.
24        Q.   You say more than once a day?
25        A.   Yes.
```

1       Q.   How many days, how often?

2       A.   Most of the time every time we chatted.

3       Q.   And you chatted daily?

4       A.   Yes.

5       Q.   And eventually you met in person?

6       A.   Yes.

7       Q.   So how long did this Skype sexting go on

8  before you met in person?

9       A.   For a while.

10      Q.   What's a while?

11      A.   About a month.

12      Q.   Who arranged to meet in person?

13      A.   Lisa did.

14      Q.   And what was the -- what was the purpose of

15  that meeting?   What was the plan?

16      A.   To have sex with R.B. and Lisa.

17      Q.   Where?

18      A.   At a hotel in Niagara Falls, Ontario.

19      Q.   Did the defendant tell you anything about

20  having sex with them in Niagara Falls?

21      A.   Yes.

22      Q.   What did she say?

23      A.   That we could make a porno.

24      Q.   And did she tell you that before she met you

25  when you were Skype sexting?

1        A.   Yes.

2        Q.   Now, did you know how old R.B. was when you

3   met her?

4        A.   Can you say that again?

5        Q.   Sure.  When you met R.B., how old was she?

6        A.   I was told that she was 16 turning 17.

7        Q.   Who told you that?

8        A.   R.B. did.

9        Q.   Did you eventually find out her true age?

10        A.   Yes, I did.

11        Q.   When did you find that out?

12        A.   A couple weeks after when I was already Skype

13   sexting R.B.

14        Q.   How did you find out her true age?

15        A.   Lisa told me.

16        Q.   So you've testified that the defendant

17   arranged to meet in person?

18        A.   Yes.

19        Q.   What were those arrangements?

20        A.   For us to have sex in the hotel.

21        Q.   Okay.  When was that meeting scheduled to take

22   place?

23        A.   May 25th.  The Memorial holiday.

24        Q.   The Memorial holiday here in the states?

25        A.   Yes.

1    Q.    And where was this meeting supposed to take

2    place?

3    A.    Can you ask that again?

4    Q.    Sure.  Where were you guys going to meet?

5    A.    Um --

6    Q.    What country were you going to meet in?

7    A.    Oh, okay, in Canada, yeah.

8    Q.    What province in Canada?

9    A.    Ontario.

10   Q.    What town in Canada?

11   A.    Saint Catherines.

12   Q.    Well, that's where you live; right?

13   A.    Yes.

14   Q.    Where were you going to meet?

15   A.    Niagara Falls.

16   Q.    Where in Niagara Falls?

17   A.    Peninsula Inn.

18   Q.    The Peninsula Inn?

19   A.    Yes.

20   Q.    Did the defendant tell you about how she and

21   R.B. were going to get to the Peninsula Inn in Niagara

22   Falls?

23   A.    They said that they were going to fly and come

24   over with a rental car and pick me up.

25   Q.    Did she say where they were going to fly to?

```
 1          A.   I recall to Buffalo.

 2          Q.   Okay.  Did you make any arrangements for this

 3     weekend?

 4          A.   No, I did not.

 5          Q.   Did you pay for any of the arrangements this

 6     weekend --

 7          A.   No, I did not.

 8          Q.   Let me finish my question.

 9          A.   Sorry.

10          Q.   Did you pay for any of the arrangements this

11     weekend?

12          A.   No, I did not.

13          Q.   Who paid for these arrangements?

14          A.   Lisa did.

15          Q.   All right.  Let's go to Memorial Day weekend.

16          A.   Okay.

17          Q.   What happened?

18          A.   I was picked up and we drove to the Peninsula

19     Inn.

20          Q.   All right.  Who picked you up?

21          A.   Lisa did.

22          Q.   Was anybody with her?

23          A.   Yes, R.B.

24          Q.   Where did they pick you up?

25          A.   Out in front of my house.
```

1       Q.     Do you remember what day of the weekend they

2    picked you up?

3       A.     Friday.

4       Q.     All right.  Now, you've testified that you

5    live with your mother, her boyfriend, your brother?

6       A.     Yes.

7       Q.     What did you tell your mother you were doing

8    that weekend?

9       A.     I was staying at a friend's house for the

10   weekend.

11      Q.     So you lied to your mother?

12      A.     Yes.

13      Q.     Instead you were -- went to the Peninsula Inn

14   with the defendant and R.B.?

15      A.     Yes.

16      Q.     How far is Niagara Falls from Saint

17   Catherines?

18      A.     About 20 minutes.

19      Q.     And when they picked you up at your house,

20   what did you leave your house with?

21      A.     A couple bags of clothes.

22      Q.     What else?

23      A.     And I did bring marijuana.

24      Q.     Why did you bring marijuana?

25      A.     Because Lisa told me to bring it.

1        Q.    So, what happens after they pick you up?

2        A.    We went to the hotel and they checked in.

3        Q.    What did you do while they checked in?

4        A.    I waited in the car.

5        Q.    Okay.  How long were they gone?

6        A.    About 10, 15 minutes.

7        Q.    What happened when they came back?

8        A.    We drove to a gas station.

9        Q.    For what purpose?

10       A.    To get orange juice and cigarettes.

11       Q.    Who got orange juice and cigarettes?

12       A.    Lisa did.

13       Q.    Who paid for it?

14       A.    Lisa.

15       Q.    After getting orange juice and cigarettes at

16   the gas station, where did you go?

17       A.    Then after that we went to the LCBO.

18       Q.    What's the LCBO?

19       A.    It's the Liquor Control of Ontario which is --

20       Q.    The Liquor Control Board of Ontario?

21       A.    Yes, where you can get your alcohol.

22       Q.    Okay.  And did you have to show the defendant

23   where the LCBO was?

24       A.    We used GPS, but yes.

25       Q.    Okay.  And who went into the LCBO?

```
 1        A.   R.B. and Lisa did.

 2        Q.   You waited in the car?

 3        A.   Yes.

 4        Q.   Why were you waiting in the car all the time?

 5        A.   I had injured feet.

 6        Q.   How did you injure your feet?

 7        A.   I walked through fire.

 8        Q.   When did you walk through fire?

 9        A.   A couple weeks before I went to the hotel.

10        Q.   What mental condition were you in that caused

11   you to walk through fire?

12        A.   I was drunk with a couple friends.

13        Q.   All right.  The defendant comes out of the

14   LCBO?

15        A.   Yes.

16        Q.   Did you see what she came out with?

17        A.   Vodka and a case of beer.

18        Q.   Okay.  Who paid for that vodka and beer?

19        A.   Lisa did.

20        Q.   What happens after the visit to the gas

21   station and the LCBO?

22        A.   We headed back to the hotel.

23        Q.   Okay.  Tell me what happens when you get to

24   the hotel?

25        A.   We got to the hotel and we went upstairs and
```

1    we started to drink alcohol and smoke marijuana.

2         Q.   All right.  So you went upstairs to this hotel

3    room?

4         A.   Yes.

5         Q.   And you started to drink alcohol.  Who was

6    drinking what?

7         A.   R.B. and Lisa were drinking the vodka and

8    orange juice and I was drinking Budweiser.

9         Q.   Who made the vodka and orange juice drinks?

10        A.   Lisa did.

11        Q.   Did she make one for herself?

12        A.   Yes.

13        Q.   Did she make one more R.B.?

14        A.   Yes.

15        Q.   And you were drinking the beer?

16        A.   Yes.

17        Q.   You said you also started smoking marijuana?

18        A.   Yes.

19        Q.   And you brought the marijuana?

20        A.   Yes.

21        Q.   Who smoked marijuana in that hotel room?

22        A.   R.B., Lisa and me.

23        Q.   What did you smoke it out of?

24        A.   Rolling papers.

25        Q.   So you used rolling papers?

1        A.   Yes.

2        Q.   Who rolled the joint?

3        A.   I did.

4        Q.   And did you see R.B. smoking marijuana?

5        A.   Yes, I did.

6        Q.   Did you see the defendant smoke marijuana?

7        A.   Yes.

8        Q.   Did the defendant try to stop R.B. from

9   smoking marijuana?

10        A.   No, she did not.

11        Q.   Now, were there any other drugs present in the

12   hotel room, Kevin?

13        A.   No, there was not.

14        Q.   So only the marijuana that you brought?

15        A.   Yes.

16        Q.   You're positive?

17        A.   Yes.

18        Q.   Now, that's not what you told the Ontario

19   Provincial Police when they interviewed you about this

20   case; right?

21        A.   Yes.

22        Q.   What did you tell them?

23        A.   I told them that there was coke and Ecstasy.

24        Q.   Why did you do that?

25        A.   Because I was nervous.

1       Q.   Okay.  You were nervous and you lied to the

2   police?

3       A.   Yes.

4       Q.   You know you're under oath here today?

5       A.   Yes.

6       Q.   Are you telling the truth today?

7       A.   Yes.

8       Q.   So that we understand, there was only

9   marijuana and alcohol in that room?

10      A.   Yes.

11      Q.   I'm going to show you a photograph.  I'm going

12  to ask you to take a look at this photograph and tell me

13  if you recognize it?

14      A.   Yes, I do.

15      Q.   What's depicted in that photograph?

16      A.   Me and R.B.

17      Q.   Where are you and R.B.?

18      A.   On the hotel bed.

19      Q.   What hotel bed?

20      A.   In the Peninsula Inn.

21      Q.   Peninsula Inn?

22      A.   Yes.

23      Q.   Okay.

24           MR. KACAVS:  Your Honor, at this point I move

25  to admit this exhibit which is Exhibit 1A for ID as a

1   full exhibit.

2             THE COURT:  Any objection?

3             MR. MOIR:  No objection.

4             THE COURT:  Without objection it will be

5   admitted.

6             (Government's Exhibit 1A admitted.)

7             MR. KAVACAS:  May I show the picture to the

8   jury, your Honor?

9             THE COURT:  Yes.

10       Q.   BY MR. KACAVAS:  Who took the photograph,

11  Kevin?

12       A.   Lisa did.

13       Q.   And when was this photograph taken?

14       A.   The Friday that we got there.

15       Q.   The Friday that you arrived?

16       A.   Yes.

17       Q.   Okay.  What were you guys doing when that

18  photograph was taken?

19       A.   Listening to music and laying on the bed.

20       Q.   Okay.  What are those on your feet?

21       A.   They're booties that I had over my injured

22  feet.

23       Q.   Okay.  And what is that you're looking at?

24       A.   Lisa's laptop.

25       Q.   Lisa's laptop?

1         A.   Yes.

2         Q.   And what are you looking at on that laptop?

3         A.   A music video.

4         Q.   A music video did you say?

5         A.   Yes.

6         Q.   Okay.  Now, you see over by R.B.?

7         A.   Yes.

8         Q.   There's a green thing there.  What's that?

9         A.   R.B.'s turtle pillow, teddy bear.

10        Q.   And there's a little table at the foot of the

11   bed?

12        A.   Yes.

13        Q.   What's on that table?

14        A.   Lisa's drink.

15        Q.   Okay.  And there's a bedside table there.  And

16   what's on that table?

17        A.   The Budweiser that I was drinking.

18        Q.   I'm going to show you what's marked as

19   Government's Exhibit 1B for ID.  And I'm going to ask

20   you if you recognize what that photograph shows?

21        A.   That's R.B. on the hotel bed.

22        Q.   On a hotel bed where?

23        A.   In the Peninsula Inn.

24        Q.   Okay.  And when was that taken?

25        A.   I'm pretty sure it was the Friday, the first

1   day.

2            MR. KAVACAS:  Your Honor, at this point I'd

3   move to strike the ID on Exhibit 1B and admit it as a

4   full exhibit.

5            THE COURT:  Any objection?

6            MR. MOIR:  No.

7            THE COURT:  Without objection.

8            (Government's Exhibit 1B admitted.)

9       Q.   BY MR. KACAVAS:  Now, you said this photograph

10  was taken on that Friday?

11      A.   Yes.

12      Q.   Was this when you were hanging out?

13      A.   Yes.

14      Q.   Was it taken around the same time as the

15  photograph we just saw of you and R.B. on the bed?

16      A.   Yes, it was.

17      Q.   Was it taken when you guys were drinking?

18      A.   Yes.

19      Q.   Was it taken when you guys were smoking

20  marijuana?

21      A.   Yes.

22      Q.   Who took it?

23      A.   Lisa did.

24      Q.   I'd like to show you now Government's

25  Exhibit 1C for ID and ask you if you recognize what's in

1    that picture?

2         A.   Yes, it's me.

3         Q.   And where are you?

4         A.   On the hotel bed in the Peninsula Inn.

5              MR. KAVACAS:  Your Honor, I'd move at this

6    point to strike the ID and admit this exhibit as a full

7    exhibit.

8              THE COURT:  Without objection?

9              MR. MOIR:  Without objection.

10             THE COURT:  It will be admitted.

11             (Government's Exhibit 1C admitted.)

12        Q.   BY MR. KACAVAS:  Kevin, when was this

13   photograph taken?

14        A.   The same time as the other one, Friday.

15        Q.   And who took it?

16        A.   Lisa did.

17        Q.   So this was taken by Lisa when you were all

18   hanging out in that hotel room?

19        A.   Yes.

20        Q.   Okay.  Kevin, I'm going to show you what's

21   been marked as Exhibit 2 for ID.  This video is

22   45 seconds long and I'm going to ask you to watch it by

23   yourself, listen to it by yourself, and when you

24   recognize it, look up at me, tell me you recognize it.

25             THE COURT:  Wait a minute.  So you have

1   headphones for him?

2             MR. KAVACAS:  We do.

3       Q.   You don't have to listen to the entirety of

4   this if you don't want to.  I want to know when you

5   recognize it.  Can you move that microphone for me.

6   Thanks.  Put these headphones on.

7             (Witness looking and listening to video.)

8       A.   Oh yeah, okay.

9       Q.   All right.  You recognize that video?

10      A.   Yes.

11      Q.   What does that video show?

12      A.   It's me and R.B. in the hotel bedroom or bed.

13      Q.   Okay.  When is this video taken?

14      A.   The Friday that we arrived.

15      Q.   Who took the video?

16      A.   Lisa did.

17            MR. KACAVAS:  Your Honor, I'd ask to strike

18  the ID from Exhibit 2, admit it as a full exhibit and

19  publish it to the jury.

20            THE COURT:  Is there an objection?

21            MR. MOIR:  No objection.

22            THE COURT:  Without objection it will be

23  admitted.

24            (Government's Exhibit 2 admitted.)

25      Q.   BY MR. KACAVAS:  Okay, Kevin, before we play

1   this video for the jurors, you say that Lisa, the

2   defendant, took this video?

3        A.   Yes.

4        Q.   Can you hear anything on the video?

5        A.   Yes.  Okay, it's a song playing.

6        Q.   Okay, what song?

7        A.   The artist is MGK.  MGK, it's a rapper.

8        Q.   What's MGK?

9        A.   Machine Gun Kelly.

10        Q.   All right.  Did you hear anything else on the

11   video?

12        A.   Yes, Lisa's voice.

13        Q.   Lisa's voice, okay.

14             (Video being played.)

15        Q.   All right, Kevin, you heard the defendant say

16   this will be proof you can show Shawn.  Who's Shawn?

17        A.   A friend of mine at the time.

18        Q.   So Shawn's a friend of yours?

19        A.   Yes.

20        Q.   All right.  In this video, you see who is on

21   the bed there?

22        A.   R.B.

23        Q.   Okay.  And that's her little stuffed turtle

24   there next to her?

25        A.   Yes.

74

1      Q.   Okay.

2           (Video being played.)

3      Q.   Okay, you see that right there?  What's that?

4      A.   It's the towel to prevent the smoke of

5   marijuana to go in the hallway of the hotel.

6      Q.   Who put the towel at the foot of that door?

7      A.   Lisa did.

8      Q.   Okay.

9           (Video being played.)

10     Q.   All right, Kevin, now, after the defendant

11   took this video, what happened?

12     A.   After this video we -- us three began kissing

13   and foreplay, and then Lisa said to have sex with R.B.

14     Q.   All right.  How long after you actually got to

15   the hotel room did you start kissing, the three of you?

16     A.   About an hour.

17     Q.   Okay.  And you testified that the defendant

18   told you to have sex with R.B.?

19     A.   Yes.

20     Q.   Okay, I'm going to show you another video.

21   Kevin, this video is 67 seconds long.  You can watch it

22   in its entirety or tell me when you recognize what you

23   see?

24     A.   All right.

25     Q.   Put the headphones on, please.

1               (Witness watching and listening to video.)

2          Q.   What's depicted in that video, Kevin?

3          A.   Me and R.B. having intercourse, sex.

4          Q.   Where?

5          A.   On the hotel bed in the Peninsula Inn.

6               MR. KACAVAS:  Your Honor, I move to strike the

7     ID from Exhibit 3 and admit it as a full exhibit and

8     publish it to the jury.

9               MR. MOIR:  Without objection.

10              THE COURT:  Without objection.

11              (Government's Exhibit 3 admitted.)

12         Q.   BY MR. KACAVS:  Okay, Kevin, before we play

13    this video for the jurors, what's it going to show them?

14         A.   Well, I was told that it was R.B.'s first

15    time.

16         Q.   Okay, I didn't ask what you were told.  What's

17    it going to show them?

18         A.   That me and R.B. had -- or R.B. had

19    intercourse, sex.

20         Q.   And what can you hear?  Can you hear anything

21    in the background?

22         A.   Yes.  Music and Machine Gun Kelly again.

23         Q.   About how long after that first video we saw

24    was this video taken?

25         A.   Right after.

1     Q.   Okay.  Go ahead.

2          (Video being played.)

3     Q.   All right, Kevin, who took that video?

4     A.   R.B. did -- I mean Lisa, sorry.

5     Q.   You're on the bed having sex with R.B.; right?

6     A.   Yes.

7     Q.   The defendant took that video?

8     A.   Yes.

9     Q.   Was there anybody else in the room?

10    A.   No, there was not.

11    Q.   And that video was taken when?

12    A.   The Friday that I was there.

13    Q.   I think you testified about an hour -- within

14    an hour of arriving at the room?

15    A.   Yes.

16    Q.   Now, was that the only time you had sexual

17    intercourse with R.B. that weekend?

18    A.   No, it was not.

19    Q.   Was that the only time that you were video

20    recorded having sexual intercourse that weekend?

21    A.   No, it was not.

22    Q.   What was the next time you had sexual

23    intercourse with R.B. that was video recorded?

24    A.   When R.B. is on all fours and I'm behind her.

25    Q.   Okay.  Is there a time before that?

1        A.    No, there was not.

2        Q.    Okay.  Let me ask, do you remember what day

3   the next video was produced?

4        A.    Saturday.

5        Q.    The next one was done on Saturday, the day

6   after you arrived; right?

7        A.    Yes.

8        Q.    You arrived on Friday?

9        A.    Yes.

10        Q.    All right.  I'm going to show you another

11   video.  Kevin, this video is 31 seconds long.  I'm going

12   to ask you to watch it.  You can watch it in its

13   entirety or until you recognize what the video shows.

14        A.    All right.

15              (Witness watching and listening to video.)

16        Q.    You recognize that?  What does that video

17   show?

18        A.    Me and R.B. having intercourse in the hotel of

19   the Peninsula Inn on the bed.

20        Q.    Okay.  When was this video taken?

21        A.    Saturday.

22        Q.    And -- where are you and where's R.B., what's

23   the position you're in?

24        A.    R.B. is on top and I'm on bottom.

25        Q.    Now, you earlier testified that the next time

1    you had sex after that Friday you were behind R.B.

2    Having seen this video; is that true?

3        A.   Yes.

4        Q.   This video, though, was taken Saturday?

5        A.   Saturday.

6        Q.   This video was taken on Saturday?

7        A.   Yes, yes.

8             MR. KAVACAS:  Your Honor, at this point I move

9    to strike the ID and move Exhibit 4 as a full exhibit

10   and show it to the jury.

11            MR. MOIR:  No objection.

12            THE COURT:  Without objection.

13            (Government's Exhibit 4 admitted.)

14       Q.   BY MR. KACAVAS:  All right, Kevin, before we

15   play this video for the jurors, who took it?

16       A.   Lisa did.

17       Q.   All right.  What can you hear on it?

18       A.   Music, Machine Gun Kelly again.

19       Q.   What else can you hear on it?

20       A.   R.B.

21       Q.   Is anybody doing any talking?

22       A.   Sorry, Lisa is.

23       Q.   Lisa is talking?

24       A.   Yes.

25            (Video being played.)

1       Q.   All right, Kevin, you were wearing a condom in

2  that video?

3       A.   Yes.

4       Q.   Who gave you the condom or did you bring one

5  on your own?

6       A.   Lisa brought some.

7       Q.   And you said this video was taken on Saturday?

8       A.   Yes.

9       Q.   What were you guys doing before this video was

10  taken?

11       A.   Drinking and smoking marijuana.

12       Q.   Anything else?

13       A.   No, there was not.

14       Q.   Well, was R.B. the only person you had sex

15  with that weekend?

16       A.   No.

17       Q.   Did you have sex with the defendant too?

18       A.   Yes.

19       Q.   When would you have sex with the defendant?

20       A.   Right after R.B.

21       Q.   How about on that Friday, the day before, did

22  you have sex with the defendant after you had sex with

23  R.B.?

24       A.   Yes, I did.

25       Q.   How about on Saturday.  Did you have sex with

1   the defendant after this video?

2       A.   Yes.

3       Q.   I'm going to show you another video.  This is

4   the last video.  It's 44 seconds long.  Same rule

5   applies, Kevin.  You can watch it in its entirety or

6   tell me when you recognize it; okay?

7       A.   Okay.

8            (Witness watching and listening to video.)

9       Q.   You recognize what that video shows?

10      A.   Yes.

11      Q.   What's that?

12      A.   It's the Saturday night, R.B. on all fours and

13  me behind her on the bed.

14      Q.   Okay, you say this was Saturday night?

15      A.   Yes.

16      Q.   Okay.  So when was the video we last saw with

17  R.B. on top of you, when was that taken?

18      A.   Right after.

19      Q.   Are you sure or are you guessing?

20      A.   I don't know exactly.

21      Q.   Okay.  But you're sure both of them were taken

22  that Saturday?

23      A.   Yes, yes, they both were.

24      Q.   And you're sure both of them were taken by the

25  defendant?

1       A.    Yes.

2       Q.    And where are you in that video?

3       A.    Behind R.B. having intercourse.

4       Q.    Where?

5       A.    On the hotel bed in the Peninsula Inn.

6             MR. KAVACAS:  Your Honor, I'd move to strike

7   the ID on Exhibit 5 and admit it as a full exhibit.

8             THE COURT:  Without objection.

9             MR. MOIR:  Yes, no objection.

10            (Government's Exhibit 5 admitted.)

11            (Video being played.)

12      Q.    BY MR. KACAVAS:  All right, Kevin, we've

13  watched three videos now of your sexual intercourse with

14  R.B.; right?

15      A.    Yes.

16      Q.    Was that the only time, were those the only

17  times you had sex with R.B. that weekend?

18      A.    No, it was not.

19      Q.    You testified that you also had sex with the

20  defendant?

21      A.    Yes.

22      Q.    Was that ever recorded?

23      A.    No, it was not.

24      Q.    When you had sex with the defendant, where was

25  R.B.?

1       A.   In the room.

2       Q.   All right.  How many times did you have sex

3  with the defendant compared with sex with R.B. that

4  weekend?

5       A.   About the same.

6       Q.   What else would you do when you were having

7  sex with both of them, what else were you three doing?

8       A.   Drinking and smoking marijuana.

9       Q.   Where did you sleep that weekend?

10       A.   In between both R.B. and Lisa.

11            THE COURT:  Counsel, we've got to take a break

12  at some point in the next couple minutes.

13            MR. KAVACAS:  I am five minutes away, your

14  Honor.

15            THE COURT:  Okay.

16       Q.   You slept on the bed, all three of you?

17       A.   Yes.

18       Q.   And where did you sleep on that bed?

19       A.   In the middle of R.B. and Lisa.

20       Q.   Did you ever leave the hotel that weekend?

21       A.   No, I did not.

22       Q.   Why not?

23       A.   I had injured feet and was not able to walk.

24       Q.   Did R.B. and the defendant leave the hotel

25  room that weekend?

1      A.   Yes, they did.

2      Q.   Do you remember when?

3      A.   I recall Saturday.

4      Q.   Okay.  Do you recall the defendant telling you

5   where they went?

6      A.   To Niagara Falls on our side, Ontario side.

7      Q.   And how did you guys eat that weekend?

8      A.   We got pizza delivered to the hotel.

9      Q.   Just pizza, is that all you ate?

10      A.   Yes.

11      Q.   I'm showing you Exhibit 1I for ID and ask you

12   if you recognize that?

13      A.   Yes, it's R.B., Lisa and me.

14      Q.   Where are you?

15      A.   In the hotel bed.

16      Q.   In what hotel?

17      A.   In the Peninsula Inn.

18           MR. KACAVAS:  Your Honor, I'd move to strike

19   the ID and publish this full Exhibit 1I to the jury.

20           THE COURT:  Without objection?

21           MR. MOIR:  No objection.

22           THE COURT:  It will be admitted.

23           (Government's Exhibit 1I admitted.)

24      Q.   BY MR. KACAVAS:  So Kevin, what's this

25   photograph show?

1        A.    Me holding my private part with R.B. on the

2    right, my right, and Lisa on my left.

3        Q.    What's the defendant wearing?

4        A.    The defendant is wearing a blue shirt.

5        Q.    Okay.  How was this photograph taken?

6        A.    By the timer on the camera.

7        Q.    Was there anybody else in the room who took

8    this photograph?

9        A.    No, there was not.

10       Q.    Where was the camera placed?

11       A.    On the bed or on the table.

12       Q.    When was this photograph taken?

13       A.    The Monday we were leaving.

14       Q.    The Monday morning you were checking out of

15   the hotel?

16       A.    Yes.

17       Q.    I want to show you Exhibit 1H for ID and ask

18   you if you recognize that?

19       A.    Yes.  It's R.B. on my left and Lisa on my

20   right.

21       Q.    Where is that photo taken?

22       A.    In the Peninsula Inn.

23       Q.    All right.

24             MR. KAVACAS:  Your Honor, I move to strike the

25   ID, admit it as a full exhibit and publish to the jury.

1             MR. MOIR:  Without objection.

2             THE COURT:  Without objection.

3             (Government's Exhibit 1H admitted.)

4        Q.   BY MR. KACAVAS:  Kevin, what does this

5    photograph depict?

6        A.   R.B. and Lisa and me.

7        Q.   Okay, is that the same -- does that appear to

8    be the same shirt the defendant was wearing in the

9    previous photo we saw?

10        A.   Yes, it was.

11        Q.   How was this photo taken?

12        A.   The one, this one -- this one is actually the

13    previous one I had just seen.

14        Q.   I'm sorry?

15        A.   This one is taken after the one I just seen.

16        Q.   Right, right.  How is this photo taken?

17        A.   Oh, by the timer on the camera.

18        Q.   And where was the camera placed?

19        A.   On the TV.

20        Q.   Okay.  So this one was taken on the Monday

21    before you checked out?

22        A.   Yes.

23        Q.   Just a couple more questions.  What happened

24    after you all checked out of the hotel?

25        A.   R.B. and Lisa went and checked out and I

1  stayed behind, and then I went and -- I left the hotel

2  and I went with R.B. and Lisa and they drove me home.

3      Q.   After they drove you home and dropped you off,

4  did you continue to have contact with them over the

5  Internet?

6      A.   Yes, over Skype, yes.

7      Q.   Did you ever meet them again in person?

8      A.   No, I did not.

9      Q.   Kevin, have you been arrested before?

10     A.   Yes, I have.

11     Q.   How old were you when you were arrested?

12     A.   Seventeen turning 18.

13     Q.   What were you arrested for?

14     A.   Possession of marijuana.

15     Q.   And how were you charged?

16     A.   Um --

17     Q.   Let me clarify.  Were you charged as a

18  juvenile as we say here or a minor as you say in Canada?

19     A.   Yes, I was charged as a minor.

20     Q.   What does that mean?

21     A.   It means it's a minor record and it's not an

22  adult record.

23     Q.   Have you ever been arrested -- do you have any

24  other arrests?

25     A.   No, I do not.

1      Q.   Were you arrested in this case?

2      A.   No, I was not.

3      Q.   You met with the Ontario Provincial Police;

4  right?

5      A.   Yes.

6      Q.   With Detective Constable Doug Reese?

7      A.   Yes.

8      Q.   He arrested you when he interviewed you,

9  didn't he?

10      A.   Yes.

11      Q.   So, are you facing charges in Canada over

12  this?

13      A.   No, I'm not.

14      Q.   Why not?

15      A.   I was told by Doug Reese that I was not.

16      Q.   Okay.  What were you told by Doug Reese?

17      A.   That I was arrested and questioned.

18      Q.   Okay.  And did I make any promises to you to

19  get you to testify here?

20      A.   No, you did not.

21      Q.   Did Doug Reese make any promises to you to get

22  you to testify here?

23      A.   No, he did not.

24          MR. KACAVAS:  Your Honor, if I may be

25  permitted under 611 to sort of develop his testimony a

1   little bit?

2           THE COURT:  Yes.

3       Q.   Kevin, you were told by Detective Reese, were

4   you not, that you wouldn't be charged for these crimes

5   if you came here to testify truthfully?

6       A.   Yes.

7       Q.   All right.  So the condition of you not being

8   charged is that you testify truthfully?

9       A.   Yes.

10      Q.   Did you do that here today?

11      A.   Yes.

12      Q.   Thank you.

13          MR. KACAVAS:  I have nothing further, your

14   Honor.

15          THE COURT:  All right, let's take our morning

16   break now, members of the jury.  We will break for about

17   15 minutes.

18          (Recess taken.)

19          THE COURT:  Counsel, you may cross-examine.

20          MR. MOIR:  Thank you, your Honor.

21                      CROSS-EXAMINATION

22   BY MR. MOIR:

23      Q.   Good morning, Mr. Watson.

24      A.   Good morning.

25      Q.   Do you mind if I call you Kevin?

 1        A.    That's all right, yup.

 2        Q.    Okay, thank you.  I've never met you before.

 3   I'm Jim Moir.

 4        A.    Okay.

 5        Q.    Now, I want to cover some of the same

 6   territory that's already been covered.  Obviously you

 7   told the story already that you met R.B. on line; right?

 8        A.    Yes.

 9        Q.    Okay.  And at some point, you know, fairly

10   quickly you started talking about things with her;

11   right?

12        A.    Yes.

13        Q.    And as you said, you talked about your country

14   and my country and just stuff; right?

15        A.    Yes.

16        Q.    But it did turn to sex; right?

17        A.    Yes.

18        Q.    And you guys had some pretty explicit sexual

19   conversations; right?

20        A.    Yes.

21        Q.    I mean, we're talking about pretty --

22   explicit, I guess, is the word; right?

23        A.    Yes.

24        Q.    And it was a mutual thing, though; right?

25        A.    Yes.

1        Q.    I mean, you didn't force her to talk about

2    sex; right?

3        A.    No.

4        Q.    And apparently from what you can tell, because

5    you're seeing her as you're doing this, right, you're

6    able to see her because you're Skyping; right?

7        A.    Yes.

8        Q.    Okay.  You can see her and she can see you?

9        A.    Yes.

10        Q.    You're talking.  And then it sort of becomes

11    physical after that; right?  You told this jury already

12    at certain points, you know, you would masturbate and

13    she would masturbate; right?

14        A.    Yes.

15        Q.    And that would be done for each other; right?

16        A.    Can you say it again?  Sorry.

17        Q.    I mean you did for yourself and for each

18    other; right?

19        A.    Yes.

20        Q.    Okay.  And again, you didn't force her to do

21    that, did you?

22        A.    No, I did not.

23        Q.    And she didn't force you to do it; right?

24        A.    No, she did not.

25        Q.    And certainly the very beginning part, at

1   least for the first weeks at least, you had this going

2   on and apparently R.B.'s mother didn't know about it;

3   right?

4        A.   Yes.

5        Q.   And then R.B.'s mother found out; right?

6        A.   Yes.

7        Q.   And initially, at least, she was angry about

8   it; right?

9        A.   Yes.

10       Q.   I mean, she was the one that, look, how old

11  are you; right?  She wanted to know how old you were?

12       A.   Yes.

13       Q.   And you told her?

14       A.   My age.

15       Q.   Which was 18 at the time; right?

16       A.   Nineteen.

17       Q.   Nineteen, sorry.  Okay.  And she told you how

18  old R.B. was; right?

19       A.   Yes.

20       Q.   And so in any event, initially at least, mom

21  didn't like that but then it changed; right?

22       A.   Yes.

23       Q.   But again, up to that whole period of time

24  initially before mom ever found out, this whole thing

25  was, again, nobody forced anybody to do anything; right?

```
 1        A.   No.

 2        Q.   Now, I want to jump ahead to Canada now.  When

 3   you were in Canada, as you told this jury, you had sex

 4   with R.B.; right?

 5        A.   Yes.

 6        Q.   And once again, did you make her have sex with

 7   you?

 8        A.   No, I did not.

 9        Q.   I mean, did it appear that she wanted to have

10   sex with you?

11        A.   Yes, it did.

12        Q.   I mean, you knew that from all your

13   conversations; right?

14        A.   Yes.

15        Q.   And all the mutual stuff you did while you

16   were having this online relationship; right?

17        A.   Yes.

18        Q.   And when she came up there both of you -- I

19   mean, her mom didn't force her to have sex with you;

20   right?

21        A.   No, she did not.

22        Q.   All right.  Nothing, I mean, she didn't do

23   anything to make her have sex, because R.B. wanted to

24   have sex; right?

25        A.   Yes.
```

1      Q.    Just like you wanted to have sex?

2      A.    Yes.

3      Q.    Now, you knew at the time that she was too

4   young; right?

5      A.    Yes.

6      Q.    And I guess my question is, why did you then

7   proceed to have sex with her when you knew it's illegal?

8      A.    Because we were drinking and smoking marijuana

9   under her mom's permission.

10      Q.    Well, let me ask you a question.  I mean, the

11   language you just used didn't sound like Kevin Watson.

12   Where did you get that line from?  Did you talk to these

13   people about this?

14      A.    I can't have my own speech?

15      Q.    No, I'm just wondering.  It just didn't seem

16   to sound like you.  Did anybody over here on this table

17   give you responses?

18      A.    No, they did not.  No, they did not.

19      Q.    Okay.  So, you're telling me that if there was

20   no alcohol and no marijuana, there would have been no

21   sex?

22      A.    Um, I do not know.

23      Q.    Well, you would have had sex; right?

24      A.    I could have.

25      Q.    I mean, I just want to get this straight.

1  They were coming up from the United States to meet you;

2  right?

3      A.   Yes.

4      Q.   And to see the sites; right?

5      A.   Yes.

6      Q.   And initially the plan was you were going to

7  take them around and show them Niagara Falls and that

8  kind of thing; right?

9      A.   Yes.

10     Q.   But then you burned your feet; right?

11     A.   Yes.

12     Q.   Walking through a fire?

13     A.   Yes.

14     Q.   And you really weren't able to walk?

15     A.   Yes.

16     Q.   All right.  And so you're telling me when they

17  came up there was no plan to engage in sex?

18     A.   Yes, there was.

19     Q.   Was the plan I'm only going to have sex if I

20  drink and have marijuana?

21     A.   No.

22     Q.   So you were going to have sex anyway; right?

23     A.   Yes.

24     Q.   I mean, so when this whole thing, when you

25  started talking about marijuana and alcohol and this

1   kind of stuff, you were going to have sex anyway;

2   weren't you?

3        A.   Yes.

4        Q.   I mean, it didn't require that to have sex;

5   right?

6        A.   No.

7        Q.   Okay.  Because really am very curious, Kevin,

8   where that came from, saying I had to have alcohol and

9   sex -- marijuana before I have sex.  I just don't know

10  where that came from.  Can you tell me?

11            MR. KAVACAS:  Objection.  Asked and answered.

12            THE COURT:  Overruled.

13       A.   It just happened that way.  Sorry, can you ask

14  it again because I don't know what you're trying to do.

15       Q.   Correct me if I'm wrong, I mean, you told the

16  jury just a few moments ago that, I think I sort of

17  asked you a fairly simple question, and you said, well,

18  it was only when Lisa gave us marijuana and alcohol that

19  we had sex, something like that.  Do you recall that?

20       A.   Okay, I may have said that, but the plan was

21  for Lisa and R.B. to kind of have sex with me, that's

22  their plan.

23       Q.   You already were having virtual sex, right, in

24  other words, the online sex; right?

25       A.   Yes.

1        Q.   So the big step in going from there to have

2   real sex was to be expected; right?

3        A.   Yes.

4        Q.   And that's why you met with them; right?

5        A.   Yes.

6        Q.   Okay.  And so it didn't require alcohol and

7   marijuana?

8        A.   No, it did not.

9        Q.   For you or anybody else?

10        A.   No.

11        Q.   It was just a little plus; right?

12        A.   Yes.

13        Q.   Okay.  And you're the guy who brought the

14   marijuana; right?

15        A.   Yes.

16        Q.   I mean, that's because you have a source for

17   marijuana?

18        A.   Yes.

19        Q.   I mean, it's a relative; right?

20        A.   Yes.

21        Q.   Somebody grows it?

22        A.   No.

23        Q.   Oh, okay.  All right.  Going back to the

24   question I think I left a while back, you go to the

25   hotel, your intention is to have sex with both of these

1   women; right?

2        A.    Yes.

3        Q.    And again, nobody is forcing you to have sex

4   with R.B. or Lisa; right?

5        A.    No.

6        Q.    And nobody is forcing R.B. to have sex with

7   you?

8        A.    No.

9        Q.    And nobody is forcing Lisa to have sex with

10  you; right?

11       A.    No.

12       Q.    And it was all mutual and voluntary; right?

13       A.    Yes.

14       Q.    Okay.  I mean, you weren't paid do this;

15  right?

16       A.    No.

17       Q.    R.B. wasn't paid; right?

18       A.    No.

19       Q.    And nobody held a gun to her head; right?

20       A.    No.

21       Q.    And nobody offered her anything to do it;

22  right?

23       A.    No.

24       Q.    Okay.  I want to go back to something

25  different.  You got arrested in Canada back in November;

1   right?

2       A.   Yes.

3       Q.   And you were met by I guess it was Detective

4   Constable Reese, Doug Reese?

5       A.   For my charge?

6       Q.   Yes.

7       A.   On the possession?

8       Q.   No, no, I'm talking about when you got

9   arrested in Canada --

10      A.   Yes.

11      Q.   -- for this stuff here.

12      A.   Okay, yes.

13      Q.   Because you had sex with a minor; right?

14      A.   Yes.

15      Q.   And they said you were making child

16  pornography; right?

17      A.   Yes.

18      Q.   I mean, so those are the charges you're

19  looking at.  It's pretty serious stuff?

20      A.   Yes.

21      Q.   And they made sure you were quite aware it was

22  serious; right?

23      A.   Yes.

24      Q.   I mean, they scared the heck out of you;

25  right?

1        A.   Yes.

2        Q.   And so you sat down with Detective Constable

3    Reese; right?

4        A.   Yes.

5        Q.   And apparently up there they make sure that

6    they record the interviews; right?

7        A.   Yes.

8        Q.   And you were told very clearly this is being

9    audio recorded?

10        A.   Yes.

11        Q.   And video recorded; right?

12        A.   Yes.

13        Q.   And do you know that a copy of that was

14    provided to me?

15        A.   Yes.

16        Q.   Okay.   Which makes sense.

17        A.   Yes.

18        Q.   So we know exactly what you said in that

19    interview; right?

20        A.   Yes.

21        Q.   Because if you don't audio and tape-record it

22    and somebody is summarizing what you said, that's

23    probably not as good; right?

24        A.   Yes.

25        Q.   So we know exactly what was said there by

1   looking at it; right?  And obviously during that

2   interview, you express some real concerns about the

3   charges against you; right?

4          A.   Yes.

5          Q.   You don't want to go to jail; right?

6          A.   No.

7          Q.   In fact, you asked them, am I going to jail

8   for this?

9          A.   Yes.

10         Q.   And he said it depends?

11         A.   Yes.

12         Q.   And what did it depend on?

13         A.   On me telling the truth.

14         Q.   All right.  And how did one figure out what

15   the truth was?

16              MR. KAVACAS:  Objection.  Foundation.

17              MR. MOIR:  Understanding --

18              THE COURT:  One second, please.  I'm not sure

19   I understand the question.  Why don't you rephrase it.

20              MR. MOIR:  I'm happy to rephrase it, yes.

21         Q.   What's your understanding what the truth

22   means?

23         A.   Telling the truth.

24         Q.   And so when you met with Constable Reese up

25   there, you told the truth?

1     A.   No, I did not on some of the facts.

2     Q.   Which ones?

3     A.   About the drugs.

4     Q.   Okay.  I think Mr. Kacavas talked a little bit

5  about that with you.  You were not truthful about the

6  drugs; right?

7     A.   Yes.

8     Q.   He had asked you what drugs were there; right?

9     A.   Yes.

10    Q.   And there was marijuana there; right?

11    A.   Yes.

12    Q.   But you were untruthful, you lied to him;

13  right?

14    A.   Yes.

15    Q.   You said no, there was actually cocaine and

16  Ecstasy?

17    A.   Yes.

18    Q.   And that was never there?

19    A.   No, it was not.

20    Q.   Why did you make that up?

21    A.   Because I was nervous and I was scared.

22    Q.   Well, isn't it more typical when you're

23  nervous and you have a police officer questioning you,

24  you're going to not make up stuff that gets you further

25  in trouble, you're going to say less, aren't you?

 1       A.   I don't know.

 2       Q.   Well, have you seen that interview recently?

 3       A.   No, I have not.

 4       Q.   Do you recall Constable Reese basically

 5  hammering on you insisting that there were other drugs

 6  there?

 7       A.   Yes, I recall that.

 8       Q.   You told him it was just marijuana; right?

 9       A.   Yes.

10       Q.   And he just whaled on you; right?

11       A.   Yes.

12       Q.   He didn't believe you; right?

13       A.   Yes.

14       Q.   And the only way to get it to stop with him

15  was to say, yeah, there was cocaine and Ecstasy.  Isn't

16  that how that happened?

17       A.   Yes.

18       Q.   And you didn't just make it up.  He was

19  telling you it was there; right?  You agree with me?

20       A.   No, I made it up.

21       Q.   Isn't he the one who used cocaine first?

22  Didn't he say there was cocaine there, didn't he say?

23       A.   Not that I recall.

24       Q.   Okay.  Okay.  But he wasn't going to let you

25  go until you said there were other drugs there; right?

1      A.   Not that I recall.

2      Q.   All right.   In that interview you admitted to

3  having sex with an underage girl; right?

4      A.   Yes.

5      Q.   You admitted to providing drugs; right?

6      A.   Not in that interview.

7      Q.   No, you didn't at that point; right?

8      A.   No.

9      Q.   You told him that Lisa brought the drugs;

10  right?

11      A.   Yes.

12      Q.   You told him she probably brought them from

13  the United States?

14      A.   Yes.

15      Q.   Came across the border with drugs.   And you

16  also refused to tell him that you went to buy alcohol

17  with them; right?

18      A.   Yes.

19      Q.   You said that she brought the alcohol from the

20  United States; right?

21      A.   Yes.

22      Q.   Why did you say that?

23      A.   Because I was nervous at the time, just I like

24  said, and now I'm under oath and I'm telling the truth.

25      Q.   So being under oath makes a difference?

1        A.    Yes.

2        Q.    I mean, if you're talking to a police officer

3   and you're not under oath, you can lie to him?

4        A.    No.

5        Q.    So why does being under oath make a

6   difference.  Isn't it good policy to tell the truth?

7        A.    Yes, it's a good thing to tell the truth, yes.

8        Q.    Okay.  I'm just wondering if the oath is what

9   causes you to tell the truth versus anything else?

10        A.    I just didn't really know what to say while I

11   was interviewed and I was under pressure at the time.

12        Q.    You're not under pressure today?

13        A.    Yes, I am, but I'm more confident now.

14        Q.    Why are you more confident today?

15        A.    Because I've been discussing it.

16        Q.    With who?

17        A.    Just myself thinking about it more.

18        Q.    Anybody at this table you discuss it with?

19        A.    No.

20        Q.    Ever?

21        A.    No.

22        Q.    You never met with these people?

23        A.    Yes, I've met them.

24        Q.    You've talked about it though; right?  It's

25   not wrong to talk with them about a case.

1        A.    Okay, yes, I have.

2        Q.    They're preparing you to testify; right?

3        A.    Yes.

4        Q.    It's okay to do that.

5        A.    Yes.

6        Q.    So you did talk to them.  How long did you

7   spend talking to them, if you recall?

8        A.    For a couple hours.

9        Q.    And that was just recently; right?

10        A.    Yes.

11        Q.    It was like on Sunday?

12        A.    Yes.

13        Q.    Okay.  You came down from Canada, met with

14   them, and you've been around here for a couple days;

15   right?

16        A.    Yes.

17        Q.    Okay.  Going back to the interview with

18   Constable Reese, you said most of what you told him is

19   the truth in that; right?

20        A.    Yes.

21        Q.    You admitted to having sex with a minor which

22   was huge; right?

23        A.    Yes.

24        Q.    And basically you admitted to the crimes;

25   right?

1       A.   Yes.

2       Q.   And he said yes, you had sex with a minor and,

3   you know, you were creating child porn; right?  That's

4   what he told you; right?

5       A.   Yes.

6       Q.   So you admitted to all basically the bad stuff

7   you did; right?

8       A.   Yes, but I did not film it, so I did not make

9   it.

10      Q.   I understand.  You participated.  I

11  understand.  They explained that to you; right?

12      A.   Yes.

13      Q.   Okay.  But basically it's pretty true with

14  Constable Reese, you admitted to everything bad you did;

15  right?

16      A.   Yes.

17      Q.   Except I think the marijuana part but that's

18  pretty minor; right?

19      A.   Yes.

20      Q.   And you had that in the past, not a big deal?

21      A.   Yes.

22      Q.   But everything else you admitted to.  All the

23  stuff.  And you were as complete and thorough in this

24  two-hour interview as you could be; right?

25      A.   Yes.

1        Q.    I mean it was a long interview?

2        A.    Yes.

3        Q.    Okay.  So during that interview you -- and

4   again, he pushed you pretty hard; right?

5        A.    Yes.

6        Q.    During that interview you told him that Lisa

7   said we want to come to Canada to make a porn?

8        A.    Yes.

9        Q.    No you didn't, did you?  It's not in there, is

10  it?

11       A.    Sorry, can you repeat that?

12       Q.    You never said that to Constable Reese, did

13  you?

14       A.    Not at the time.

15       Q.    No.  In fact, when did you first say that to

16  anybody in this case?

17       A.    When I was talking with them.

18       Q.    On Sunday; right?

19       A.    Yes.

20       Q.    And that was over, what, in this building

21  somewhere?

22       A.    Pardon?

23       Q.    That was somewhere in this building you met

24  with them?

25       A.    Yes.

1       Q.   Okay.  And so the first time you mentioned

2  anything about Lisa saying I want to make a porno was to

3  them; right?

4       A.   Yes.

5       Q.   On Sunday?

6       A.   That's because I wasn't questioned with Reese

7  about that.

8       Q.   Was that right?

9       A.   Yes.

10       Q.   He questioned you for pretty much two hours,

11  questioned you about a lot of stuff, didn't he?

12       A.   Yes.

13       Q.   Didn't he ask you extensive questions about

14  how this meeting with you and Lisa and R.B. came about?

15       A.   Yes.

16       Q.   Didn't he ask you extensive questions about

17  how you met?

18       A.   Yes.

19       Q.   Didn't he ask you extensive questions about

20  the plan to come up?

21       A.   Yes.

22       Q.   I mean, he asked you all that stuff; right?

23  Basically the same stuff they were talking about; right?

24       A.   Yes.  It just didn't come out.

25       Q.   You just didn't think of it at that time;

1   right?

2       A.   No.

3       Q.   Okay.  And so you were doing incredible

4   amounts of, what, texting I guess you call it with R.B.

5   and Lisa?

6       A.   Yes.

7       Q.   I mean, we're talking about a lot; right?

8       A.   Yes.

9       Q.   Has anybody ever showed them to you?

10      A.   No.

11      Q.   Have you ever seen what the volume of them is?

12      A.   No.

13      Q.   We're talking about from the time you met

14  until let's say going to Canada, how many texts do you

15  think there were?

16      A.   A lot.

17      Q.   I mean tens of thousands?

18      A.   Yes.

19      Q.   I mean, I was provided in discovery just this

20  stuff here which is texts.  I'm not saying they are all

21  texts between you and them, but this kind of thing sound

22  about right, a lot of texting going on?

23      A.   Yes.

24      Q.   All right.  So in those texts, going back and

25  forth, back and forth, anything in those texts written

1   about you and Lisa discussing coming to Canada to make a

2   porno as you said?

3        A.   Yes.

4        Q.   There is something in writing in there?

5        A.   Yes.

6        Q.   So I'll find a text in there about it?

7        A.   You -- yes.

8        Q.   Okay, so there should be one.  So I'm sure if

9   there is one, because I know the government spent a lot

10  of time with this, I'm sure they will pull it out and

11  show us; right?

12       A.   Yes.

13       Q.   So I'll count on them for that.

14       A.   Yes.

15       Q.   Okay.  So you're sure it's been done in

16  writing, says we can make a porno?

17       A.   Yes, there could be, yes.

18       Q.   Might be.  Might not be?

19       A.   Might not be.

20       Q.   Why wouldn't there be?

21       A.   I don't know, because most of the time we were

22  talking over Skype.

23       Q.   Okay.  So you're saying there is one or isn't

24  one?

25       A.   I don't know.  As you can see, there are so

1   many texts there, I have no clue.  I haven't had a cell

2   phone for a couple months right now, and I have no clue

3   and most of our stuff is Skyped.

4        Q.   Okay.  Now, when you came here, from jumping

5   back again, to meet with the U.S. Attorney and the

6   special agent; right?

7        A.   Yes.

8        Q.   The three of you sat and met; right?

9        A.   Yes.

10        Q.   Okay.  And did they specifically ask you this

11   question, did Lisa Biron ever tell you that they planned

12   to come up and make a porno?

13        A.   Yes.

14        Q.   They asked you specifically that question;

15   right?

16        A.   Yes.

17        Q.   Because they knew it's an important question

18   to be answered; right?

19        A.   Yes.

20        Q.   And obviously you've got to tell the truth;

21   right?

22        A.   Yes.

23        Q.   And you need to please these people; right?

24        A.   No.

25        Q.   Well, you want them to call up the Ontario

```
 1   authorities and say, hey, this guy did a great job;

 2   right?

 3        A.   Yes.

 4        Q.   Right.  And so you really need to please them;

 5   right?

 6        A.   Yes.

 7        Q.   Right.  And so when they asked you a question,

 8   I guess it was a very leading question, right, saying

 9   she did this, didn't she?

10        A.   Yes.

11        Q.   And you said yes, she did.

12        A.   Yes.

13        Q.   Right?  And it certainly helps your case;

14   right?

15        A.   Yes.

16        Q.   Okay.  Think about it, I mean, you're telling

17   us that Lisa said we want to come to Canada to make a

18   porno; right?

19        A.   Yes.

20        Q.   And I should ask you this, have you ever

21   watched pornography?

22        A.   Yes.

23        Q.   I mean legal pornography I'm talking about?

24        A.   Yes.

25        Q.   When people make a porno, what do they look
```

1    like?

2         A.    People.  Humans.

3         Q.    Beginning to end; right?

4         A.    Yes.

5         Q.    They come in, they're having sex, you know how

6    those are; right?

7         A.    Yes.  But there's also home videos that do

8    little clips.

9         Q.    Are there?

10        A.    Yes.

11        Q.    Have you seen those?

12        A.    Yes.

13        Q.    Where do you see those?

14        A.    On the Internet.

15        Q.    Okay, so little clips on the Internet?

16        A.    Yes.

17        Q.    Okay, home --

18        A.    They can range from ten minutes to

19    two minutes.

20        Q.    I'm sorry?

21        A.    They can range from ten minutes to

22    two minutes.

23        Q.    Sure, sure.  And so the whole idea that, you

24    know, coming up to make a porno -- let me ask you a

25    question.  You're having sex with R.B.; right?

1        A.   Yes.

2        Q.   And is there a discussion, okay, let's set up

3   the cameras so we can make a porno?

4        A.   No.

5        Q.   No, there isn't; right?

6        A.   No.

7        Q.   In fact, you were having sex; right?

8        A.   Yes.

9        Q.   And Lisa picks up the camera and does, again,

10  like you say, a short video; right?

11       A.   Yes.

12       Q.   Right.  Doesn't ask you to set this whole

13  thing up; right?  You're having sex and then she does

14  the picture; right?

15       A.   Yes.

16       Q.   Just a couple of things.  I know that Mr.

17  Kacavas talked about that little green turtle in the

18  pictures?

19       A.   Yes.

20       Q.   Do you know what that turtle is for?

21       A.   No, I do not.

22       Q.   Have you ever seen anything carried inside it?

23       A.   What I seen was makeup.

24       Q.   Right.

25       A.   For R.B.

1        Q.    Right.   It's a makeup kit; right?

2        A.    Yes.

3        Q.    Okay.   Finally, I know we saw a couple of

4    photos here; right?

5        A.    Yes.

6        Q.    How many photos do you think were taken in

7    that room, I'm just talking about still photos right

8    now, between cell phone, iPhone, and all this other

9    stuff, over the course of the weekend?

10       A.    The ones that we have?

11       Q.    Aren't there others?

12       A.    No, not in the hotel, no there's not.

13       Q.    How about out at the falls and that kind of

14   thing, did they come back and show you those pictures?

15       A.    I think a couple.   I don't remember.

16       Q.    Did they talk about taking the Maid of the

17   Mist, for example?

18       A.    Yes.

19       Q.    And you know what the Maid of the Mist is;

20   right?

21       A.    Yes.

22       Q.    Have you been on it before?

23       A.    Yes.

24       Q.    So you know it's a pretty exciting ride;

25   right?

1      A.   Yes.

2      Q.   And so they went out, they saw the falls, they

3  took the Maid of the Mist, this kind of thing; right?

4      A.   Yes.

5      Q.   And you would have gone normally except you

6  burned your feet; right?

7      A.   Yes.

8           MR. MOIR:  If I can have just one moment, your

9  Honor.

10           THE COURT:  Yes.

11           MR. MOIR:  See if I'm missing anything here.

12  No, I think that's it.  Thank you very much, Kevin.

13           THE COURT:  Thank you.  Any redirect?

14           MR. KAVACAS:  Very briefly, your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. KACAVAS:

17      Q.   Kevin, I want to take you back to some

18  questions the defendant's lawyer asked you about the

19  Skype sex; okay?

20      A.   Yup.

21      Q.   So you're Skype sexting with R.B. first?

22      A.   Yes.

23      Q.   And the defense lawyer said to you the

24  defendant found out about it?

25      A.   Yes.

1      Q.    She was angry?

2      A.    Yes.

3      Q.    How do you know she was angry?

4      A.    She went on to Skype, too, and started getting

5   mad and wanted to know who I was.

6      Q.    Okay.  And she wanted to know how old you

7   were?

8      A.    Yes.

9      Q.    Did you tell her?

10      A.    Yes.

11      Q.    And after she found out who you were, was she

12   angry still?

13      A.    No.  She began to like what she seen, liked my

14   looks, and she continued to want me to take off my

15   clothes and do more than just that, like masturbate to

16   her.

17      Q.    So she wasn't angry with you anymore?

18      A.    No, she was not.

19      Q.    She was having Skype sex with you?

20      A.    Yes.

21            MR. KAVACAS:  Thank you, your Honor.

22            THE COURT:  All right.  Do you need to

23   follow-up on that last point?

24            MR. MOIR:  No, your Honor, thank you.

25            THE COURT:  All right.  Thank you, sir, you

1   can step down.  Call your next witness.

2              MR. KAVACAS:  Thank you, your Honor.  The

3   United States calls Brandon Ore.

4              THE COURT:  Come around here, sir, right over

5   to the side and follow this gentleman's directions,

6   okay?

7              THE CLERK:  Step into the witness box and

8   raise your right hand.

9                         BRANDON ORE

10       having been duly sworn, testified as follows:

11             THE CLERK:  Thank you.  Would you please state

12   your name and spell your last name for the record.

13             THE WITNESS:  Brandon Ore, O-R-E.

14             THE CLERK:  Thank you.  You may be seated.

15                    DIRECT EXAMINATION

16   BY MR. KAVACAS:

17       Q.   Good morning, Brandon.

18       A.   Good morning, how are you?

19       Q.   Fine.  How are you?

20       A.   Pretty well.

21       Q.   Good.  I'm going to pour you a little cup of

22   water here.

23       A.   Thank you.

24       Q.   All right, Brandon, I'm going to be asking you

25   questions from back here in order for you to keep your

1   voice up.  Speak clearly, because if I can hear you then

2   it's likely the jurors can hear you too; okay?

3        A.   Okay.

4        Q.   All right.  Brandon, how old are you?

5        A.   18 years old.

6        Q.   And when's your birthday?

7        A.   April 15th, 1994.

8        Q.   Where do you live?

9        A.   Lebanon, New Hampshire.

10        Q.   Who do you live in Lebanon, New Hampshire

11   with?

12        A.   With some friends that I know.

13        Q.   And do you work?

14        A.   I do.

15        Q.   Where?

16        A.   Price Chopper.

17        Q.   What's Price Chopper?

18        A.   It's a supermarket.

19        Q.   What do you do at Price Chopper?

20        A.   I work in the produce department.

21        Q.   Is this a full time or part time job?

22        A.   Part time currently.

23        Q.   Part time currently you said?

24        A.   They said they have a full-time opportunity

25   coming up.

1          Q.    And where did you grow up?

2          A.    Merrimack, New Hampshire.

3          Q.    Where did you go to high school?

4          A.    Merrimack High School.

5          Q.    When did you graduate from Merrimack High

6    School?

7          A.    June 9 of 2012.

8          Q.    So just this past June?

9          A.    Correct.

10         Q.    Do you have any further formal education after

11   high school?

12         A.    I do not.

13         Q.    Brandon, do you know the defendant?

14         A.    I do.

15         Q.    How long have you known her?

16         A.    Since July of 2012.

17         Q.    Okay.  I'm going to ask you if you see her in

18   the courtroom, to point her out and describe what she's

19   wearing, please?

20         A.    She's sitting over there in a pink shirt and a

21   black jacket.

22         Q.    Do you know the defendant's daughter?

23         A.    I do.

24         Q.    Brandon, let me advise you that for purposes

25   of this trial we're referring to the defendant's

1    daughter as R.B., okay.  Do you understand that?

2         A.    I do.

3         Q.    And how long have you known R.B.?

4         A.    Almost as long as I've known the defendant.

5         Q.    So you met the defendant before you met R.B.?

6         A.    Correct.

7         Q.    How did you meet the defendant?

8         A.    I had been at my friend's house and I was

9    looking online at Craig's List and I started looking

10   through the personal ads, and I responded to one that

11   Lisa had posted.

12        Q.    Okay.  Brandon, I know you're probably a

13   little bit nervous, but I'm going to ask you to slow

14   down your pace of speech, okay.  We have a stenographer

15   whose fingers are burning because you're talking to

16   fast, all right?

17        A.    Yup.

18        Q.    So you say you were at a friend's house, you

19   were a looking at Craig's List.  What's Craig's List?

20        A.    It's a site that you can make sales and post

21   other classified ads.

22        Q.    And what section of Craig's List were you

23   looking at?

24        A.    I was looking in the personal section.

25        Q.    And what did you see?

1        A.   I had seen one that said two girls looking to

2   party, 18, 33.

3        Q.   What did you do when you saw that ad?

4        A.   I read it and I responded to it.

5        Q.   How did you respond to it?

6        A.   Through e-mail.

7        Q.   Okay.  And did you receive a return response?

8        A.   I did.

9        Q.   And what happened from there?

10       A.   From there we had agreed to meet, and I had

11   gone over to her house within a few days.

12       Q.   Okay.  Well, let me ask you, before you

13   actually went over, when you say to her house, whose

14   house?

15       A.   Lisa's house.

16       Q.   Okay.  Before you went to the defendant's

17   house, did you just exchange two e-mails?

18       A.   No.  We exchanged a few e-mails and then

19   texted.

20       Q.   Did you exchange anything else over the

21   Internet?

22       A.   Pictures of ourselves.

23       Q.   I'm sorry?

24       A.   Pictures of ourselves.

25       Q.   All right.  Now, let's go to the time when you

1    went to the defendant's house.  What happened?

2         A.    I had gone to the house and I met the

3    defendant and she introduced herself and allowed me into

4    the house.

5         Q.    Do you remember when that was?

6         A.    Some time in July.

7         Q.    Okay.  So you responded to an ad that said two

8    girls, 18 and 33, looking to party; is that accurate?

9         A.    Correct.

10        Q.    When you got there, were there two girls, 18

11   and 33, there?

12        A.    There was only one.

13        Q.    Okay.  And that was the defendant?

14        A.    Correct.

15        Q.    What happened after she let you in her house?

16        A.    She showed me the dog and invited me into the

17   living room.

18        Q.    Do you remember when you went, was it

19   daylight, was it nighttime?

20        A.    It was nighttime.

21        Q.    Do you remember what time?

22        A.    Probably nine or ten at night.

23        Q.    I don't want you to guess, all right?  When

24   you say probably, are you saying about or are you

25   guessing?

1        A.    I'd say about.

2        Q.    About nine or ten?  So, what happened when you

3   went in?

4        A.    She introduced me to herself, the dog, and

5   invited me into the living room.

6        Q.    Okay.  And what happened later that evening?

7        A.    Later that evening I had sex with her.

8        Q.    And what happened after you had sex with her?

9        A.    We went to bed in her bedroom and the next

10  morning I had left.

11       Q.    Okay.  And when you left did the defendant

12  tell you to do anything?

13       A.    She invited me to come back another time and

14  to bring a friend with me.

15       Q.    Okay.  Did you do that?

16       A.    I did.

17       Q.    When did you return to the defendant's house?

18       A.    Within a few days time.

19       Q.    And did you return with a friend?

20       A.    I did.

21       Q.    What happened when you and your friend got to

22  the defendant's house that second time?

23       A.    We had gone into the house.  She introduced

24  herself.  And at that point R.B. was there and she

25  introduced my friend and myself to R.B. as well.

1        Q.    Okay.  How did the defendant introduce R.B. to

2    you and your friend?

3        A.    As a roommate.

4        Q.    And how did R.B. address the defendant when

5    you were there that second time, what did she call her?

6        A.    Lisa.

7        Q.    And she was calling R.B. by her first name?

8        A.    Correct.

9        Q.    And after these introductions, what happened?

10       A.    We had gone inside the living room and we all

11   talked for a little bit.

12       Q.    And then what happened a little bit later that

13   night?

14       A.    A little bit later on R.B. and I had had sex

15   and my friend had had sex with Lisa.

16       Q.    Okay.  And did you stay the night again?

17       A.    We did.

18       Q.    What happened when you left?

19       A.    We woke up the next morning and my friend came

20   in and said --

21       Q.    I don't need to hear what your friend said.

22   What happened?

23       A.    We left the next morning, and she invited me

24   to come back again.

25       Q.    Did you come back again?

1        A.    I did.

2        Q.    All right.  Did you bring a friend?

3        A.    I did.

4        Q.    How many times did you come back with a

5    friend?

6        A.    I'd say about five or six.

7        Q.    Over what period of time?

8        A.    Few weeks.

9        Q.    And what would happen when you'd come back

10    with five or six friends over that period of two weeks,

11    what would happen between you?

12        A.    The same thing that happened with the first

13    friend.  I would have sex with R.B. and they would have

14    sex with Liza.

15        Q.    Under the same roof?

16        A.    Yes.

17        Q.    And eventually what happens after this period

18    of time where you're bringing friends over to the

19    defendant's house?

20        A.    Eventually I had moved out of my parents'

21    house and moved into their house.

22        Q.    Why did you move out of your parents' house?

23        A.    Because my parents and I had had a fight and

24    they gave me the option of leaving or there were set

25    rules that I didn't personally agree with, and they

1   wanted me to give up my full-time job that I had taken,

2   and I didn't want to do that either, so I had chosen to

3   move out.

4          Q.   So you and your parents got in a beef.  Did

5   they kick you out?

6          A.   I wouldn't say they kicked me out.  I'd say

7   they gave me the option to leave or to follow the rules

8   that I didn't personally agree with, so I chose the

9   option to leave.

10         Q.   Where did you go?

11         A.   I had stayed at Lisa and R.B.'s house.

12         Q.   When you say I had stayed there, how long?

13         A.   It ended up being about two months.

14         Q.   Let's go back to the beginning of that two

15   months, all right?  When you move in there, do you know

16   the nature of the relationship between the defendant and

17   R.B. when you moved in there?

18         A.   Not yet.

19         Q.   How did you find that out?

20         A.   Lisa had started calling R.B. baby and things

21   of that nature, and at some point R.B. had called Lisa

22   mom.

23         Q.   Okay.  And how long after you moved in did you

24   notice that?

25         A.   Within a couple weeks.

1      Q.   When you moved in where were you sleeping?

2      A.   On the couch or in one of their beds.

3      Q.   Okay.  So you would either sleep in the

4  defendant's bed or R.B.'s  bed?

5      A.   One of those two or on the couch.  It would

6  vary night to night.

7      Q.   Okay.  After you heard them refer to

8  themselves, as you said, baby and mom, what did you do?

9      A.   I asked them what was up with that, and they

10 came out and told me they were mother and daughter, not

11 roommates.

12     Q.   Now, when you first saw that Craig's List

13 posting that said two girls 18 and 33; right?

14     A.   Yes.

15     Q.   When you first met the defendant, did you

16 think she was 33?

17     A.   I thought she was probably a little older than

18 that.

19     Q.   When you first met R.B., did you think she was

20 18?

21     A.   I thought she could possibly be 18, yeah.

22     Q.   Okay.  Did you find out the truth?

23     A.   Later on, yes.

24     Q.   When you say later on, when?

25     A.   It was after I had moved in.  Probably two or

1    three weeks before I had moved out.

2        Q.    Okay.  How did you find out their true ages?

3        A.    When it became Lisa's birthday, she told me

4    that she was turning 43, and that was when I found out

5    that she was actually older than 33.

6        Q.    Do you remember when that was?

7        A.    Some time in August.

8        Q.    Okay.  So you met in July, some time in August

9    you're living there and she tells you she's 43?

10       A.    Correct.

11       Q.    How do you find out R.B.'s true age?

12       A.    They started talking about high school and

13   eventually going back her freshman year, and then I

14   questioned that, and they came out and told me that R.B.

15   was 14, not 18.

16       Q.    Now, while you're living at the defendant's

17   house, are you living there for free?

18       A.    I am not.

19       Q.    What kind of rent were you paying?

20       A.    I was paying cash to the defendant.

21       Q.    Where were you working?

22       A.    Freudenberg.

23       Q.    What's that?

24       A.    It's a factory on the airport property that

25   makes bumpers for cars.

1        Q.    So after you learned the true nature of their

2    relationship as mother and daughter and after you learn

3    their true ages, did you continue to live there?

4        A.    That was when I had started looking for

5    somewhere else to live.

6        Q.    Okay, that wasn't my question.  My question

7    was, did you continue to live there?

8        A.    Yes, I did.

9        Q.    Why?

10       A.    Because I hadn't had another place to go.

11       Q.    Now, you just found out that you had been

12   having sex with a 14-year-old girl; right?

13       A.    Yes.

14       Q.    Did you continue to have sex with her?

15       A.    Yes.

16       Q.    Why?

17       A.    Because at that point her and I were dating.

18       Q.    Dating?  What did you do dating?

19       A.    We were boyfriend and girlfriend.

20       Q.    Okay.  What did you do as boyfriend and

21   girlfriend?

22       A.    We stayed monogamous and we went on a date

23   once.

24       Q.    And were you sleeping in her bedroom now?

25       A.    Almost always.

1        Q.   Did the defendant know about that to your

2    knowledge?

3        A.   Yes.

4        Q.   And she permitted it?

5        A.   Yes.

6        Q.   What did the defendant say about you and her

7    daughter having sex?

8        A.   She encouraged it.

9        Q.   How did she encourage it?

10       A.   There was a day where she had spoken to me

11   personally without R.B. and said R.B. would prefer if

12   you made the moves instead of her all the time.

13       Q.   Okay.  What else did she say about having sex

14   with R.B.?

15       A.   She didn't mind if it happened.

16       Q.   Did she say where it should happen?

17       A.   One day she had suggested that we have sex on

18   the couch in the living room in front of her.

19       Q.   Do you remember when that was?

20       A.   I could not tell you exactly when.

21       Q.   All right, set the scene for us.  Tell us what

22   happened.  Tell us where you were, the time of day it

23   was, what happened?

24       A.   It was probably -- I would say about 11 in the

25   morning, and she -- Lisa had suggested that we have sex

1  in the living room because we were all sitting in the

2  living room, and she suggested that we have sex on the

3  couch in front of her.  And R.B. and I had agreed.  And

4  then Lisa had filmed it.

5         Q.    Okay.  So where were you having sex with R.B.?

6         A.    On a two-seater couch in the living room.

7         Q.    Okay.  And the defendant was right there?

8         A.    She was on the other couch in the living room.

9         Q.    And you say that she -- you saw her doing

10  what?

11         A.    Filming us.

12         Q.    Do you know what she was filming you with?

13         A.    Her iPhone.

14         Q.    And where was she standing as she was filming

15  you and her daughter having sex?

16         A.    Behind us.

17         Q.    Did she tell you ahead of time that she was

18  going to film you doing it?

19         A.    She did not.

20         Q.    Was it your idea to do that?

21         A.    It was not.

22         Q.    All right, Brandon, I'm going to show you a

23  video.  Brandon, this video is about one minute long and

24  I'm going to ask you to view it to yourself first.  I'm

25  going to bring a laptop up there so you can see it with

1   headphones.

2        A.   Okay.

3        Q.   You can watch it in its entirety or until you

4   recognize it.  And when you recognize it, just tell me.

5   Can you move that microphone for me.   Thanks.

6        A.   No problem.

7        Q.   Let me give you those headphones.

8             (Video being played.)

9        Q.   Do you recognize that video?

10       A.   I do.

11       Q.   Have you seen it before?

12       A.   I have.

13       Q.   What does that video show?

14       A.   It was the video that Lisa had taken of me and

15   R.B. having sex.

16       Q.   And where were you and R.B. having sex when

17   the defendant took this video?

18       A.   On the two-seater couch in the living room.

19            MR. KAVACAS:  Your Honor, at this point I'd

20   ask that the ID be stricken and Exhibit 6 be admitted as

21   a full exhibit and published to the jury.

22            MR. MOIR:  No objection.

23            THE COURT:  Without objection.

24            MR. KAVACAS:  Thank you.

25            (Government's Exhibit 6 admitted.)

1              (Video being played.)

2         Q.   BY MR. KACAVAS:   Brandon, what do you say on

3    that video?  How do you refer to the defendant?

4         A.   Mom.

5         Q.   Why did you do that?

6         A.   It was an inside joke.

7         Q.   What was the inside joke, let us in?

8         A.   I would just call her mom as a joke and I

9    thought it was funny because at that point I had known

10   they were mother/daughter.

11        Q.   Okay.  What else do you say on that video?

12        A.   Are you still taking a video.

13        Q.   You say are you still taking a video.  So was

14   she taking a video before this?

15        A.   Yes.

16        Q.   Of you two?

17        A.   Yes.

18        Q.   And what else do you say?  You say I thought

19   video time was over?

20        A.   Yes.

21        Q.   And do you hear R.B. speaking on that video?

22        A.   Yes.

23        Q.   What does she say?

24        A.   She says are you still taking a video.

25        Q.   And how does the defendant respond to her

1   daughter's question?

2       A.   She says no, and then, well, maybe, and

3   laughs.

4       Q.   And after you -- I want to play this to point

5   out something in particular, okay.

6            (Video being played.)

7       Q.   Okay, that's you on top; right?

8       A.   Correct.

9       Q.   Who's on the bottom?

10      A.   R.B.

11      Q.   You see her left hand on your back?

12      A.   I do.

13      Q.   What's she wearing?

14      A.   A purity ring.

15      Q.   What's that?

16      A.   It's a ring that means that you won't have sex

17   until marriage.

18      Q.   How do you know that?

19      A.   Because it's a religious thing.

20      Q.   And do you know where R.B. got that ring?

21      A.   I do.

22      Q.   Where?

23      A.   In New York.

24      Q.   How do you know that?

25      A.   Because Lisa had told me she got it for R.B.

1   in New York as a gift.

2       Q.   I want to show you some photographs.  I'm

3   going to show you this photograph, which is marked

4   Government's Exhibit 7B for identification.  Do you

5   recognize what's depicted in that photograph?

6       A.   I do.

7       Q.   What is it?

8       A.   It's the living room of Lisa's house.

9           MR. KAVACAS:  Your Honor, at this point I ask

10  the ID be stricken and the exhibit be admitted as a full

11  exhibit and displayed to the jury.

12          MR. MOIR:  No objection.

13          THE COURT:  Out objection.

14          (Government's Exhibit 7B admitted.)

15      Q.   BY MR. KACAVAS:  All right, Brandon, what's

16  this show?

17      A.   This shows the living room and both couches

18  and how it would normally look.

19      Q.   Okay.  And when you were having sexual

20  intercourse with R.B., what couch were you on?  Just

21  point to it and circle it on that monitor right there.

22          (Witness doing so.)

23      Q.   Okay.  So where those blue arrows are, that's

24  the two-seater you referred to?

25      A.   Correct.

1      Q.   And where was the defendant?

2      A.   Right about here.

3      Q.   Okay.  I'm going to show you Exhibit 7C for ID

4    and ask you if you recognize that?

5      A.   I do.

6      Q.   What is that?

7      A.   It is the other side of the living room.

8      Q.   Whose house?

9      A.   Lisa's house.

10          MR. KAVACAS:  Your Honor, I'd ask that the ID

11   be stricken on Exhibit 7C and it be admitted as a full

12   exhibit and displayed to the jury.

13          MR. MOIR:  No objection.

14          THE COURT:  Without objection.

15          MR. KAVACAS:  Thank you.

16          (Government's Exhibit 7C admitted.)

17     Q.   BY MR. KACAVAS:  Describe for the jurors what

18   this depicts?

19     A.   It shows the two-seater couch, the TV, and you

20   can see R.B.'s bedroom door.

21     Q.   Okay.  Now, in that video we just watched,

22   that TV, was that on?

23     A.   Yes, it was.

24     Q.   And there was some noise in the background.

25   Where was that noise coming from?

```
 1        A.   The TV.

 2        Q.   I'm showing you what's been marked as

 3   Government's Exhibit 7D for ID.  Do you recognize that?

 4        A.   I do.

 5        Q.   What is that?

 6        A.   That is Lisa's bedroom.

 7        Q.   In her house?

 8        A.   Yes.

 9             MR. KAVACAS:  Your Honor, I'd ask that the ID

10   be stricken on Government's Exhibit 7D and it be

11   admitted as a full exhibit and displayed for the jury,

12   please.

13             MR. MOIR:  No objection.

14             THE COURT:  Without objection, it will be

15   admitted.

16             (Government's Exhibit 7D admitted.)

17        Q.   BY MR. KACAVAS:  Okay, what's that photograph

18   show?

19        A.   That shows Lisa's bed and her end table.

20        Q.   So that's the defendant's bedroom?

21        A.   Yes.

22        Q.   All right.  I'm showing you what's been marked

23   as Government's Exhibit 7E for ID and ask you if you

24   recognize that?

25        A.   I do.
```

1    Q.   What's that?

2    A.   That is R.B.'s bedroom.

3    Q.   At the defendant's house?

4    A.   Yes.

5         MR. KAVACAS:  Your Honor, I'd ask that the ID

6    be stricken on Government's Exhibit 7E and it be

7    admitted as a full exhibit and displayed to the jury.

8         MR. MOIR:  No objection.

9         THE COURT:  Without objection.

10        (Government's Exhibit 7E admitted.)

11   Q.   BY MR. KAVACAS:  Describe for the jury what's

12   depicted in that photo?

13   A.   That shows R.B.'s bedroom.

14   Q.   And that's where you stayed most of the time

15   you were living there?

16   A.   Correct.

17   Q.   And again, how long did you live there?

18   A.   About two months.

19   Q.   Now, in that two-month time frame did the

20   defendant show you any other videos in which R.B. was

21   having sex with another young man?

22   A.   Yes.

23   Q.   Tell us about that.

24   A.   She had showed me a video of R.B.'s first time

25   having sex.

1     Q.    And did she tell you when that took place?

2     A.    Yes, she did.

3     Q.    When?

4     A.    Memorial Day weekend.

5     Q.    Where?

6     A.    In Canada.

7     Q.    Set the scene for us, Brandon, and tell us how

8  she came to show you this video of her daughter having

9  sex with a guy in Canada?

10    A.    We were sitting in the living room, myself and

11 R.B. on the two-seater couch and Lisa on the

12 three-seater couch, and she had taken out her laptop and

13 asked if she could show me that video.

14    Q.    So you're sitting on the living room couches?

15    A.    Correct.

16    Q.    And what happens, I'm sorry, I missed the last

17 part of what you said?

18    A.    Lisa had taken her laptop out and asked R.B.

19 if she could show me that video.

20    Q.    Do you know whether or not R.B. wanted you to

21 see that video?

22    A.    She seemed to be very defensive of it and not

23 want me to see it.

24    Q.    The defendant showed it to you anyway?

25    A.    She eventually convinced R.B. to let me see

1    the video.

2        Q.    And what was depicted in that video?

3        A.    R.B. having sex with another male.

4        Q.    Okay.  What was R.B.'s position in that video?

5        A.    She was on her hands and knees.

6        Q.    Where?

7        A.    On either the floor or bed.

8        Q.    And did you see anybody else with her?

9        A.    There was another guy in the video.

10        Q.    What stood out to you about the guy?

11        A.    He had blue booties on.

12        Q.    Where?

13        A.    On his feet.

14        Q.    And what did the defendant tell you about that

15    video?

16        A.    That he had burned his feet walking on hot

17    coals.

18        Q.    Okay, that's what she told you about the blue

19    booties.  What did she tell you about the guy in the

20    video?

21        A.    About the guy in the video?  That he was from

22    Canada and R.B. had met him online through Facebook.

23        Q.    And did she say anything about why she went to

24    Canada?

25        A.    Yes, she did.

1      Q.   What did she say?

2      A.   Because they had been drinking one night and

3 they had been intoxicated and planned to go up there.

4      Q.   Who had planned to go up there?

5      A.   I believe it was Lisa.

6      Q.   And who else, who was she going to take with

7 her?

8      A.   R.B.

9      Q.   And what was the plan?

10      A.   The plan was to go up there and meet Kevin.

11      Q.   For what purpose?

12      A.   To have sex with Kevin.

13      Q.   Who said that to you?

14      A.   Lisa.

15      Q.   And who was going to have sex with Kevin?

16      A.   Both R.B. and Lisa.

17      Q.   Did the defendant say anything to you about

18 what she wanted to do when R.B. was having sex with

19 Kevin?

20      A.   To film it.

21      Q.   She said that to you?

22      A.   Yes.

23      Q.   And do you know whether or not R.B. had ever

24 had sex with a boy before that trip to Canada?

25      A.   They said that was her first time having sex.

1          Q.    And so the defendant showed you that video?

2          A.    Yes.

3          Q.    Even though R.B. was a little reluctant to let

4     her do that; right?

5          A.    Yes.

6          Q.    And did all three of you watch it?

7          A.    Yes.

8          Q.    So, you said that you lived there for about

9     two months.  When did you move in?

10         A.    September.

11         Q.    So you moved out when?

12         A.    I moved out in September.

13         Q.    When did you move in?

14         A.    Late July.

15         Q.    Did anybody else move into the defendant's

16    house before you moved out?

17         A.    Yes.

18         Q.    Who?

19         A.    Rob.

20         Q.    Okay, and who is Rob?

21         A.    He was a guy that showed up at a party one

22    night and just never left.

23         Q.    And how long before you left did he move in?

24         A.    About two weeks.

25         Q.    And where did he sleep?

1     A.   Usually in Lisa's bed.

2     Q.   So what caused you to move out of the

3 defendant's house in September?

4     A.   The party was getting out of control.  The sex

5 was out of control.  And she was charging me a lot in

6 rent.

7     Q.   So what did you do?

8     A.   I went online and started looking for

9 apartments.

10    Q.   Okay.  And you found one?

11    A.   I did.  And then I moved into the apartment

12 and out of Lisa's house.

13    Q.   All right.  And after you moved out of the

14 defendant's house, what did you decide to do?

15    A.   I decided to go to the police department and

16 make a report of the fact that I had sex with an

17 underage girl.

18    Q.   Why did you do that?

19    A.   Because I knew it was wrong and it would be

20 better if I just told them myself than have Lisa or R.B.

21 go there.

22    Q.   I'm sorry, can you move that microphone

23 towards you.  I can't make out what you just said.  Say

24 that again.

25    A.   I figured it would be better to tell them

1    myself and tell them the truth than have Lisa or R.B.

2    show up there.

3        Q.   Why were you afraid of Lisa or R.B. showing up

4    there?

5        A.   Because I had just gotten in a fight with

6    R.B., a small one on Facebook.

7        Q.   Now, after you made this report to the

8    Manchester police -- what did you report?

9        A.   I reported that I had had sex with an underage

10   girl.

11       Q.   And did you report anything else?

12       A.   I did.  I reported that there was a lot of --

13       Q.   No.  Did you report seeing anything else?

14       A.   Oh, I did.  I reported having seen the video

15   of R.B. when she was in Canada.

16       Q.   All right.  After you made that report to the

17   Manchester police, did you ever return to the

18   defendant's home?

19       A.   I did.

20       Q.   Why?

21       A.   Because my paycheck didn't show up to my new

22   apartment, so I figured it might be there.

23       Q.   You had been having it mailed to her home?

24       A.   Correct.

25       Q.   What happened when you went back to look for

1    your paycheck?

2         A.   Lisa told me I need to come into the house

3    because DCYF was on their way over.

4         Q.   Do you know what DCYF stands for?

5         A.   I do not know exactly what it stands for.

6         Q.   Have you heard of the Division of Children,

7    Youth and Families before?

8         A.   Yes.

9         Q.   Do you know what they do?

10        A.   I do.

11        Q.   What's your knowledge of what they do?

12        A.   They take care of child abuse and things of

13   that nature.

14        Q.   And did a representative of DCYF come to the

15   defendant's home when you were there?

16        A.   Yes.

17        Q.   And what happened?

18        A.   She had asked myself and R.B. to leave the

19   room so she could talk to Lisa privately.

20        Q.   Who asked you to leave the room?

21        A.   The DCYF worker.

22        Q.   So she could talk to the defendant?

23        A.   Yes.

24        Q.   And how long was she with the defendant?

25        A.   About 20 minutes.

1       Q.    What happened after the DCYF worker left?

2       A.    Lisa came out to the back porch and got myself

3   and R.B. and told us that she wasn't supposed to tell us

4   what they talked about, but she did anyway, and she said

5   that she lied about everything and said that nothing

6   happened.

7       Q.    She told you that she lied to the DCYF case

8   worker?

9       A.    Yes.

10      Q.    And that she told her nothing had happened?

11      A.    Yes.

12      Q.    What else did she tell you?

13      A.    She told me that I should go to the police

14   department, withdraw my statements, and take a

15   misdemeanor charge of false reporting.

16      Q.    Okay.  And did you do that?

17      A.    I did.

18      Q.    Why?

19      A.    No, I did not, I'm sorry.  I went to the

20   police department and told them that she had lied to the

21   DCYF worker.

22      Q.    How did you get to the police department?

23      A.    Lisa had given me a ride there.

24      Q.    Do you know why she gave you a ride there?

25            MR. MOIR:  Objection, your Honor.

1            THE COURT:  Sustained.  Lay a foundation,

2    personal knowledge.

3            MR. KAVACAS:  Absolutely.

4       Q.   Did the defendant tell you why she was driving

5    you have to the Manchester Police Department?

6       A.   So I could take back my statements that I had

7    made.

8            THE COURT:  Wait, wait.  Did she tell you.

9    Answer that one yes or no.

10      A.   Yes.

11      Q.   What did she tell you was her reason for

12   taking you to the Manchester Police Department?

13      A.   So that I could withdraw my statements that I

14   had previously made.

15      Q.   And did you do that?

16      A.   I did not.

17      Q.   What did you in fact do?

18      A.   I asked if I could make a report of her lying,

19   and they said to come back later when the original

20   officer that I had spoken to was there.

21      Q.   All right.  So you report yourself to the

22   Manchester police for having sex with an underage girl;

23   right?

24      A.   Yes.

25      Q.   Pretty steady sex; right?

1       A.    Yes.

2       Q.    You're in pretty hot water, aren't you?

3       A.    Yes.

4       Q.    Have I made any promises to you in exchange

5    for your testimony?

6       A.    No, you have not.

7       Q.    Who's made a promise to you, if anyone, in

8    exchange for your testimony today?

9       A.    The Hillsborough County Attorney's Office.

10       Q.    And what's the Hillsborough County Attorney's

11    Office told you?

12       A.    They said that as long as I tell the truth,

13    then I won't be charged with anything.

14       Q.    And did they tell you that in writing?

15       A.    They did.

16       Q.    Okay.  Have you read that letter?

17       A.    I have.

18       Q.    Do you understand it?

19       A.    I do.

20       Q.    You understand your obligation to tell the

21    truth?

22       A.    Yes, I do.

23             MR. KAVACAS:  Nothing further.

24             THE COURT:  Thank you.  About how long do you

25    anticipate cross?

1           MR. MOIR:  I don't know what time the court

2     wants to break for lunch, but it's going to be fairly

3     lengthy.

4           THE COURT:  Okay, well, then we should break

5     now for lunch.  So we will break, members of the jury.

6     We'll take a lunch break until 1:30, we'll resume at

7     1:30.

8           If counsel could remain, please.

9           (Jury exited the courtroom.)

10          THE COURT:  Be seated, please.  Have you got

11    your jury instructions yet?

12          MS. FITZGIBBON:  No, your Honor.  It's my

13    intention to do them at the break and --

14          THE COURT:  All right, well, do a good job of

15    them, okay?  I want to talk to you about a few issues

16    that, as I'm starting to put the instructions together,

17    Count Two, sexual exploitation of children, that

18    count -- excuse me, let's start with Count One.  Count

19    One is the transportation count?

20          MS. FITZGIBBON:  Yes, your Honor.

21          THE COURT:  Okay.  The indictment alleges

22    transportation in interstate commerce, okay?  It doesn't

23    allege transportation in foreign commerce.  It alleges

24    transportation in interstate commerce.  How are you

25    going to prove that she was transported in interstate

1    commerce?  Have you thought that one through?

2              MS. FITZGIBBON:  Yes, your Honor.  The

3    testimony will be from people that Lisa Biron told them

4    that they flew from New Hampshire to Buffalo.

5              THE COURT:  They flew?  Okay.

6              MS. FITZGIBBON:  Yes, your Honor.

7              THE COURT:  So they flew to Buffalo.  So they

8    crossed the boundaries from -- okay, good, so there will

9    be testimony on that fact.

10             MR. KAVACAS:  There was some.

11             MS. FITZGIBBON:  And there has been already

12   from Kevin Watson.

13             THE COURT:  He said Lisa told them they flew,

14   okay, good.  Sorry, I missed that, okay.

15             Second, the way the statute is worded, I'm

16   assuming that the issue is whether the transportation is

17   for the purpose of -- that the transportation is with

18   the intent that the individual engage in any sexual

19   activity for which any person can be charged with a

20   criminal offense.  Is it your view that that statute is

21   transportation for the purpose of engaging in conduct

22   which qualifies as a criminal offense under the United

23   States law, even if the person is transported to a

24   foreign country to engage in conduct which is, say,

25   unlawful under United States law and lawful under

1    Canadian law?

2              MS. FITZGIBBON:  Yes, your Honor.

3              THE COURT:  Okay.  I think that's the way the

4    statute is worded, but I would appreciate if you would

5    find some case law support for that proposition.  So the

6    intention is to engage in activities which are lawful

7    under United States law, not the law of Canada.  That's

8    what -- because the actual crime, the completed offense,

9    one could argue that there was a conspiracy that was

10   committed in the United States.

11             MS. FITZGIBBON:  Yes, your Honor.

12             THE COURT:  But the ultimate transportation

13   with intent to engage in activity was to transport to

14   Canada to engage in sexual activity.  But I don't need

15   to get into a definition of whether that activity was

16   lawful or unlawful under Canadian law in order to have

17   the crime proved.  That's what I'm trying to get at.

18             MS. FITZGIBBON:  And your Honor, the purpose

19   was to, with the intent that such person engage in

20   sexual activity, production of child pornography, which

21   as 2427 says, the term sexual activity for which any

22   person can be charged with a criminal offense includes

23   the production of child pornography.

24             THE COURT:  And I guess I'm not being clear

25   enough about what I'm saying.  One could act with that

1    purpose, but suppose one were to transport somebody to a

2    country, country X, that does not make the production of

3    child pornography a crime.  Is it still an offense under

4    this statute to transport in interstate commerce for the

5    purpose of engaging in activity which is lawful in the

6    place where you're engaging in it but unlawful under

7    United States law?  I think the answer to that question

8    is yes, that seems to be the way the statute is phrased,

9    but I'm simply suggesting that it would be helpful to me

10   if you would try to identify any case law that would

11   support that proposition so that I can clearly give the

12   instruction because I doubt I'm going to be requested to

13   give any instructions about whether the behavior was

14   lawful or unlawful under Canadian law.

15           MS. FITZGIBBON:  Yes, your Honor, understood.

16           THE COURT:  Okay.  The second question I have

17   concerns the Count Two.  The statute in Count Two is a

18   fairly complicated poorly worded gigantic paragraph-long

19   sentence with many commas and clauses and so forth, but

20   I understand you've charged the indictment in the

21   conjunctive, which is a common prosecutorial practice,

22   and identifies alternative theories of liability in the

23   conjunctive.  Under First Circuit case law when you

24   charge in the conjunctive, you can be convicted under a

25   disjunctive theory, so if there are three ways one can

1    commit the crime, and you allege as you've done here,

2    they've done A, B and C, the judge can instruct that you

3    can find guilt based on A, B or C as long as you

4    unanimously agree on A, B or C beyond a reasonable

5    doubt.  Is that your understanding?

6            MS. FITZGIBBON:  Yes, your Honor.

7            THE COURT:  Okay.  Will there be evidence that

8    the depictions here that comprise Counts Two through

9    Seven were themselves transported in interstate

10   commerce?

11           MS. FITZGIBBON:  With respect to Counts Two

12   through Six, yes, your Honor, those were produced in

13   Canada.

14           THE COURT:  Oh, those are all -- Two through

15   Six were all Canadian?

16           MS. FITZGIBBON:  Two through Five, I'm sorry.

17           THE COURT:  Two through Five.

18           MS. FITZGIBBON:  Two through Five, your Honor.

19           THE COURT:  So Two through Five the evidence

20   will be they are produced in Canada, they flew through

21   Buffalo, therefore they took them with them and

22   transmitted them in interstate commerce.

23           MS. FITZGIBBON:  And they were retrieved here

24   in Manchester, New Hampshire, your Honor, yes.

25           THE COURT:  Right.  Because one could drive

1    from New Hampshire to Canada without engaging in

2    interstate commerce, but you're saying the evidence will

3    be that they flew through Buffalo and therefore they

4    would have necessarily, from going from Buffalo to New

5    Hampshire, have transported them in interstate commerce,

6    or she would have, the defendant.

7              MS. FITZGIBBON:  Yes, your Honor.

8              THE COURT:  Okay.  And what about Six and

9    Seven?

10             MS. FITZGIBBON:  Those, your Honor, the

11   testimony will be that those images were produced using

12   materials which traveled in interstate or foreign

13   commerce.

14             THE COURT:  Okay.  So that one you won't be

15   trying to prove transportation in interstate or foreign

16   commerce.  You're going to prove produced using

17   materials that had been mailed, shipped or transported

18   in interstate commerce.

19             MS. FITZGIBBON:  That's correct, your Honor.

20             THE COURT:  And the proof will be that was

21   done on an iPhone.

22             MS. FITZGIBBON:  iPhone and a computer

23   component.

24             THE COURT:  And you have somebody coming in

25   saying those computer components are not produced in New

1    Hampshire.

2              MS. FITZGIBBON:  There will be the actual

3    physical exhibits, your Honor, that have the made in

4    sticker made in the Philippines, made in China.

5              THE COURT:  Okay, so they'll bear stickers

6    that will identify, so it will be self-identifying

7    having not been produced here.  Okay, I haven't gotten

8    to the third count yet.

9              So you understand the questions that I'm

10   asking and the views I'm expressing about the statute.

11   Do you think I am misunderstanding the way the statutes

12   work in any way?

13             MR. MOIR:  Obviously I've submitted my

14   proposed instructions and I think that fairly outlines

15   the law that should be given.

16             THE COURT:  I know, but I've explained to you

17   the way I think the law works, and it's incumbent upon

18   you as an officer of the court to tell me now if you

19   think that I'm misunderstanding the way the law works in

20   any way, in a way that is to the detriment of your

21   client, I'm asking you to tell me now so I can do some

22   more reading and thinking about it.  Is there -- have I

23   expressed any view of the law of the way these statutes

24   work that is a misunderstanding from your view in the

25   way the law works to the extent that it works to the

1  detriment of your client.

2          MR. MOIR:  At this point I don't see anything

3  the court has misconstrued.

4          THE COURT:  Okay.  If you do, bring it to my

5  attention as soon as you do because I'm trying to draft

6  these instructions, and I want to get them right, and I

7  don't want to have last minute delays because somebody

8  comes up and says, oh, that's not the way this works, it

9  works some other way.  So please think about what I'm

10 saying here.  I've got your instructions.  I'm keeping

11 them in mind, of course.  My job is to run the trial and

12 get the instructions on the law right, and I want to do

13 my job well and I need you as officers of the court to

14 both assist me in doing that job, okay?  So get those

15 instructions in to me as soon as you can.

16          (Luncheon recess taken.)

17          THE COURT:  Take a seat, sir.

18                     CROSS-EXAMINATION

19 BY MR. MOIR:

20     Q.   Good afternoon, Mr. Ore.  Is it okay if I call

21 you Brandon?

22     A.   That's fine.

23     Q.   Okay.  I'm Jim Moir.  I don't think we've met

24 before.

25          All right, I want to I guess jump straight off

1   to something I believe you said on direct examination.

2   I took some notes, they may not be right, so.  You

3   talked about what, was it Lisa or R.B., which one of

4   them talked about this plan they had on going to Canada?

5        A.   It was Lisa.

6        Q.   Okay, it was never R.B.?

7        A.   R.B. had joined into the conversation later.

8        Q.   So this is the single time it was talked

9   about; right?

10       A.   It was talked about on a couple of different

11  occasions.

12       Q.   As far as the plan?

13       A.   As far as the plan of how they chose to go

14  there, yes.

15       Q.   Was talked about on multiple occasions?

16       A.   Yes.

17       Q.   You told the jury that the plan was to go to

18  meet Kevin; right?

19       A.   Yes.

20       Q.   Of course they are talking about something

21  that happened months earlier.  Right?

22       A.   Yes.

23       Q.   Okay.  Said okay, we had the planned, and our

24  plan was to go meet Kevin, and we were going to have sex

25  with Kevin.  Right?

1        A.    They had said they were drinking and they had

2    planned the trip to Canada to go see Kevin.

3        Q.    Right.  They had planned a trip and the plan

4    was to have sex with him; right?

5        A.    Yes.

6        Q.    And the plan was to make a video of it; right?

7        A.    I do not know if there was a plan to make a

8    video.

9        Q.    Okay, that's what I want to be sure because

10   they never said that, did they, either of them?

11       A.    Not to my knowledge.

12       Q.    In fact, they talked about how their video was

13   made.  You obviously saw it; right?

14       A.    Yes.

15       Q.    But neither of them at any point said to you,

16   you know, we wanted to go to Canada to have sex with

17   Kevin and produce a video?

18       A.    They had never said they wanted to produce a

19   video.

20       Q.    Okay.  You have been interviewed many times;

21   right?

22       A.    Yes.

23       Q.    I think the count I have is 11 times.  Does

24   that sound about right?

25       A.    That sounds a little more than what it was.

1        Q.    Okay.  I mean, just going through it real

2   quickly.  I think Officer Powers, you talked to him on

3   September 28th, Manchester PD?

4        A.    Some time around September.  I don't know the

5   exact date.

6        Q.    Then you talked to him about four days later

7   again?

8        A.    Yes.

9        Q.    Okay.  And then you talked to Detective Nanan,

10   it would be October 6th or after that?

11        A.    Yes.

12        Q.    And then you talked to Detective Nanan another

13   time?

14        A.    Yes.

15        Q.    And then you met with Agent Gibeley the first

16   time later in October?

17        A.    Yes.

18        Q.    Okay.  And then you went on and had another

19   meeting with him on the 27th?

20        A.    Yes.

21        Q.    Another meeting with him on November 17th?

22        A.    Yes.

23        Q.    Another meeting with him on November 19th?

24        A.    I believe so.

25        Q.    Another meeting with him on December 11th?

1      A.   I --

2      Q.   I can show you if you like.

3      A.   If you'd like to show me, that would be all

4   right.

5      Q.   Sure, let me pull it out.

6           MR. MOIR:  Can I approach your Honor?

7           THE COURT:  Pardon me?

8           MR. MOIR:  Can I approach?

9           THE COURT:  Yes.

10          MR. MOIR:  Thank you.

11     Q.   Let me see.  I think I said to December 11th,

12   you agreed.  There's number nine.  Short reports?

13     A.   (Nods head affirmatively.)

14     Q.   Just meeting him; right?

15     A.   Yes.

16     Q.   And then the tenth time would have been I

17   guess December 22nd.  That's the meeting you had with

18   the U.S. Attorney?

19     A.   Yes.

20     Q.   Okay.  And finally number 11 was on, what's

21   the date, at night?

22     A.   I believe so, yes.

23     Q.   On the 5th; is that correct?

24     A.   Yes.

25     Q.   I counted 11.  Sound about right to you?

1     A.   Yes.

2     Q.   Okay.  Now, you indicated that you first met

3   Lisa in July; right?

4     A.   Yes.

5     Q.   Okay.  And you indicated that you got out

6   there, she was there alone; right?

7     A.   Yes.

8     Q.   And you had sex with her?

9     A.   Yes.

10     Q.   And then she said, hey, come on back, bring a

11   friend, something like that; right?

12     A.   Yes.

13     Q.   Okay.  And the first time you went you had no

14   plan to go with a friend; right?

15     A.   Correct.

16     Q.   You just went alone; right?

17     A.   Yes.

18     Q.   And you didn't even talk about bringing a

19   friend; right?

20     A.   No.

21     Q.   That never came up?

22     A.   No.

23     Q.   It was you going alone and you thought there

24   was going to be two women; right?

25     A.   No.

1       Q.   You thought there was only one woman there?

2       A.   Yes.

3       Q.   Okay.  Now, because I know that you actually

4   printed off some of your, I guess they would be text

5   messages, that you had between you and Lisa from that

6   same day.  Do you recall that?

7       A.   I only remember printing off e-mails.

8       Q.   If I had can approach, your Honor?

9            THE COURT:  Yes.

10      Q.   I don't know if you've ever seen these before.

11      A.   Yes, those are the e-mails.

12      Q.   Okay.  Did you print them off?

13      A.   I did.

14      Q.   Okay.  And you brought them over to Agent

15   Gibeley?

16      A.   Detective Nanan, believe

17      Q.   Detective Nanan at the beginning.  And do you

18   recall saying this:  I'm 18 and I have a friend in his

19   twenties and we wouldn't mind partying and having a

20   little fun with you girls if you're up with it?

21      A.   That was in the original.

22      Q.   Okay.  So you're the guy that brought up two

23   people; right?

24      A.   Yes.

25      Q.   Okay.  I mean, that wasn't injected in this

1   conversation by anybody but you; right?

2        A.   Yes.

3        Q.   Okay, going back to it.  You meet Lisa, you

4   have sex with her, you come back the next time.  At this

5   point you meet R.B.; right?

6        A.   Yes.

7        Q.   And you have sex with her that night; right?

8        A.   Yes.

9        Q.   Okay.  And pretty soon you eventually become

10  her boyfriend; right?

11       A.   Eventually, yes.

12       Q.   I mean, it didn't take long; right?

13       A.   Not too long, no.

14       Q.   Right.  I mean, basically it was a week or

15  two; right?

16       A.   It might have been a little bit longer, but

17  somewhere in that time frame.

18       Q.   But pretty quickly you considered her your

19  girlfriend; right?

20       A.   Yes.

21       Q.   Okay.  Now, let me ask you about this.  I mean

22  --

23            THE COURT:  Counsel, could you just clarify.

24  When you say her, her boyfriend, who?

25       Q.   Her, would be R.B.'s boyfriend.  Okay.  Not

1   Lisa's boyfriend but R.B.'s; right?

2       A.   Correct.

3       Q.   The 14-year-old.  Okay.  Obviously you said

4   you didn't know she was 14 at that time?

5       A.   Yes.

6       Q.   Okay.  Now, obviously you engaged in sex with

7   her; right?

8       A.   Yes.

9       Q.   And when you did that, did you want to have

10  sex with her?

11      A.   Yes.

12      Q.   And did it appear that she wanted to have sex

13  with you?

14      A.   Yes.

15      Q.   I mean, you didn't force her; right?

16      A.   No.

17      Q.   And you didn't make her any promises?

18      A.   No.

19      Q.   And you didn't induce her in any way to have

20  sex; right?

21      A.   No.

22      Q.   This is purely a mutual thing; right?

23      A.   Yes.

24      Q.   And over the course of the time you lived in

25  that house with her, I mean, and it's hard to say, but

1    how many times do you think you had sex with her?

2         A.   I'd say a lot, I mean.

3         Q.   I mean a lot; right?

4         A.   Yeah.

5         Q.   I mean, you're a young guy, right, and she

6    wanted to have sex and you wanted to have sex; right?

7         A.   Yes.

8         Q.   And you did it quite a few times a week;

9    right?

10        A.   Yes.

11        Q.   And during that time, I mean, you never forced

12   her to have sex; right?

13        A.   No.

14        Q.   And she always wanted to have sex with you;

15   right?

16        A.   Yes.

17        Q.   And you'd agree with me that Lisa didn't force

18   you to have sex; right?

19        A.   No.

20        Q.   And she didn't force R.B. to have sex; right?

21        A.   No.

22        Q.   You talk about this one point when Lisa

23   encouraged you; right?

24        A.   Yes.

25        Q.   I mean, let me get that straight.  She told

1    you that apparently R.B. said you weren't initiating it;

2    right?

3         A.   Yes, sir.

4         Q.   She always had to initiate having sex with

5    you; right?

6         A.   Yes.

7         Q.   And so she's basically saying hey, you know,

8    why don't you initiate with her too; right?

9         A.   Correct.

10        Q.   I mean, that's what we're talking about with

11   encouraging; right?

12        A.   Yes.

13        Q.   I mean, she didn't say you have to have sex

14   with her; right?

15        A.   No.

16        Q.   Nothing like that?

17        A.   No.

18        Q.   Because she was your girlfriend; right?

19        A.   Yes.

20        Q.   And you're dealing with the girlfriend's

21   mother.

22             Now, you lived there for a good, basically two

23   months; right?

24        A.   Yes.

25        Q.   Approximately.  And during those two months, I

1   mean, there's only the three of you living there; right?

2       A.    Until the last couple weeks I was there.

3       Q.    And then this other gentleman came there;

4   right?

5       A.    Yes.

6       Q.    Do you know this other guy?

7       A.    I only knew him from when I was living there.

8       Q.    Okay.  And but he was, of the people there, I

9   mean, you were pretty close to these two women; right?

10      A.    Yes.

11      Q.    This woman and girl.  I mean you guys talked

12  about a lot; right?

13      A.    Yes.

14      Q.    You talked basically about everything, you

15  were like family; right?

16      A.    Almost.  Kind of.

17      Q.    Almost, yeah.  I mean you even had a joke

18  about calling her mom; right?

19      A.    Yeah.

20      Q.    But I mean, it was sort of like family, so not

21  only were you intimate having sex, but you were also

22  intimate in their personal lives; right?

23      A.    To an extent, yes.

24      Q.    I mean, to a big extent, right, because this

25  is your girlfriend?

```
 1        A.    Yes.

 2        Q.    You would talk about lots of things?

 3        A.    Yes.

 4        Q.    I mean, when this other guy moved in later on,

 5   he was no where near as close, was he?

 6        A.    No.

 7        Q.    Because he's sort of a weird guy; isn't he?

 8        A.    Kind of.

 9        Q.    Kind of, yeah, I think we'll see him shortly.

10   Okay.  But he was not like you were with these people;

11   right?

12        A.    No.

13        Q.    And you felt, you know, I suppose that you

14   could confide in them?

15        A.    I wouldn't say I could confide in him, no.

16        Q.    Not him, I'm talking about R.B.?

17        A.    Yes.

18        Q.    I mean, she's your girlfriend, and you could

19   actually confide in Lisa as well; right?

20        A.    Yes.

21        Q.    And they confided in you?

22        A.    Yes.

23        Q.    I mean, they told you things about like going

24   to Canada; right?

25        A.    Yes.
```

1    Q.   And, you know, now, you saw one video from

2   Canada; right?

3    A.   Yes.

4    Q.   I mean, you heard that there's a number of

5   other ones?

6    A.   I have not heard that.

7    Q.   Okay.  The jury has already seen them today.

8   There's a number of others from Canada.  You were only

9   shown one; right?

10    A.   Yes.

11    Q.   And that one was shown to you because there

12   was that funny noise that they wanted to show you;

13   right?

14    A.   Yes.

15    Q.   And that was the purpose of showing you;

16   right?

17    A.   Yes.

18    Q.   And they all were laughing; right?

19    A.   R.B. was embarrassed, but Lisa was laughing.

20    Q.   And you laughed too?

21    A.   Yeah.

22    Q.   Yeah.  Right.  I mean, the thing was done

23   basically as a joke; right?

24    A.   Yeah.

25    Q.   And do you recall that video clip being pretty

1   short; right?

2        A.   It was pretty short, yes.

3        Q.   It was not like a big porno video, it was a

4   little short thing; right?

5        A.   Yes.

6        Q.   During the time you were living in that house,

7   I mean, there were -- obviously you know that Lisa had a

8   camera; right?

9        A.   Yes.

10        Q.   And she had an iPhone; right?

11        A.   Yes.

12        Q.   In fact, there were a few cameras lying

13   around, weren't there?

14        A.   Yes.

15        Q.   And Lisa took a lot of pictures, didn't she?

16        A.   Yes.

17        Q.   I mean, of lots of things; right?

18        A.   Yes.

19        Q.   Including apparently you and R.B. having sex;

20   right?

21        A.   Yes.

22        Q.   But also things like you wrestling in the

23   backyard?

24        A.   Yes.

25        Q.   And the dog Gunner?

1          A.    Yes.

2          Q.    And she was always snapping pictures; right?

3          A.    Yes.

4          Q.    And always taking videos; right?

5          A.    Correct.

6          Q.    Okay.  A couple of things.  I'll move on.  We

7    have heard, you know, something about there was a lot of

8    pot smoking and drinking; right?

9          A.    Yes.

10         Q.    In that house.  It was pretty routine; right?

11         A.    Yes.

12         Q.    And everyone there was doing it; right?

13         A.    Yes.

14         Q.    And I think that when you were interviewed, in

15   one of your interviews you basically told the

16   interviewer, I think it was Agent Gibeley, that you were

17   pretty much wasted; right?

18         A.    At times, yes.

19         Q.    A lot of times; right?

20         A.    To some extent.  I mean, there was a lot more

21   pot smoking than drinking.

22         Q.    I'm sorry?

23         A.    There was a lot more pot smoking than

24   drinking.

25         Q.    Okay, okay.  But that was just part of being

1    there; right?

2         A.    Yes.

3         Q.    Everyone was doing it.  And I guess finally my

4    only other question is I know there is some talk about

5    this, about having, being granted immunity; right?

6         A.    Yes.

7         Q.    And I mean obviously you were potentially

8    facing charges; right?

9         A.    Yes.

10        Q.    And nobody is going to prosecute you; right?

11        A.    Yes.

12        Q.    Okay.  And that's the agreement, that's been

13   the agreement for a while; right?

14        A.    I actually only received that letter about a

15   week ago.

16        Q.    Okay, but the letter was written some time

17   before that?

18        A.    I don't know when that was written.

19        Q.    I did have one other question if I can just

20   find it here.  No, I think that's actually it.  Thank

21   you very much.

22             THE COURT:  Thank you.  Any redirect?

23             MR. KAVACAS:  Very brief, your Honor.

24                      REDIRECT EXAMINATION

25   BY MR. KAVACAS:

174

1       Q.   Brandon, the defense lawyer asked you

2   questions about your e-mail correspondence with the

3   defendant; right?

4       A.   Yes.

5       Q.   And he showed you I believe this e-mail on

6   page 159, counsel, where it says I'm 18 and I have a

7   friend in his twenties?

8       A.   Yes.

9       Q.   And he talked about you being the first one to

10  raise the notion of having two people come over; right?

11      A.   Yes.

12      Q.   When you responded to the Craig's List ad that

13  you testified the defendant posted, what was the ad,

14  what did it say?

15      A.   Two girls looking to party.

16      Q.   Okay.  And then on page 158, counsel, this

17  e-mail correspondence continues.  Just read that and

18  tell me if you recognize that?

19      A.   I do recognize that.

20      Q.   Who's that from?

21      A.   Lisa.

22      Q.   To who?

23      A.   Myself.

24      Q.   Is it in that same e-mail conversation?

25      A.   Yes, it is.

1      Q.    And what does the defendant say to you in that

2    e-mail conversation?

3      A.    She's going to be home alone tonight.

4      Q.    Exactly what does it say?

5      A.    Hey, I'm home alone tonight.  Might want to

6    hang out, though.

7      Q.    Is that the night you met her?

8      A.    Yes.

9      Q.    The defense lawyer asked you some questions

10   about you wrestling in the backyard?

11     A.    Yes.

12     Q.    Who were you wrestling with?

13     A.    My friend Brad.

14     Q.    Was he one of the friends you talked about in

15   your direct testimony when you brought friends over to

16   the defendant's house?

17     A.    Yes.

18     Q.    One final series of questions.  You've

19   indicated that the defendant didn't tell you that they

20   were going to Canada for the specific purpose of

21   creating a video; right?

22     A.    Correct.

23     Q.    She showed you a video that she created in

24   Canada?

25     A.    Yes.

1        Q.    Do you remember hearing anything in the

2    background?

3        A.    Yes.

4        Q.    What did you hear?

5        A.    A song.

6        Q.    What was the song?

7        A.    Half Naked and Almost Famous.

8        Q.    Did the defendant tell you anything about why

9    she played that song?

10        A.    Because it was R.B.'s favorite song.

11              MR. KAVACAS:  Nothing further.

12              THE COURT:  Thank you, sir, you can step down.

13    Call your next witness, please.

14              MS. FITZGIBBON:  Yes, your Honor, the

15    government calls Robert Hardy.

16              THE CLERK:  Stand and raise your right hand.

17                          ROBERT HARDY

18        having been duly sworn, testified as follows:

19              THE CLERK:  Would you please state your name

20    and spell your last name for the record.

21              THE WITNESS:  Robert Hardy, H-A-R-D-Y.

22              THE CLERK:  Thank you.  You can be seated.

23                        DIRECT EXAMINATION

24    BY MS. FITZGIBBON:

25        Q.    Good afternoon, Mr. Hardy.

1        A.   How you doing?

2        Q.   I'm going to stand back here, okay, for the

3   purpose of keeping my voice up, and if you keep your

4   voice up then the jury will be able to hear everything

5   you say, okay?  It's important that you answer yes or no

6   or answer verbally and not shake your head because we

7   have a court reporter right here who is taking

8   everything down; okay?

9        A.   Okay.

10       Q.   Make sure to keep your voice up and also try

11   not to speak too, too fast, and I will too because I

12   tend to talk fast, and she will get everything down;

13   okay?

14       A.   Yup.

15       Q.   Thanks.  Mr. Hardy, where are you from?

16       A.   New Hampshire.

17       Q.   Okay, where in New Hampshire?

18       A.   Merrimack.

19            THE COURT:  Would you slide in a little bit

20   because your voice is a little soft.  Thank you.

21       Q.   How old are you?

22       A.   Twenty-five

23       Q.   What do you do?

24       A.   For work?

25       Q.   Yes.

1      A.   Landscaping.

2      Q.   And do you live in Merrimack now?

3      A.   Yes.

4      Q.   Do you know Lisa Biron?

5      A.   Yes.

6      Q.   And do you see Lisa Biron in the courtroom

7  today?

8      A.   Yes.

9      Q.   And could you indicate where she is, please?

10     A.   Right there.

11     Q.   And what's she wearing?

12     A.   Blue coat.

13     Q.   Could it be a black coat?

14     A.   I'm sorry, black.

15     Q.   How did you meet Lisa Biron?

16     A.   At a party.

17     Q.   Where was the party?

18     A.   At her house.

19     Q.   And when was it?

20     A.   I --

21     Q.   Roughly.  You don't have to give me the exact

22  dates.

23     A.   I believe November maybe or before then.

24     Q.   Of -- are you talking about 2012?

25     A.   Yes.

1       Q.    And do you remember was it summertime or

2    wintertime when you met her?

3       A.    I think towards the end of summer.

4       Q.    Okay, of 2012?

5       A.    Yes.

6       Q.    And you said it was at a party at her house?

7       A.    Yes.

8       Q.    Who was at the party?

9       A.    A few people.  Brandon was there, a kid Josh

10   was there, a kid Jacob was there, R.B. was there.

11      Q.    Okay.  Now, you and I, when you say R.B., are

12   you referring to the defendant's daughter?

13      A.    Yes.

14      Q.    The first time you were at this party you met

15   a young girl you're referring to as R.B.; right?

16      A.    Yes.

17      Q.    So she was at the party and you named some

18   other, the individuals you named, did you just name

19   various men that were at the party?

20      A.    Yes.

21      Q.    Were there any women at that party?

22      A.    Lisa and her daughter was there.

23      Q.    R.B.  Any other females?

24      A.    No.

25      Q.    And how late did that party last?

```
1       A.   Two, 3 a.m.

2       Q.   And did you leave, did the party end?

3       A.   Yes.

4       Q.   And did you go back to --

5       A.   Yes.

6       Q.   When did you go back?

7       A.   Roughly around 6 a.m. I returned.

8       Q.   And so on the same continuing day of the

9  party?

10       A.   Yes, ma'am.

11       Q.   And after you went back, how long did you stay

12  there?

13       A.   The whole day.

14       Q.   Did there come a time, did you then leave

15  after that day?

16       A.   I stayed there for a while.

17       Q.   Okay.  Did you move in and start living there?

18       A.   Yes.

19       Q.   On the night of the party you mentioned

20  Brandon was there.  Is that Brandon Ore?

21       A.   Yes.

22       Q.   Who did you have an understanding Brandon Ore

23  was?

24       A.   Josh and Jacob's friend.

25       Q.   Okay.  And did you have any knowledge of his
```

1    relationship to Lisa or R.B.?

2         A.    It was R.B.'s boyfriend.

3         Q.    At some point did you have sexual relations

4    with the defendant, with Lisa Biron?

5         A.    Yes.

6         Q.    When was the first time you had sex with Lisa

7    Biron?

8         A.    That night.

9         Q.    That first night at the party?

10        A.    Yes.

11        Q.    You stated you basically then started living

12   there.  Did you continue a sexual relationship with Lisa

13   Biron?

14        A.    Yes, ma'am.

15        Q.    During the time that you were living there,

16   did R.B. continue to reside there?

17        A.    Yes, ma'am.

18        Q.    Did Lisa -- excuse me, did Brandon Ore

19   continue to reside there?

20        A.    Yes.

21        Q.    And were you aware, did they have a sexual

22   relationship?

23        A.    Yes.

24        Q.    Did you personally witness that sexual

25   relationship?

1        A.   Yes.

2             MR. MOIR:  Your Honor, these questions have

3    all been leading.

4             THE COURT:  Try to ask non-leading questions.

5        Q.   After that first night when you lived there,

6    were there other parties that took place in that house?

7        A.   Yes.

8        Q.   How often would you say parties happened at

9    that house?

10       A.   It happened a couple times during the week and

11   on the weekends.

12       Q.   Who would generally be at the party?

13       A.   Lisa, her daughter and mostly guys.  Brandon

14   was there, Josh was there, and Jacob.

15       Q.   These men that you're referencing, are they

16   all men about your age?

17       A.   Younger.

18       Q.   When you were in the defendant's house, were

19   there ever any other females aside from Lisa Biron and

20   R.B. present at a party in that house?

21       A.   No.

22       Q.   Do you know why, do you personally know why

23   there were never other women in that house?

24             MR. MOIR:  Objection, your Honor.

25             THE COURT:  Sustained.  Show personal

1    knowledge for what they are going to testify about.

2            MR. MOIR:  I guess my other point is relevance

3    to a lot of these questions.

4            THE COURT:  All right, come up to sidebar, the

5    relevance isn't apparent to me.

6            MR. MOIR:  Thank you.

7                        AT SIDEBAR

8            MS. FITZGIBBON:  Your Honor, it's only one

9    more question and it's done for the purpose of

10   identification of the final exhibit.  There are a number

11   of ways that even though you can't see R.B. in that

12   final video we are going to identify as her, I expect

13   him to testify --

14           THE COURT:  What video is it?

15           MS. FITZGIBBON:  That's exhibit --

16           THE COURT:  Have you shown it yet?

17           MS. FITZGIBBON:  No, it's coming up, your

18   Honor.

19           THE COURT:  So you're going to show another --

20           MS. FITZGIBBON:  One more video.

21           THE COURT:  And are there other women in the

22   video?

23           MS. FITZGIBBON:  It's the one, your Honor, of

24   the defendant performing oral sex.  You can't see R.B.'s

25   face.  I only expect --

1           THE COURT:  What's this about the other women?

2           MS. FITZGIBBON:  He's going to testify that

3    the defendant told him that other women were not allowed

4    in that house.

5           THE COURT:  So his answer would be other women

6    weren't allowed in the house.  You don't have any

7    problem with that?

8           MR. MOIR:  No, but I'm wondering about the

9    video.

10          THE COURT:  She's going to try to prove that

11   it was the defendant who was performing oral sex on R.B.

12          MS. FITZGIBBON:  And that R.B. is the female

13   in the video.

14          THE COURT:  Oh, I'm sorry.

15          MR. MOIR:  Trying to prove that R.B. is in the

16   video, I don't think --

17          MS. FITZGIBBON:  No.

18          THE COURT:  It's a circumstantial thing.

19   Women aren't allowed in the house.  This video is

20   obviously made in the house.  Because the video was made

21   in the house that other women weren't allowed in the

22   house, it must be the two of them.  It's a weak

23   inference but it's logically relevant and it's not

24   prejudicial, so it's minimally relevant, not

25   prejudicial.  You can do it.

1                    BEFORE THE JURY

2         Q.   BY MS. FITZGIBBON:  So Mr. Hardy, I asked you

3    did you ever see women, other women other than Lisa and

4    R.B. present in that house?

5         A.   No.

6         Q.   And do you have personal knowledge of why

7    there were no women in that house?  Just say yes or no,

8    please, first.

9         A.   Yes.

10        Q.   Okay.  And what is your knowledge of why there

11   were no women in that house?

12        A.   She said that if anybody was going to have sex

13   it would be her.

14        Q.   When you say she, who are you talking about?

15        A.   Lisa.

16        Q.   While you were living there -- if you could

17   please keep your voice up.  Lean in a little bit.  When

18   you were living in Lisa Biron's residence, did you ever

19   see a recording of R.B. engaged in sexual activity?

20        A.   I did not see it.

21        Q.   Did you ever hear a recording of R.B. engaged

22   in activity?

23        A.   Yes.

24        Q.   Tell us about that.  What were the

25   circumstances of you listening to a video of R.B.?

1       A.   She was talking, Lisa was talking back on the

2   video and you can hear R.B. --

3            THE COURT:  Wait.  Stop.  Get a little closer,

4   speak a little louder.

5       A.   I'm sorry.  You could hear Lisa in the

6   background and R.B. and the gentleman who also you could

7   hear in the video.

8       Q.   Okay.  First I'm going to ask you, when you

9   heard this video, where were you?

10      A.   I was on the backside of the computer in the

11  living room.

12      Q.   You were in the living room of Lisa Biron's

13  house?

14      A.   Yes.

15      Q.   I think you said you were sitting in the

16  living room?

17      A.   Yes.

18      Q.   Who was -- and the video is being played on

19  what?

20      A.   Her computer, laptop.

21      Q.   When you say her, you mean Lisa Biron?

22      A.   Lisa, sorry.

23      Q.   And who was playing it?

24      A.   Lisa was.

25      Q.   And you did not view the video, is that what

1    you said?

2          A.    I did not.

3          Q.    Did Lisa Biron make any statements about the

4    video that she was playing?

5          A.    Yes.

6          Q.    What did she say?

7          A.    She said that she recorded her daughter having

8    sex for the first time.

9          Q.    Did she say who she was having sex with?

10         A.    A gentleman, I can't remember his name.

11         Q.    Did she say where the film was made?

12         A.    In Canada.

13         Q.    Did she say anything -- what else did she say

14   about her travel to Canada?

15         A.    That they were going for a vacation and R.B.

16   was talking to a gentleman on Facebook and that she

17   wanted to lose her virginity and she wanted it recorded,

18   she wanted to record her first time.

19         Q.    Did Lisa -- Lisa told you that?

20         A.    Yes.

21         Q.    And did Lisa say that she did in fact film it?

22         A.    Yes.

23         Q.    Did Lisa Biron tell you how they first met

24   this person on -- or how they first met this person?

25         A.    It was on Facebook.

1       Q.    And did she tell you why they decided to go to

2   Canada?

3       A.    So R.B. could lose her virginity.

4       Q.    Mr. Hardy, are you a member of any gangs?

5       A.    Yes.

6       Q.    Which gang?

7       A.    Crips.

8       Q.    The Crips?  How long have you been a gang

9   member?

10      A.    Since I was 12.

11      Q.    Do you have a criminal record?

12      A.    Yes.

13      Q.    What have you been convicted of?

14      A.    Receiving stolen property.

15      Q.    Have you been convicted of that more than

16  once?

17      A.    Yes.

18      Q.    How many times?

19      A.    Twice.

20      Q.    And where were those convictions?

21      A.    Manchester and Merrimack court.

22      Q.    Now, have you been promised anything at all in

23  conjunction with your testimony today?

24      A.    No.

25      Q.    Have I promised you anything?

1        A.   No.

2        Q.   Has the U.S. Attorney, John Kacavas, promised

3   you anything?

4        A.   No.

5             MS. FITZGIBBON:  Thank you, Mr. Hardy.

6             THE COURT:  Cross-examination.

7             MR. MOIR:  Thank you, your Honor.

8                      CROSS-EXAMINATION

9   BY MR. MOIR:

10       Q.   Good afternoon Mr. Hardy.

11       A.   Good afternoon.

12       Q.   I'm Jim Moir.  I've never met you before, have

13   I?

14       A.   No.

15       Q.   I guess I'm want to start at the last part

16   first.  You're a Crip?

17       A.   Yup.

18       Q.   Is that like Bloods and Crips?

19       A.   Yes.

20       Q.   Can you tell the jury what a Crip is?

21       A.   Huh?

22       Q.   Tell the jury what a Crip is?

23       A.   A Crip is a gang member that has rivals with

24   other gangs, they do what they do.

25       Q.   And what do they do?  I mean, what makes you a

1    Crip versus like the YMCA?

2         A.   Well, it's a family and we make money and we

3    fight with rival gangs, it's a family.

4         Q.   Okay, into criminal activity, though; right?

5         A.   Yes.

6         Q.   Absolutely, right?  And what kinds of criminal

7    activity?

8         A.   Yes.

9         Q.   I mean what kinds?

10        A.   Violence.  Drugs.

11        Q.   Now, you were originally contacted in this

12   case, I think I've got a report here says December 7th;

13   right?  Do you recall getting a phone call from Agent

14   Gibeley?

15        A.   Yes.

16        Q.   Okay.  And where were you when you got the

17   call?

18        A.   I was in Manchester.

19        Q.   Okay.  And was it on your cell phone?

20        A.   Yes.

21        Q.   Okay.  So all of a sudden a cell phone calls

22   and you find yourself talking to an FBI agent?

23        A.   Yes.

24        Q.   It's probably not good for a Crip to talk to

25   FBI agents; right?

```
 1        A.    No.

 2        Q.    Were you with any of your buddies when the

 3   call came in?

 4        A.    Yes.

 5        Q.    Okay, and did they know you were talking to an

 6   FBI agent?

 7        A.    Yes.

 8        Q.    Probably not too good for your health, is it?

 9        A.    No.

10        Q.    So you're with some buddies.  You've got an

11   FBI agent on the phone; right?

12        A.    Yes.

13        Q.    And obviously you don't know what this guy is

14   calling about; right?

15        A.    I did not.

16        Q.    Right.  And so you talk to this guy and I

17   believe you expected, expressed a rather strong desire

18   not to talk to him; right?

19        A.    Yes.

20        Q.    You told him in no uncertain terms when you

21   say things like you've been arrested many times, you're

22   aware how the system works; right?

23        A.    Yes, sir.

24        Q.    And no desire to speak to the FBI.  You told

25   them if you want to talk to him, get a subpoena; right?
```

1          A.    Yup.

2          Q.    And he kept trying to talk to you; right?

3          A.    Yeah.

4          Q.    And you kept on saying, hey, I know how the

5     criminal justice system works, I don't have to do

6     anything like this, you know, and finally you hung up on

7     him; right?

8          A.    Yup.

9          Q.    Okay.  It was a pretty short conversation;

10    right?

11         A.    Yes.

12         Q.    You made it very, very clear you want nothing

13    to do with these people; right?

14         A.    Yup.

15         Q.    And as a Crip you probably shouldn't be

16    dealing with the FBI; right?

17         A.    Yes.

18         Q.    Only thing worse would be the DEA; right?

19         A.    Yes.

20         Q.    Okay.  Because your life expectancy can be

21    kind of short; right?

22         A.    Yes.

23         Q.    Okay.  So that was on December 7th.  Jump

24    ahead.  I all of a sudden got a report from

25    December 26th, the day after Christmas.  And you are at

1   the Dunkin Donuts at the corner of Valley and Elm in

2   Manchester; right?

3        A.   Yes.

4        Q.   And you're having a coffee and a donut?

5        A.   Coffee.

6        Q.   Okay.  And there you meet with two FBI agents;

7   right?

8        A.   Yes.

9        Q.   So how did that happen?  There's nothing in

10  here that says how this happened?

11       A.   I called him up and asked him what he wanted.

12       Q.   Okay, so when you were private you called him

13  up?

14       A.   Yes.

15       Q.   Okay.  So who did you call?

16       A.   I called Mike.

17       Q.   Mike Gibeley?

18       A.   Yes.

19       Q.   Okay, you called him up.  How did you get his

20  number?

21       A.   It was on my phone.

22       Q.   Okay, so you just did basically call back,

23  right, from your phone; right?

24       A.   Yes.

25       Q.   And you call him up.  This is once you're away

1   from your buddies; right?

2        A.   Yes.

3        Q.   And you call and say I'd like to talk to you;

4   right?

5        A.   Yes.

6        Q.   Okay.  And so you set up a meeting over at

7   Dunkin' Donuts?

8        A.   Yes.

9        Q.   Okay.  You get to the Dunkin' Donuts and you

10  tell them once again I'm a member of the East Coast

11  Crips; right?

12       A.   Yes.

13       Q.   Have been since you were 12 years old?

14       A.   Yup.

15       Q.   And then you go on and talk to them, answer

16  their questions; right?

17       A.   Yes.

18       Q.   Now, in talking to them you certainly admitted

19  to a number of crimes; right?

20       A.   Yes.

21       Q.   Okay.  And did they talk to you about them?

22       A.   I'm sorry, can you repeat that?

23       Q.   Did they say anything about the crimes you

24  admitted to?

25       A.   Um --

1      Q.    They say, hey, don't worry about it, we're not

2   interested in that?

3      A.    No.

4      Q.    They didn't say that.  Why were you talking

5   about committing crimes?

6      A.    I'm sorry, what?

7      Q.    Why did you tell them you were committing

8   crimes?  That doesn't sound like a logical thing to do.

9      A.    Because I did what I did and it is what it is.

10  I mean, if I did a crime, I'm going to own up to what I

11  did.

12     Q.    So being a Crip and all those crimes of

13  violence and drug charges, you're happy just to admit to

14  them, no matter what happens to you?

15     A.    I did it, so I'm going to man it.  If I did

16  it, I going to own up for what I did.

17     Q.    Okay.  So you're 25 and you've been a Crip

18  since you were 12; right?

19     A.    Right.

20     Q.    So you've been more than half your life as a

21  Crip; right?

22     A.    Yes.

23     Q.    And you only got two convictions?

24     A.    Yes.

25     Q.    How did you do that?

1          MS. FITZGIBBON:  Objection, your Honor,

2    relevance.

3          THE COURT:  I'll let you go a little further.

4    Q.    Do you remember the question?

5    A.    You asked me how I only got two convictions.

6    Q.    Yeah.

7    A.    I had two convictions.

8    Q.    Because you told the police you knew the

9    system inside and out, you've been arrested many times.

10    A.    I've been convicted of two crimes.

11    Q.    You've been arrested many times, though?

12    A.    Yes, I've been arrested.

13    Q.    All right, let's go on.  You move in -- well,

14    I think you testified on direct you said you moved into

15    the house; right?

16    A.    Yup.  Basically, yup.  I was there every day,

17    so.

18    Q.    When you talked to the agents at the Dunkin'

19    Donuts, weren't you very, very clear that you did not

20    live at the house?

21    A.    I was there for a month, so technically yes.

22    Q.    Excuse me?

23    A.    I said I was there for over a month, so

24    technically yes, I was living there.

25    Q.    You told the agents you began to live at the

1    residence for a short duration; right?

2         A.    Yes.

3         Q.    And you said you didn't actually consider it

4    home.  You stayed there for periods of time during the

5    day and frequent overnights; right?

6         A.    Yes.

7         Q.    Okay.  You made it very clear I don't live

8    there; right?

9         A.    I had another residence.

10        Q.    Excuse me?

11        A.    I said I have my own place to live, yes.

12        Q.    Okay.  So you're just visiting there; right?

13        A.    Every day.

14        Q.    Okay.

15        A.    And I slept over just about every night.

16        Q.    I'm sorry?

17        A.    I said I slept over just about every night.

18        Q.    All right.  So you were there basically

19   because it was a free place to stay, right, and you got

20   sex?

21        A.    I had my own place.  I'm 25 years old.

22        Q.    Well, you could get drunk and high for free

23   and have sex whenever you wanted; right?

24        A.    Yeah.

25        Q.    And that's why you stayed there; right?

```
1        A.    Sure.

2        Q.    I mean it's not like you were being

3  particularly close to these people; right?  I mean, did

4  you talk to them a lot?

5        A.    I'm sorry, can you repeat --

6        Q.    Did you talk to the people who lived there a

7  lot?

8        A.    Yeah.

9        Q.    Okay, that would be Lisa and R.B.; right?

10        A.    Yes.

11        Q.    Okay.  And when you had this conversation

12  where you were talking about that Canada trip, who was

13  there, was Brandon there?

14        A.    No.

15        Q.    Where was Brandon?

16        A.    I don't know.

17        Q.    All right.  So he was, Brandon was not there

18  for this conversation?

19        A.    The first conversation, no.

20        Q.    Okay.  The first conversation?

21        A.    Yes.

22        Q.    About the trip to Canada, where they said they

23  went up to Canada; right?

24        A.    Brandon was not there.

25        Q.    Okay.  Was he there at the second
```

1    conversation?

2         A.   Yes.

3         Q.   Okay, so Brandon was there for the second

4    conversation?

5         A.   Yes.

6         Q.   Let's get the two conversations straight.

7    What was said in the first conversation?

8         A.   That they went up to Canada for R.B. to lose

9    her virginity and for them to record it.

10        Q.   Okay, and Lisa said that; right?

11        A.   Yes.

12        Q.   Did R.B. say that?

13        A.   Yes.

14        Q.   So R.B. said that too.  Were they saying it

15   like together or separately?

16        A.   The second conversation they were both in the

17   living room.

18        Q.   So who said it?

19        A.   R.B. -- I'm sorry R.B. said it and Lisa said

20   it the second conversation.

21        Q.   Let's deal with just the first conversation;

22   okay?

23        A.   Okay.

24        Q.   You're saying one of the two or both of them

25   said we went to Canada so R.B. could lose her virginity

1    and we wanted to record it?

2        A.    The first conversation was me and Lisa.

3        Q.    Okay, and she said exactly what?

4        A.    That they went to Canada for R.B. to lose her

5    virginity and she was going to record it.

6        Q.    She was going to record it --

7        A.    She recorded it.

8        Q.    Or she recorded it?

9        A.    She recorded it.

10       Q.    Right, she told you she recorded it; right?

11       A.    Yes.

12       Q.    So, just want to be sure.  She didn't say

13   we're going to record it, because they had already been

14   up there; right?

15       A.    Yes.

16       Q.    Said we recorded it?

17       A.    Yes.

18       Q.    And how about the second conversation.

19   Brandon was present; right?

20       A.    Yes.

21       Q.    So how did that one come up?

22       A.    She was talking about how R.B. --

23       Q.    Let's say who is she?

24       A.    Lisa was talking about how R.B. showed Brandon

25   the video and R.B. was talking about how she went to

1   Canada and she lost her virginity and that Lisa recorded

2   it.

3        Q.   Right.   Basically the same as the first;

4   right?

5        A.   Yes.

6        Q.   Okay.   I just want to be sure I have it

7   correct and the jury knows what was said here, right.

8   And Brandon was there for that one; right?

9        A.   Yes.

10       Q.   Okay.   Let me see if I have anything else.   I

11  guess the only other thing is, did you ever have a

12  chance to look at the report that was prepared by Agent

13  Gibeley?

14       A.   No.

15       Q.   All right.   Do you know how he reported -- you

16  just reported a conversation, do you know what he said?

17       A.   No.

18       Q.   Let me see if I can find it here.   All right,

19  I'll leave it at that.   Thank you very much.   I have no

20  other questions.

21            THE COURT:  Any redirect?

22            MS. FITZGIBBON:  Nothing further.

23            THE COURT:  Thank you, sir, you can step down.

24  Call your next witness, please.

25            MR. KAVACAS:  Thank you, your Honor.   The

 1   United States calls Lisa Brien.

 2            THE CLERK:  Step into the witness box and

 3   raise your right hand.

 4                        LISA BRIEN

 5        having been duly sworn, testified as follows:

 6            THE CLERK:  Thank you.  Would you please state

 7   your name and spell your last name.

 8            THE WITNESS:  Lisa Brien, B-R-I-E-N.

 9            THE CLERK:  Thank you.  You may be seated.

10                    DIRECT EXAMINATION

11   BY MR. KAVACAS:

12        Q.   Hi, Lisa.  I'm going to pour you a cup of

13   water.

14        A.   Thank you.

15        Q.   Lisa, I'm going to be standing back here and

16   asking you questions from here, and I'm going to ask you

17   to keep your voice up, because if I can hear you, it's

18   likely the jurors can hear you too; okay?

19        A.   Okay.

20        Q.   Lisa, where are you from?

21        A.   I live in Manchester, New Hampshire.

22        Q.   Okay.  And who do you live in Manchester with?

23        A.   My husband, Norm.  He's in the back.

24        Q.   He's in the back?

25        A.   Yeah.

1       Q.    Oh.   There he is.   Lisa, do you know the

2   defendant, Lisa Biron?

3       A.    Yes, I do.

4       Q.    How long have you known her?

5       A.    At least 12 years.

6       Q.    Do you see her in the courtroom here today?

7       A.    Yes.

8       Q.    Can you just point her out and tell us what

9   she's wearing?

10      A.    She's wearing a black suit jacket with a tank

11  top underneath.

12      Q.    Thank you.   How did you meet the defendant?

13      A.    We were going to the same church.

14      Q.    Okay.   And in going to the same church, how

15  did you establish a relationship?

16      A.    Well, not only were we being mentored by the

17  same person, the same woman, but we also were members of

18  what they call home group, which is just an extension of

19  the church where you gather, you know, during the week

20  to talk over what, you know, what went on in church on

21  Sunday.

22      Q.    When was it that you met her in church, was it

23  12 years ago or was it some time after that?

24      A.    No, it was 12 years ago.

25      Q.    And at the time was she married?

1     A.   Yes.

2     Q.   Did you know her husband?

3     A.   Yes.

4     Q.   What was his name?

5     A.   Michael.

6     Q.   And were you married?

7     A.   At that time, no.

8     Q.   Can you describe your relationship with the

9  defendant and how it grew, if it did?

10     A.   Well, yeah, I became, like I said, we were

11  close because we were being mentored by the same person.

12     Q.   Did you socialize with one another?

13     A.   Yes.  We had gatherings, barbecues, I had gone

14  over and had dinner many times with her and her child.

15  My daughter would play with her --

16     Q.   Okay, let me stop you there.  So you know the

17  defendant's daughter?

18     A.   Yes, I do.

19     Q.   Okay.  Lisa, let me advise you that for

20  purposes of this trial we're referring to the

21  defendant's daughter as R.B.; okay?

22     A.   Okay.

23     Q.   How long have you known R.B.?

24     A.   Twelve years.

25     Q.   Okay.  Now, at some recent point in time did

1   this close friendly relationship that you had with the

2   defendant change in any way?

3       A.   Yes.

4       Q.   Okay, tell us how and when?

5       A.   Back in June -- I mean July 4th, it was a

6   Fourth of July party, not this summer, the summer

7   before, so we were all over her house for a barbecue

8   with her and her husband and her dad and some friends

9   from church.

10      Q.   And this was in July of 2011?

11      A.   Yes.

12      Q.   Okay.  What about July, that July party at her

13  house?

14      A.   We had a great barbecue.  It was nice.

15  Everybody was having a good time.  We had fireworks.

16      Q.   Did you go with your husband Norm?

17      A.   Yes, I did.

18      Q.   And what is significant about that barbecue?

19      A.   It was within five or six days of that

20  barbecue that Lisa's husband Mike left for the second

21  time.

22      Q.   How often would you go to the defendant's

23  house?

24      A.   Every few, you know, once or twice a month.

25      Q.   How long after that July 4th barbecue?

1      A.   I didn't see her again, I don't think I saw

2   her again at all until October of this year.

3      Q.   October --

4      A.   Last year.

5      Q.   October of 2012?

6      A.   Yes.

7      Q.   And what caused you to see her again after

8   that about 15 months in October of 2012?

9      A.   She had left a text message for me at

10   nighttime asking me if I would come to court with her.

11   I had offered to come and, you know, support her.

12      Q.   And you said come to court, do you know what

13   had happened to her before she contacted you?

14      A.   No.  She called me and told me that we needed

15   to talk.

16      Q.   Okay.  Did you respond?

17      A.   I did.

18      Q.   What did the defendant tell you?

19      A.   A lot of things.  She had told me that she had

20   been arrested.

21      Q.   She told you she had been arrested?

22      A.   Yup.  And that her bail was $35,000 in cash.

23   That they had found pornography, child pornography on

24   her computer.  R.B. was, she was separated from R.B.,

25   and --

```
 1        Q.   Anything else?

 2        A.   Not for that particular conversation.

 3        Q.   Okay.

 4             THE COURT:  Can I see counsel at sidebar.

 5             MR. KAVACAS:  Certainly.

 6                            AT SIDEBAR

 7             THE COURT:  The witness's husband is at

 8   various times vigorously shaking his head and being very

 9   demonstrative.

10             MS. FITZGIBBON:  I'll talk to him.

11             THE COURT:  You go back and tell him if he

12   doesn't remain stone faced throughout the proceeding,

13   I'm going to have to have him removed.

14             MR. KAVACAS:  I apologize.

15             THE COURT:  That's all right.

16        Q.   BY MR. KACAVAS:  Okay, Lisa, so you told us

17   about this telephone call that you had with the

18   defendant after she was arrested.  Did you have another

19   conversation with her?

20        A.   I had conversations with her after she was

21   arrested, yes, other conversations.

22        Q.   On the telephone or in person?

23        A.   All but one were on the telephone or computer.

24        Q.   Okay.  In asking questions about what the

25   defendant told you I'm not interested in things
```

1   unrelated to this case; okay?

2        A.   Yup.

3        Q.   So, the next time you spoke to her on the

4   telephone, what did the defendant tell you?

5        A.   She had told me that her and R.B. had gone,

6   were going to Niagara Falls, and that R.B. --

7        Q.   It's okay.

8        A.   That, you know, that if you don't take me, I'm

9   going to run away.

10        Q.   Who said if you don't take me I'm going to run

11   away?

12        A.   R.B. said if you don't take me, I'm going to

13   run away.  What she was talking about is that she was

14   going to run away to Canada to a boy that she was

15   texting and, so she asked her mom if her mom would take

16   her up there.  She wanted to have her first sexual

17   experience videotaped for prosperity.

18        Q.   Who wanted to videotape for prosperity?

19        A.   R.B. asked her mom if she could have a video,

20   if she could videotape her having her first time because

21   she wanted to keep it more as a keepsake I think was

22   more of the word.

23        Q.   And this is the defendant telling you this?

24        A.   Yes.

25        Q.   And this was in October of 2012?

1     A.   Yes.

2     Q.   Okay.  Now, you said the defendant told you

3  they were going to Niagara Falls.  Were they planning on

4  going after October 2012 to your understanding or had

5  they already gone?

6     A.   No, they had already gone.

7     Q.   Okay.  Do you know when they went?

8     A.   Memorial Day weekend I think.

9     Q.   You've known R.B. since you've known the

10 defendant, right, 12 years?

11    A.   Ah-hum.

12    Q.   Do you know how old R.B. is?

13    A.   Yes.

14    Q.   How old?

15    A.   She's 14 now.

16    Q.   And what did the defendant tell you about her

17 thoughts about going to Canada to video record her

18 daughter and her first experience?

19    A.   She didn't think that there was anything wrong

20 with it.  She thought that it was safer I guess than to

21 let her possibly run away and not be able to find her.

22 There was -- she made a comment about something funny

23 happened on the video and they laughed, and she had just

24 told me that they were pictures of them partying.

25    Q.   Pictures of who partying?

```
 1        A.   R.B., Lisa and this boy Kevin.

 2        Q.   What did she tell you, what did the defendant

 3   tell you about this boy Kevin?

 4        A.   Besides what I said about him, you know, R.B.

 5   wanting to be with him, that he was -- he spent the

 6   weekend with them and that they both really loved him.

 7        Q.   The defendant said that she and R.B. both

 8   really loved him?

 9        A.   Right.

10        Q.   Did she tell you how old this kid was?

11        A.   Yes.  I believe he was 20.

12        Q.   You know how old the defendant is?

13        A.   Yes.

14        Q.   Lisa?

15        A.   Yes.

16        Q.   How old is she?

17        A.   She's 43.

18        Q.   Now, you started to talk about a video I think

19   in which something happened, something funny?

20        A.   Yeah.  She said while she was making, or she

21   was filming Lisa and this boy that something funny

22   happened and that everybody laughed, but she never told

23   me what it was.

24        Q.   Lisa, do you still have warm feelings toward

25   the defendant?
```

1        A.   I love Lisa, and I feel really bad.

2             MR. KAVACAS:  Thank you.  Nothing further.

3             THE COURT:  Cross-examination.

4             MR. MOIR:  One moment, your Honor.

5             (Mr. Moir consulting defendant.)

6                       CROSS-EXAMINATION

7   BY MR. MOIR:

8        Q.   Good afternoon.  I'm Jim Moir.  We spoke for a

9   couple of minutes just a few days ago?

10       A.   Yes.  Nice to meet you.

11       Q.   For two minutes.  You were on your way out the

12  door.

13       A.   Yes.

14       Q.   Now, you had really that last normal barbecue

15  in July of 2011; right?

16       A.   (Nods head affirmatively.)

17       Q.   And did everything seem normal then?

18       A.   Actually yeah, we had a lot of fun.

19       Q.   A lot of fun.  It was a normal barbecue just

20  like you'd had so many before; right?

21       A.   Yes.

22       Q.   And you discovered that it was just a couple

23  of days later that Lisa's husband disappeared really;

24  right?

25       A.   Yes.

1     Q.   I mean, did you find out the circumstances of

2  that?

3     A.   Yes.

4     Q.   What were the circumstances?

5     A.   He said that, like he had the first time,

6  called and said that he was leaving because he wanted to

7  do drugs more than he wanted to be at home and be a

8  husband.

9     Q.   And do you know how long he -- did he ever go

10  back home?

11     A.   Pardon?

12     Q.   Do you know if he ever went back home?

13     A.   No, he never went back home after he got out

14  of, after he got out of Teen Challenge.

15     Q.   So he wanted to do drugs more than he wanted

16  to be home; right?

17     A.   Yup.

18     Q.   Prior to that, though, had they seemed like

19  sort of a normal group?

20     A.   Yes, except before, the first time that he

21  left.

22     Q.   That happened before?

23     A.   Right.

24     Q.   But you met through a church; right?

25     A.   Yes, we did.

1      Q.    And was the barbecue basically church people

2    or were there other people as well?

3      A.    I believe that this particular one, that I

4    know her mom was there and I believe her dad and his

5    wife, and I think everybody else was from the church at

6    that particular one.

7      Q.    Now, after that barbecue did you have any

8    contact with her up until, again, from July of 2011

9    until October of 2012?

10     A.    We had spoke on the phone a number of times.

11   We never had any, we never saw each other face-to-face,

12   but talking on the phone as we do as friends and

13   Christians and moms.

14     Q.    But you also noted she had changed; right?

15     A.    I didn't know, I didn't know anything about

16   how her change was until after she was arrested and she

17   called me because then everything about her was changed.

18     Q.    Right.  You indicated you love Lisa.  I mean,

19   but, hearing all this was kind of shocking, wasn't it?

20     A.    Yes.

21     Q.    I mean completely shocking?

22     A.    It is.

23     Q.    You find out that she's been arrested for, you

24   know, by the Manchester Police Department, charged with

25   possessing child pornography; right?

1          A.   Yes.

2          Q.   And she's going to court.  It's in the papers;

3    right?

4          A.   Ah-hum.

5          Q.   Didn't seem like the same Lisa you knew;

6    right?

7          A.   No.

8          Q.   And, but you're a friend and she basically

9    talked to you to say this is what I did; right?

10          A.    It could be.  I constantly over the period of

11    time after Mike left I would always be sending her text

12    messages and e-mails, and they kind of stopped around

13    February maybe and, so I just kept on sending text

14    messages and e-mails.

15          Q.   They went into the ozone never to be heard

16    from?

17          A.    I didn't hear from her.  I shouldn't say that.

18    Occasionally she'd send me I love you too, we're fine,

19    but other than that I couldn't get her to be in contact

20    with me.

21          Q.   When she finally, after she got arrested, you

22    know, the wheels had completely come off at this point;

23    right?

24          A.   Right.

25          Q.   She didn't have her daughter?

1      A.    Right.

2      Q.    She's all over the press and she's come back

3  to you as a friend; right?

4      A.    (Nods in the affirmative.)

5      Q.    She's looking for support from a friend?

6      A.    Ah-hum.

7      Q.    And she tells you about what she's been doing,

8  right, which I know the government's been just asking

9  about; right?

10      A.    Yes.  It came out little pieces at a time,

11  different times of the day, sometimes 4:00 in the

12  morning.

13      Q.    All right.  But she was telling you as a

14  friend; right?

15      A.    Yeah.

16          MR. MOIR:  No further questions.  Thank you

17  very much.

18          THE COURT:  Redirect?

19          MR. KAVACAS:  Nothing, your Honor.

20          THE COURT:  Thank you, ma'am, can you step

21  down.  Let's go another 15 minutes.  Call another

22  witness, please.

23          MS. FITZGIBBON:  Your Honor, at this time

24  there's some recorded phone calls where the ID had been

25  stricken.  They have been entered by agreement as

1    exhibits.  So we would play those phone calls.

2              THE COURT:  Okay.  When you play the calls,

3    identify the exhibit number, okay?

4              MS. FITZGIBBON:  Yes, your Honor.

5              THE COURT:  You're not going to need to have

6    anybody to testify about them?

7              MS. FITZGIBBON:  I think there's a stipulation

8    we can prepare before the end of the trial that defense

9    counsel stipulates that this is the voice of the

10   defendant.

11             THE COURT:  All right.  Are you prepared to

12   stipulate that the voice, one of the voices on the

13   telephone call is the defendant?

14             MR. MOIR:  Yes.  We discussed that with the

15   government.  We agreed to do so, your Honor.

16             THE COURT:  All right.  Thank you.

17             MS. FITZGIBBON:  I would ask that Exhibit No.

18   10A be played, please.

19             (Audio being played.)

20             THE COURT:  Are we going to have any context.

21   When was this phone call?  Who was the other person

22   speaking on it?  Is somebody at some point going to

23   identify that or would that be in the subject of the

24   stipulation?

25             MS. FITZGIBBON:  It will be in the

1    stipulation, your Honor.  And I can state that all of

2    the phone calls that you will hear were recorded in

3    December of 2012.

4              THE COURT:  All right.  Thank you.  Are you

5    going to play the next one?

6              MS. FITZGIBBON:  Yes, your Honor.

7              THE COURT:  What exhibit number?

8              MS. FITZGIBBON:  That will be 10B.

9              (Audio being played.)

10             MS. FITZGIBBON:  10C.

11             (Audio being played.)

12             MS. FITZGIBBON:  The next is 10D.

13             (Audio being played.)

14             MS. FITZGIBBON:  10E.

15             (Audio being played.)

16             MS. FITZGIBBON:  And the final exhibit is 10F,

17    your Honor.

18             (Audio being played.)

19             MS. FITZGIBBON:  We do have one witness.  We

20    will check on his availability.  It would be appropriate

21    to take a break now, your Honor, and then we'll have

22    that witness ready to go.

23             THE COURT:  All right.  Are you going to have

24    enough witnesses to -- are you going to complete your

25    case today?

1          MS. FITZGIBBON:  I think, your Honor, there

2     will be only one more witness left for tomorrow.  I

3     think we can do the rest.

4          THE COURT:  Okay, we will take a 15-minute

5     break, ladies and gentlemen.

6          (Recess taken.)

7          THE COURT:  Call your next witness.

8          MR. KAVACAS:  Your Honor, the United States

9     calls Richard Nanan.

10         THE COURT:  Come on up here, sir, stand right

11    over here by the witness stand and this gentleman will

12    tell you what to do.

13         THE CLERK:  Stand and raise your right hand.

14                    RICHARD NANAN

15       having been duly sworn, testified as follows:

16         THE CLERK:  Would you please state your name

17    and spell your last name for the record?

18         THE WITNESS:  Detective Richard Nanan,

19    N-A-N-A-N.

20         THE CLERK:  Thank you.  You may be seated.

21                  DIRECT EXAMINATION

22    BY MR. KAVACAS:

23         Q.   Good afternoon, Detective Nanan.

24         A.   Good afternoon.

25         Q.   What do you do for a living?

1          A.    I'm a detective with the Manchester Police

2     Department.

3          Q.    How long have you been employed by the

4     Manchester Police Department?

5          A.    Fourteen years.

6          Q.    What do your duties involve as a detective?

7          A.    Investigate crimes.  Mainly I'm assigned to

8     the Child Abuse Sexual Exploitation Unit.

9          Q.    And how did you become involved in this case?

10         A.    I became involved, Manchester police initially

11    took a report from a Brandon Ore on September 28th,

12    2012, and I got assigned that case.

13         Q.    And did you speak to Brandon Ore?

14         A.    I did.

15         Q.    And based on the information Brandon Ore

16    provided you, what did you do?

17         A.    Based on the information that I obtained from

18    him I was able to apply for a search warrant.

19         Q.    For what?

20         A.    For a certain laptop computer belonging to

21    Lisa Biron.

22         Q.    Okay.  When you were able to get that search

23    warrant, what did you do?

24         A.    After receiving the search warrant, the search

25    warrant was executed that day.

1        Q.    Where was it executed?

2        A.    At Lisa Biron's residence, 42 Pratt Court in

3   Manchester.

4        Q.    Was she there?

5        A.    She was there.

6        Q.    And what were you looking for?

7        A.    Specifically information from Brandon Ore of a

8   gray laptop, HP laptop computer.

9        Q.    Did you find that laptop computer at Lisa

10   Biron's house?

11        A.    Yes.  I located it in the leaving room on a

12   coffee table where Brandon Ore had stated it may be.

13        Q.    Brandon Ore told you where it might be?

14        A.    Yes.

15        Q.    And that's where you found it?

16        A.    That's correct.

17        Q.    I'm showing you what's been marked as

18   Government's Exhibit 9A for ID.  Do you recognize what

19   that is?

20        A.    I do.

21        Q.    What is it?

22        A.    It's the laptop computer that I seized that

23   day.

24        Q.    Once you seized this laptop computer, what did

25   you do with it?

1        A.    Returned to the Manchester Police Department

2    where it was entered into evidence.

3        Q.    And after it was entered into evidence did you

4    see it again?

5        A.    I did not.

6        Q.    Do you know whether or not it ever left the

7    custody of the Manchester police?

8        A.    To my knowledge only when it was released to

9    the FBI.

10              MR. KAVACAS:   Thank you.   Nothing further.

11              THE COURT:   Thank you.   Any cross-examination?

12              MR. MOIR:   A couple of questions.

13                   CROSS-EXAMINATION

14    BY MR. MOIR:

15        Q.    Hi, detective.

16        A.    Good afternoon.

17        Q.    Attorney Jim Moir.   That laptop, obviously,

18    you seized it pursuant to the warrant, brought it back

19    and entered into evidence; right?

20        A.    Correct.

21        Q.    And there's a protocol for that; right?

22        A.    Yes.

23        Q.    In the evidence logs?

24        A.    Yes.

25        Q.    Can you just tell the jury how exactly that's

1  done.  You bring it back, you bring it to the, what,

2  evidence tech?

3       A.   Bring it back to the police department, enter

4  it into the computer as evidence, give it a number,

5  which I gave it I believe RN1, and at that time it's

6  logged into evidence but it was also submitted or left

7  in possession of our computer forensics guy.

8       Q.   So it was left with the computer forensics

9  person.  Do you know what that person did?

10       A.   That person examined the computer.

11       Q.   Okay.  And this is all before it went to the

12  FBI?

13       A.   Correct.

14       Q.   Okay, thank you.  Now, obviously you had more

15  investigation than that; right?

16       A.   Yes.

17       Q.   It's not just doing the warrant, you were in

18  fact in charge of this investigation; right?

19       A.   Yes.

20       Q.   That was prior to the FBI becoming involved;

21  right?

22       A.   Yes.

23       Q.   The FBI was in, what, a month later, weeks

24  later, if you recall?

25       A.   Within a week.

1          Q.    And during that time you were in charge before

2     they became involved; right?

3          A.    Yes.

4          Q.    There's a person named L.B. in this case.  Do

5     you know who I'm referring to?  That would be the victim

6     in the case?

7          A.    R.B.

8          Q.    Did I say L.B.?  R.B., thank you very much.

9     R.B., do you know what I'm talking about?

10         A.    Yes.

11         Q.    I'm really not trying to confuse you, I'm just

12    confusing myself.  By the way, I hear that people don't

13    hear me.  If I'm not speaking loudly enough, just wave

14    your hand or something like that.  I do drop off

15    sometimes.  Sorry, judge.

16               THE COURT:  That's all right.

17         Q.    So R.B., was she interviewed?

18         A.    She was interviewed.

19         Q.    Okay.  And so she was interviewed; right?

20         A.    Yes.

21         Q.    Okay.  You didn't do the interview; right?

22         A.    I did not.

23         Q.    It was done by a child --

24         A.    Forensic interviewer.

25         Q.    A forensic child interviewer; right?

1      A.    Yes.

2      Q.    And to your knowledge, how many times was she

3  interviewed?

4      A.    Once.

5      Q.    Okay, very good.  Thank you.

6            MR. KAVACAS:  Nothing further, your Honor.

7            THE COURT:  Thank you, sir, you can step down.

8  Call your next witness.

9            MS. FITZGIBBON:  Call Special Agent Michael

10  Gibeley, your Honor.

11           THE CLERK:  Please raise your right hand.

12                        MICHAEL GIBELEY

13       having been duly sworn, testified as follows:

14           THE CLERK:  Thank you.  Would you please state

15  your name and spell your last name for the record.

16           THE WITNESS:  My name is Michael Gibeley,

17  G-I-B-E-L-E-Y.

18                     DIRECT EXAMINATION

19  BY MS. FITZGIBBON:

20      Q.    Good afternoon.  How are you employed?

21      A.    I'm a special agent with the Federal Bureau of

22  Investigation.

23      Q.    How long have you been with the Federal Bureau

24  of Investigation?

25      A.    I'm in my sixteenth year.

1          Q.    Where are you currently assigned?

2          A.    Portsmouth, New Hampshire resident agency

3    office.

4          Q.    And what area do you cover for jurisdiction?

5          A.    I cover the state of New Hampshire, ma'am.

6          Q.    In the fall of 2012 did you become involved in

7    the investigation into Lisa Biron?

8          A.    Yes, ma'am, I was.

9          Q.    How did you become involved?

10         A.    Received a telephone call from my supervisor

11   instructing me to report to the United States Attorney's

12   Office to meet directly with the United States Attorney.

13   It was October 15, 2012.  At that time I was instructed

14   to -- or instructed to open a federal investigation

15   regarding the information provided by a Manchester

16   police report involving the defendant.

17         Q.    And did you open that investigation?

18         A.    Immediately, yes, ma'am.

19         Q.    And what did you do in the course of your

20   investigation?

21         A.    We conducted numerous interviews of numerous

22   people who had potential information regarding the

23   allegation of child pornography.

24         Q.    And did you prepare a search warrant for any

25   materials in this case?

1      A.   Yes, ma'am, we applied for a search warrant

2    which was returned I believe it was November 2nd, 2012.

3    The search warrant was executed on the same day for a

4    laptop computer which was alleged to be owned by the

5    defendant, Lisa Biron.  I executed that search warrant

6    at the Manchester Police Department and obtained a

7    laptop computer.

8      Q.   I'm going to show you what's been marked for

9    identification as Government's Exhibit 9A.  Do you

10   recognize this?

11     A.   Yes, ma'am, I do.

12     Q.   And what is that?

13     A.   The laptop computer that I received from the

14   Manchester Police Department.

15     Q.   What did you do when you seized that?

16     A.   That laptop was seized in the very late

17   afternoon on a Friday.  I immediately returned to the

18   Portsmouth, New Hampshire office, locked it in the safe

19   in our office.  Monday morning I went back to Portsmouth

20   from my residence, retrieved the laptop, drove it to

21   Boston to the evidence control room and entered it into

22   evidence.

23     Q.   And based on your knowledge of this case has

24   that been in FBI custody since that date?

25     A.   Yes, ma'am, it has.

1           MS. FITZGIBBON:  Your Honor, I move to strike

2    the ID on Government's Exhibit 9A.

3           MR. MOIR:  No objection.

4           THE COURT:  Without objection.

5           MS. FITZGIBBON:  Thank you, your Honor.

6           (Government's Exhibit 9A admitted.)

7      Q.   BY MS. FITZGIBBON:  Is it your understanding,

8    Agent Gibeley, does that laptop computer contain a hard

9    drive?

10     A.   Yes, ma'am.

11     Q.   And did you ever remove that from the

12   computer?

13     A.   No.

14     Q.   Based on your recent investigation in this

15   case, is that hard drive still installed in that

16   computer?

17     A.   Yes, ma'am.

18     Q.   And are you aware how that's been marked as

19   Government's Exhibit 9B?

20     A.   I'm sorry, ma'am?

21     Q.   Are you aware that that's Exhibit 9B?

22     A.   I am.

23           MS. FITZGIBBON:  Your Honor, I'd move to

24   strike the ID sticker on 9B and move it into evidence.

25           MR. MOIR:  No objection.

1          THE COURT:  Without objection.

2          MS. FITZGIBBON:  Thank you, your Honor.

3          (Government's Exhibit 9B admitted.)

4     Q.   BY MS. FITZGIBBON:  Agent Gibeley, in the

5     course of this investigation did you prepare any further

6     search warrants?

7     A.   Yes, ma'am.  An additional search warrant was

8     applied for and executed on November 16th at the

9     residence of the home as well.

10    Q.   And what did that search warrant seek to

11    obtain?

12    A.   Any and all evidence that was pertinent to

13    child exploitation, specifically for electronic devices,

14    paperwork, thumb drives, laptops, CDs, DVDs, cameras, et

15    cetera.

16    Q.   And was evidence of that nature seized on the

17    day you just testified to?

18    A.   Yes, ma'am, it was.

19         MS. FITZGIBBON:  If I could have just one

20    moment, your Honor.

21         (Pause.)

22    Q.   I'm going to show you what's been marked for

23    identification as Government's Exhibit 8.

24    A.   Yes, ma'am.

25    Q.   Do you recognize that?

```
 1        A.    I do.

 2        Q.    How do you recognize that?

 3        A.    I know that's the iPhone that was taken --

 4   that iPhone was actually in Lisa Biron's vehicle or the

 5   vehicle that she showed up in at Manchester court that

 6   day.  I was with Ms. Biron placing her under arrest at

 7   the time and we seized that phone at that time from the

 8   vehicle that she showed up in.

 9        Q.    Did you personally seize that phone?

10        A.    I did.  It was provided to me, but yes.

11        Q.    And what did you do with it?

12        A.    Same thing.  After we went to the arraignment,

13   returned it back to the Portsmouth resident agency

14   office, it was locked up, and then it was brought to

15   Boston for process in the evidence control room.

16        Q.    Hs that phone been in the custody of the FBI

17   since the day that you seized it?

18        A.    Yes, ma'am.

19              MS. FITZGIBBON:  Your Honor, I'd ask to strike

20   the identification on Exhibit 8.

21              MR. MOIR:  No objection.

22              THE COURT:  Without objection, it may be

23   admitted.

24              (Government's Exhibit 8 admitted.)

25              MS. FITZGIBBON:  Thank you.  I have nothing
```

 1    else.

 2              THE COURT:  Cross-examination.

 3                      CROSS-EXAMINATION

 4    BY MR. MOIR:

 5        Q.    Agent Gibeley, we actually chatted a bunch of

 6    times, haven't we?

 7        A.    Yes, sir, we have.

 8        Q.    During the course of this investigation?  You

 9    agree with me that the FBI is a pretty thorough

10    organization?

11        A.    Yes, sir, it is.

12        Q.    Tries to be, at least; right?

13        A.    We do our best, sir.

14        Q.    Okay.  When you executed the search warrant at

15    the 42 Pratt Street house, obviously you had a warrant

16    that was broad enough, as you said, to get any

17    electronic devices, any media storage, anything like

18    that; right?

19        A.    Yes, sir, but just to clarify, I was not

20    present at 42 Pratt Street.  I was with the defendant.

21        Q.    Okay.  So who was actually conducting the

22    search then?

23        A.    Numerous agents and officers from numerous

24    departments.

25        Q.    And as part of your -- you're the head agent

1    in this case?

2         A.   I'm the assigned case agent, sir.  A lot of

3    very good agents worked on this.

4         Q.   I understand, but are you sort of the one who

5    coordinates this investigation?

6         A.   I'm the case agent, sir.

7         Q.   Okay.  I'm not sure what a case agent is, but

8    that's why I'm asking.

9         A.   Yes, sir.

10        Q.   You did review the items that were seized from

11   the Pratt house; right?

12        A.   Yes, sir, I did.

13        Q.   Okay.  And there was quite a lot; right?

14        A.   Quite a lot.

15        Q.   As far as you were talking about, you know, a

16   lot of media storage; right?

17        A.   Yes, sir.

18        Q.   And there was a return from that search,

19   right, that was prepared?

20        A.   Yes, sir, it was.

21        Q.   And can you tell the jury what a return is?

22        A.   A return is an inventory essentially of what

23   is returned, what is taken out of that house, or that

24   location or whatever, the fruits of the search.

25        Q.   So you got a list something like this; right?

1        A.   Yes, sir.

2        Q.   Okay.  And on this you seized a number of

3   cameras; right?

4        A.   I guess a number would be fair, yes, sir.  I

5   mean, depends how you define cameras, but sure.

6        Q.   Well, you had certainly a digital video

7   cameral; right?

8        A.   Yes, sir, we did.

9        Q.   That's number one on the list; right?

10       A.   Sir, I'd have to look at the list to tell you

11   what number it would be.

12            MR. MOIR:  Can I approach, your Honor?

13            THE COURT:  Yes.

14            MR. MOIR:  I'm not trying to make it a

15   guessing name.

16       A.   I don't know the numbers off the top of my

17   head, sir.

18       Q.   Sure.  Just showing you this.  This looks like

19   a copy of the return?

20       A.   This is, yes, sir, this was -- in addition to

21   this is one of the returns that we had, but yes.

22       Q.   Okay.  But just going through that you can see

23   lots and lots of thumb drives and things like that?

24       A.   Yes, sir.

25       Q.   I mean, just going through there how many

1    would you say there are?

2         A.    How many thumb drives would I say there were,

3    sir?

4         Q.    Yes, exactly.

5         A.    There were several, sir.

6         Q.    And also there were other things for digital

7    media; right?

8         A.    Yes, sir, there was.

9         Q.    I mean, wouldn't you say there's a lot; right?

10        A.    I would say it was a lot.

11        Q.    Has anybody reviewed all these things?

12        A.    Yes, sir, I've reviewed just about every item

13   on this list.

14        Q.    Okay.  And of those things that were again

15   digital images that come up here, how many would you say

16   you viewed during the course of this investigation from

17   this, just from here?

18        A.    How many of the electronic devices here did I

19   view?

20        Q.    How many pictures did you see from these

21   things?

22        A.    Oh --

23        Q.    Thousands and thousands; right?

24        A.    Sir, I couldn't even -- a very large number is

25   the best answer I can give.

1      Q.    Sort of mind boggling after a while; right?

2      A.    I don't know if I would characterize it as

3   mind boggling, sir, but it was a large number of

4   pictures, a very large number of pictures.

5      Q.    Did you find pictures, for example, of Niagara

6   Falls?

7      A.    I did.

8      Q.    How many were there of Niagara Falls, of the

9   falls?

10      A.    Sir, I honestly don't remember the number of

11   Niagara Falls pictures.  I can tell you for certain that

12   I saw them.

13      Q.    Okay.  And pictures taken from the Maid of the

14   Mist, for example?

15      A.    I was not familiar with that, sir, so I didn't

16   know what that was.

17      Q.    Okay.  That's a boat underneath the falls?

18      A.    Sir, I was a Coast Guard officer, I understand

19   the boats.

20      Q.    Okay.  But again, you saw, you know, lots of

21   pictures?

22      A.    Yes, sir, I did.

23      Q.    How many videos did you review, if you recall,

24   I mean hours worth?

25      A.    For digital evidence, yes, sir.  I don't know

1    about hours, but there were many video clips at varying

2    lengths.

3         Q.   The only other thing I want to ask you, agent,

4    you also reviewed some of the investigation done by

5    Manchester before you got involved; right?

6         A.   I received one piece of paper from them, sir,

7    with approximately two to three paragraphs total.

8         Q.   Okay, I'm talking about even afterwards,

9    later?

10        A.   Never.

11        Q.   Okay.  You are aware that they had R.B.

12   interviewed?

13        A.   I am aware.  I did see the -- I received a --

14   I was allowed to view that interview, I was not allowed

15   to take a copy when I first saw it.

16        Q.   Okay.  And you're aware that she was

17   interviewed twice, correct, by them?

18        A.   I'm sorry -- she was interviewed twice by

19   Manchester?

20        Q.   Yes.

21        A.   I don't think that's accurate, sir.

22        Q.   Okay.

23        A.   She was interviewed a second time by an FBI

24   child forensic interviewer and I was present for that.

25        Q.   Sorry about that, I stand corrected.  Once by

1   a Manchester forensic child interviewer; right?

2        A.   Yes, sir.

3        Q.   And then a second time by an FBI forensic

4   child interviewer; right?

5        A.   Yes, sir.

6        Q.   Where was that FBI interviewer out of, just

7   out of curiosity?

8        A.   She's assigned to the Boston division.

9        Q.   And then you interviewed her personally;

10  right?

11       A.   I did, sir.

12            MR. MOIR:  Thank you.

13            THE COURT:  Any redirect?

14            MS. FITZGIBBON:  No, your Honor, thank you.

15            THE COURT:  Thank you, sir, you can step down.

16  Call your next witness.

17            MS. FITZGIBBON:  The government calls Michael

18  Biron, your Honor.

19            THE CLERK:  Please raise your right hand.

20                      MICHAEL BIRON

21       having been duly sworn, testified as follows:

22            THE CLERK:  Would you please state your name

23  and spell your last name for the record.

24            THE WITNESS:  Michael Biron, B-I-R-O-N.

25            THE CLERK:  Thank you.  You may be seated.

1                    DIRECT EXAMINATION

2    BY MS. FITZGIBBON:

3        Q.    Good afternoon, sir.

4        A.    Hello.

5        Q.    Just a couple of instructions.  Will you

6    please when you're speaking try and speak up, keep your

7    voice up, okay.  If I can hear you, then the jury can

8    hear you.

9        A.    Yeah.

10       Q.    It's important that you wait until I finish a

11   question because the stenographer is there taking down

12   everything you say.

13       A.    Okay.

14       Q.    So, if you wait until I finish and then

15   answer.  And also make sure that your answers are

16   audible, okay, because she can't take down shakes of the

17   head or nods.

18       A.    Okay.

19       Q.    Where you from, Mr. Biron?

20       A.    Williamsburg, Virginia.

21       Q.    Okay, that's where you live now?

22       A.    Yes.

23       Q.    Where were you raised?

24       A.    Goffstown, New Hampshire.

25       Q.    You lived in New Hampshire and now you live in

1    Williamsburg, Virginia?

2         A.    Yes, ma'am.

3         Q.    How old are you?

4         A.    Forty-four.

5         Q.    And what do you do for a living?

6         A.    I work for a company that, I do a lot of

7    logistics for the Navy, so like a DOD contractor.

8         Q.    Are you married?

9         A.    No.

10        Q.    Were you ever married?

11        A.    Yes.

12        Q.    Who were you married to?

13        A.    To Lisa Biron.

14        Q.    And when were you married?

15        A.    1996.  November 23rd, 1996.

16        Q.    And for how long were you married to Lisa

17   Biron?

18        A.    Approximately 15 years.  We just got divorced

19   this past June.

20        Q.    Were you living in New Hampshire when you got

21   divorced?

22        A.    Yes, ma'am.

23        Q.    Would you like a glass of water?

24        A.    No, I'm okay right now.

25        Q.    And during the course of your marriage did you

1   have any children?

2        A.   Yes.

3        Q.   How many children?

4        A.   One daughter.

5        Q.   And when was she born?

6        A.   May 1998.

7        Q.   Were you present for her birth?

8        A.   Yes.

9        Q.   I'm going to show you what's been marked as

10  Government's Exhibit 1B.

11            THE COURT:   The jury's monitor is not on.

12  Okay.

13       Q.   Okay.  And can you tell me who that is?

14       A.   That's my daughter.

15       Q.   And if I ask you questions about your

16  daughter, we're going to refer to her as R.B.  Is that

17  okay?

18       A.   Yes.

19       Q.   And so I think you said R.B. was born in May

20  of 1998; is that right?

21       A.   Ah-hum.

22       Q.   Now, do you speak with Lisa Biron currently,

23  do you have conversations with her?

24       A.   No, ma'am.

25       Q.   When is the last time that you spoke with Lisa

1    Biron?

2        A.   Back in October, as soon as I found out about

3    the stuff that just happened.

4        Q.   Okay, that would be October of 2012?

5        A.   Yeah, yeah, about that.  I don't know the

6    exact date, but it was part of the beginning of October,

7    something like that.

8        Q.   Did you ever have any conversation with Lisa

9    Biron about her travel to Canada?

10       A.   I did, in May I did -- no, May, April -- April

11   of last year she asked me for my honor points because

12   she was going to take my daughter there for my

13   daughter's birthday present, and I refused because we

14   were in the process of getting a divorce and she already

15   used my honor points prior to that, you know, going

16   other places, so I refused, and she was upset with me

17   about that, but that was that.

18       Q.   You're saying one word I just didn't

19   understand, I'm sorry.  Honor points?

20       A.   Yeah, yeah, Hilton honor points.  You know, if

21   you travel a lot, like you get frequent flyer miles or

22   if you go to a hotel you get points for staying there.

23       Q.   Okay, Hilton?

24       A.   Hilton, yes, ma'am.

25       Q.   Did she say when she was asking you for this,

1   did she say anything about her plan to travel to Canada?

2          A.    Yeah, she said she wanted to take R.B. there

3   for her birthday.

4          Q.    Did she say how she was going to travel there?

5          A.    At that point no, no, she didn't.

6          Q.    Now, you say that you were married to Lisa

7   Biron for 14 years; is that correct?

8          A.    Fourteen, 15 -- 14, 15 years, yeah, just up

9   until this past June, so.

10          Q.    And you lived with her until the summer of

11   last year -- I'm sorry, the summer of 2011?

12          A.    July of 2011, correct.

13          Q.    And did R.B. live with you the entire time as

14   well?

15          A.    Yes, ma'am.

16          Q.    And what kind of relationship did you have

17   with R.B.?

18          A.    I think it was really good, you know, I mean

19   we got along great.

20          Q.    So you had daily interaction with R.B.?

21          A.    Yes.

22          Q.    Now, I'm going to play something for you

23   that's been marked as Government's Exhibit 12 for

24   identification.  I'm going to step up here with you for

25   a minute.

 1        A.    Ah-hum.

 2        Q.    Put these on, please.  I'm going to play a

 3   clip.  I'm going to ask you to listen to it.  And I'm

 4   going to ask you if you hear voices that you recognize

 5   and tell me when you do.

 6        A.    Ah-hum.

 7        Q.    Okay?  Okay, now you can put the headphones

 8   on.

 9              (Audio being played for the witness only.)

10        Q.    Can you hear anything?

11        A.    Uh-um.

12        Q.    Okay.  How about yet?

13        A.    Uh-um.

14        Q.    We're going to ask someone to test the

15   computer.  We will try it one more time.  How about now?

16        A.    Uh-um.

17              THE COURT:  Have the paralegal come up and

18   help.

19        A.    Now I do.  Whoops, stopped again.  You have to

20   turn it up.  It's too low for me to hear.

21        Q.    Okay.

22              (Audio being played for the witness only.)

23        A.    That's Lisa.  That's my daughter R.B.

24        Q.    Okay.

25        A.    I don't want to listen anymore.

1          MS. FITZGIBBON:  Give me a second, your Honor,

2     I'll close the computer.

3          (Pause.)

4          THE COURT:  Can I see counsel at sidebar.

5          MS. FITZGIBBON:  Yes, your Honor.

6                    AT SIDEBAR

7          THE COURT:  What are we doing?

8          MS. FITZGIBBON:  This is my plan, your Honor.

9     I am going to ask him to ID that video.  Right now --

10          THE COURT:  What is the video?

11          MS. FITZGIBBON:  It's the sexual assault

12     video.  I'm going to ask him to ID it and move it in,

13     and then I'm going to --

14          THE COURT:  Members of the jury, just step

15     outside for a minute, please.

16          (Jury exited the courtroom.)

17          THE COURT:  Sir, why don't you step down and

18     go outside the courtroom and we will come and get you in

19     a minute.

20          (Witness exited the courtroom.)

21          THE COURT:  What are you doing?

22          MS. FITZGIBBON:  Your Honor, I have just asked

23     Mr. Biron to identify the voices on that video.  It was

24     my intention then, your Honor, I would ask to strike the

25     ID and move that exhibit in as a full exhibit.

1            THE COURT:  You're going to play it with him

2    here?

3            MS. FITZGIBBON:  No, your Honor, then I was

4    going to ask the court, once the ID was stricken and it

5    was moved in, if he could then -- he was going to

6    identify a very brief portion of a house, and then I was

7    going to ask if we could ask him to, he could be excused

8    once the video was --

9            THE COURT:  There's got to be some way we can

10   do this that doesn't involve the drama and the

11   traumatization of the father.  I mean, can't we come up

12   with a better way of doing this?

13           MS. FITZGIBBON:  Well, your Honor, absent

14   striking the ID, this child --

15           THE COURT:  This is a video of what you say is

16   the defendant having oral sex, performing oral sex on

17   the daughter, and you want to play that with the father

18   in the courtroom?

19           MS. FITZGIBBON:  Again, your Honor, once the

20   ID was stricken I would ask to play it without.  The

21   child's face is not visible, your Honor.  Her voice is

22   audible on the tape.  There was no one else that really

23   we felt was a witness that would identify her as clearly

24   as the child's father knows the voice.

25           THE COURT:  What have you done?  You've

1   already played the sound for him?

2           MS. FITZGIBBON:  I already played the sound.

3           THE COURT:  He has not watched the video?

4           MS. FITZGIBBON:  He turned his head away which

5   he -- he has watched a portion of the video in

6   preparation, but he identified the voices, the court

7   reporter I believe took down, he said that's Lisa,

8   that's R.B.  I could ask the court to let the record

9   show that he's identified those two voices.  He would

10  not have to watch other than --

11          THE COURT:  Can we stipulate that the two

12  voices that he's identified are the voices which will be

13  depicted on the tape that he says are Lisa and, and we

14  don't have to play it again for him and have him in the

15  courtroom while you're playing it again.

16          MR. MOIR:  I'm more than happy to agree that

17  he's identified the voices as being Lisa and R.B.

18          THE COURT:  Yeah.  So I don't know why we need

19  to go further than that.  He's done it.  You know,

20  you've already had the presentation in front of the

21  jury.  I don't know why we need to put him through it

22  again.

23          MS. FITZGIBBON:  It was my intention to ask

24  that he be allowed to be excused.

25          THE COURT:  Now, there's some portion of the

```
1   video that doesn't depict the two of them --

2           MR. MOIR:  Yes -- I'm sorry.

3           THE COURT:  -- in a sexual position that you

4   want him to identify?

5           MS. FITZGIBBON:  Yes, your Honor, at the very

6   beginning of the video there is the defendant's living

7   room.  It's the house that he lived in and can identify.

8           THE COURT:  All right.

9           MS. FITZGIBBON:  And then we would freeze

10  frame it there.

11          THE COURT:  Is there any dispute that this

12  video was taken in the -- appears to have been taken in

13  the living room of the defendant's home?

14          MR. MOIR:  Again, I personally can't identify

15  that, so that's why I'm putting the state to their proof

16  on that.

17          THE COURT:  All right, all right.  Well, then,

18  if that's a contested point and he lived there, you're

19  going to have to show him that first part of it, all

20  right, so queue it up, show the first part of it and

21  then what -- I haven't seen this video, so what does it

22  do, does it cut from some portion of the room to them or

23  something?  How does it work?

24          MS. FITZGIBBON:  Yes, your Honor --

25          THE COURT:  Let me see it.  Let me see the
```

1   beginning of the video, okay?

2           MS. FITZGIBBON:  To do this best I'm going to

3   ask Ms. Blanco to come up here and play this for you

4   again.

5           THE COURT:  You tell me when you get to the

6   point -- I don't need the audio right now.  Just show me

7   the point in which you propose to stop it.

8           MS. FITZGIBBON:  Okay, this would be a living

9   room, your Honor.

10          THE COURT:  Okay.  Are you going to go any

11  further than that?

12          MS. FITZGIBBON:  Just that, your Honor, just

13  those couches and wall.

14          THE COURT:  Okay.  And they appear to be the

15  same couch that's in the picture of the other place, but

16  you don't think -- you're going to put them to their

17  proof that that is where it is.

18          MR. MOIR:  That's correct, your Honor.

19          THE COURT:  Okay.  Well, I don't know any

20  other way to avoid that, then.  I want the paralegal up

21  here controlling the computer and she will stop it at

22  the appropriate point, and you're going to say I'm just

23  going to show you the first portion of that video that

24  doesn't depict any individual persons and I want to ask

25  you if you can identify the place that's depicted in the

1    video, all right?  So she will stop the video, and he

2    can be excused, and you want to play the video through

3    with the jury, and then we will have a stipulation that

4    the voices that are heard on the video are the voices

5    that the witness earlier testified are the voices of

6    Lisa and R.B., okay?

7              MS. FITZGIBBON:  That's correct.  Your Honor,

8    I can have --

9              THE COURT:  Everybody okay with that?

10             MR. MOIR:  I've got no problem indicating that

11   he identified the voices in the background.

12             THE COURT:  The voices that are depicted on

13   this video are the ones that he testified were R.B. and

14   Lisa Biron, the defendant.

15             MR. MOIR:  That's correct.

16             THE COURT:  Okay.  You can argue that they

17   weren't, but he's testified that that's what they were.

18   I just don't want there to be any confusion that the

19   voices that he listened to earlier are in fact the

20   voices because if there's any dispute about that, then I

21   will make him watch the video and tell the jury what he

22   heard.

23             MR. MOIR:  I was listening carefully and I

24   heard him identify the voices on those videos.

25             MS. FITZGIBBON:  Your Honor, if at this point

 1   to make things --

 2               THE COURT:  Can you run this in slow motion

 3   because you're not --

 4               MS. FITZGIBBON:  I can even keep the still

 5   frame like that, your Honor.

 6               THE COURT:  And he can identify the room based

 7   on that still frame.

 8               MS. FITZGIBBON:  I believe so, your Honor.

 9               THE COURT:  Okay.  And we will then stipulate

10   that that's a still frame from the video that the jury

11   will be shown, and that the audio portion that he

12   listened to, the voices that are depicted in the video

13   the jury is going to hear he testified were the voices

14   of Lisa and the -- the defendant and R.B., okay?  We all

15   set on that?  Why don't you leave that still photo up.

16   Do you have any problem with that?

17               MR. KAVACAS:  No, not at all.  Before the jury

18   reenters, your Honor, I just want to flag a scheduling

19   issue for the court.  Mike Biron was intended to be our

20   last, and this evidence was intended to be our final

21   evidence of the day.  We have the FBI CART examiner

22   left.  He's coming from Springfield, Mass.  He'll be

23   here tomorrow.

24               THE COURT:  How long do you think he will be

25   on?

```
 1                  MS. FITZGIBBON:  Probably one hour or less.
 2                  THE COURT:  And do you anticipate -- I know
 3       that you can't commit to anything completely, but do you
 4       currently anticipate any witnesses?
 5                  MR. MOIR:  No, your Honor.
 6                  THE COURT:  All right.  So in terms of
 7       scheduling, I'll have the jury come at nine, we'll do
 8       the witness, then we will rest assuming there's no
 9       additional testimony, we will take a break and make sure
10       we've got the jury instructions lined up, and depending
11       upon what time we finish we'll either do closing
12       arguments at like 10:30 or at 1 o'clock, depending upon
13       where we are in the process.  I think it's probably
14       better to have closings back to back without a lunch
15       break intervening.  I don't mind instructing after the
16       lunch break, but I'd like to have the two closings
17       either both before or both after lunch, okay?
18                  All right, anything else before we bring the
19       jury back in?
20                  MR. KAVACAS:  No, your Honor.
21                  THE COURT:  Want to leave that up on the --
22                  MS. FITZGIBBON:  Yes, your Honor, it's a
23       matter of keeping the computer awake so it doesn't
24       freeze.
25                  THE COURT:  All right.  So you will reawaken
```

1    it if you need to.  Will it stay on that image if it's

2    reawakened?

3            MS. FITZGIBBON:  Yes, your Honor.

4            THE COURT:  Okay.  Let's bring the witness

5    back in and you can bring the jury back in.  I just want

6    to be clear.  I'm not precluding the defendant from

7    doing anything.  You do whatever you have to do.

8            MR. MOIR:  I understand, your Honor.

9            (The witness and jury return to

10            the courtroom.)

11           THE COURT:  All right, please continue.

12       Q.   BY MS. FITZGIBBON:  Mr. Biron, you won't be

13   here that much longer.  I do have to ask you just a

14   couple questions totally unrelated to that video, okay?

15       A.   Yes.

16       Q.   Did Lisa Biron ever tell you that she wanted

17   to take R.B. to Canada for her birthday?

18       A.   Um, yeah, ah-hum.

19       Q.   And when was R.B.'s birthday, last birthday?

20       A.   It was May 4th.

21       Q.   Of what year, I'm sorry?

22       A.   Oh, just 2011 -- 12.

23       Q.   Okay.  And did the defendant say then in that

24   conversation how they were going to go to Canada?

25       A.   No, but I called, she told me she was going

1    Labor Day weekend or Memorial Day weekend, whatever

2    weekend that is, and I wanted to see possibly if I could

3    watch our dog then, you know, while she was gone, and

4    she said no, my mother is going to watch him she said

5    because I've got to let you go because we have to catch

6    a flight.  And I, like, what do you mean you're going to

7    fly?  I drove a lot for my old job.  I drove to Buffalo

8    and all that.  I thought it would be more economical to

9    drive instead of flying.  She says no, we're going to

10   fly out of Boston.  Now, whether she did or not, I don't

11   know, but that's what she told me, she was going to fly

12   out of Boston.

13          Q.   Out of Boston, Massachusetts?

14          A.   Yes.

15          Q.   Logan Airport?

16          A.   I guess, yeah.

17          Q.   After that she never did tell you how they

18   traveled?

19          A.   No, I tried not to talk to her that much.

20          Q.   Okay.  I'm going to approach the witness.  I'm

21   not going to play this video, Mr. Biron.  I'm going to

22   pull up a still.  You were shown this video once before,

23   is that correct, or portions of it, the video you just

24   listened to?

25          A.   Yes.

1      Q.   Okay.  I'm going to just ask you to look at

2   the screen, sir, it's just a still shot.  Do you

3   recognize what you see on that screen?

4      A.   Yeah, that's the love seat in my house and

5   that's a picture and that's the hardwood floor and the

6   TV would be over here, and that would lead to our

7   kitchen.

8      Q.   And when you say your house, which house are

9   you talking about?

10      A.   Well, it was the house that I bought and that

11   we lived in together until we got divorced.

12      Q.   And who resides there currently?

13      A.   No one.  It's going through a foreclosure.

14           THE COURT:  Why don't you just -- do you know

15   the address?

16      A.   Yeah, it's 42 Pratt Court.

17      Q.   Okay.  And was Lisa Biron living there with

18   R.B. after you left?

19      A.   Yes.

20      Q.   Okay.

21           MS. FITZGIBBON:  At this point, your Honor, I

22   would ask that the exhibit, the ID be stricken and it be

23   entered as a full exhibit.

24           MR. MOIR:  No objection.

25           THE COURT:  Without objection.

1                    MS. FITZGIBBON:  I would also ask, your Honor,

2          for permission to excuse Mr. Biron at this time.  We can

3          bring him back for --

4                    THE COURT:  For cross-examination.  You're

5          done with your direct?

6                    MS. FITZGIBBON:  I am done.

7                    THE COURT:  All right, Mr. Biron, could you

8          step out.  We're going to play that video.  There's no

9          need for you to be present when I do it.  We'll bring

10         you back in for cross-examination when we're done.

11                   THE WITNESS:  Oh, do I go out --

12                   THE COURT:  Go right back out like you did

13         before.  We'll come and get you, okay?

14                   (Witness exited the courtroom.)

15                   MS. FITZGIBBON:  I believe the deputy clerk is

16         going to give the jury headphones, your Honor, for

17         Exhibit 12.

18                   THE COURT:  Will I need to hear --

19                   MS. FITZGIBBON:  Yes, your Honor.

20                   THE COURT:  You have to give me some, too.

21         Have we tested these?  The batteries are sometimes --

22                   THE CLERK:  We have, no, we've tested them.

23                   THE COURT:  Okay.  And someone is going to

24         give instructions to the jurors about how to turn them

25         on.  Don't change the station.  If you have any

1   questions about whether it's on or not, ask the clerk.

2   The jury monitors need to be turned on.

3                THE CLERK:  Okay.

4                THE COURT:  All right, you want to play it?

5                (Video being played.)

6                MR. MOIR:  Your Honor.

7                THE COURT:  Stop.  Stop the video.  Yes?

8                MR. MOIR:  If I can hear it in the

9   courtroom --

10               MS. FITZGIBBON:  Yes, your Honor --

11               THE COURT:  This is to enhance so that people

12   can hear the voices.

13               MR. MOIR:  It's supposed to be heard in open

14   court?

15               THE COURT:  Nobody has moved to do otherwise.

16               MR. MOIR:  Okay.

17               (Video continuing to play.)

18               THE COURT:  All right, stop the video.  Is

19   anybody having any problem with theirs cutting in and

20   out?

21               THE CLERK:  Your Honor, if you're out of sync

22   with the infrared lights here, you might miss it, just

23   because of where you're sitting.

24               THE COURT:  All right, well --

25               THE CLERK:  It's an infrared sensor.

1          THE COURT:  I need to hear what the jury is

2    hearing.  Are you saying like you stand over there you

3    will be able to hear better?  All right.

4          (Video being played again.)

5          THE COURT:  Let's stop the video for a minute.

6    Can I see counsel at sidebar?

7                         AT SIDEBAR

8          THE COURT:  I can't stop the government from

9    continuing to play this if the defendant is going to

10   continue to contest ID.  I mean, if there are more

11   words, I mean, there's enough in my mind I hear clearly

12   the defendant's voice and the daughter's voice.  I don't

13   know why we need to continue to play it, but if there's

14   a dispute about that issue, you're free to contest it, I

15   don't think I can stop the government from just

16   continuing to play it.  I just feel like we ought to be

17   playing these things to the minimum extent necessary to

18   satisfy the government's need to prove it's case.

19         MR. MOIR:  I agree.  The issue in this case, I

20   agree there's plenty there.  You have the ID.  You have

21   everything else.  Obviously if I was the government I

22   would play as much of it as I could.

23         THE COURT:  They were willing to stop.  Do you

24   think you have enough of the words?  Are there more

25   words later in the --

1          MR. KAVACAS:  Yes.

2          MS. FITZGIBBON:  I think we just got to the

3  point where we heard the voice that the witness

4  identified.

5          MR. KAVACAS:  The defendant.

6          THE COURT:  But there are more -- there's more

7  speaking?

8          MR. KAVACAS:  Yes.

9          MS. FITZGIBBON:  I can ask the paralegal

10  perhaps to advance it.

11          THE COURT:  Can we advance it to where --

12          MS. FITZGIBBON:  I can ask if she can advance

13  because the voices come at the end.

14          MR. KAVACAS:  Yeah, that's the problem.  The

15  voices that are clear come at the end of this.

16          THE COURT:  All right, so do you think you can

17  check with her and maybe advance it to the last like

18  30 seconds.

19          MS. FITZGIBBON:  I think we can.

20          MR. MOIR:  The last ten seconds is what it is.

21          THE COURT:  Again, I want to be clear.  I

22  can't stop the government from doing this because the

23  government has to prove beyond a reasonable doubt its

24  case, and if part of its argument is that this was, this

25  video is tied to the defendant showing that she was

1   depicted in it, is going to be important to the

2   government's case.  I'm just trying to be sensitive to

3   the victim where I don't end up broadcasting or

4   displaying to anyone more of this than needs to be

5   displayed.  That's all I'm getting to.  So, you know,

6   subject to depending on what he does on

7   cross-examination or whatever, you can play the whole

8   thing.  And of course the defendant can play it over and

9   over again if he wants to.  I'm not stopping him from

10  doing anything.  But I would ask you to ask the

11  paralegal if you can skip ahead to the last part where

12  the voices are clear and then I'll announce to the jury

13  by agreement we are going to skip ahead and just show

14  the last few seconds of the video.

15          MR. MOIR:  I plan no cross-examination.

16          THE COURT:  Okay.  Thank you.  All right.

17                       BEFORE THE JURY

18          THE COURT:  Members of the jury, this goes on

19  for a while.  I'm just going to ask if we can skip ahead

20  because there are voices depicted at the end of the tape

21  and that's the reason for which it's being played, okay?

22          MS. FITZGIBBON:  We believe it can be done,

23  your Honor, and it's just go to take --

24          THE COURT:  Take the time you need, okay.

25          MS. FITZGIBBON:  We believe we've identified

1   the part close to the end of the video.

2            THE COURT:  All right, put the headphones back

3   on and hear the last few seconds of this.

4            MS. FITZGIBBON:  It's in a slightly different

5   view, your Honor, but.

6            THE COURT:  Okay.

7            (Video being played.)

8            THE COURT:  If you're done with that.  You

9   want to bring the witness back in for cross-examination,

10  or you have no cross?

11           MR. MOIR:  I have to questions, your Honor.

12           THE COURT:  You can simply excuse the witness.

13  Tell him he's been excused.  You have no further

14  witnesses today?

15           MS. FITZGIBBON:  That's correct, your Honor.

16           THE COURT:  Okay.  Members of the jury, we

17  have one more witness tomorrow, a forensic examiner who

18  will testify about examinations he did I guess of the

19  computer.  Is that --

20           MS. FITZGIBBON:  Yes.

21           THE COURT:  So I expect we're going to

22  complete the evidence in the case tomorrow, and in the

23  morning, so we will either have closing arguments in,

24  unless something unexpected happens and sometimes

25  unexpected things can happen, but we'll either have

1   closing arguments in the morning or immediately after

2   lunch depending upon where we are in the process.  Okay?

3         So, please keep my general instructions in

4   mind.  Don't discuss the case with anybody.  Keep an

5   open mind.  Don't expose yourself to any discussions of

6   the case in the media.  Come back tomorrow a little

7   before 9:00 and hopefully we will get started right at

8   9, okay?  So you're excused for the evening.

9         (The jury exited the courtroom.)

10        THE COURT:  Does the government have proposed

11   jury instructions?

12        MS. FITZGIBBON:  Yes, your Honor.  I have a

13   hard copy.  They are being ecf'd.

14        THE COURT:  Well, why doesn't counsel meet me

15   upstairs in chambers and let's do a quick review of

16   potential instructions now.  I will refine them over the

17   weekend.  And hopefully before lunch time or maybe,

18   yeah, probably at lunch break I'll have a final set for

19   you.  Meet me upstairs and we can go over them, okay?

20        (Court adjourned at 4:05 p.m.)

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4         I, Sandra L. Bailey, do hereby certify that

5    the foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 9/12/13       **SANDRA L. BAILEY, LCR, CM, CRR**

11                            LICENSED COURT REPORTER, NO. 15

12                            STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25