*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12/11/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * *
                              *
UNITED STATES OF AMERICA      *
                              *  12-cr-140-01-PB
         v.                   *  January 10, 2013
                              *  9:25 a.m.
LISA BIRON                    *
                              *
* * * * * * * * * * * * * * * *

DAY 3
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE PAUL J. BARBADORO
AND A JURY

Appearances:

For the Government:   John P. Kacavas, U.S. Attorney
                      Helen Fitzgibbon, AUSA
                      53 Pleasant Street
                      Concord, NH 03301

For the Defendant:    James H. Moir, Esq
                      Moir & Rabinowitz, PLLC
                      5 Green Street
                      Concord, NH  03301

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                        I N D E X

2

3    Witness              Direct   Cross   Redirect   Recross

4    JAMES SCRIPTURE
     BY Ms. Fitzgibbon      5                 31
5    By Mr. Moir                     27

6

7
     Motions, page 37
8

9    Discussion of jury instructions in chambers, page 45

10
     Closing argument by Ms. Fitzgibbon, page 51
11   Closing argument by Mr. Moir, page 59
     Rebuttal closing argument by Mr. Kacavas, page 73
12

13   Instructions to the Jury, page 76

14
     Verdict, page 99
15

16

17

18

19   Exhibits                         ID        Evid.

20   Government's Exhibit No. 14A                14
     Government's Exhibit No. 14B                15
21   Government's Exhibit No. 14C                19
     Government's Exhibit No. 14D                23
22

23

24

25

1                    BEFORE THE JURY

2              THE CLERK:  Court is in session and has for

3    consideration jury trial day three in United States of

4    America versus Lisa Biron, Criminal Case No.

5    12-cr-140-01-PB

6              THE COURT:  What's the exhibit number of the

7    last exhibit, the computer clip that was played to the

8    jury?

9              MS. FITZGIBBON:  That's Exhibit 12, your

10   Honor.

11             THE COURT:  Good morning, members of the jury.

12   Yesterday you heard testimony from R.B.'s father.  He

13   was shown a still taken from a computer video file and

14   testified about what he saw depicted in that still.  And

15   you also heard him testify that he had -- saw him listen

16   to the audio portion of a computer video clip and

17   testify concerning the identity of the voices on the

18   video clip.  I just want to make sure you understand

19   that the parties agree that the still image that he saw

20   and the audio that he listened to were both taken from

21   Exhibit 12 which you saw at the end of the day

22   yesterday, okay?

23             I also want to announce a stipulation.  You

24   heard audio clips of conversations that were played and

25   that were purportedly conversations in which the

1   defendant was a participant.  I simply want to read a

2   stipulation about those exhibits to you.

3          Were they played in the order in which they

4   are listed?

5          MS. FITZGIBBON:  Yes, your Honor.

6          THE COURT:  Okay.  So, the first of those

7   audio clips was, is Exhibit 10A.  And the parties here

8   agree that these were all clips that involved the

9   defendant, Lisa Biron, as a participant.  And further

10  agree that with respect to 10A, that was a recorded clip

11  from a recorded call between Lisa Biron and R.B. on

12  12/9/12.

13         10B was a recorded telephone call clip between

14  Lisa Biron and her friend, Suzanne Harbinson, on

15  12/14/12.  The first call occurred at 12:48 p.m. on

16  12/9.  The second call occurred on 12/14 at 5:20.

17         Exhibit 10C is a recorded call of, a clip of a

18  call between Lisa Biron and R.B. on 12/15/12 at 11:11.

19         10D is a clip of a recorded call between Lisa

20  Biron and her mother, Jo-Ann Bonczar, at 12 -- on

21  12/19/12 at 4:47 p.m.

22         10E was a recorded telephone clip of a call

23  between Lisa Biron and her mother, Jo-Ann Bonczar, at

24  12/20/12 at 5:33.

25         And 10F is a recorded telephone clip of a call

1   between Lisa Biron and her father, Mike Bonczar, on

2   12/21/12 at 12:08 p.m.

3            And the parties agree that these facts are

4   correct, so you can treat these stipulations as if there

5   was evidence admitted at the trial establishing those

6   facts, all right?

7            Are we ready to proceed?

8            MS. FITZGIBBON:  Yes, your Honor.

9            THE COURT:  Call your next witness, please.

10            MS. FITZGIBBON:  The government calls James

11   Scripture, your Honor.

12            THE CLERK:  Would you please raise your right

13   hand.

14                    JAMES SCRIPTURE

15       having been duly sworn, testified as follows:

16            THE CLERK:  Thank you.  Would you please state

17   your name and spell your last name for the record.

18            THE WITNESS:  My name is James E. Scripture,

19   Jr., S-C-R-I-P-T-U-R-E.

20                    DIRECT EXAMINATION

21   BY MS. FITZGIBBON:

22       Q.   How are you employed, sir?

23       A.   I'm a special agent with the Federal Bureau of

24   Investigation.

25       Q.   And how long have you been with the Federal

1    Bureau of Investigation?

2         A.    Thirty-three years.

3         Q.    What's your current title?

4         A.    I'm a certified forensic examiner as well as a

5    special agent.

6         Q.    What are your current job responsibilities?

7         A.    My primary responsibilities are executing

8    search warrants in digital environments, computer

9    environments, and I perform computer forensic

10   examinations on the evidence that is seized, and I also

11   testify in court, much like today.

12        Q.    How long have you been a computer forensic

13   examiner with the FBI?

14        A.    Since 1996.

15        Q.    And can you tell the jury very briefly about

16   your educational background, please?

17        A.    I have a bachelor's degree in accounting from

18   the University of Maine at Orono.  I have a masters in

19   criminal justice from Westfield State College.  I have a

20   bachelor degree in computer science with a minor in

21   mathematics from Westfield State College.

22        Q.    And how did you first become involved in

23   computer forensics?

24        A.    In 1996 the FBI lab could not keep up with the

25   amount of electronic evidence that was being received in

1    Washington, so they decided to train people like myself

2    in the field so that that evidence didn't have to be

3    shipped to Washington, DC.

4         Q.   So prior to '96 you were a special agent with

5    the FBI doing investigations?

6         A.   Correct.

7         Q.   And since '96 you've been a CART examiner?

8         A.   Correct.

9         Q.   Are there particular tools that you utilize as

10   as a forensic examiner with the FBI?

11        A.   There are many forensic software programs that

12   we use.  There are three or four primary tools such as

13   EnCase, AccessData Lab, and x-rays forensics that are

14   used more than others.

15        Q.   And have you received training with respect to

16   these tools?

17        A.   Yes, I have.

18        Q.   Would you just describe some of the computer

19   training and courses you've had with the FBI?

20        A.   Each year I attend three, four or five-week

21   long or two-week long classes put on by the FBI or by

22   commercial companies.  Each year I am subject to

23   maintaining my certification by passing a proficiency

24   exam, and I also have to pass mandated computer-based

25   self-based trainings.

1       Q.   Do you have any computer-related industry

2   certifications?

3       A.   I do.  I'm a certified Novell administrator.

4   I hold the A++ and Net+ certifications and also the

5   Access Data Certified Examiner certification.

6       Q.   Have you worked on a variety of different

7   types of cases as a forensic examiner while employed

8   with the FBI?

9       A.   I have.

10      Q.   How many hard drives would you estimate you've

11  examined while working at the FBI?

12      A.   Hundreds, possibly a thousand.

13      Q.   And how many external media such as CDs, DVDs

14  have you reviewed?

15      A.   Thousands of pieces of external media.

16      Q.   Have you ever testified in court before

17  regarding computer forensic exams that you performed?

18      A.   I have.  I have testified in federal and state

19  court.

20      Q.   And have you been certified as a computer

21  forensic expert by these courts?

22      A.   Each time I was certified, yes.

23           MS. FITZGIBBON:  Your Honor, I move to have

24  Special Agent Scripture declared an expert in computer

25  forensics.

1                MR. MOIR:  No objection.

2                THE COURT:  Proceed.

3         Q.   Now, you mentioned some of the tools that the

4    FBI uses.  I think you said AD, STK.  The various tools

5    you use, how do you obtain them, how do you come to use

6    them for your forensic exam?

7         A.   They have to be approved through independent

8    verification by the FBI forensic support unit out of

9    headquarters in order to establish that they are

10   reliable and that they do what they purport to do, and

11   at that point in time they are made available to each of

12   the computer forensic examiners.

13        Q.   And are these tools used by other law

14   enforcement agents as well nationwide?

15        A.   Yes, they are.

16        Q.   And the tools, are these some of the tools

17   that you will be testifying about today?

18        A.   Yes.

19        Q.   And are these tools that you have used in

20   cases where you have been certified as an expert?

21        A.   Yes.

22        Q.   Did you conduct an examination of a computer

23   evidence related to this case, United States versus Lisa

24   Biron?

25        A.   I did.

1       Q.    And have you helped prepare some exhibits for

2   this matter?

3       A.    Yes.

4       Q.    Okay.  I'd like to show you what's been marked

5   as Exhibit 9A.  And can you tell me if you recognize

6   that?

7       A.    I do.

8       Q.    And how do you recognize that?

9       A.    I recognize it as a computer that I examined

10  by the date, my initials, the file number, and the

11  exhibit number that I gave it when it arrived at my lab.

12      Q.    And when did it arrive at your lab?

13      A.    It arrived on December 6, 2012, and I started

14  the examination on December 10th, 2012.

15      Q.    What did you do when you first obtained this

16  exhibit?

17      A.    I locked it in an evidence locker.  I received

18  it on a Thursday.  And the following Monday I took it

19  out of the evidence locker and removed the battery,

20  removed the hard drive, and started to make an image of

21  the contents of the hard drive that was contained within

22  this computer.

23      Q.    I'm going to show you what's been marked as

24  Government's 9B.  And do you recognize that?

25      A.    Yes, I do.

1          Q.    How do you recognize it?

2          A.    I recognize it as the hard drive that was

3    contained within this computer, and I have my initials,

4    the date, the file number for the case that it applies

5    to, as well as the questioned item number that I wrote

6    on this hard drive.

7          Q.    And what did you do when you first received

8    that hard drive?

9          A.    I hooked it up to a write blocker so that I

10   could make an exact image of the contents of that hard

11   drive.

12         Q.    Okay, I'm going to come back to that.  I'm

13   just going to ask you to identify one more item.  If I

14   could ask you to look at Government's Exhibit 8 and ask

15   you if you recognize that?

16         A.    I do.

17         Q.    And how do you recognize that?

18         A.    It's an iPhone that I received as part of this

19   examination.  It contains my initials, the questioned

20   item number that I wrote on it, as well as the numbers

21   for the case file number.

22         Q.    And when did you obtain this exhibit?

23         A.    On December 6, the same as the hard drive and

24   the laptop computer.

25         Q.    And what did you do when you received it?

1      A.    Placed it in an evidence locker until I was

2   ready to start the exam.

3      Q.    Okay.  Just going back for a second to 9A and

4   9B.  You testified that 9B is a hard drive?

5      A.    Correct.

6      Q.    Did that come to you in the form that I handed

7   them to you?

8      A.    No.  The hard drive and the battery were

9   actually in place in the computer.  I removed them, the

10  batteries, so it wouldn't accidentally start up on its

11  own power, and I removed the hard drive so that I could

12  examine it or at least make an image of it using a write

13  blocker.

14     Q.    Okay, and can you tell the jury what an image

15  is?

16     A.    An image is a bit for bit copy of the entire

17  content of the hard drive.

18     Q.    And a hard drive is what?

19     A.    It's the item of storage contained within a

20  computer.  It is where the data and the programs on the

21  computer are located.

22     Q.    And I think you said you used a write block.

23  Can you tell the jury what a write block does?

24     A.    It can be either a hardware or software device

25  that prevents me from making any changes to the hard

1   drive.  So, when I conduct the examination, I conduct it

2   on the image of the hard drive which has been verified

3   to be an exact and true copy.

4         Q.   When you look at a hard drive, is there

5   usually any information which indicates the user of that

6   computer?

7         A.   Yes, there are several locations that user

8   information may be found.

9         Q.   And when you looked at this computer, was

10  there any information which led you to have an idea of

11  who the user was of this computer?

12        A.   Yes, there was.

13        Q.   And what was that?

14        A.   Well, within the computer name, within the

15  system registry file, there was the name Lisa Biron dash

16  HP as the name of the computer.  Within the security

17  administration manager file, the SAM file, S-A-M, one of

18  the users was listed as Lisa Biron, and the user

19  security ID 1,000 which is usually the first user

20  created account on the machine.  And within the software

21  registry file the registered owner was listed as Lisa

22  Biron.

23        Q.   I'm going to show you what's been marked as

24  Exhibit 14A for identification.  Can you just tell me if

25  you recognize that; please?

1        A.   Yes.

2        Q.   Okay, and how do you recognize that?

3        A.   I obtained this through AD Lab.  It's a

4    shortened version of the contents of the registry system

5    file.

6        Q.   And so did you create that document?

7        A.   I did.

8             MS. FITZGIBBON:  Your Honor, I'd ask to strike

9    the ID on 14A and move it as a full exhibit.

10            MR. MOIR:  No objection.

11            THE COURT:  Without objection.

12            (Government's Exhibit 14A admitted.)

13            MS. FITZGIBBON:  Publish this to the jury.  We

14    need the jury monitors on.

15            THE COURT:  The jury monitors are on.  The

16    image isn't coming up on my screen either.

17            THE CLERK:  They're on.

18            THE COURT:  They're on, so it's on your end.

19            MS. FITZGIBBON:  Thank you.

20        Q.   Would you just please tell the jury again,

21    what does this screen shot contain?

22        A.   It's information contained within the registry

23    file known as SYSTEM on this particular computer, and it

24    registers the computer name which in this case is Lisa

25    Biron dash HP.

15

1          Q.   And you obtained this from Government's

2    Exhibit 9B?

3          A.   It came from the hard drive within that net-

4    book computer, yes.

5          Q.   I'm going to show you what's been marked as

6    Government's 14B.  And can you just say if you recognize

7    that?

8          A.   I do.

9          Q.   How do you recognize it?

10          A.   It's the very first portion of a report that

11   was generated using Celebrite and it lists information

12   pertaining to the iPhone here at the desk that I

13   examined.

14          Q.   And what is Celebrite?

15          A.   It's a forensic apparatus and related software

16   that we use to examine cell phones.

17               MS. FITZGIBBON:  Your Honor, I move to strike

18   the ID on 14B and publish it to the jury.

19               MR. MOIR:  No objection.

20               THE COURT:  Without objection.

21               (Government's Exhibit 14B admitted.)

22          Q.   And were you able to obtain information using

23   Celebrite with respect to the user of this cell phone?

24          A.   I was.

25          Q.   And can you -- I'm sorry.  I was going to ask

1    you to point out to the jury, then, which line and where

2    you were able to obtain information about the user of

3    this cell phone?

4         A.   The very last line where it says computer,

5    which is the computer that's up here with me, the one

6    that I examined, it indicates that this iPhone was

7    backed up or synced to a computer named Lisa Biron dash

8    HP and that the particular user that effected that

9    backup used the user account named Lisa Biron.

10        Q.   And does it have an actual number associated

11   with it?

12        A.   It has the actual phone number to that iPhone

13   right there.  And it describes the iPhone as an Apple

14   iPhone 4S.

15        Q.   And is that consistent with the iPhone that

16   was in your possession for examination?

17        A.   Yes, it is.

18        Q.   I'm going to show you what's been marked as

19   Government's Exhibit 14C.  Can you just tell the jury if

20   you recognize that document?

21        A.   I do.

22        Q.   How do you recognize that document?

23        A.   This is a printing of information that AD Labs

24   showed for a file named Info.plist.

25        Q.   And what does that tell you?

17

1      A.   This particular file was contained within a

2  backup folder for an iPhone and it identifies the device

3  that was backed up.   In this instance it describes the

4  device as being -- the device name being Lisa Biron's

5  iPhone, the display name as being Lisa Biron's iPhone,

6  the phone number, the iPhone 4, it shows the serial

7  number to that iPhone.

8      Q.   And which tool did you use to extract this

9  information?

10      A.   AD Lab.

11      Q.   I'm going to leave these two aside right now.

12           I'd like to ask you, Mr. Scripture, were you

13  asked to look for any particular files when you were

14  asked to examine these computer devices that you have?

15      A.   The original request was to identify video,

16  still images, and deleted e-mails from the devices.

17      Q.   And were you asked to look for a certain type

18  of still images or videos?

19      A.   Not originally.   As the exam proceeded I was

20  asked to try to identify certain videos in particular as

21  well as some graphics files which are still shots.

22      Q.   Okay.   Now, I'm going to show you what has

23  been marked Government's 1A.   Do you recognize that

24  photo?

25      A.   I do.

1      Q.   How do you recognize that photo?

2      A.   It is one of a number of photos that were

3  found on the hard drive that I examined, and in

4  particular I believe it was found in the folder under

5  users Lisa Biron, pictures Kevin.

6      Q.   When you say the computer, would that be the

7  hard drive that you examined, Government's 9B?

8      A.   Yes.

9      Q.   And I'm going to ask you to look at

10  Government's Exhibit 1B.  Do you recognize that photo?

11      A.   Yes.

12      Q.   And what do you know about that photo?

13      A.   It was found in the same location as the

14  previous photo that I just looked at.

15      Q.   Again, is Lisa Biron -- user Lisa Biron,

16  photos Kevin; is that what it says?

17      A.   Users Lisa Biron, pictures Kevin.

18      Q.   I'm going to show you what's been marked as

19  Government's 1C.

20      A.   And that's another photo found in the same

21  location.

22      Q.   Government's Exhibit 1H?

23      A.   That's another still image that was found in

24  the same location, users Lisa Biron, pictures Kevin.

25      Q.   And Government's 1I?

19

1        A.    That photo is in the same location as well.

2        Q.    Okay.  Thank you.

3            MS. FITZGIBBON:  Your Honor, I neglected to

4    ask to strike the ID on the last identification screen

5    shot that he identified.  I move to strike that ID now.

6            MR. MOIR:  No objection.

7            THE COURT:  Without objection.

8            MS. FITZGIBBON:  Thank you.

9            (Government's Exhibit 14C admitted.)

10       Q.    BY MS. FITZGIBBON:  Now, in addition to the

11   photographs that you just identified, did you also find

12   video evidence on the defendant's computer?

13       A.    I did.

14       Q.    And by agreement we're going to show you still

15   shots and ask you if you can recognize the still shot

16   that we put in front of you.  So I'm going to ask you to

17   look at what is Government's Exhibit 2.

18       A.    (Witness examining exhibit.)

19       Q.    Did you recognize that yet?

20       A.    Yes.

21       Q.    And what can you tell me about that video?

22       A.    It's one of several videos that were found in

23   the folder users Lisa Biron, videos Kevin.

24       Q.    And I'm going to ask you to look at

25   Government's Exhibit 3.

1            (Witness looking at exhibit.)

2      A.   I recognize that as the beginning of a video

3   that was found in that same folder.

4      Q.   Government's Exhibit 4.

5            (Witness looking at exhibit.)

6      A.   I recognize that video as well.

7      Q.   And where was that located?

8      A.   In the same folder.  Users Lisa Biron, videos

9   Kevin.

10      Q.   And Government's 5.

11            (Witness looking at exhibit.)

12      Q.   Do you recognize that?

13      A.   Yes, I recognize that as being from the same

14   folder.

15      Q.   And Government's Exhibit 6.

16            (Witness looking at exhibit.)

17      A.   I recognize that video as being in a different

18   folder.  It was in users Lisa Biron, videos SEPT 7 --

19   numeral seven, numeral one, numeral two, 712.

20      Q.   And that was also on the hard drive 9B?

21      A.   Yes.

22      Q.   And Government's Exhibit 7 -- no, 6 --

23   Government's Exhibit 12.

24            (Witness looking at exhibit.)

25      Q.   Do you recognize that screen shot?

1          A.    I do.

2          Q.    And how do you recognize that?

3          A.    It's a video that was contained in a backup

4     folder for the iPhone that was described in the

5     info.plist file, Government Exhibit 14C.

6               THE COURT:   Just to be clear.  You're saying

7     the backup folder for the iPhone that was on the

8     computer?

9               THE WITNESS:   Correct.

10         Q.    So this is stored in a different fashion than

11    the other videos that you testified to?

12         A.    Yes.

13         Q.    If I could ask you to look again at 14B.  Does

14    this extraction report deal with that video that you

15    just identified?

16         A.    Could you rephrase the question?  I'm not sure

17    --

18         Q.    Sure.  This extraction report is for the

19    iPhone.  Is that consistent with the iPhone backup that

20    you just testified to?

21         A.    Yes.

22         Q.    And now I'm going to show you what's been

23    marked for identification 14D.  Do you recognize that

24    screen shot?

25         A.    I do.  That was obtained --

1      Q.    Just tell me, how do you recognize it?

2      A.    During the examination of the iPhone I used a

3    program called Blacklight, and I used it against the

4    backup folder, or a copy of the backup folder that was

5    contained on the hard drive that I examined, and this is

6    the first portion of the extraction report that was

7    contained on the Blacklight extraction report.

8            MS. FITZGIBBON:   I'd ask to strike the ID on

9    Government's 14D.

10           MR. MOIR:   No objection.

11           THE COURT:   Without objection.

12           (Government's Exhibit 14D admitted.)

13     Q.    BY MS. FITZGIBBON:   What information on this

14   screen shot is related to the film, Government's Exhibit

15   12, that you just identified?

16     A.    Well, it describes the iPhone as an iPhone 4S.

17   And it was used in the iOS operating system, version

18   6.0.1.  It describes the serial number of the iPhone.

19   It describes the actual telephone number that pertains

20   to that phone.  It describes the name of that iPhone, in

21   addition to the backup folder or the sub-folder that the

22   backup was contained in.

23     Q.    And can you point out that sub-folder; please?

24     A.    It's the sub-folder here and it's also listed

25   down here.  It's BB8F and it ends with 1B14.

1       Q.    And does that contain the video that you

2    identified as Government's Exhibit 12?

3       A.    It did.

4       Q.    The last document is Government's Exhibit 14E.

5    Do you recognize that?

6       A.    I do.

7       Q.    How do you recognize it?

8       A.    During the examination of the backup folder

9    using Blacklight I was able to extract information

10   pertaining to the last video that we just had displayed

11   on the screen with the two females.

12          MS. FITZGIBBON:  I move to strike the ID on

13   14E, your Honor, and publish to the jury.

14          MR. MOIR:  No objection.

15          THE COURT:  Without objection.

16          (Government's Exhibit 14E admitted.)

17      Q.    BY MS. FITZGIBBOH:  And can you describe how

18   you created this using Blacklight?

19      A.    It's a -- this is an extract from a report

20   using Blacklight, and it might even be a screen shot

21   that I took of that report, and it lists the backup

22   folder, it lists the file name of that video.

23      Q.    When you say that video, you're referring to

24   video Exhibit No. 12?

25      A.    Correct.  It shows that the video was taken

24

1    using the iPhone 4S, Apple iPhone 4S.  It was recorded

2    on May 19, 2012 at 0350, universal coordinated time,

3    which would be Greenwich Meridian time, so for

4    Massachusetts it would actually be May 18, 2012 at

5    approximately 11:50 p.m. at night.  And it also shows

6    the latitude and longitude location as to the position

7    of the iPhone or the location of the iPhone at the time

8    the picture was taken.

9         Q.   And what is your understanding about the

10   iPhone settings with respect to time and date?

11        A.   The time and date when I examined the iPhone

12   were correct, they were accurate.

13        Q.   I'm going to ask you to look at Government's

14   14E again.  It's actually the two females video at the

15   top.  Again this is the iPhone extraction.  There are

16   latitude indications at the bottom of that page.  What

17   do those indicate to you?

18        A.   Well, the latitude paired with the longitude

19   indicate the approximate position of the Apple iPhone at

20   the time that the video was recorded.

21        Q.   And there are indications as to that latitude

22   and longitude on that document?

23        A.   Yes, there are.

24        Q.   And did you perform anything else to find out

25   where that latitude and longitude is directed?

1      A.   I did.   I plugged those numbers into Google

2  Earth.

3      Q.   And what did you find?

4      A.   And the result came back to Pratt Court,

5  Manchester, New Hampshire.

6      Q.   I'm going to ask you to look at Government's

7  Exhibit 9A which should still be there, the Hewlett

8  Packard computer.  Would you take a look at that, Mr.

9  Scripture, and do you see any markings on the Hewlett

10 Packard?

11     A.   With respect to?

12     Q.   Is there a marking that indicates where that

13 device was manufactured?

14     A.   It indicates that it is a product of China.

15     Q.   Okay.  I'm going to ask you to look at 9B.

16 And again, 9B is the hard drive; is that correct?

17     A.   It is.

18     Q.   And it was contained within the Hewlett

19 Packard?

20     A.   Correct.

21     Q.   And does that have any markings with respect

22 to where it was made?

23     A.   It indicates that it is a product of

24 Philippines.

25     Q.   And I'm going to ask you to please look at

1    Government's Exhibit 8, the iPhone.  And is there any

2    indication on that device as to where it was made?

3         A.   It indicates that it was assembled in China.

4              (Pause.)

5         Q.   If I could just show you again Government's

6    Exhibit 6.  I think you testified that you recognized

7    this screen shot?

8         A.   Yes, I do.

9         Q.   And that file was found where?

10        A.   That file was found in users Lisa Biron,

11   videos, in a sub-folder SEPT 712.

12        Q.   Okay.  And that was found strictly on the hard

13   drive?

14        A.   On the hard drive, correct.

15        Q.   With respect to that video that was extracted

16   there -- with respect, I'm sorry, to Government's

17   Exhibit 12, that was found also on the hard drive in a

18   way that indicated a backup from the iPhone, is that

19   correct?  I'm sorry.  That was found on the hard drive?

20             THE COURT:  We're now talking about a

21   different exhibit than the one that was shown,

22   Exhibit 12.  Now ask --

23        Q.   Exhibit 12, you testified you found in a

24   backup format on the hard drive?

25        A.   Correct.

1            MS. FITZGIBBON:  Thank you.

2            THE COURT:  All set?

3            MS. FITZGIBBON:  Yes, your Honor.

4            THE WITNESS:  That last picture that you

5    showed me --

6            MS. FITZGIBBON:  Yes.

7            THE WITNESS:  Was not on the backup.

8            MS. FITZGIBBON:  No, that was found in a

9    folder on the Hewlett Packard.

10           THE WITNESS:  Right.

11           THE COURT:  Cross-examination.

12                    CROSS-EXAMINATION

13   BY MR. MOIR:

14       Q.   Good morning.

15       A.   Good morning, sir.

16       Q.   I'm Jim Moir.  I've actually very few

17   questions for you.

18           Dealing with Exhibit 12 just to be sure,

19   Exhibit 12 is the one that's of the two women, right,

20   from the iPhone?

21       A.   It's the film from the iPhone, Exhibit 12,

22   yes.

23       Q.   I want to make sure we're talking about the

24   same one.  All the other videos that you observed and

25   the photographs for that matter were actually in folders

1    on the HP computer hard drive, correct, all the other

2    ones?

3         A.    They were all in folders.

4         Q.    Okay.  But the last one was not a labeled

5    folder except for backup; right?

6         A.    It was identified with a 40-character

7    hexadecimal name which is consistent with an iTunes

8    backup, but that is the name of the folder.

9         Q.    Okay.  I'm not the most savvy person when it

10   comes to these things.  When it says backup, what does

11   that mean to you, or does it mean anything?

12        A.    With respect to an iTunes and an iPhone

13   device, it means that the content of the iPhone was

14   copied to the hard drive.

15        Q.    All right.  And it does not appear in a

16   folder, for example, the other one which had Lisa

17   Biron's slash pictures slash Kevin; right?

18        A.    They appear in different folders, correct.

19        Q.    Right.  When it says backup, though, does that

20   mean a person actually saved a video to backup or does

21   it automatically go to backup?

22        A.    It could work either way.

23        Q.    Okay.  So I could take a video with my iPhone,

24   for example, and say I'm going to save it.  Do I have to

25   do something to save it?

1      A.   You could either do a backup using iTunes or

2   you could save it directly to a folder.

3      Q.   Okay, so let's say I wanted to save it to a

4   folder, how would I do that?

5      A.   You would just indicate the folder and you

6   could let iTunes either give a default or you could,

7   default name, or you could name it yourself.

8      Q.   Okay.  And if I wanted to save it on HP, for

9   example, on the computer, I would have to actually

10  connect to the computer and do it through Wi-Fi; right?

11          THE COURT:  You better clarify because I think

12  you're talking about different things.

13          MR. MOIR:  Okay.  I'm sure you're more savvy

14  with the stuff than I am.

15     Q.   BY MR. MOIR:  Is there any indication that

16  that particular one, the Exhibit 12, somebody had

17  attempted to delete it, or can you say?

18     A.   I did not perform an exhaustive review of

19  every file that is currently on the iPhone, but from my

20  limited exam I did not find that file on the iPhone,

21  however, my analysis indicates that it was on the iPhone

22  at a particular point in time.

23     Q.   Right, and I guess what that means is a person

24  could have taken that particular video with the iPhone,

25  thought you deleted it, then it end up in the backup

1   folder?

2        A.   Well, it would have had to have been backed up

3   first and then deleted.

4        Q.   And if you sync your iPhone with the computer,

5   does that back it up?

6        A.   It does.  And in this case it appears that

7   the, how the iPhone iOS 6 usually works is that when you

8   back it up, if there is a file on the iPhone from a

9   previous backup, it will not back that up again because

10  it saves time.

11       Q.   Right.  So anything that hasn't been backed up

12  previously, it will backup?

13       A.   Correct.

14       Q.   So when does the backup take place, I really

15  don't know, how does a backup take place?  Is it

16  something automatically done or is it something I have

17  to do?

18       A.   It can occur either way.

19       Q.   Okay.

20       A.   And I don't know what the settings were on

21  this particular iPhone at the time.

22       Q.   Okay.  Some, for example, you backup

23  automatically at a certain period over a certain date

24  and time?

25       A.   It can be set up to backup auto or at certain

1    dates or you can cause it to be done manually.

2        Q.   And the idea to do backup is in case the phone

3    crashes or something, you don't want to lose the data;

4    right?

5        A.   So that you can restore the data that was

6    present at that particular date of the backup.

7             MR. MOIR:  Okay, great.  Thank you very much.

8             THE COURT:  Redirect?

9             MS. FITZGIBBON:  Just briefly, your Honor.

10                    REDIRECT EXAMINATION

11   BY MS. FITZGIBBON:

12       Q.   I believe you testified with respect to

13   Exhibit 12, the video from the iPhone backup, your

14   information tells you that that was created on what

15   date?

16       A.   It's consistent with it having been created on

17   a backup of June 10th, 2012.

18       Q.   And having been originally filmed on the

19   iPhone on what date?

20       A.   We discussed it earlier.  It was UTC time.  I

21   believe it was May 19th at about 3 a.m., which would

22   correspond to daylight savings time, eastern standard

23   time the previous day at approximately 11:50 p.m.

24       Q.   Okay, so May 19, 2012?

25       A.   Correct.

     1              MS. FITZGIBBON:  Thank you.  Nothing further.

     2              THE COURT:  Anything else?  Thank you, sir,

     3      you're excused.

     4              Does the government have any additional

     5      witnesses?

     6              MR. KAVACAS:  No, your Honor, and the United

     7      States rests.

     8              THE COURT:  All right.  We have some business

     9      to attend to outside the presence of the jury.  Does the

    10      defense intend to put on a case?

    11              MR. MOIR:  No, your Honor.  The defense rests

    12      as well.

    13              THE COURT:  The defense rests as well subject

    14      to the matters we will be covering outside of the

    15      presence of the jury.

    16              MR. MOIR:  That's correct.

    17              THE COURT:  So members of the jury, here we

    18      are, it's 10:15.  I've got some work to do with counsel

    19      that doesn't involve you.  We will try to keep that work

    20      down to a minimum.  It's possible we may be able to do

    21      the closing arguments before lunch, but I've got to take

    22      the time to do what I need to do with the lawyers

    23      without you.  So, there may be some waiting around in

    24      the jury deliberation room.  We're going to buy your

    25      lunch today because the day you deliberate we like you

1    to stay in, so the clerk will present you with some

2    lunch orders.  And as soon as we know whether you'll

3    hear the closings before lunch or after lunch, we'll let

4    you know, and we will, if we -- we will move as quickly

5    as we can, but you will definitely get the closings

6    either immediately before lunch or immediately after

7    lunch, all right?

8            So, you can go back to the jury deliberation

9    room.  We'll get back to you as soon as we can.

10           (Jury exited the courtroom.)

11           THE COURT:  I may be confused about this

12   backup stuff.  Is the witness still here or did he

13   leave?  I just want to be sure I understand what's going

14   on if you can find him.

15           While that's going on, it's not my place to

16   try to dictate how anything that happens in my courtroom

17   is covered, but when I -- when something that I think is

18   good happens, I really want to just compliment the

19   people from the media who have apparently agreed on your

20   own to not disclose the fact that the victim in this

21   case is the child of the defendant.  That would have

22   inevitably led to the identification of the child, and

23   it was, I think it's an act of responsibility to not

24   report that and I appreciate the fact that you haven't

25   done that.

1           Okay, oh, you're here, sir.  Can you just --

2    you can sit there.  Just explain this backup issue to

3    me.  I want to be sure I understand it so that there

4    wasn't anything inadvertently misleading going on.

5           SA SCRIPTURE:  On the hard drive there were

6    three backup sessions.  Each device has its own backup

7    session.  There was two backup sessions, one each for

8    separate iPod touch, the third one was specifically for

9    the iPhone.  And the iPhone that we had entered into

10   evidence was the specific iPhone for which that backup

11   folder existed.

12          THE COURT:  Let me ask you about what I

13   understand backing up means.  When you backup a device,

14   you are recording, making a copy of information that is

15   on that device and storing it in some other device.  Is

16   that what you think of as backup?

17          SA SCRIPTURE:  Yes.

18          THE COURT:  I thought, and I may be wrong

19   about this, that in order to backup an iPhone to a

20   laptop computer it has to be physically connected to the

21   laptop computer.

22          SA SCRIPTURE:  It can be connected by hard

23   wire.  I believe it can also backup through infrared or

24   Blue Tooth.

25          THE COURT:  Okay, but it has to be an act of

1   trying to take the information on the iPhone and putting

2   it on to the computer.  It isn't something that, well,

3   when it gets within a certain number of feet of your

4   computer it senses that it's there and automatically

5   backs up, is it?

6           SA SCRIPTURE:  I believe it can be set up to

7   automatically backup, but you would notice that --

8           THE COURT:  That it was backing up?

9           SA SCRIPTURE:  That it was backing up.

10          THE COURT:  See, I thought that backing up

11  ordinarily happens during a syncing operation, and

12  that's the ordinary way that one backs up an iPad or an

13  iPhone to a computer, isn't it?

14          SA SCRIPTURE:  That would be the usual way.

15          THE COURT:  But you think it can happen

16  automatically if you use a Blue Tooth or IR connection

17  and you set the phone to do that?

18          SA SCRIPTURE:  Well, I think you would be

19  knowledgeable that it was happening because of activity

20  that would be showing on the front of the device.

21          THE COURT:  You wouldn't be able to use it,

22  really, while it's backing up.  Can you use it --

23          SA SCRIPTURE:  I don't believe so.

24          THE COURT:  -- in the middle of a syncing

25  operation, I know.  So, I don't know the extent to which

1   that is consistent with your understanding or not, but I

2   had always understood that you basically had to take the

3   connection and make the connection to the computer.  But

4   it can be made, apparently, through Blue Tooth or IR,

5   but it isn't the ordinary case that an iPhone will

6   backup to your laptop by going over a wireless Internet

7   connection and going back down to the laptop and backing

8   up so that it could just occur either over your cellular

9   connection or a Wi-Fi connection.  It has to happen

10   through a hard connection or perhaps through IR or Blue

11   Tooth.  Is that right?

12            SA SCRIPTURE:  It can happen through IR, I

13   believe Blue Tooth, as well as hard wire connection.

14            THE COURT:  But not wirelessly or through the

15   cellular network?

16            SA SCRIPTURE:  I wouldn't want to testify one

17   way or another.

18            THE COURT:  Okay.  I appreciate that.  I'll

19   get one of my people downstairs to tell me because

20   that's not the way we do it.  I know if it could be

21   setup to have my iPhone automatically backed up

22   wirelessly, I would do it, but I don't think you can do

23   it.

24            In any event, it seems to me that your

25   questioning was suggesting that there might be some way

1   that that happens automatically wirelessly over the

2   cellular network or Wi-Fi connection and I didn't think

3   that it happened that way.  I don't think the witness

4   testified in any way that's wrong or inconsistent or

5   confusing, it's just I needed to clarify that myself.

6            MR. MOIR:  I don't have a 4, I've got a 3, and

7   I always do it by plugging in when I sync it.

8            THE COURT:  Yeah.

9            MR. MOIR:  But I just saw backup, I was

10  wondering what that meant.

11           THE COURT:  You can backup and you sync and

12  you can sync in a way that will backup automatically.

13  That's the way I understand.  But I've never done it

14  wirelessly through Blue Tooth or IR, and I just don't

15  know.

16           All right.  Thank you, sir, I appreciate your

17  help on that.

18           Okay, so, you've got a motion.  I want to hear

19  you on the motion.

20           MR. MOIR:  I'll be very brief, your Honor.

21  I'll deal with Count One first, your Honor.

22           THE COURT:  All right.

23           MR. MOIR:  Obviously looking at my motion to

24  dismiss based upon the standards which are to be applied

25  at this point, both at the close of evidence -- both

1    upon the government resting and of course the close of

2    the evidence and looking at it obviously in a light most

3    favorable to the government, as far as Count One goes,

4    which is the transportation with the intent, I would

5    request the court dismiss that charge because there

6    really has been no evidence of, and the elements of the

7    offense, we'll go over the instructions, but one of the

8    elements is transport with an intent to engage in sexual

9    activity, in this case child pornography.  Again,

10   there's no question from the evidence you saw that in

11   Canada there was pornography created.  I think it's very

12   clear.

13            THE COURT:  What are you saying to the

14   government's argument that they elicited testimony that

15   at least one of the purposes of the trip was to

16   memorialize her first sexual experience, and that

17   suggests that before even embarking on the trip, that

18   there was an intention to prepare a memorialization of

19   that experience which would involve the production of

20   child pornography?

21            MR. MOIR:  I was listening very carefully to

22   the evidence as it came in, your Honor, and my

23   understanding is that, number one, Kevin Watson

24   indicated on cross-examination that he was unaware of

25   any such intent.  Brandon Ore testified I believe the

1    same way.  Mr. Hardy, I'm not sure where we ended up --

2              THE COURT:  I think, again, you do a good job

3    in cross-examining and I do think there's room to argue

4    that point, but I have to say construing the evidence in

5    a light most favorable to the government I think there

6    is sufficient evidence to support the conclusion that

7    that was one of the purposes for which they entered, so

8    I'll overrule your objection on that point but recognize

9    it's a fair ground for argument.

10             MR. MOIR:  Very good.  Dealing with Counts Two

11   through Seven, those are all the sexual exploitation of

12   children counts.  In this case I think the evidence was

13   quite clear from the testimony of everyone that R.B.

14   engaged in sexual relations voluntarily, I guess that's

15   the word I'll use, and certainly as part of the

16   indictment the government must prove that the defendant,

17   Lisa Biron, did knowingly employ, use, persuade, induce

18   entice or coerce a minor child.  And I would submit

19   there's no evidence of any of those factors there.

20             THE COURT:  Well, let's separate out the issue

21   of coercion because my current thinking is, to avoid

22   confusion here, I would charge using the other forms of

23   action.  It's quite clear that, and I propose to

24   instruct, that consent by the minor is not a defense to

25   any of the charges in the indictment.  It simply isn't a

40

```
 1   defense to production of child pornography that the
 2   minor can consent, because the minor can't consent.
 3             MR. MOIR:  Nor are we going to argue that,
 4   your Honor.
 5             THE COURT:  And so I want to make that clear
 6   at the outset.  So, then you have to say let's look at
 7   the other elements, other terminology in the statute.
 8   Employed, used, persuaded, induced or enticed.  You
 9   don't think there's any evidence that would permit a
10   jury to conclude that there was employment, use,
11   persuasion, inducement or enticement?
12             MR. MOIR:  That's correct.
13             THE COURT:  The evidence is sufficient to
14   support a conclusion that your client was the one, and
15   you can say there's reasonable doubt about this, but the
16   evidence is sufficient if construed in a light most
17   favorable to the jury to support a conclusion that your
18   client was the one who was actually operating the
19   recording device.
20             MR. MOIR:  That's correct.
21             THE COURT:  And with respect to at least one
22   of the videos there's evidence to believe that the minor
23   was not even aware that the recording was occurring
24   during a significant portion of the event; right?
25             MR. MOIR:  Right.
```

 1          THE COURT:  I think there's evidence on that

 2    point.  And so how is not employment of R.B. -- how is

 3    it not the defendant -- we also recognize a

 4    mother/daughter relationship here, we also recognize

 5    that the mother was the one buying the tickets,

 6    transporting the child, paying for the hotel room,

 7    arranging with the people involved to have sex with her,

 8    how is it not employment of her in sexually explicit

 9    conduct?

10          MR. MOIR:  Well, your Honor, obviously that's

11    ultimately what the jury will have to decide.

12          THE COURT:  Yeah, but you're saying there's

13    not sufficient evidence to permit a conclusion that any

14    reasonable juror could find that she was -- she employed

15    the -- R.B. to engage in sexually explicit conduct.

16          MR. MOIR:  That is my position, your Honor.

17          THE COURT:  Okay.  What does the government

18    want to say in response to that?

19          MR. KAVACAS:  Well, your Honor, I think the

20    video evidence speaks for itself.  And I think that that

21    video evidence shows that the minor child was at least

22    used, certainly employed by the defendant to produce

23    this child pornography.

24          THE COURT:  Yeah, let's say that a -- let's

25    take an extreme case.  For example, suppose that two

1    minors decide to engage in sexual, explicit sexual

2    conduct in a public place and someone films that.  Is

3    the person filming that using, employing those minors to

4    produce child pornography?

5              MR. KACAVAS:  I mean, it may be more

6    attenuating in light of the fact that there's no

7    connection between the two minors and the film producer,

8    but I would argue yes, that person is using those two

9    minors to produce child pornography.

10              THE COURT:  I think the answer to that

11    question is yes, even in that extreme case.  Of course

12    this one is obviously much different.  And I don't think

13    you can ignore the existence of the parent/child

14    relationship and the act of involvement in the mother in

15    encouraging people to have sex with the daughter,

16    encouraging and making arrangements for the people to

17    have sex and recording, being the one recording R.B.

18    having sex.  I think on balance that evidence is

19    sufficient to permit a reasonable jury to conclude

20    beyond a reasonable doubt that there was either

21    employment, use, persuasion, inducement or enticement.

22              I'm going to leave out coercion.  I think an

23    argument can be made that there would be coercion here

24    as well, but I don't want to create confusion between

25    the issue of consent or not, and it might be harder to

1   explain.  I am going to instruct the jury that her

2   consent is not a defense to any charge.

3        MR. KAVACAS:  I agree with your Honor.  I

4   think coercion could create confusion in this case.

5        MR. MOIR:  Your Honor, I actually would object

6   to that.  The indictment spells out, among others, the

7   term coercion.  That was what was presented to the grand

8   jury.  And while I understand where the court is coming

9   from, I think that is part of the statutory language,

10  and frankly for the court to excise one part which

11  certainly the jury could consider and I think should

12  consider, I would object to that.

13       THE COURT:  Well the problem is this, then.  I

14  mean, you know the First Circuit case law is quite clear

15  on this and the government uses this strategy routinely

16  in indictments in this circuit and across the country,

17  they charge multiple ways in which the crime was

18  committed and use the conjunctive form in the

19  indictment, and they say he did it by doing A, B and C.

20  We know from case law that the way that allegation

21  should be construed is, did A, B or C.  And as long as

22  they do it one way and there's agreement on the one way,

23  the jury can convict on any, leaving the others as

24  surplusage.  Ordinarily the government's allowed to

25  strike surplusage from an indictment.  And to the extent

44

1   they allege coercion and acquiesce in my judgment that

2   it is potentially confusing to leave it in, I don't

3   think that you have a right to have it in.  It's sort of

4   my judgment, because it's just an alternative means by

5   which the crime may be committed.  To the extent the

6   government is electing not to proceed on that means, I

7   don't think it's a right to include it.  But you're free

8   to -- so I overrule your -- I note your objection to my

9   proposal not to instruct on coercion as a form of

10  action, that's one among several that are charged in the

11  indictment, and I overrule that objection.

12          So, I deny your motion with respect to Two

13  through Seven.  Did you have an argument with respect to

14  Eight, the possession charge?

15          MR. MOIR:  I do not, your Honor.

16          THE COURT:  All right.  So I deny the

17  defendant's motion for judgment as a matter of law with

18  respect to the counts in the indictment.

19          Now, I've got a draft copy of my instructions.

20  I want you to read those and I want to talk about them.

21  They're fairly brief and straightforward.  The

22  boilerplate part of the instructions I told you I was

23  going to give are the same ones I give in every single

24  case.  So I think you can focus on the elements.

25          What I suggest we do is let's take 10 minutes,

1    15 minutes for you to read those, and why don't you meet

2    me up at my office at quarter of 11, and we'll go over

3    them with a court reporter any objections you have to

4    them.

5              Now, if we finish that by 11, how long is the

6    government's closing expected to be.

7              MS. FITZGIBBON:  It's approximately

8    20 minutes.

9              THE COURT:  And how about yours?

10             MR. MOIR:  Approximately a half hour, your

11   Honor.

12             THE COURT:  All right.  If we can get done

13   with the jury instructions by 11, my proposal would be

14   to do closing arguments and then instruct immediately

15   after lunch.  Let them have lunch and then I'll give my

16   instruction immediately after that.  Is that acceptable

17   to everybody?

18             MR. KAVACAS:  Yes, your Honor.

19             MR. MOIR:  It is, your Honor.

20             THE COURT:  All right, so, let's take a short

21   break now.  I'll meet you up in chambers with a court

22   reporter at 10:45.

23             (Recess taken.)

24             (The following was held chambers:)

25             THE COURT:  So last night I presented you with

 1    a rough draft of my instructions.  I haven't had a

 2    chance to review the government's instructions and I

 3    also, because of the speed, hadn't really come up with a

 4    final version of my own instructions.  I did that last

 5    night and I've given that to you now and I'm asking for

 6    your observations, suggestions, and comments before the

 7    closing arguments.

 8              MR. MOIR:  Can I jump in, your Honor?

 9              THE COURT:  Yes.

10              MR. MOIR:  I've had a chance to review.  I

11    didn't really go over the pattern ones that you usually

12    do, I have no problem with that I'm sure.  As far as the

13    ones dealing with the various substantive counts, they

14    seem to be quite in line with what you discussed with us

15    last night and I have no objection to them.

16              THE COURT:  All right.  And your objection

17    about the leaving out coercion of course you've already

18    raised and that's preserved.

19              Does the government have any objections with

20    respect to the proposed instructions?

21              MR. KAVACAS:  No objections, your Honor, just

22    one observation.  In the instruction regarding Count

23    Eight, possession of child pornography, paragraph four

24    says that the image -- I'll let you catch up.

25              THE COURT:  What page?

1            MR. KAVACAS:  I'm sorry, page 12.

2            THE COURT:  Okay.

3            MR. KAVACAS:  Paragraph four.  That the image

4    of child pornography had been mailed, shipped or

5    transported in interstate or foreign commerce by any

6    means including by computer.  I think there's no

7    question that we know Counts Two through Five could

8    qualify under that, but there is another part of the

9    statute and that is, or that was produced using

10   materials manufactured outside the states.

11           THE COURT:  Did you allege that in the count

12   itself?  Let's look at the indictment.  If you did, I

13   agree you're entitled to that instruction, as I did give

14   it with respect to the production count.  So that's

15   count --

16           MR. KAVACAS:  Eight.

17           THE COURT:  Eight.

18           MR. KAVACAS:  Nope, you're right.  You're

19   right.

20           THE COURT:  That was the problem.  You alleged

21   it that way and I felt I had to follow through.

22           MR. KAVACAS:  And you're right, you're right.

23   I apologize.

24           THE COURT:  All right, nope, no problem.

25   Other than that, you're okay?

1          MR. KACAVAS:  Fine.

2          THE COURT:  All right.  I simply want to note

3     for the record one issue that I had given some thought

4     to, is one of the counts is apparently based on the

5     picture of the three of them in the bed, and that

6     depends on lascivious exhibition of genitals.  I did not

7     purport to define lascivious.  My reading of the First

8     Circuit's opinion of course in the, what I think of as

9     infamous case in which I was reversed by the First

10    Circuit as well as a more recent -- every case in which

11    I'm reversed is infamous -- I mean that facetiously, I

12    have nothing but respect for the First Circuit, but the

13    more recent case, and I don't have it in the -- I may

14    have trouble finding it in the midst of this mass of

15    material, but I read both of them.  Do you remember the

16    name?  I've got it.  So I'm talking about Amirault and

17    Fabrizio is the more recent case.  Fabrizio seems to

18    suggest that lascivious is I know it when I see it kind

19    of terminology and doesn't require further definition.

20    Since I have no request by the defendant for a further

21    definition and since Fabrizio suggests that the many

22    definitions people are trying to give to it are

23    problematic, I would propose to leave the issue

24    undefined.

25          MR. KAVACAS:  We agree.

1          THE COURT:  And that's why I haven't further

2     attempted to define lascivious conduct.  Only one of the

3     images really depends on lascivious conduct.  The others

4     involve intercourse broadly defined as it is in the

5     statute, so, but it is that one image that is, depends

6     on lascivious exhibition of the genitals of any person

7     and engagement of the child in that production.  So,

8     that's why I've done what I've done.

9          So I appreciate your comments and I will give

10    the instructions as I have drafted them.  If by chance

11    you should see something that's objectionable in the

12    boilerplate, of course, and you should anyways, anyone

13    who has objections, to preserve them for purposes of

14    appeal should come up afterwards, and I'll give you a

15    chance to do that, to give me a final chance to correct

16    in the event I make any misstatements, all right?

17          With that we can go back down and do the

18    closing arguments now.

19          MR. MOIR:  Can I just take one look before I

20    go?

21          THE COURT:  Yes.

22          MR. MOIR:  Do you have an instruction on the

23    failure of the defendant to testify?

24          THE COURT:  I have one embedded in, of course

25    it's important, it needs to be done.  If you look at

1    page eight, government's burden of proof.  First I say,

2    on presumption of innocence, I talk about it generally

3    and say a defendant, although accused, begins a trial

4    with a clean slate with no evidence against her.  The

5    law permits nothing but admissible evidence presented

6    before you to be considered.  The presumption of

7    innocence alone is sufficient to acquit.  And then I go

8    on on burden of proof and say the law does not compel a

9    defendant in a criminal case to take the witness stand

10   and to testify.  No presumption of guilt may be raised

11   and no inference of any kind may be drawn from the fact

12   that a defendant does not testify because the law does

13   not impose upon a defendant in a criminal case the

14   burden or duty of calling any witnesses or producing any

15   evidence.  I think that covers it.

16            MR. MOIR:  I just didn't see it.

17            THE COURT:  Okay?  All right, anything else?

18            MR. MOIR:  No.

19            THE COURT:  Thank you.

20            MR. KACAVAS:  Thank you.

21            THE COURT:  Let's got down.  We'll get started

22   as soon as everybody can get setup.

23                        BEFORE THE JURY

24            THE COURT:  All right, the government may

25   proceed with its closing argument.

1          MS. FITZGIBBON:  Thank you, your Honor.  Good

2     morning.  (Audio being played.)  That's the defendant,

3     Lisa Biron, in a telephone call to her mother about her

4     daughter, a 14-year-old girl.  (Audio being played.)

5     And that's the defendant in a conversation with her

6     father.  Again, speaking about her 14-year-old child,

7     the victim in this matter.  A child that she is now

8     blaming for the criminal acts that she, the defendant,

9     an adult, committed.

10          And these words, along with the other evidence

11     in this case, proves to you beyond a reasonable doubt

12     that the defendant is guilty of the crimes of

13     transportation with intent to engage in criminal sexual

14     activity, the production of child pornography, sexual

15     exploitation of a child, possession of child

16     pornography, and among the other evidence that you saw,

17     the graphic videos and photos, and the evidence is

18     difficult, and we know that, it's difficult to see, it's

19     difficult to hear, and we thank you for your careful

20     attention to it, because it's important, it's important

21     because it takes away any doubt of this defendant's

22     guilt, of her responsibility for these crimes.

23          You're soon going to be asked to render a

24     verdict in this matter.  And we are asking you to find

25     this defendant guilty on all eight counts.  And ladies

1   and gentlemen, you have everything you need to do that.

2   You've heard the testimony of the witnesses.  You'll

3   have access to all the exhibits that were introduced,

4   the photographs, the videos, and the other items.  And

5   the evidence and testimony will lead you to the correct

6   verdict in this case, because it's a very

7   straightforward case.

8           It's about a woman, this woman, Lisa Biron,

9   who planned and plotted and used and exploited her

10  14-year-old daughter.  Used her as a sexual object.  And

11  for what purpose?  To produce video evidence of that

12  exploitation.  We've proven all the elements of this

13  case beyond a reasonable doubt.

14          Now, with respect to Count One we have to show

15  that the defendant caused the interstate transportation

16  of a child, that the child was under 18 years of age,

17  and that the defendant caused that transportation with

18  the intention of producing child pornography.

19          Now, as I said, this is a very straightforward

20  case because two of the elements you don't really even

21  need to spend much time considering.  The evidence has

22  shown, and you heard from Kevin Watson, that the

23  defendant and her daughter traveled interstate, from New

24  Hampshire to Buffalo, and then into Canada.  And Mike

25  Biron, the father, told you that the defendant told him

1    that she was flying out of Boston, Massachusetts.  So

2    that's the first element.

3            The child was under 18.  You've heard so many

4    witnesses testify.  It is uncontroverted that R.B. is

5    14 years old, having just turned 14 the previous May.

6    So there's really only one last element for you to

7    consider, and that's Lisa Biron's intent at the time

8    that she caused that travel.  And the evidence in this

9    case proves beyond any reasonable doubt that she

10   transported that child for the purpose of producing

11   child pornography.

12           And what is that evidence?  Well, you heard

13   from Kevin Watson.  He said the defendant told him,

14   we'll come up there.  We'll meet.  We'll have sex.  And

15   we'll make a porno.  And that testimony is completely

16   believable because what did the defendant do when she

17   met Kevin, her daughter's friend on the Internet?  Well,

18   first the testimony was she was mad that R.B. had an

19   Internet friend.  But then you heard from Kevin, Lisa

20   began contacting him.  And what did the defendant, Lisa

21   Biron, say?  She liked what she was seeing.  She liked

22   my looks.  She asked me to take my clothes off.  And

23   then she began engaging in Skype sex with Kevin, and not

24   alone, then Skype sex where the 14-year-old victim

25   participated.

1            And you heard from Robert Hardy.  The

2    defendant told him that when they went to Canada it was

3    for R.B.'s first time, sex with Kevin was going to be

4    her first sexual experience, and she wanted to capture

5    that on video.  So she went up there to make a video of

6    her child having sex with Kevin.  And Rob Hardy was

7    living in the house.  He observed the defendant watching

8    the video.  And again, that's believable.

9            You heard from Brandon Ore that Lisa Biron

10   liked to go show that video to people in the house, and

11   Rob Hardy was living in the house at the same time

12   Brandon Ore was.

13           And you heard from Lisa Brien, a very close

14   friend of the defendant.  And what did she tell you the

15   defendant told her?  She told you that the defendant

16   told her R.B. wanted to have sex for the first time, and

17   Lisa Biron wanted to film it because that's an important

18   thing to have as a keepsake.

19           You heard this admission from three different

20   people.  And could they be any more different?  Kevin

21   Watson, immature young man from Canada, who met the

22   defendant sex Skyping on the Internet and then was

23   invited to come have sex.

24           Lisa Brien, dear friend of 12 years, belongs

25   to the same church, met the defendant going to church.

1            And then Rob Hardy, self-admitted gang member,

2    Crip, took the stand and told you he belongs to a gang

3    that's dedicated to violence and crime, commits crime,

4    goes to a party at the defendant's house and he never

5    leaves.  Why didn't he leave?  You heard him admit on

6    cross-examination, because living there he got free

7    booze, weed, and sex whenever he wanted.  That's what he

8    had when living at the defendant's house.

9            These three individuals, who are clearly from

10   such different parts of life and don't know each other,

11   all told you that this defendant told them the same

12   thing, that she went to Canada for the purposes of

13   making a video of the 14-year-old's sexual encounter.

14   That's Count One.

15           Counts Two through Seven, child exploitation,

16   the production of child pornography, and for that we

17   have to show you that the defendant knowingly employed,

18   used, persuaded, induced or enticed the victim to engage

19   in sexually explicit conduct for the purpose of

20   producing a visual depiction of that conduct.  And that

21   that depiction was either transported across state lines

22   in interstate or foreign commerce, or was produced using

23   materials that were shipped or transported in interstate

24   or foreign commerce.

25           So, used, persuaded, induced her.  As Attorney

1    Kacavas said to you yesterday, R.B. wasn't dragged

2    kicking and screaming.  She wasn't held captive.  She

3    participated.  But she was 14 -- 14 years old.  And the

4    person who has control of her, her mother, what does she

5    do?  She gives her weed.  Has her smoke marijuana.

6    Gives here alcohol.  And then encourages her, coaches

7    her to have sex, and then stands by to film three

8    pornographic videos of her own daughter with Kevin

9    Watson engaged in various sexual positions.  And you

10   heard it, the defendant laughs during one of them, she

11   laughs at her child's expense.

12            Well, it's not a joke.  It's not funny.  We're

13   asking you to render a verdict that says that.  Because

14   she doesn't just film her daughter, she joins in the

15   act.  We know from the testimony she engaged in sex with

16   Kevin Watson.  Engaged in sex with the child present.

17   And you can see her joining in because Count Five,

18   there's an exhibit, the farewell photo, just before

19   they're checking out of the hotel, Liza Biron, the

20   defendant, she's in bed smiling with the minor child in

21   bed also, and between them Kevin Watson.  And the focal

22   point of that photo, Kevin Watson's erect penis.

23            And Count Six is the Brandon Ore video.  You

24   heard from Brandon Ore.  Who is Brandon?  Brandon is

25   another man invited by the defendant to her home to have

1  sex with the minor child.  First with the defendant, and

2  then bring a friend over, and then you can have sex with

3  my minor child.  At first she even dupes Brandon into

4  believing that R.B. was 18 and that they were roommates.

5  So there's no doubt about who's producing that video.

6  You heard it from Brandon, and you heard it on the video

7  from both Brandon and R.B.  You heard, are you still

8  filming?  And then the defendant's voice, no.  And then,

9  well, maybe.  And again, laughing.  But it's not funny.

10          This is the sexual exploitation of a

11  14-year-old girl.  A girl that this woman used and

12  employed to produce those videos.  These are serious

13  crimes.  And contrary to what you heard in those phone

14  calls, this is not her fault, and she doesn't have a

15  bigger part in this than anyone.  This is the

16  defendant's fault and it's the defendant's criminal

17  responsibility.

18          In Count Seven, the most disturbing evidence,

19  the video of the defendant sexually assaulting her

20  child.  The defendant is clearly visible in that video.

21  The child's father identified the voices of Lisa Biron

22  and his child.

23          And those videos that you sat through, that

24  you listened to, the evidence shows that those videos

25  either were produced in Canada and were transported

1   here, or they were produced using material that traveled

2   in interstate commerce.

3            You heard from Special Agent Scripture.  Those

4   are computer components that were all manufactured

5   outside the United States of America, and they were

6   used, those videos were found on that computer.  And

7   that iPhone was found to have created and backed up to

8   that video which is the subject of Count Seven.

9            And the final count, Count Eight, possession,

10  very similar elements.  The United States will show you

11  that the defendant knowingly possessed a computer, a

12  computer that contained child pornography, that the

13  defendant knew that it contained child pornography, and

14  that those images traveled in interstate or foreign

15  commerce.

16           So again, this is very straightforward.  You

17  heard the evidence.  Those images were all on a computer

18  owned by Lisa Biron.  The videos -- the video, the

19  photos of Kevin were all stored in their own folder

20  Kevin.  So really, whose keepsake was that?  Lisa

21  Biron's keepsake.

22           And all of those, the videos of Brandon and

23  the video of her own assault, again, all contained on

24  materials that traveled in interstate commerce.

25           And James Scripture told you the user name for

1   that phone and that computer, the user name was Lisa

2   Biron.  Well, the user of that computer used her child

3   to produce images of child pornography.  She transported

4   that child for that purpose.  She possessed those images

5   on her computer.  We've proven it.  And we ask you to

6   return a verdict of guilty on all counts.  Thank you

7   very much.

8            THE COURT:  Thank you.  Counsel.

9            MR. MOIR:  Thank you.  Your Honor, what I want

10   to do is just have several of the indictments on --

11            THE COURT:  The document camera.  The clerk

12   will enable the document camera.

13            MR. MOIR:  That will be great.  There we go.

14   Good morning.  I want to first return to a theme that I

15   touched on in my opening statement.  And that really

16   comes down to I want you to focus on what this case is

17   about as well as to understand what this case is not

18   about.

19            What it's about is very simple.  Has the

20   government proved each and every element of each test

21   beyond a reasonable doubt to you.  That's their burden.

22   However, what it's not about is whether Lisa Biron is a

23   good or bad person, whether she's a good or bad mother.

24   It's not about whether she's morally depraved.  And it's

25   also not about whether she's guilty of crimes that have

1   not been charged.  It's about whether the government's

2   proven each one of these elements.  And one of the

3   things I do want to talk about is charging decisions.

4   Who decides what charge is going to be presented to you.

5   And who decides in what court it's going to be.

6             Obviously it's not the judge.  He doesn't

7   decide what the charges are.  And certainly it's not

8   Lisa Biron and it's not me.  It's the United States

9   Attorney.  They're the ones who decide what charges are

10  going to be brought.  And you know from the testimony

11  that charges were brought at the state level by the

12  Manchester Police Department.  And then the FBI came in

13  and then it got brought up here by the United States

14  Attorney.

15            But, it's the United States Attorney who

16  decides which federal crime has been committed, and by

17  doing that they define what they have to prove.  They

18  define the elements of the offense, and sometimes you

19  have to shoehorn things into that to try to make things

20  fit.

21            So, I want to go through each of these charges

22  and go through the elements.  I know they've been done

23  verbally to you.  But what you have in front of you is a

24  copy of Count One, and Count one defines what the

25  government has to prove.  And I know the government just

1    went through this with you, but let me do it again.

2    Actually, it's fairly straightforward here.  Knowingly

3    transport a minor across state or foreign boundaries

4    with the intent that the minor engage, in this case,

5    production of child pornography.

6           No question R.B. is a minor.  That's easy.

7    There's no question she was transported across state

8    lines.  And I'd submit to you that there's certainly no

9    question that there were very explicit pornographic

10   films made.  So where do we lie here?  The essence of

11   this charge, what makes it a federal charge, if anything

12   else, is that at the time she is being transported, at

13   the time she's basically crossing the boundary, you have

14   to be able to look and see what's going on in Lisa

15   Biron's head.  You have to look at that and say, what

16   was her purpose in bringing her up there?  She was

17   brought to Canada.  We know there were certain several

18   purposes there.  It is very clear that they went up to

19   meet Kevin Watson.  And it seems to be also very clear

20   they were going up there to have sex with Kevin Watson.

21   It's also clear they went up to see Niagara Falls.

22   There's multiple purposes here.  But what you have to

23   look at here is at the time she was traveling, did she

24   intend to make a pornographic video, because that's what

25   makes that a federal charge.

1          This charge is one that's defined by Congress.

2     Congress is the one that sets up these elements here,

3     and therefore that's what has to be proven.

4          Judge Barbadoro, when he instructs you, is

5     going to instruct you on a number of things.  He's going

6     to instruct you that if she was in Canada and then she

7     decided let's create a porno, let's create a video,

8     she's not guilty of this charge.  He's going to instruct

9     you even if she drives up there and goes there with the

10    intent that her daughter have sex, she's not guilty of

11    this charge.  It comes down to what was her intention as

12    she was transporting her.

13         So let's take a look at what the evidence of

14    the intent is.  I know we've gone through it once, but

15    let's do it again.

16         Brandon Ore.  Brandon Ore, as you know, lived

17    in that house, the Biron house for quite a while.  He

18    was there for several months.  As he indicated, he was

19    pretty close to them and they talked a lot.  In fact, of

20    everybody you heard here, he's certainly the closest to

21    these two.  He saw the videos from Canada.  They talked

22    about them.  He was interviewed eleven times.  And you

23    know in these interviews the government wanted to find

24    out what he knew.  They asked him specifically what was

25    the plan, what did they tell you about the plan to go to

1    Canada.  See the sites and have sex.  That was it.  He

2    never heard anything about a plan to create pornographic

3    videos.  And he was the closest one.

4         Kevin Watson.  You saw Kevin testify first.

5    You know that he was interviewed for two hours by the

6    Ontario Provincial Police.  We talked about that.

7    Talked about that for a while.  And that interview was

8    challenging and it was intimidating.  He's looking at

9    charges himself.  He's in serious trouble in Canada.

10   And of course the only way he gets out of that trouble

11   in Canada is basically by pleasing the United States

12   government here.  They say it's the truth, but the fact

13   of the matter is, he's got to say something.  If he said

14   something that's not helpful, he's not getting the deal.

15   And during that interview with the OPP, he never once

16   mentioned anything about a plan to come up and do the

17   video.  Never said that.  In two hours.  And he was

18   pushed.  Which is odd, because it's not like he has any

19   reason to hide it.  He's up there saying yes, I had sex

20   with a 14-year-old.  In fact, he even says, oh yes, we

21   had cocaine and Ecstasy.  I mean, we had somebody that

22   got him to say that, but it didn't happen.  So, he never

23   ever once says here was the plan.

24        The first time he tells anybody about this

25   plan is when he's brought down to the United States and

1    he's interviewed by the people sitting at this table

2    here, and that's when the plan comes up.  He didn't talk

3    about that, they asked specifically about the plan.  He

4    needs to please because the government knows that's part

5    of its burden.  They have to try to prove that.  And you

6    have to ask yourself, why didn't he mention it before.

7              Rob Hardy, another interesting character, Mr.

8    Crip.  I think this is the first time I've ever met a

9    Crip.  I've heard Crips and Bloods.  Here's one here.

10   And you heard about how he sort of came forward.

11   Apparently he receives a phone call when he's in a

12   meeting with his buddies, other Crips, it's from the

13   FBI, and he puts on I'm not talking, I know my rights,

14   I've been in the system, I know, I know, and hangs up on

15   the guy.  And then he tells you that at some point later

16   he calls them back and, well, I do want to talk to you

17   after all.  That makes no sense at all.  That makes no

18   sense at all.  If you are a Crip dedicated to violence

19   and drug dealing, you're not calling up the FBI to be a

20   good citizen.  Why else is he doing it?

21             There is something going on here.  I wish I

22   could tell you what it is.  But certainly when he met

23   with the agents from the FBI, all of a sudden he comes

24   up with a story about this.  Again, he's the guy who is

25   in the house for, relatively speaking, a short period of

1    time.  He was there.  Sex, drugs and -- sex, weed and a

2    free place to stay.  That's what he's there for.  He is

3    not close to these people.  You saw him.  He doesn't

4    sound like a guy you can be warm and fuzzy and close

5    with.  If it was going to happen with anybody, it would

6    have been Brandon Ore.  I ask you to reject him.

7              And then you go to Lisa Brien.  Lisa, as she

8    told you, is a good friend of Lisa Biron.  They've been

9    friends for 12 years.  She's known her daughter.  She

10   thought she was a good person.  They went to church

11   together.  And after Lisa Biron's arrest they talked,

12   and she basically unloads a lot on her, on this friend

13   who she thought was a basically clean Christian woman

14   who turns out she's doing all this stuff and she's

15   telling her friend about it.  She talks about sex with

16   Brandon Ore, sex with Kevin and this kind of stuff.  And

17   then she talks about memento, the video as a memento.

18   What Lisa Brien never said is that Lisa Biron told me I

19   went to Canada to make this video.  They're talking

20   certainly.  They're talking about how the video was made

21   and then it becomes a memento.  But she never told you

22   she told me she went there to Canada to make the video.

23             One other thing and then I'm on to the next

24   count.  If Lisa Biron's intent in taking her daughter to

25   Canada was to make that video, a porno video, to

1    memorialize her daughter's first sexual experience, I

2    mean, what would she have done?  You're not going to

3    make these very brief video clips.  You go up with your

4    tripod, you set the camera up, and take a video of the

5    first sexual experience versus this stuff here.  Not a

6    full record of that experience if that's what she wanted

7    to do.  I mean, what you see here and when you look at

8    it closely is consistent with somebody who appears to

9    have been drinking, pulling out the camera and basically

10   impulsively taking some shots, which really goes against

11   the idea that she planned to make this before she left.

12   And as Agent Gibeley told you, he looked through

13   thousands and thousands of pictures and videos that were

14   seized from her house.  I mean, what we know from that

15   is she takes lots of pictures.

16            Again, just finishing up with this one.  The

17   proof has to be beyond a reasonable doubt that when she

18   drove to Canada she intended to create the videos.

19            Let me get to the next count.  Excuse me.  I'm

20   not going to go through each one in such detail, but

21   this one is Count Two.  Count Two through Count Seven

22   are essentially the same.  They all charge the same

23   thing, which is sexual exploitation of a child.  What

24   does the government have to prove here?

25            One, that Lisa Biron did knowingly employ,

1    use, persuade, induce, entice or coerce a minor child to

2    engage in sexually explicit conduct, in this case the

3    sexually explicit conduct is child pornography, for the

4    purpose of producing video depictions being transported

5    in interstate, et cetera.  The last two elements, by the

6    way, are what make this the federal crime, it is the

7    interstate transportation, otherwise it wouldn't be a

8    federal crime.  But the first one is the one we have to

9    look at.  I mean, there's no question that the images

10   were sexually explicit.  Absolutely no question.  And

11   it's clear that the ones from Canada were transported

12   back to the United States.  That's easy.  And actually

13   all of them were made with materials that were

14   manufactured outside the United States.  That's easy.

15   But where the government fails is this.  Number one, did

16   Lisa Biron in some way basically cause R.B. to engage in

17   sexual conduct to produce those videos?  You saw those

18   words.  You can see those words in front of you.

19   Knowingly employ, use, persuade, induce, entice a minor

20   child.  That involves doing something to make the child

21   do it.  If R.B. is voluntarily having sex, and you heard

22   that from everyone, and the mother films it, yeah,

23   that's really not a nice thing to do, it is not a nice

24   act, and it certainly can be a crime in other areas, but

25   it's not this crime, because she hasn't done anything.

1          I mean, this federal law here was enacted

2     initially to basically go after the usual child

3     pornography you think about.  The one who, here's some

4     money, little girl, that is forced into make a video and

5     for commercial distribution, something like that.

6     That's not an element in this crime.  It has to be

7     distribution for commercial.  But that's why it was

8     created, because the idea was to protect unsuspecting

9     and vulnerable children from being caused to engage in

10    sex to make videos like this.  Cause by force, by money,

11    by coercion.  Bottom line, some sort of inducement.  I

12    mean, it's not enough for this charge that you find that

13    Lisa Biron took videos of this girl having sex.  Instead

14    you have to find that she did something to cause this.

15          Briefly, you heard from Brandon Ore.

16    Voluntary.  She was my girlfriend.  Kevin Watson.

17    Voluntary.  No inducement.  Those are the two we're

18    talking about here.  Without an inducement, without

19    causing her to do this, it is not this crime.  And you

20    just heard the government tell you, I mean, if you look

21    back at what they just told you in opening and closing,

22    what do they say was an inducement here?  What was it

23    that she did to cause this to happen?

24          You heard that she was barely 14 and mom was a

25    role model in the opening.  I don't think those are

1   inducements that are legally cognizable here.  Weed,

2   alcohol.  Again, you've heard no evidence whatsoever

3   that that was used as an inducement.  It's not an

4   inducement under the law.

5           Move on from this one -- one other thing.

6   There's a few points I want to make and then I'll

7   basically sit down.  But what are we missing here?  You

8   heard from Agent Gibeley that R.B. was interviewed three

9   times.  She was interviewed twice by forensic child

10  interviewers, and then he interviewed her himself.  You

11  know, if she said my mom made me do this, my mom did

12  something to induce this, she'd be here on the stand

13  testifying.  She's not here.  Certainly not shy about

14  hearing things, but she's not here.

15          I do want to talk about Count Seven in

16  particular because Count Seven is the one of the oral

17  sex taking place, and there's no question that that is

18  probably the one that is the most disturbing, probably

19  the most repugnant.  But once again, the fact that it is

20  repugnant does not mean that it is this crime.  It still

21  has to be proven the same way, with that there has to be

22  some proof that this girl was induced to do this.

23  Again, there's nothing there that establishes this

24  inducement.

25          Count Eight.  Not even going to put it up

1   there.  Possession of child pornography knowingly.

2   There were images of child pornography on Lisa Biron's

3   computer.  That about says it all.

4          A couple other points.  These are more

5   comments than points I want to make to you.  I mean, we

6   know from Lisa Brien, she talked a little bit about Lisa

7   Biron.  Keep the two Lisa's separate here.  But what she

8   did talk about on direct examination was she talked

9   about how she had known her for 12 years and basically

10   seemed like a normal regular person, even through this

11   July 4th, 2011 barbecue.  Everything seemed normal.  And

12   then she sort of disappeared from sight.  Wasn't talking

13   to her.  Didn't see her.  Occasionally answered texts.

14   Something happened.  Something happened in that time.

15   She went down this hole, this deep hole, and she brought

16   her daughter with her.  I'm not offering this by way of

17   justification or anything like that, not for an excuse,

18   but these are human beings we're dealing with.  The good

19   and the ugly.

20          Another thing I learned in this case which I

21   really didn't know about, there's a lot of people out

22   there, apparently, some subculture of people who use the

23   Internet to hookup for just sex, random sex, and in this

24   case you met three of them.  You met Lisa Biron, you met

25   Brandon Ore, and you met Kevin Watson.  Didn't know it

1    was out there.  Didn't want to know.

2             Okay, we've talked about emotion.  We've

3    talked about things like that.  I need to talk to you

4    about it.  Because clearly seeing these images are going

5    to bring up feelings.  We're human beings.  We're built

6    that way.  Seeing images like this, seeing what a mother

7    is doing with her daughter, and allowing her daughter to

8    do, it's oh my God, what kind of person is this, what

9    kind of mother is this, how can she do this?  You can

10   hate her, you can loath her, you can hate what she did,

11   you can be morally outraged about this, that's all fine,

12   but this is big.  Judge Barbadoro in his instructions is

13   going to tell you that you can have those feelings but

14   place them aside when you deliberate.  He's going to

15   tell you you have one duty and one duty only in this

16   courtroom, and that's to decide whether the government

17   has proven every element of this case beyond a

18   reasonable doubt.  That's it.  You're not here to decide

19   whether she's a bad mother or a bad person or anything

20   like that.  You can find that.  But you still have to do

21   your job, you have to do your duty.

22             And the other thing is that you're not to

23   decide whether she may have done other crimes because as

24   I told you, it's not up to me to decide what charges are

25   here, it's the government.  And if you look at what

1    happened here, that last video for example, the last

2    video, right, I mean clearly there's a sexual assault

3    committed, you have endangered a child, you have under

4    state law production of child pornography, you have

5    Canadian prosecution, all of those things are out there,

6    but they're not before you.  You need to focus on these.

7    If she's prosecuted tomorrow on the charges, that's not

8    your concern.

9            Finally, I am asking you to do something

10   really, which is difficult in this case, which is follow

11   the law, the law as Judge Barbadoro gives it to you.

12   Ask yourself these questions and these questions alone.

13   Is there proof beyond a reasonable doubt that Lisa Biron

14   transported R.B. to Canada so she could engage in sex

15   for the purpose of creating pornography, for the purpose

16   of creating pornography.  Two, is there proof beyond a

17   reasonable doubt that Lisa Biron in some way caused or

18   made or enticed her daughter to engage in sex or create

19   pornography.

20           At the end of the day if you reach this point

21   and say you know, I'm not sure, you know what your

22   answer has to be, it's not guilty.  If you say I'm

23   pretty sure, I'm almost positive, even at that point

24   your answer has to be not guilty.  It has to be proven

25   beyond any reasonable doubt that that was what her

1    intent was and that she did something.

2           It's your obligation and your sworn duty.  And

3    I'm confident you'll follow it.  Thank you very much for

4    your time.

5           THE COURT:  Thank you.  Rebuttal.

6           MR. KAVACAS:  Briefly, your Honor, thank you.

7    Good morning, folks.  I just want to address a couple of

8    points the defense lawyer just talked to you about, and

9    one of those is Lisa Biron's intent.

10          He said you have to get into Lisa Biron's head

11   to find out what she was thinking.  No you don't.  All

12   you need to do is look at the evidence, not in a vacuum,

13   but the evidence as a whole, those videos, okay.  If you

14   want to know what Lisa Biron was thinking when she took

15   her young daughter to Canada to meet Kevin Watson, all

16   you have to know about is the Skype sexing that she was

17   engaging in with Kevin Watson over the preceding two

18   months.  Remember Kevin Watson's testimony?  She found

19   out that her daughter was Skype sexing with him and she

20   was angry.  She wasn't angry for long, was she.  She

21   started asking Kevin Watson how old he was, who is he.

22   And then she started asking him to take his clothes off,

23   and then they started engaging in sex.

24          You know, maybe she was angry.  But she wasn't

25   angry at R.B. because it was inappropriate, she was

1    angry because R.B. was doing something she wanted to do.

2          Now, the defense lawyer and the United States

3    have not agreed much in this case at all.  But there is

4    one thing I do agree with them.  The defendant didn't go

5    to Canada and didn't take R.B. to Canada to memorialize

6    her daughter's first sexual experience.  Uh-um.  You

7    know why you know that?  Because her daughter's first

8    sexual experience, or a sexual experience was

9    memorialized on May 18, one week before they went to

10   Canada.  You heard that from Jim Scripture today.  Jim

11   Scripture told you that that video, Exhibit 12, in which

12   she is performing oral sex on her daughter, was created

13   one week before they went to Canada.  So that trip to

14   Canada wasn't to memorialize her first sexual

15   experience, that was just to make child pornography with

16   Kevin Watson.  That's how you know that.

17         The defendant -- the defense lawyer talks

18   about that litany of terms, employed, used, enticed,

19   induced, and he talked about how Congress wrote this

20   law.  Then he talked about how there's no evidence that

21   the defendant caused R.B. to engage in this conduct.

22   Well, Judge Barbadoro is going to instruct you on the

23   proper application of the law to the facts in this case,

24   okay?  But what you're going to hear from him, you're

25   not going to hear the word cause, because Congress did

1    write that law and they didn't put the word cause in

2    that law.  So, there's no argument here that the

3    defendant had to cause.  All she had to do was use or

4    employ this minor child to create child pornography.

5    Don't check your common sense at the door, folks.  Use

6    is use.  She's a user.  That's what she did here.  She

7    used her daughter.

8             Finally, the defense lawyer said something

9    happened here.  The defendant did something, took her

10   daughter with her.  Something happened here.  Yup.

11   Something did happen.  The defendant sexually exploited

12   her own daughter.  She encouraged young men to have sex

13   with her, and she video recorded it.  And now she blames

14   her daughter for that conduct.  Probably more than

15   anyone else.  You heard it in the audio recording.

16            Again, I'm going to ask you with your

17   verdicts, tell this defendant this is not her daughter's

18   fault.  Tell her she should have been the mom.  Thank

19   you.

20            THE COURT:  Thank you.  I think we have enough

21   time that I can give you my instructions on the law so

22   that you can have your lunch and then begin

23   deliberating.  Is my court reporter up to going?

24            COURT REPORTER:  Yes.

25            THE COURT:  So I want to -- you notice

1   everybody runs for the door when I -- I would be, too,

2   if I could but.

3          What I have to do here is a very important

4   function, and that is to talk to you about the law of

5   the case.  And I apologize in advance, but I'm going to

6   have to read these instructions because it's very

7   important that I describe the law to you correctly.  As

8   I mentioned at the beginning of the trial, you won't

9   have to take notes on what I'm saying to you now because

10  I'll give you a copy of these instructions to have with

11  you in the jury deliberation room.  And you'll see for

12  your benefit I have section headings.  So if you want to

13  find out what I had to say about the burden of proof or

14  something like that, the presumption of innocence,

15  there's a separate section there you can turn to it.  I

16  won't read the section heads to you as I go through the

17  instructions now, but they're there for you if you want

18  to use them.

19          So, at this stage of the trial it's my duty to

20  instruct you on the principles of law that you will

21  apply in deciding this case.  It's your duty to follow

22  these instructions during the course of your

23  deliberations.  You should not single out any one

24  instruction but instead apply these instructions as a

25  whole to the evidence in the case.

1           You are the sole and exclusive judges of the

2    facts.  You must weigh the evidence that has been

3    presented impartially, without bias, without prejudice,

4    without sympathy.  You must make a determination as to

5    what the facts are, what the truth is, based upon the

6    evidence presented in the case.  You will decide the

7    case by applying the law as I give it to you in these

8    instructions and the facts as you find them to be from

9    the evidence.

10           In determining what the facts are, what the

11   truth is, you must necessarily assess the credibility of

12   each witness and determine what weight you will give to

13   each witness's testimony.  By credibility I mean the

14   believability or truthfulness of a witness.

15           You should carefully scrutinize all the

16   testimony given, the circumstances under which each

17   witness has testified, and every matter in evidence

18   which tends to show whether a witness is worthy of

19   belief or not worthy of belief.  Consider each witness's

20   intelligence, motive, state of mind, demeanor and manner

21   while testifying.  Consider the witness's ability to

22   see, hear, or know the matters about which that witness

23   has testified.  Consider whether the witness had a good

24   memory of what the witness has testified about.

25   Consider whether the witness had any reason for telling

1    the truth or not telling the truth, whether the witness

2    had an interest in the outcome of the case, and whether

3    the witness had anything to gain or lose as a result of

4    his or her testimony, whether the witness had any

5    friendship, relationship, or animosity towards other

6    individuals involved in the case, whether the witness's

7    testimony was consistent or inconsistent with the

8    witness's own testimony and the testimony of other

9    witnesses.  Consider the extent to which, if any, the

10   testimony of each witness is either supported or

11   contradicted by other evidence in the case.

12        After assessing the credibility of each

13   witness, you will assign to the testimony of each

14   witness, both under direct and cross-examination, such

15   weight as you deem proper.  You're not required to

16   believe the testimony of any witness simply because that

17   witness was under oath.  You may believe or disbelieve

18   all or part of the testimony of any witness.  It is

19   within your province to determine what testimony is

20   worthy of belief and what testimony may not be worthy of

21   belief.

22        During the course of the trial you have heard

23   several government agents testify.  You should consider

24   the testimony of a government agent in the same manner

25   as you consider the testimony of any other witness in

 1    the case.  In no event should you give the testimony of

 2    a government agent any more credibility or any less

 3    credibility simply because that witness is a government

 4    agent.

 5            The testimony of a witness may be discredited

 6    or, as we sometimes say, impeached by showing that the

 7    witness previously made statements which are different

 8    than, or inconsistent with, his testimony here in court.

 9    Inconsistent or contradictory statements which are made

10    by a witness outside of court may be considered only to

11    discredit or impeach the credibility of the witness and

12    not to establish the truth of these earlier out-of-court

13    statements.  You must decide what weight, if any, should

14    be given to the testimony of a witness who has made

15    prior inconsistent or contradictory statements.  In

16    making this determination you may consider whether the

17    witness purposely made a false statement or whether it

18    was an innocent mistake; whether the consistency

19    concerns an important fact, or whether it had to do with

20    a small detail; whether the witness had any explanation

21    for the inconsistency, and whether that explanation

22    appealed to your common sense.

23            If a person is shown to have knowingly

24    testified falsely concerning an important or material

25    matter, you obviously have a right to distrust the

1    testimony of such an individual concerning other

2    matters.  You may reject all of the testimony of that

3    witness or give it such weight or credibility as you

4    think it deserves.

5         It is exclusively your duty, based upon all

6    the evidence and your own good judgment, to determine

7    whether the prior statement was inconsistent, and if so

8    how much, if any, weight is given to the inconsistent

9    statement in determining whether to believe all or part

10   of the witness's testimony.

11        The fact that the prosecution is brought in

12   the name of the United States of America entitles the

13   government to no greater consideration than that

14   accorded to any other party in litigation.  By the same

15   token, the government is entitled to no less

16   consideration.  All parties, whether the government or

17   individuals, stand as equals at the bar of justice.

18        The weight of the evidence is not necessarily

19   determined by the number of witnesses testifying on

20   either side.  You should consider all the facts and

21   circumstances in evidence to determine which witnesses

22   are worthy of belief.  You may find that the testimony

23   of a small number of witnesses on a particular issue is

24   more credible than the testimony of a greater number of

25   witnesses on the other side of that issue.

1            In reviewing the evidence, you will consider

2      the quality of the evidence and not the quantity.  It's

3      not the number of witnesses or the quantity of testimony

4      that is important, but the quality of the evidence that

5      has been produced that is important.  You will consider

6      all of the evidence no matter which side produced or

7      elicited it, because there are no property rights in

8      witnesses or in the evidence that is presented.

9            During the course of the trial you have heard

10     certain statements, arguments and remarks from counsel.

11     These are intended to help you in understanding the

12     evidence and in applying the law to this case.  However,

13     in the event that counsel have made any statements

14     concerning the evidence that are contrary to your

15     recollection of the evidence, you must take your own

16     recollection of the evidence.  If counsel have made any

17     statements concerning the law that are contrary to my

18     instructions, you must take the law from me.  You're not

19     to be concerned with the wisdom of any rule of law.

20     Regardless of any opinion you may have as to what the

21     law ought to be, it would be a violation of your sworn

22     duty to base a verdict upon any other view of the law

23     than the law as I give it to you in my instructions.

24            From time to time during the course of the

25     trial counsel have made objections.  This is a proper

1  function to be performed by counsel on behalf of their

2  respective clients.  You should not concern yourself

3  with the fact that objections have been made, nor with

4  my rulings on these objections.  I must rule on

5  objections and I have not intended to indicate in any

6  way by my rulings or by what I have said what the

7  verdict should be in this case.

8          In this case, as in call cases, I'm completely

9  neutral and impartial.  It's up to you to determine

10  whether the defendant is guilty or not guilty based on

11  the facts as you find them to be and the law as I give

12  it to you.

13          The direct evidence in this case consists of

14  (1) the sworn testimony of witnesses both on direct and

15  cross-examination, regardless of who may have called the

16  witness; and (2) the exhibits which have been received

17  into evidence; and (3) any facts to which all lawyers

18  have agreed or stipulated.

19          Certain things are not evidence and cannot be

20  considered by you as evidence:

21          Arguments and statements by lawyers are not

22  evidence.  What they have said in their opening

23  statements, closing arguments and at other times is

24  intended to help you interpret the evidence, but it is

25  not evidence.  If the facts as you remember them differ

1  from the way the lawyers have stated them, your memory

2  controls.

3           Questions and objections by lawyers are not

4  evidence.  Attorneys have a duty to their clients to

5  object when they believe a question is improper under

6  the rules of evidence.  You should not be influenced by

7  objections or by my ruling on objections.

8           Testimony that has been excluded or stricken,

9  or that you have been instructed to disregard, is not

10 evidence and may not be considered.

11          Anything you may have seen or heard when court

12 was not in session is not evidence.  You're to decide

13 the case solely on the evidence received at trial.

14          There are two types of evidence which you may

15 properly use in deciding whether a defendant is guilty

16 or not guilty.

17          Direct evidence consists of the testimony

18 given by a witness about what that witness has seen, has

19 heard or has observed, or what the witness knows based

20 on personal knowledge.  Direct evidence also includes

21 any exhibits that have been marked and any stipulations

22 which have been agreed to by the lawyers for both sides.

23          Evidence may also be used to prove a fact by

24 inference, and this is referred to as circumstantial

25 evidence.  In other words, from examining direct

1   evidence you may be able to draw certain inferences

2   which are reasonable and justified in light of your

3   daily experience and common sense.  Such reasonable

4   inferences constitute circumstantial evidence.

5           The law makes no distinction between the

6   weight to be given to either direct or circumstantial

7   evidence.  It's up to you to decide how to weigh the

8   evidence in this case.  However, the defendant cannot be

9   found guilty of any crime based upon a hunch or a

10  suspicion, even a strong one, or what is probably the

11  case.  She can only be found guilty if on the direct

12  evidence and the reasonable inferences you draw from the

13  direct evidence, you are satisfied she's guilty of the

14  crime beyond a reasonable doubt.

15          During the course of the trial, I may have

16  instructed you that certain evidence is being admitted

17  for a limited purpose.  It's your duty to follow these

18  instructions during your deliberations.

19          I mentioned this earlier, but I'll repeat it.

20  The fact that an indictment has been returned against

21  the defendant is not evidence of the defendant's guilt.

22  An indictment is merely a formal method of accusing an

23  individual of a crime in order to bring that person to

24  trial.  It is you who will determine whether the

25  defendant is guilty or not guilty of the offenses

1  charged based on a consideration of all the evidence

2  presented and the law applicable to the case.  Therefore

3  you must not consider the indictment in this case as any

4  evidence of the guilt of this defendant, nor should you

5  draw any inference from the fact that an indictment has

6  been returned against her.

7          A defendant, although accused, begins a trial

8  with a clean slate -- with no evidence against her.  The

9  law permits nothing but the admissible evidence

10 presented before you to be considered in support of the

11 charge against the defendant.

12         The presumption of innocence alone is

13 sufficient to acquit the defendant unless you are

14 satisfied beyond a reasonable doubt that the defendant

15 is guilty after a careful and impartial consideration of

16 all the evidence in the case.

17         The burden is always on the government to

18 prove guilt beyond a reasonable doubt.  That burden

19 never shifts to the defendant.  The law does not impose

20 upon a defendant in a criminal case the burden or duty

21 of calling any witnesses or producing any evidence.  The

22 law does not compel a defendant in a criminal case to

23 take the witness stand and to testify.  No presumption

24 of guilt may be raised and no inference of any kind may

25 be drawn from the fact that a defendant does not

1  testify, because the law does not impose upon a

2  defendant in a criminal case the burden or duty of

3  calling any witnesses or producing any evidence.

4           If, after careful and impartial consideration

5  of all the evidence in this case, you have a reasonable

6  doubt as to whether the defendant is guilty of any

7  charge, you must find the defendant not guilty on that

8  charge.

9           You must never find a defendant guilty based

10 upon mere suspicion, conjecture or guess.  Rather, you

11 must decide the case on the evidence that's before you

12 and on the reasonable inferences that can be drawn from

13 that evidence.

14          The superseding indictment charges that the

15 offenses at issue were committed on or about certain

16 dates.  The proof need not establish with certainty the

17 exact dates of an alleged offense unless the term "on or

18 about" is used, for in such instance, it is sufficient

19 if the evidence establishes beyond a reasonable doubt

20 that the offense was charged -- excuse me, that the

21 offenses charged -- excuse me, the offense charged was

22 committed on a date reasonably near the date alleged;

23 that is, a date reasonably close in time to the date

24 upon which the offense is alleged to have occurred.

25          All right, so now I'll talk to you about the

1   specific charges at issue here.

2          The superseding indictment contains several

3   counts charging Lisa Biron with transportation with

4   intent to engage in criminal sexual activity, in

5   violation of 18 U.S.C. Section 2423(a); sexual

6   exploitation of a minor, in violation of 18 U.S.C

7   Section 2251(a); and possession of child pornography, in

8   violation of 18 U.S.C. Section 2252A(a)(5)(B).

9          I'll start with Count One.

10         The defendant is charged in Count One of the

11  indictment with transporting an individual under the age

12  -- under 18 years of age in interstate or foreign

13  commerce with the intent that the individual engage in

14  the production of child pornography.

15         The defendant can be found guilty of this

16  crime only if the government proves the following

17  elements beyond a reasonable doubt:

18         1.  That the defendant knowingly transported

19  R.B. in interstate commerce.

20         2.  At the time of the transportation, R.B.

21  was less than 18 years of age; and

22         3.  At the time of the transportation, the

23  defendant's intention was to have R.B. engage in the

24  production of child pornography.

25         The government does not need to prove that the

1   defendant's sole purpose in causing R.B. to be

2   transported in interstate commerce was to have R.B.

3   engaged in the production of child pornography.   A

4   person may have several different purposes or motives

5   for such transportation.   The government must prove

6   beyond a reasonable doubt, however, that at least one of

7   the defendant's substantial motivations for causing the

8   transportation was to have R.B. engage in the production

9   of child pornography.   In other words, the production of

10  child pornography must not have been a merely incidental

11  motivation for the interstate transportation of R.B.

12          In order to find the defendant guilty of the

13  charge of causing the transportation of an individual

14  under 18 in interstate commerce with the intent to have

15  R.B. engage in the production of child pornography, the

16  government must prove that the defendant caused the

17  individual to be transported from one state to another

18  with that intent.   A person travels from one state to

19  another by crossing the state line or boundary.   If you

20  find that the defendant caused R.B. to be transported

21  from one state to another, you may conclude that the

22  government has proved this element of the offense.

23          It is not necessary for the government to

24  prove that anyone actually engaged in the production of

25  child pornography after being transported across state

1    lines.   The government must prove beyond a reasonable

2    doubt that a person under the age of 18 years old was

3    knowingly transported across state lines by the

4    defendant and that the defendant intended at the time of

5    transportation for the person under 18 to engage in the

6    production of child pornography.

7              So now I'll talk to you about Counts Two

8    through Seven, the sexual exploitation of minor charges.

9              The defendant is charged in Counts Two through

10   Seven with sexual exploitation of a minor.

11             The defendant can be found guilty of these

12   crimes only if the government proves the following

13   elements beyond a reasonable doubt:

14             1.   At the time, R.B. was under the age of 18;

15             2.   The defendant knowingly employed, used,

16   persuaded, induced, or enticed R.B. to engage in

17   sexually explicit conduct for the purpose of producing a

18   visual depiction of such conduct; and

19             3.   Either the visual depiction was

20   transported across state lines or in foreign commerce or

21   the visual depiction was produced using material that

22   had been mailed or shipped or transported across state

23   lines or in foreign commerce.

24             Now I'll talk to you about Count Eight,

25   possession of child pornography.

1           The defendant is charged in Count Eight with

2    knowingly possessing child pornography that has been

3    mailed, shipped, or transported in interstate or foreign

4    commerce.

5           The defendant can be found guilty of this

6    crime only if the government proves the following

7    elements beyond a reasonable doubt:

8           1.  That the defendant knowingly possessed a

9    Hewlett Packard laptop computer;

10           2.  That the Hewlett Packard laptop computer

11    contained at least one image of child pornography;

12           3.  That the defendant knew that the Hewlett

13    Packard laptop computer contained an image of child

14    pornography; and

15           4.  That the image of child pornography had

16    been mailed, shipped, transported -- mailed, shipped, or

17    transported in interstate or foreign commerce by any

18    means, including by a computer.

19           Now I'm going to give you some definitions of

20    some of the terms that I have used here.

21           In determining whether or not the government

22    has proved each of the material elements of the offenses

23    charged in the superseding indictment beyond a

24    reasonable doubt, you are to consider the following

25    definitions:

1          CHILD PORNOGRAPHY:  Child pornography means

2     any visual depiction, including any computer-generated

3     image or picture, whether made or produced by

4     electronic, mechanical, or other means, of sexually

5     explicit conduct, where such visual depiction is of a

6     minor engaging in sexually explicit conduct.

7          Minor means any person under the age of 18.

8          Visual depiction includes data stored on a

9     computer disk, in this case, a computer hard drive.

10         SEXUALLY EXPLICIT CONDUCT:  Sexually explicit

11     conduct includes:  (1) sexual intercourse, including

12     genital-genital intercourse or oral-genital intercourse,

13     whether between persons of the same or opposite sex, and

14     (2) lascivious exhibition of the genitals or pubic area

15     of any person.

16         KNOWINGLY:  The term knowingly as used in

17     these instructions to describe the alleged state of mind

18     of the defendant means that she was conscious and aware

19     of her actions, that she realized what she was doing and

20     did not act because of ignorance, mistake or accident.

21         To decide whether the government has proved

22     beyond a reasonable doubt that the defendant acted

23     knowingly, you should consider all the surrounding

24     circumstances.  There's often no direct evidence of a

25     person's knowledge because it is difficult to prove

1    directly a person's state of mind.  Therefore, you

2    should consider all the evidence in the case in deciding

3    whether the government has proved beyond a reasonable

4    doubt that the defendant acted knowingly.

5         POSSESSION:  A person has possession of

6    something if she knows of its presence and content and

7    has physical control of it, or has the power and

8    intention to control it.

9         INTERSTATE OR FOREIGN COMMERCE:  Interstate

10   commerce includes commerce between one state, territory,

11   possession, or the District of Columbia and another

12   state, territory, possession or the District of

13   Columbia.  Foreign commerce includes commerce with a

14   foreign country.  Computer transmission of images across

15   state lines by means of the Internet would constitute

16   interstate commerce.

17        Consent by a person under the age of 18 is not

18   a defense to any of the charges set forth in the

19   superseding indictment.

20        The superseding indictment charges eight

21   separate crimes against the defendant.  Each offense

22   charged in the indictment and the evidence pertaining to

23   it should be considered separately.  The fact that you

24   may find the defendant guilty or not guilty on one of

25   the charges should not control your verdict as to any

1    other offense charged against the defendant.

2           The principles of law set forth in these

3    instructions are intended to guide you in reaching a

4    fair and just result in this case which is important to

5    all of the parties.  You are to exercise your judgment

6    and common sense without prejudice, without sympathy,

7    but with honesty and understanding.  You should be

8    conscientious in your determination of a just result in

9    this case because that is your highest duty as officers

10   of the court.  Remember also that the question before

11   you can never be:  Will the government win or lose this

12   case?  The government always wins when justice is done,

13   regardless of whether the verdict be guilty or not

14   guilty.

15          When you've considered and weighed all of the

16   evidence, you must make one of the following findings:

17          If you have a reasonable doubt as to whether

18   the government has proved one or more of the essential

19   elements of the crime charged, it is your duty to find

20   the defendant not guilty.

21          If you find that the government has proved all

22   of the elements of the crime charged beyond a reasonable

23   doubt, then you may find the defendant guilty.

24          The punishment provided by law for the

25   offenses charged in the indictment is exclusively my

1   responsibility, and should never be considered by you in

2   any way in arriving at an impartial verdict.

3          When you retire, you should elect one member

4   of the jury as your foreperson.  That individual will

5   act very much like the chairman of a committee, seeing

6   to it that the deliberations are conducted in an orderly

7   fashion and that each juror has a full and fair

8   opportunity to express his or her views, positions and

9   arguments on the evidence and on the law.

10          The verdict must represent the considered

11   judgment of each juror.  In order to return a verdict,

12   it is necessary that each juror agree thereto.  Your

13   verdict must be unanimous as to each count.

14          It is your duty as jurors to consult with one

15   another and to deliberate with a view to reaching an

16   agreement, if you can do so without violence to

17   individual judgment.  Each of you must decide the case

18   for yourself, but do so only after a impartial

19   consideration of the evidence in the case with your

20   fellow jurors.  In the course of -- in the course of

21   your deliberations, do not hesitate to re-examine your

22   views and to change your opinion if convinced it is

23   erroneous.  But do not surrender your honest conviction

24   as to the weight or effect of the evidence solely

25   because of the opinion of your fellow jurors or merely

 1   for the purpose of reaching a verdict.

 2          Remember at all times you are not partisans,

 3   you are judges, judges of the facts.  Your sole interest

 4   is to seek the truth from the evidence in the case.  If

 5   during your deliberations it becomes necessary to

 6   communicate with me, you may do so only in writing,

 7   signed by the foreperson or by one or more members of

 8   the jury.  Give that note to the marshal and he will

 9   bring it to my attention.  No member of the jury should

10   ever attempt to communicate with me except by a signed

11   writing, and I will communicate with you on anything

12   concerning the case either in writing or orally in the

13   courtroom.  Remember, you're not to tell anyone,

14   including me, how the jury stands, numerically or

15   otherwise, on the matters you are deciding, until you

16   have reached a unanimous verdict or have been

17   discharged.

18          Nothing in these instructions is intended to

19   suggest or convey in any way or manner what your verdict

20   should be.  The verdict is your sole and exclusive duty

21   and responsibility.

22          When you have arrived at a verdict, notify the

23   marshal and you will be returned to the courtroom where

24   the foreperson will render the verdicts orally.

25          Does anyone need to see me with respect to any

1    issues concerning the instructions?

2              MR. KAVACAS:  No, your Honor.

3              MR. MOIR:  No, your Honor.

4              THE COURT:  All right.  The verdict form I

5    have here is self-explanatory, so I won't go through

6    that with you.  I think you will understand it by

7    reading it.  And I will have a minor modification made

8    in these instructions to make it consistent with what

9    I've read.  I will get it back down to you.

10             We now have to discharge the alternates.  Can

11   you tell me who the jurors are, who are the alternates?

12             THE CLERK:  Mr. Emerson and Mr. Pattison.

13             THE COURT:  Mr. Emerson and Mr. Pattison, you

14   are alternate jurors.  I apologize that you have to sit

15   through the trial and then don't get to participate in

16   the deliberations, but we need to bring in more jurors

17   than we need for deliberation because it's not that

18   uncommon that we lose somebody.  Here we lost a juror

19   before we even started the case.  So, we need to have

20   alternates and you've performed a great service by being

21   here, so I want to thank you on behalf of everybody

22   else.

23             I also want to tell you that I can't discharge

24   you from your responsibilities as a juror yet.  I'm

25   going to instruct you to follow my instructions until

1    you hear from the clerk.  That is, don't go out and

2    investigate the case, don't expose yourself to any

3    discussions of the case, don't discuss the case with

4    anybody.  If we do need to bring you back before the

5    jury reaches a verdict, we need to make sure that you

6    follow the instructions.  Once the jury has returned a

7    verdict in the case, the clerk will contact you and tell

8    you that you've been relieved of your obligations as a

9    juror.

10            Now, we've ordered lunch for you.  When we

11   retire you can go back into the jury deliberation room,

12   pick up lunch and take it with you.  Say goodbye to the

13   jurors but don't discuss the case with them.  And the

14   jurors should not begin deliberations until after the

15   alternate jurors have left the room.

16            As far as timing, I'll leave it up to you.  If

17   you want to enjoy your lunch in peace before you start

18   deliberations, you can do that.  But from here on out

19   it's really in your control how you handle things.  So

20   once you go back in the jury deliberation room and the

21   alternates have left, you can decide the order in which

22   you want to proceed.

23            The last thing is we need to swear the court

24   security officer.

25            THE CLERK:  Would you raise your right hand.

1          (Court security officer duly sworn.)

2          THE COURT:  All right, thank you.  With that,

3   members of the jury, we are in recess and we will await

4   your verdict.

5          (Jury exited the courtroom for deliberations.)

6          THE COURT:  Can I ask just briefly.  Have the

7   parties had any discussions about how to handle the

8   pornographic exhibits, the child pornography?

9          MS. FITZGIBBON:  They're each saved on disks,

10  your Honor, they can go back and there's a laptop to go

11  back.

12         THE COURT:  There is, okay.  And then after

13  deliberations just be sure you take custody of all of

14  the exhibits, count them up, make sure we've got

15  everything that went in comes out, okay, because we have

16  to be responsible for --

17         THE CLERK:  Absolutely.

18         MR. MOIR:  Before you go, am I going to have

19  time to get some lunch?

20         THE COURT:  Yeah, we won't need you until 1:15

21  at least.

22         MR. MOIR:  Very good.  Thank you.

23         THE COURT:  Thank you.

24         (Luncheon recess taken while.

25          jury deliberates.)

1            THE COURT:  Mr. Foreperson, has the jury

2  reached a verdict?

3            FOREPERSON:  Yes, we have.

4            THE COURT:  All right, if you can hand the

5  verdict up to the court security officer, please.

6            (Pause.)

7            THE CLERK:  In the matter of United States of

8  America versus Lisa Biron, we the jury find the

9  defendant, Lisa Biron, guilty as to Count One of the

10 superseding indictment.  Guilty as to Count Two of the

11 superseding indictment.  Guilty as to Count Three of the

12 superseding indictment.  Guilty as to Count Four of the

13 superseding indictment.  Guilty as to Count Five of the

14 superseding indictment.  Guilty as to Count Six of the

15 superseding indictment.  Guilty as to Count Seven of the

16 superseding indictment.  Guilty as to Count Eight of the

17 superseding indictment.

18            THE COURT:  Does anybody wish to have the jury

19 polled?

20            MR. MOIR:  I do, your Honor.

21            THE COURT:  All right.  Members of the jury,

22 I'm going to go through each of you and ask you if --

23 and I propose to poll them collectively as to all

24 counts, any objection to that?

25            MR. MOIR:  No objection.

1           THE COURT:  So I'm going to ask each of you if

2   your verdict was guilty as to all eight counts.  And

3   I'll go one at a time and I'll point at you and say 1,

4   2, 3, 4, et cetera.

5           Juror No. 1, was your verdict guilty on all

6   eight counts?

7           JUROR NO. 1:  Yes, it was.

8           THE COURT:  Juror No. 2, is your verdict

9   guilty on all eight counts?

10          JUROR NO. 2:  Yes, your Honor.

11          THE COURT:  Juror No. 3, was your verdict

12  guilty on all eight counts?

13          JUROR NO. 3:  Yes, it was.

14          THE COURT:  Juror No. 4, was your verdict

15  guilty on all eight counts?

16          JUROR NO. 4:  Yes, your Honor.

17          THE COURT:  Juror No. 5, was your verdict

18  guilty on all eight counts?

19          JUROR NO. 5:  Yes, your Honor.

20          THE COURT:  Juror No. 6, was your verdict

21  guilty on all eight counts?

22          JUROR NO. 6:  Yes, your Honor.

23          THE COURT:  Juror No. 7, was your verdict

24  guilty on all eight counts?

25          JUROR NO. 7:  Yes, your Honor.

1             THE COURT:  Juror No. 8, was your verdict

2    guilty on all eight counts?

3             JUROR NO. 8:  Yes, your Honor.

4             THE COURT:  Juror No. 9, was your verdict

5    guilty on all eight counts?

6             JUROR NO. 9:  Yes.

7             THE COURT:  Juror No. 10, was your verdict

8    guilty on all eight counts?

9             JUROR NO. 10:  Yes, your Honor.

10            THE COURT:  Juror No. 11, was your verdict

11   guilty on all eight counts?

12            JUROR NO. 11:  Yes, your Honor.

13            THE COURT:  And Juror No. 12, was your verdict

14   guilty on all eight counts?

15            JUROR NO. 12:  Yes, your Honor.

16            THE COURT:  All right, thank you.  I want on

17   behalf of everyone to thank you for your service here.

18   This trial was short but it was a very difficult trial

19   to have to serve on and I really appreciate the

20   sacrifice you made by serving.  All of us thank you for

21   your service.  You're released from your oath as jurors

22   and you're excused.  If you would, if you could wait in

23   the jury deliberation room briefly I'd like to come back

24   and thank you individually.  You're excused now.  I need

25   to briefly talk to counsel.

1                (Jury exited the courtroom.)

2                THE COURT:  Sentencing in this case will take

3     place April 22nd at 10:30.  The defendant is currently

4     in custody.  I see no reason to change her custody

5     status.

6                I deem the defendant to have re-raised any

7     motions for judgment as a matter of law and I deny those

8     motions.

9                Is there anything else that we need to deal

10    with today?

11               MR. KAVACAS:  I don't think so, your Honor.

12               MR. MOIR:  No, your Honor.

13               THE COURT:  All right, thank you.  I commend

14    counsel for the fine job that both sides did in this

15    case.  This is a difficult case to handle.  I thought it

16    was presented very effectively and efficiently, and I

17    appreciate both of you -- both sides behaving as

18    professionally as they did, so thank you.

19               MR. KAVACAS:  Thank you, your Honor.

20               (Jury trial adjourned at 1:35 p.m.)

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4            I, Sandra L. Bailey, do hereby certify that

5      the foregoing transcript is a true and accurate

6      transcription of the within proceedings, to the best of

7      my knowledge, skill, ability and belief.

8

9

10     Submitted: 9/12/13      **SANDRA L. BAILEY, LCR, CM, CRR**

11                             LICENSED COURT REPORTER, NO. 15

12                             STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25