UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                              *
UNITED STATES OF AMERICA      *
                              *  12-cr-140-01-PB
         v.                   *  May 23, 2013
                              *  2:15 P.M.
LISA BIRON                    *
                              *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:   John P. Kacavas, U.S. Attorney
                      Helen Fitzgibbon, AUSA
                      53 Pleasant Street
                      Concord, NH 03301

For the Defendant:    James H. Moir, Esq
                      Moir & Rabinowitz, PLLC
                      5 Green Street
                      Concord, NH  03301

Probation Officer:    Melissa Elworthy

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

1                    BEFORE THE COURT

2          THE CLERK:  Court is in session and has for

3   consideration a sentencing hearing in United States of

4   America versus Lisa Biron, Criminal Case No.

5   12-cr-140-01-PB.

6          THE COURT:  Can I see counsel at sidebar.

7                      AT SIDEBAR

8          THE COURT:  I have a question about the victim

9   impact statement.  My general view, a victim impact

10  statement should be public, and so I think we ought to

11  play it in the courtroom.  Does anybody have a different

12  view about that?

13         MR. KACAVAS:  I do not.

14         MR. MOIR:  I don't either, your Honor.

15         THE COURT:  Is there any statutory reason why

16  that should not happen?

17         MS. FITZGIBBON:  Only for identity of the

18  child.  If we could shut the monitors off like we did

19  with the display so the minor's face is not visible,

20  under 3509 we're supposed protect her identity.

21         THE COURT:  Well, if she were here in court we

22  wouldn't have her testify behind the screen.

23         MS. FITZGIBBON:  That's correct, your Honor,

24  but --

25         THE COURT:  We don't want to identify her by

1   name.

2          MR. KAVACAS:  Judge, we have no problem.

3          THE COURT:  The problem I have -- I'll ask the

4   probation officer to come up.  I can't get this to work.

5   So I hope you have one that works.

6          PROBATION OFFICER:  I went to IT yesterday

7   with it because it wasn't working in my computer either.

8          MR. KAVACAS:  We have a copy.

9          MS. FITZGIBBON:  Yeah, but it's not -- all the

10   copies are the same format.  I asked the paralegal if

11   there's a particular program to put it under.

12          THE COURT:  So does anybody -- who prepared

13   this?

14          MS. FITZGIBBON:  It was prepared by our office

15   by a paralegal.

16          THE COURT:  And do you have something that --

17   a way that you can display it?

18          MS. FITZGIBBON:  I'm going to ask.  She

19   brought a laptop with her that I believe will probably

20   play it.  Sometimes, too, your Honor --

21          THE COURT:  You work with her paralegal so at

22   the appropriate time we can play it, okay?

23          THE CLERK:  Do you want to take a break while

24   we do this?

25          THE COURT:  No.  We will just go ahead.  It's

1  going to be a while before we get to that, so you can be

2  working on it to get ready.  And if we need to take a

3  break to set it up, we can do that.  So you get your

4  copy and --

5          MS. FITZGIBBON:  Yes, your Honor.

6                    IN OPEN COURT

7          THE COURT:  All right, Ms. Biron, the

8  Presentence Investigation Report I have for you was

9  prepared on May 10th, it was revised on May 20th.  Have

10  you seen that report?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  Have you read it and discussed it

13  with your attorney?

14          THE DEFENDANT:  Yes, I have, your Honor.

15          THE COURT:  Do you feel you understand it?

16          THE DEFENDANT:  Yes, I do, your Honor.

17          THE COURT:  Thank you.  You can be seated.

18  Does the government dispute any of the facts or legal

19  conclusions contained in the report?

20          MS. FITZGIBBON:  No, your Honor.

21          THE COURT:  The defendant is pressing certain

22  objections to the report.  I'll hear you on those.

23          MR. MOIR:  Your Honor, I've stated my

24  objections in the sentencing memorandum that I provided

25  to the court and I would incorporate those objections,

1  and I certainly can rest on those if the court would

2  like --

3          THE COURT:  I would rather you didn't because

4  frankly I don't understand your position.  So we need to

5  go through them one-by-one so that I can understand them

6  in order to determine whether they have any merit.

7          MR. MOIR:  Very good, your Honor.  My

8  objections, the first one I can start with is the 4B1.5.

9          THE COURT:  Okay.

10          MR. MOIR:  That's the pattern of sexual

11  activity increase.

12          THE COURT:  Do you know which paragraph in the

13  report that is?

14          MR. MOIR:  I have not referred to cross

15  paragraphs, your Honor, I apologize.

16          THE COURT:  Maybe the probation officer can

17  tell me where it is.

18          PROBATION OFFICER:  116, your Honor.

19          THE COURT:  Okay, so let's look at that

20  paragraph.  Okay.  There is a five-level increase

21  applied after Chapter Two and Chapter Three adjustments

22  are made  because the defendant engaged in a pattern of

23  activity involving prohibited conduct.

24          So if you could just briefly state what your

25  argument is there.

1          MR. MOIR:  My argument basically is this, your

2     Honor.  Referring to the background section of 4B1.5, in

3     that section it states, and I can quote it, it only

4     applies if the instant conviction is a sex offense

5     committed against a minor, which this is of course, and,

6     it's the conjunctive, the defendant presents a

7     continuing danger to the public.  It seems under the

8     background section that both those elements are

9     required.  While I would submit the first one clearly

10    has been met, the second one has not.  So based upon

11    that I would suggest the pattern of sexual activity does

12    not apply.

13         THE COURT:  All right, let me ask you this.

14    It seems to me that in order to have any potential

15    effect on the guideline calculation, you must prevail

16    not only with respect to this argument, but at least one

17    of your other arguments.

18         MR. MOIR:  I agree.

19         THE COURT:  Is that right?

20         MR. MOIR:  That is correct.

21         THE COURT:  So let's lay this one aside for a

22    minute and look at your next one.

23         MR. MOIR:  All right.  The second one of

24    course is how this matter was grouped.  That's under

25    3D1.2.

1          THE COURT:  Okay.  And that's paragraph 112,

2    deals with the grouping.

3          MR. MOIR:  That's correct.

4          THE COURT:  Okay.  And how do you think they

5    should be grouped?

6          MR. MOIR:  Well, under -- the way I look at

7    it, your Honor, is under the grouping the -- it does

8    state under grouping 3D1.2(d), specifically under that

9    excludes 2G2.1 from grouping under that subsection.  But

10   we have to look at the other subsections a, b, and c.

11   And it does not exclude -- preclude from being included

12   under there.

13         THE COURT:  Can I just stop you and ask, let's

14   set aside the technical argument first and just tell me

15   in words a layperson can understand.  The way this

16   purports to group is it takes each count of conviction,

17   which each count having an adjusted offense level of 40,

18   and provides an increase of five levels.

19         MR. MOIR:  That's correct.

20         THE COURT:  For a total combined offense level

21   of 45.

22         MR. MOIR:  Right.

23         THE COURT:  What is your position as to how

24   that should be done?

25         MR. MOIR:  The way I submit it should be done

1    is they should all be grouped together as one which

2    would have no increase there whatsoever, would not have

3    the five-level increase.

4              THE COURT:  All right.  So the theory is even

5    though she committed six distinct crimes for which she

6    was convicted -- excuse me, there are eight counts.

7              MR. MOIR:  Eight counts altogether, your

8    Honor.

9              THE COURT:  Even though she committed eight

10   counts of conviction, that she should only be sentenced

11   as if she had only been convicted of one of those

12   groups?

13             MR. MOIR:  That's correct.  That is my

14   argument because I'm looking at the language in

15   subsection A where the counts involve the same victim

16   and same transaction.

17             THE COURT:  All right, let's get out the

18   guideline.  Which manual are we using here?  Is it the

19   2012?

20             PROBATION OFFICER:  Yes, your Honor.

21             THE COURT:  Okay.  Which section of the

22   guideline are we dealing with?

23             MR. MOIR:  3D1.2(a), your Honor.

24             THE COURT:  Let me read what I think is the

25   correct provision and you tell me if I'm right.  All

1    counts involving substantially the same harm shall be

2    group together into a single group.  Counts involving

3    substantially the same harm within the meaning of this

4    rule -- excuse me, counts involving substantially the

5    same harm within the meaning of this rule when counts

6    involve the same victim and the same act or transaction.

7            MR. MOIR:  That's correct.

8            THE COURT:  All right.  And your position is

9    that all eight counts here involve the same victim and

10   the same act or transaction.

11           MR. MOIR:  They clearly involved the same

12   victim, your Honor.  Part two, I'm submitting that this

13   involves the same harm to the same victim.

14           THE COURT:  The words are act or transaction.

15           MR. MOIR:  Act or transaction, that's correct.

16           THE COURT:  Okay.  And why do you think these

17   various counts, which occurred at various times with

18   various different males in various different places, are

19   part of the same transaction?

20           MR. MOIR:  My focus is on the victim and the

21   effect upon the victim.  I submit that, and maybe it's a

22   broad interpretation of transaction, but I submit that

23   the various counts here would constitute the same

24   transaction.

25           THE COURT:  Well, if your standard were

1   correct, which is counts that involve the same victim

2   should be grouped together without regard to whether

3   they are from the same act or transaction, your reading

4   seems to lead superfluous the last part of the sentence.

5   You would stop, when the counts involve the same victim,

6   group them all together.  And that's not what the

7   guideline says.  It says when the counts involve the

8   same victim and the same act or transaction.

9        So we need both.  We need same victim and same

10   act or transaction.  What's your argument that these are

11   the same act or transaction?

12        MR. MOIR:  My argument that it's the same act

13   or transaction comes down to the fact that we have,

14   again, I know I'm sounding somewhat circular here, but

15   we have the same victim with the same harm, we do have

16   the activities being similar between them, and therefore

17   I'm submitting that that would constitute the act, or

18   transaction, because transaction is a broader term than

19   act.  I think we have different acts here, but we have

20   the disjunctive there, so to give the word transaction

21   some meaning, I would submit transaction is broader than

22   act.

23        THE COURT:  Okay, so let's look at the

24   examples that are given.  If you look in the application

25   notes, and you look at application note three.  They

1  provide an example, right?

2          MR. MOIR:  Yes.

3          THE COURT:  Example six is the defendant is

4  convicted of two counts of assault on a federal officer

5  for shooting at the officer on two separate days.  The

6  counts are not to be grouped together.

7          Isn't our case more like that example than all

8  of the other examples listed there which are examples

9  that involve multiple convictions coming out of the same

10  act or transaction?

11          MR. MOIR:  My argument is that they are

12  different, your Honor.  The difference that I have here,

13  again, in the examples they give they have none that are

14  on all fours with this case.

15          THE COURT:  But they give five examples where

16  they are part of the same act or transaction, and in

17  each of those cases there are multiple convictions that

18  arise from conduct that occurs as a part of the same

19  temporally linked event.  It's not just that they have

20  the same victim.  It's there's a temporal link to the

21  event.  And then they give us one example where they

22  aren't part of the same act or transaction, and that's

23  where the same person is shot on two separate days.

24  This seems much more like the latter example than the

25  former set of examples, doesn't it?

1          MR. MOIR:  I agree.  It's different from the

2     former but I don't think they really had much to do with

3     this at all.  This is the one I think the court points

4     out is closer but its certainly not on the point.

5          Let me just give you another example related

6     to this case.  Some of the convictions of Ms. Biron

7     involved, again, the filming of sex acts in Canada in a

8     hotel room.  They're all in the same place, same people,

9     same --

10          THE COURT:  And they are grouped; right?

11          MR. MOIR:  They could be grouped together, but

12     they were not grouped together here.  I don't believe

13     so.

14          PROBATION OFFICER:  They were not, your Honor.

15          MR. MOIR:  They have not been grouped

16     together.

17          THE COURT:  All right, so, I may have a

18     problem with what the probation officer has done.  You

19     need to explain this to me.  Why are not the things that

20     happened in Canada part of the same act or transaction?

21          PROBATION OFFICER:  Because they occurred on

22     different days and on different times.

23          THE COURT:  But as a part of the same trip.

24          PROBATION OFFICER:  It was part of the same

25     trip, your Honor, but I view it as separate acts.

1          THE COURT:  All right.  Let's go through

2     exactly how you grouped these, then, okay, and let's

3     find out if this makes any difference to the analysis.

4          So, you have grouped Counts One, Two and

5     Eight.  What are those?

6          PROBATION OFFICER:  Count One involves the

7     transportation.  Transporting the victim across state

8     lines or across, I should say not state lines here,

9     national lines over to Canada to engage in sex acts.

10         THE COURT:  Ah-hum.

11         PROBATION OFFICER:  Count Eight is the

12    production of child pornography.

13         THE COURT:  Arising from the filming in the

14    hotel room.

15         PROBATION OFFICER:  Exactly.

16         MS. FITZGIBBON:  Excuse me, Count Eight is

17    possession, Count Two is production.

18         PROBATION OFFICER:  I'm sorry, yes, Count

19    Eight is possession of the child pornography.

20         THE COURT:  Okay.  Two is production, Eight is

21    possession.

22         PROBATION OFFICER:  Count Two is actually not

23    production of child pornography, it's -- that's not the

24    way it was charged.  It was charged by sexual

25    exploitation of a minor.

1        MS. FITZGIBBON:  That's the name of the

2    statute, your Honor, but it is the production.

3        THE COURT:  That's a production charge.

4        MS. FITZGIBBON:  That is a production charge,

5    but it's called the sexual exploitation of a child, yes.

6        THE COURT:  Am I missing something?  I think

7    of it as that's what production of child pornography is.

8        PROBATION OFFICER:  Right, your Honor,

9    but that's --

10        THE COURT:  That's not the name that the

11    statute has, but that's what we all know it to be,

12    production of child pornography.  So, does the defense

13    attorney disagree with that, that Count Two is a

14    production of child pornography count?

15        MR. MOIR:  That's what I believe the

16    indictment says.

17        THE COURT:  Yeah.  So, One, Two and Eight all

18    involve the Canada trip, but there are other counts that

19    also involve the Canada trip that you haven't grouped.

20        PROBATION OFFICER:  Yes, your Honor.

21        THE COURT:  Which counts are those?

22        PROBATION OFFICER:  I grouped One, Two and

23    Eight together because they all involved the Canada

24    trip.

25        THE COURT:  Yeah.

1          PROBATION OFFICER:  And then I grouped One,

2     Three and Eight together.  They involve the Canada trip.

3     But it's a sexual assault that occurred on a different

4     day.

5          THE COURT:  All right.  Let me ask the

6     prosecutor.  Do you agree with this analysis?

7          MS. FITZGIBBON:  Your Honor, we do agree with

8     Ms. Elworthy in that the way she did the grouping has

9     basis in the guidelines, in the law.  As we pointed out

10    in our memo, your Honor, for purposes of this case we

11    wouldn't have an objection or press an objection if the

12    Canada trip was seen as one transaction.

13         THE COURT:  If we group these as the Canada

14    trip, all the offenses being one grouping, how would

15    that affect your analysis?

16         PROBATION OFFICER:  It would reduce the --

17    give me one moment, your Honor.

18         THE COURT:  Let me ask if the prosecutor

19    knows.  If we reduce the --

20         MS. FITZGIBBON:  It's less than five so it

21    does not impact the guideline where it is.

22         THE COURT:  But does it stay at a five-level

23    enhancement or is it something less than five levels?

24         MS. FITZGIBBON:  I believe it's going to be

25    less.

1          PROBATION OFFICER:  It is less, your Honor.  I

2    believe it's a three-level enhancement.

3          MS. FITZGIBBON:  I believe three.

4          THE COURT:  How about the -- we need to go

5    through these counts, then.  I want to know from the

6    prosecutor's standpoint.

7          MS. FITZGIBBON:  Yes.

8          THE COURT:  Let's go through this and if you

9    accept that the Canada trip, because it involved a

10   continuous -- the argument that the defense -- let me

11   just be clear.  Mr. Moir's argument is, I don't accept

12   it to the extent he thinks that all these things that

13   happened in entirely different places on entirely

14   different dates with entirely different defendants are

15   part of the same group.  No offense, counsel, there's

16   just no support in the guideline for that position.

17         I'm willing to entertain an intermediate

18   position, which maybe he isn't advancing, but I assume

19   that if you don't get your all out victory, in the

20   alternative you'd say you should group by event here and

21   could include all the Canada charges in one grouping.

22         MR. MOIR:  In fact I considered that and I

23   discussed that with the probation officer in this case

24   prior to this.  I have taken the position they all

25   should be grouped.  But obviously if the court rejects

1   that I would go to that as the second position.

2           THE COURT:  Okay.  So that at least seems to

3   me your position that is worth entertaining because

4   unlike the fact pattern where the example we're given of

5   an officer shot on consecutive days, taking a trip to

6   Canada, and each time you start the camera and film, if

7   you treat that as entirely distinct event rather than

8   grouping those, it would seem to me it could arguably

9   disregard the guideline reference which suggests that if

10  something is a part of a continuing course of conduct,

11  it can be considered a part of the same transaction

12  notwithstanding the fact that some period of time goes

13  by.  I mean, your position is that if there's a break in

14  time between production one and production two, even if

15  it's part of the same trip, part of the same place with

16  the same victim, the same male participant, that it's a

17  distinct act and it should not be grouped.

18          PROBATION OFFICER:  Yes, your Honor.

19          THE COURT:  Okay.  And do you understand the

20  argument that I would expect the defendant to be making

21  that the guidelines recognize that things that can be

22  temporally distinct but if they are part of an ongoing

23  course of conduct, they can be grouped together even

24  though, say, for example, you kidnap, there's an example

25  here of kidnapping somebody and assaulting them.  They

1   can be grouped even though they are, occur at slightly

2   different times.

3          PROBATION OFFICER:  Yes, your Honor.

4          THE COURT:  Right?  So the argument would be,

5   thinking analogically, the Canada trip is more like

6   kidnapping somebody and assaulting them while you have

7   them kidnapped, isn't it?

8          MS. FITZGIBBON:  Yes, your Honor.

9          THE COURT:  Taking them across the border and

10  producing child pornography with them on multiple

11  occasions on that trip is arguably like the example of

12  kidnapping somebody and assaulting them, isn't it?

13         MR. KAVACAS:  Yes, your Honor.

14         THE COURT:  Which would sort of suggest that

15  they should be -- that they should be grouped as one

16  count for one unit or -- one group as they call it under

17  the guidelines.  Is that reasoning making sense to you?

18         MR. KAVACAS:  It does, your Honor.  I do

19  understand.  I want to point out, there is case law to

20  support the probation officer's statement that filming

21  that takes place on different dates does -- does not

22  lend itself to grouping.  She's absolutely correct

23  there, your Honor.  As our memo pointed out --

24         THE COURT:  Well, then, by that reasoning,

25  taking her across the line, if it occurs differently

1  from the time when you're filming, that shouldn't be

2  grouped either?

3  　　　　　MS. FITZGIBBON:  Yes, that's correct, your

4  Honor.

5  　　　　　THE COURT:  If you adopt a mechanical they

6  must be temporally identical events, otherwise they

7  don't get grouped, but that's not what the application

8  notes tell us.

9  　　　　　MS. FITZGIBBON:  And your Honor, as we pointed

10  out in our memo, we do, and when we ask for a sentence

11  we do look at the Canada trip as a transaction.  And for

12  that purpose we said that for purposes of this for

13  grouping, the counts involved in Canada, we would not

14  press an objection to those counts being grouped, but

15  certainly we would press an objection to the other

16  instances being grouped.

17  　　　　　THE COURT:  All right, well, I think taking a

18  more conservative approach, I'm not faulting the

19  probation officer here, since the government is prepared

20  to not object to grouping, we should at least group the

21  Canada counts which, let's identify those counts, let's

22  do the grouping, let's see where we come out, okay.  So,

23  what are the Canada counts?

24  　　　　　MS. FITZGIBBON:  Okay, Count One, your Honor,

25  is the transportation of the child into Canada.  Counts

1   Two, Three, Four and Five are sexual exploitation

2   through the production of child pornography in Canada.

3   Count Five is a production count that took place in

4   Manchester.  Count Six is a separate production charge

5   that took place in Manchester -- I'm sorry, Seven is.

6   And Count Eight is possession.

7            THE COURT:  Okay, so your position is that all

8   of the Canada counts can be grouped in one group and

9   each of the other charges should be in a distinct group?

10           MS. FITZGIBBON:  Yes, your Honor.

11           THE COURT:  Okay.  Let's run it that way and

12   tell me how many level increase we have.

13           PROBATION OFFICER:  I figured it out exactly

14   the way the prosecutor had just explained it.  That

15   would amount to a three-level -- three units.  So a

16   three-unit increase which would make it an increase in

17   offense level of three and combined adjusted offense

18   level of 43.

19           THE COURT:  Okay.  So rather than 45 it would

20   be 43.

21           PROBATION OFFICER:  Yes.

22           THE COURT:  Which is still above the maximum

23   that would implicate a life sentence under the guideline

24   range.

25           PROBATION OFFICER:  Yes, your Honor.

1          THE COURT:  All right.  Everybody agree on

2     that?

3          MS. FITZGIBBON:  Yes.

4          THE COURT:  Okay.  Now, I'm proposing to

5     accept your argument to that extent, the extent to which

6     the government has not objected, and to instruct the

7     probation officer to recalculate the units along those

8     lines.

9          Now, you would like to press an argument that

10     even that recalculation is not legally correct, and just

11     explain to me why it is that the grouping done in the

12     manner that the government is prepared to accept does

13     still not sufficiently address your argument that they

14     should all be grouped in one count.

15          MR. MOIR:  Before I do that can I make a

16     further interim step that should be considered?  What's

17     happened here is by grouping the Canada trip together,

18     one of the questions is why not put the transportation

19     with it because that seems to be all part of the same

20     transaction.

21          THE COURT:  It is.

22          MR. MOIR:  So we've got that together, they're

23     all together?

24          THE COURT:  Yes.

25          MR. MOIR:  And then we have the possession of

1    the pornographic images.

2              THE COURT:  Those are distinct, are they not?

3              MS. FITZGIBBON:  Yes, your Honor, because the

4    possession includes images that were created even after

5    the Canada trip, and the possession was occurring on the

6    date of the arrest.  So that is not all part of that

7    transaction.  They've added possession other than just

8    the Canada count.

9              MR. MOIR:  And yet the possession of those do

10   come from the Canada trip and then the New Hampshire

11   ones.  So I guess the question, should they be grouped

12   together.

13             THE COURT:  Will the prosecutor refresh my

14   memory.  What specifically was the evidence introduced

15   to support the possession charge as a distinct offense

16   from the production counts?

17             MS. FITZGIBBON:  The possession charge, your

18   Honor, was supported by the computer drive that the

19   expert testified to that contained all of the images

20   named in all of those counts, Two through Seven.  So, he

21   testified that on this computer was found images

22   involving the Canada trip, images involving Manchester

23   production with another male individual, and the final

24   count involving the defendant's production of herself.

25             THE COURT:  All right.  So I just want to be

1   clear about this because nobody has raised this issue

2   with me.  The defendant has not moved to argue that

3   Count Eight can't be recognized as a distinct count of

4   conviction.  You haven't done that; right?

5           MR. MOIR:  That's because I was going for the

6   entire same grouping.

7           THE COURT:  Whether you do or not, though, you

8   seem to be suggesting that the child pornography

9   possession charge is duplicative of the counts of

10  conviction on the manufacturing charges, and that one

11  cannot be convicted for separate offenses for both

12  producing a piece of child pornography and possessing

13  it.  Are you making that argument?  You haven't made it

14  up till now.

15          MR. MOIR:  I haven't made up till now and I'm

16  looking at the grouping for this, your Honor, is what

17  I'm looking at.

18          THE COURT:  Yeah, but your argument is

19  essentially that it is duplicative of the production

20  charges.

21          MR. MOIR:  For the grouping purposes, yes,

22  that's what I'm arguing.

23          THE COURT:  So if you produce child

24  pornography, you're going to possess it, are you not?

25          MS. FITZGIBBON:  Yes, your Honor.

1          THE COURT:  And why, then, can you be

2    prosecuted for distinct counts of production and

3    possession?

4          MS. FITZGIBBON:  The possession was an

5    ongoing, it continued well after the production --

6          THE COURT:  So you commit a separate offense

7    of possession for every day that you possess a piece of

8    pornography?

9          MS. FITZGIBBON:  Yes, your Honor.

10          THE COURT:  So if you possess it for day one,

11    you can be charged in Count One, possessing on

12    November 1st, and then you can be charged in Count Two,

13    possession on November 2nd, possession on November 3rd.

14    Are you really saying that?

15          MS. FITZGIBBON:  No, your Honor.  What I'm

16    saying, your Honor, is the production took place, there

17    is a way that you could produce and no longer possess.

18    But when you produce that video --

19          THE COURT:  Right.

20          MS. FITZGIBBON:  -- it was also found on a

21    separate date separate from the production.  Her

22    possession of those images is a separate offense.  I

23    would have to check, your Honor, because I wasn't --

24          THE COURT:  You're not really giving me very

25    clear answers to this issue.  Now, maybe you could make

1   an argument that to the extent that a separate effort is

2   made to preserve the images, that that can make you

3   guilty of possession and that that's a distinct event.

4   Now, this is something, you know, frankly, that should

5   have been briefed to me.  Do you understand his

6   argument?

7           MS. FITZGIBBON:  I understood what your Honor

8   brought up.  I --

9           THE COURT:  There is a problem conceptually in

10  trying to understand how you can be convicted of both

11  producing an image and separately possessing it, because

12  the possession is, I haven't analyzed this, but it would

13  seem to me probably a lesser included offense within the

14  act of production, because in order to produce you must

15  possess.  And if that is true, then one cannot be

16  convicted of both the greater and the lesser included

17  offense.

18          MS. FITZGIBBON:  And, your Honor, I would

19  brief this, you're right, this is not anything that I

20  had briefed for today --

21          THE COURT:  Let me ask this.  If you did not

22  group the possession charge and you only grouped the

23  other charges, that is so you'd have three groups of

24  production, Canada-related offenses including production

25  and the other two.

1          PROBATION OFFICER:  I think -- can I clarify,

2     your Honor?

3          THE COURT:  Yes.

4          PROBATION OFFICER:  The possession of child

5     pornography is grouped with the Canada stuff.  It's

6     grouped three times.  I think that's where we're getting

7     confused about here.

8          THE COURT:  So there's no separate grouping

9     for possession?

10          PROBATION OFFICER:  No, your Honor.

11          THE COURT:  Well, then, the whole point is a

12     moot point.

13          PROBATION OFFICER:  Exactly.  Count One

14     through Five and Eight are grouped together.  Count Six

15     and Eight are grouped together.  And Count Seven and

16     Eight are grouped together.

17          THE COURT:  Okay, that's what I -- that makes

18     perfect sense to me.  That's what I thought we were

19     dealing with.  Which is all the Canada counts are

20     grouped, including possession to the extent possession

21     is a distinct charge of the Canada-related materials.

22     All of the other two production events, which are

23     distinct production events, are grouped.  So we have

24     three groups and we calculate our units for three groups

25     rather than the way you had done it here.

1          PROBATION OFFICER:  Yes, your Honor.

2          THE COURT:  Okay.  And if we use three groups,

3     which you agree is an appropriate way to do it, we get a

4     total increase of three levels as a result of grouping.

5          MS. FITZGIBBON:  Yes, your Honor.

6          THE COURT:  And I am very comfortable in

7     concluding that the way the government says is

8     acceptable to it, is in fact a legally permissible way

9     of doing it.  And I don't see that you have presented

10    any persuasive argument to me that that is not an

11    acceptable way to group.

12         So, any last argument you want to make that

13    you haven't made up till now?

14         MR. MOIR:  The only argument I make on that,

15    your Honor, is I'm trying to distinguish between act and

16    transaction.  I'm taking a very broad view of

17    transaction.

18         THE COURT:  I understand, and I find as a

19    matter of fact here that these events are sufficiently

20    disparate that they are neither part of the same act or

21    transaction if grouped the way I suggest they should be

22    grouped.

23         So I direct the probation officer to modify

24    the report to reflect the change that we have identified

25    here, both the change to paragraph 112, the change to

1   paragraph 113 and 114 and 115 and any corresponding

2   changes that are necessary to follow from that.  So we

3   are adjusting the grouping finding of the probation

4   officer to group it into three groups rather than the

5   number of groups the probation officer has identified.

6   The net effect is a 43 rather than a 45, which still

7   brings your client above life, and renders superfluous

8   your argument with respect to the five-level increase

9   under chapter -- excuse me, under paragraph 116.  You

10   see my point?  Because I can't get to a higher guideline

11   than life.

12         MR. MOIR:  I understand that.

13         THE COURT:  And she gets to life with 43, and

14   so I don't need to decide anything more than that.  I

15   can simply, it's my view that where that guideline issue

16   of whether that adjustment applies or not is irrelevant

17   to my guideline calculation, and I can tell you quite

18   clearly it won't affect my discretion in how I sentence

19   regardless of how I resolve that particular issue.

20   Accordingly, I don't propose to resolve the issue.  And

21   I will simply determine that she has a total offense

22   level of 43 and not resolve that particular issue.

23         So I overrule your objection with respect to

24   grouping.  I decline to address the specifics of the

25   legal analysis that pertains to the paragraph 116

1    adjustment because it's unnecessary for me to do so to

2    calculate the defendant's guideline range, and doing so

3    would not affect my ultimate sentencing judgment in this

4    case.  And I would propose to determine that the

5    defendant's total offense level is 43.

6            Do you have other objections that you want to

7    take up with me?

8            MR. MOIR:  There are not, your Honor.

9            THE COURT:  Okay.  So I otherwise adopt the

10   findings of fact and conclusions of law set forth in the

11   report which will be made a part of the record under

12   seal.

13           I determine that the defendant's total offense

14   level is 43.  Her Criminal History Category is I.  The

15   guideline sentencing range for this defendant is life.

16           Does the probation officer -- have I made

17   myself sufficiently clear?  I apologize if I haven't

18   been, but do you --

19           PROBATION OFFICER:  Yes, your Honor, I totally

20   understand.

21           THE COURT:  Okay, okay, good.  Okay, so, we've

22   now got a guideline range.  The defendant has a motion

23   for a variance, but I will hear the government on its

24   recommendation first.

25           MS. FITZGIBBON:  Your Honor, the government's

1    recommended a sentence of 100 years, and based on the

2    following implementation if you will:  We're asking the

3    court to sentence the defendant to the 10-year minimum

4    mandatory on Count One.  That is the transportation

5    count.

6             We're asking that the court sentence the

7    defendant --

8             THE COURT:  Isn't the maximum sentence on that

9    life?

10            MS. FITZGIBBON:  Yes, your Honor.  I'm sorry,

11   it's the minimum mandatory.

12            THE COURT:  Why don't we just give her -- why

13   don't we just give her, if you want a hundred years,

14   just give her a hundred years on Count One?

15            MS. FITZGIBBON:  Your Honor, I think it's

16   important to note the harm that's perpetrated in each of

17   the other counts and have a sentence associated with

18   those counts.

19            THE COURT:  To me that seems, I mean, what we

20   do is -- well, let's assume a hundred years were right.

21   We give a hundred years on Count One.  We would give

22   30 years on Count Two through Seven, whatever the

23   statutory maximum is, to run concurrent with a hundred

24   year sentence.  That's an acceptable way to achieve a

25   hundred year sentence, isn't it?

1          PROBATION OFFICER:  Yes, your Honor.

2          THE COURT:  Why wouldn't we do that?

3          MS. FITZGIBBON:  Again, your Honor, simply we

4     were asking that you look at each of the harms

5     perpetrated in the creation of the child pornography and

6     recognize those.  For instance, the production of those

7     --

8          THE COURT:  Well, I'm giving her statutory --

9     if I bought your argument, I'd be giving the statutory

10    maximum sentence for every one of the other offenses,

11    because none of them have a life sentence as a statutory

12    maximum.

13         MS. FITZGIBBON:  Actually --

14         THE COURT:  So you would be getting the

15    statutory maximum on Two, Three, Four, Five, Six, Seven,

16    Eight.  I don't know why -- you're asking me something

17    we don't do.  I mean this almost never happens.  You

18    want a sentence on each one and then run each one

19    consecutive to get to -- that's not the way it's done in

20    federal court.

21         MS. FITZGIBBON:  Four consecutive, your Honor,

22    we're asking with four running concurrently.

23         THE COURT:  Can I legally do that?  I can.

24    But it just unnecessarily complicates the analysis in my

25    view.  I mean, am I missing something?  I ask the

1   probation officer.  We normally run, we take the longer

2   sentence, impose it, and then run concurrent sentences

3   on the other counts, don't we?

4        PROBATION OFFICER:  In most cases we do do

5   that, your Honor.

6        THE COURT:  What would be the benefit of

7   running certain sentences consecutive?

8        PROBATION OFFICER:  The benefit, when we're

9   dealing with cases when there's victims, a lot of times

10   we will do, I shouldn't say we, a lot of times the

11   prosecutor will ask for sentences based on specific

12   counts to reflect certain harms to those victims.

13        THE COURT:  I almost never see that, frankly.

14   I can't remember in 20 years more than a handful of

15   times where that's been done.  But there's nothing

16   illegal about it.  But here we have one victim, so I

17   don't know why that argument would apply at all.

18        PROBATION OFFICER:  Correct.

19        THE COURT:  So, any other benefit to doing it

20   the way you're suggesting?

21        MS. FITZGIBBON:  The benefit, to expand a

22   little bit, yeah, the grouping, just as we addressed

23   with the grouping, your Honor, the United States

24   Attorney's office looks at this, the various charges as

25   very clear episodes of harm.  And again, recognizing the

1    individual --

2         THE COURT:  Yeah, that's great for purposes of

3    conviction, but I'm imposing one sentence, and to treat

4    -- this isn't a game.  This is really serious stuff and

5    we have to look at this holistically and try to come up

6    with the right sentence.  So, you know, trying to treat

7    it as if I have separate judges sentencing the defendant

8    on separate dates for separate offenses is a kind of

9    mechanical approach that doesn't allow for a holistic

10   recognition of the harm that flows from this criminal

11   conduct.  So I'm not inclined to do it that way.

12        MS. FITZGIBBON:  Your Honor, if I may.

13   Strictly when I speak of episodic, we also -- the

14   sentence, if the court were to grant a hundred-year

15   sentence on the transportation of a minor across state

16   lines, the transportation of a minor across state lines

17   for illegal purposes could obviously include any variety

18   of harm.  In this case we are asking you to not just

19   recognize that transportation, because that of course

20   involves the Canada offenses, but the very serious

21   nature of the harm that took place in Manchester --

22        THE COURT:  Bu I guess my point is, when I

23   view somebody -- when somebody is in front of me for

24   sentencing on multiple counts, I issue one sentence that

25   captures correctly the reasonable sentence for the

1    conduct that is in front of me.  And to make these

2    distinctions, like if you're thinking that, oh, if I

3    imposed a hundred-year sentence on transportation, that

4    would be excessive because just looking at the

5    transportation in isolation, that would be too high a

6    sentence.  I don't know, I mean, maybe other judges do

7    that.  I don't.  I've never done that.  I look at what

8    did this defendant do wrong that I'm sentencing her for.

9    And I look at that and say what's the right sentence

10   ultimately for all of that conduct that I can legally

11   sentence her for.  And how I apportion it among the

12   statutes is really of no practical importance.

13         MS. FITZGIBBON:  Then your Honor, if your

14   Honor chooses not --

15         THE COURT:  If I'm making a mistake by doing

16   that, tell me why.

17         MS. FITZGIBBON:  No, your Honor.  I understand

18   what the court is saying.  Perhaps I should couch it in

19   terms of it's important that the court understands, too,

20   that a hundred years was not pulled from nowhere.  That

21   very much our recommendation to you is based on --

22         THE COURT:  Well, you can make your argument

23   that I think that ten years is for this and another ten

24   years for that and then 30 years for this and that's how

25   we get up, I mean, but, you can make that argument, but

1    just the very fact that magically it happens to end up

2    as the round number of 100 suggests to me that that's

3    not in fact how you did your analysis, because it's much

4    more likely to come out at something like 92 or 105.

5    And the fact you came out with the magic number of 100

6    suggests that somebody did what I'm suggesting should be

7    done, which is to look holistically at the crimes and

8    determine what an appropriate sentence is for them.

9    It's not to do this kind of adding up as if I know

10   nothing about the nature of these crimes in total.  It's

11   like, okay, put blinders on, analyze the first one.  Now

12   I'm done with that.  Now put blinders on and analyze the

13   second.  That's not the way judges sentence.

14           MS. FITZGIBBON:  Actually, your Honor, the

15   number was arrived at by taking the three episodes that

16   we have --

17           THE COURT:  It's just a magical chance that it

18   came out to the round number of 100.

19           MS. FITZGIBBON:  If you have three episodes of

20   child pornography as we have, your Honor, and go with

21   the statutory maximum on those, because we will argue to

22   you that because there's no mitigating we're asking for

23   the maximum on each of those episodes, and then add the

24   10-year minimum mandatory for taking --

25           THE COURT:  That's four charges out of eight,

1   so you're not giving any harm to the other four charges?

2          MS. FITZGIBBON:  On the possession, your

3   Honor, we thought that that was a number that would most

4   likely because that isn't a the min. or a man.

5          THE COURT:  All right, that's five.  You add

6   zero for that.  Now what -- you add zero on the other

7   three charges.

8          MS. FITZGIBBON:  Because of the episodic

9   nature of them, your Honor, we had chosen and ask you to

10  sentence one mass in Canada.

11         THE COURT:  Okay, that argument isn't cutting

12  any slack with me.  Please argue to me why a hundred-

13  year sentence is the right sentence given all of the

14  wrong things that the defendant did for which she was

15  convicted and can be sentenced.

16         MS. FITZGIBBON:  For all of the wrong things

17  that the defendant did, your Honor, it is difficult to

18  consider, to come up with a sentence that --

19         THE COURT:  Why not ask for a life sentence?

20         MS. FITZGIBBON:  Your Honor, a life sentence

21  would not be out of the range of reasonableness for this

22  defendant.  And in a sense we are asking you for a life

23  sentence because we're asking you to impose 100 years.

24         THE COURT:  Well, a 40-year sentence would be

25  a life sentence.  A 50-year sentence would be a life

1   sentence.  A 60-year sentence would be a life sentence.

2   High probabilities.  And we would just be knocking off

3   what is the probability that it's not a life sentence.

4   A 60-year sentence here, she's in her forties, right?

5   Do you think in prison she's likely to live beyond a

6   hundred?  No.  So a 60-year, that's probably a

7   98 percent likelihood of being a life sentence.  A

8   50-year sentence probably has a 90 percent likelihood of

9   being a life sentence.  A 40-year sentence probably has

10  an 80 percent likelihood of being a life sentence.  A

11  hundred years has a hundred percent likelihood of being

12  a life sentence.  But why not just ask for a life

13  sentence then?

14          MS. FITZGIBBON:  And, your Honor, when we were

15  faced with this similar situation in a recent case where

16  the sentence was over a hundred years, that is the exact

17  question.  When you are looking at a sentence that is

18  essentially a life sentence, where is the right number

19  in that range, particularly when you're faced with a

20  situation like this one where there's really no number

21  that captures justice for what was done here.  And I

22  really am not trying to debate the court.  It seriously

23  was something that we considered in looking at things

24  episodically and looking at the statutory structure.

25          THE COURT:  I think that gives you a false

1    sense that you've done something meaningful.  That's my

2    view.  So I'm not inclined to take that approach.  I

3    must struggle with the harder question of what's the

4    right sentence for this defendant given the horrible

5    crimes that she has committed.  I think that's the

6    responsibility here.

7         So, I understand for you there might be

8    symbolic value of giving somebody a hundred years, many,

9    many decades longer than she will in fact live, but I'm

10   not sure that it really answers the questions of what's

11   the right sentence for this defendant.

12        Help me try to figure out what the right

13   sentence is.

14        MS. FITZGIBBON:  The right sentence, your

15   Honor, is a sentence that insures her having a life

16   sentence.  This, and again --

17        THE COURT:  Let me ask you this.  You have a

18   victim witness coordinator who works out of your office?

19        MS. FITZGIBBON:  We do, your Honor.

20        THE COURT:  And part of that victim

21   coordinator's job is present to the court victim impact

22   statements?

23        MS. FITZGIBBON:  Yes, your Honor.

24        THE COURT:  Do you think victim impact

25   statements should be irrelevant to the court's

1   sentencing consideration?

2        MS. FITZGIBBON:  They should not be

3   irrelevant, your Honor, but they should also not be

4   controlling.

5        THE COURT:  I agree they shouldn't be

6   controlling, but they should be relevant, should they

7   not?

8        MS. FITZGIBBON:  They are never irrelevant to

9   the court, your Honor.

10        THE COURT:  Okay.  So, in a case in which a

11   victim has been egregiously harmed and want to convey

12   that harm to the court in order to try to obtain a

13   higher sentence, the court should listen to that victim

14   and consider the impact of the crime on that victim;

15   right?

16        MS. FITZGIBBON:  The court should, your Honor.

17   Particularly in the instance of children victims, I have

18   seen your Honor listen to those statements but also

19   acknowledge that children victims don't always have the

20   right analysis of what is the right sentence for the

21   perpetrator.

22        THE COURT:  No, but I think we can agree, can

23   we not, that victim statements are worthy of

24   consideration when a judge sentences.

25        MS. FITZGIBBON:  Absolutely.

1          THE COURT:  Okay.  In this particular case we

2     have a victim who has been, in my view, deeply damaged

3     by the defendant's egregious misconduct.  Do you agree

4     with that?

5          MS. FITZGIBBON:  Yes, your Honor.

6          THE COURT:  Do you think it is a relevant

7     consideration to sentencing how the sentence may affect

8     the victim's ability to deal with the egregious harm

9     that has been done to her?

10          MS. FITZGIBBON:  I do, your Honor.  I think

11     that the problem with that, however, is we don't know

12     right now what the long-term affect of this damage is or

13     what, any action that takes place today is going to have

14     on this child down the road.

15          THE COURT:  Should I give some consideration

16     to what the victim thinks at the moment about what would

17     help her best with her effort to address the trauma that

18     she suffered?

19          MS. FITZGIBBON:  I would always assume that

20     the court would take into consideration that.

21          THE COURT:  You know why I'm raising this

22     question?

23          MS. FITZGIBBON:  I do, your Honor.

24          THE COURT:  So, the victim here wrongly, and I

25     think egregiously wrongly, has assumed a sense of guilt

1  for the conduct that she has suffered at the hands of

2  this defendant and has expressed a concern to the court,

3  and we will see in the victim, I haven't seen it but it

4  has been described to me, in the victim impact

5  statement, that she does not want the court to impose a

6  life sentence.  Should I consider that?

7          MS. FITZGIBBON:  You should consider it, your

8  Honor, just as I know it was considered in other cases

9  as well.  There was a case in this court involving a

10 60-year sentence where the child, who had been a victim

11 of assaults, didn't want that perpetrator going to jail

12 for the rest of his life, asked can he stay out the rest

13 of his life.  It was certainly considered, but I believe

14 the court's overwhelming response was that the harm was

15 too egregious and that the sentence did in fact turn out

16 to be a number of years that equaled a life sentence.

17         THE COURT:  A sentencing seeks to vindicate

18 primarily society's interest in seeing that a criminal

19 defendant is appropriately held to account for her

20 criminal conduct.  I think we would agree on that, would

21 we not?

22         MS. FITZGIBBON:  Yes.

23         THE COURT:  But the law recognizes the victim

24 should be allowed to have a say in the sentencing

25 process.  And so the struggle I'm having here is I want

1    to pay due respect to the victim's concerns here while

2    not surrendering my obligation to see that society's

3    interests are vindicated.  But I think particularly

4    where we have a very damaged young person here, who is

5    not so young as to have her voice be completely

6    disregarded, she's a person capable of autonomous

7    decision making, that I should, when I sentence here, to

8    some degree try to take into account how the sentence

9    might affect or aid her ability to deal with the trauma

10   that she has suffered.  Isn't that a fair thing to do?

11        MS. FITZGIBBON:  It is fair.  I would ask,

12   your Honor, that when your Honor does consider that, you

13   take into account also the temporal nexus here in time.

14   At the time of the trial, obviously, and the testimony

15   you heard from witnesses, you're right, this child was

16   someone who believed she was an equal partner in the

17   crime here that she took responsibility.  She has made

18   progress in that.  I believe she will continue to make

19   progress in getting away from that.

20        THE COURT:  The goal is to see that hopefully

21   she can get to the point of recognizing that she is

22   100 percent victim and this defendant is 100 percent

23   perpetrator.

24        MS. FITZGIBBON:  Correct, your Honor.

25        THE COURT:  And we want to try to speed that

1   goal, certainly all of us who have had any involvement

2   in this case, would like to see that happen.  I have

3   other considerations, obviously, that I have to take

4   into account in sentencing.  But I think I should at

5   least be mindful of how my sentence might impact that

6   victim and to try to make some reasoned assessment about

7   whether this sentence or that sentence might have some

8   bearing on her, helping her come to the realization here

9   that you have no reason to feel guilt for the

10  victimization you have suffered.  And when considering

11  whether it's a hundred years or 80 or 60 or 40, which

12  are all close to life sentences, it may be worth

13  considering how an ultimate judgment as to which of

14  those period of years is right will impact the victim.

15  Isn't it something I should at least consider?

16          MS. FITZGIBBON:  Yes, I would agree that you

17  can consider that, should consider that, your Honor.

18          THE COURT:  Okay.  So, I mean we will hear

19  from the defendant.  So maybe that's perhaps what I

20  should do, is give defense counsel an argument, he's

21  arguing for I think a 15-year sentence, let him make his

22  argument, then you can respond to it.  But I have to say

23  I think, despite your attempt to come up with a

24  mechanical justification for a hundred years, I'm not

25  faulting you.  It's an arbitrarily chosen number that is

1   vastly in excess of the defendant's lifespan, and I'm

2   not convinced that I should simply accept it.  So we

3   will see what the defendant has to say and then we will

4   move on from there.

5         MR. MOIR:  Thank you, your Honor.  I'll just

6   go to the podium.  My eyes are not as good as they used

7   to be.

8         I guess I want to start that what I'm saying

9   here is not meant to justify, to excuse, even to

10   explain.  There's no question that the court knows, and

11   everyone in this courtroom here, knows that the actions

12   that Lisa Biron took were certainly morally

13   reprehensible.  I mean she's a mother and she completely

14   abdicated her responsibility as a mother.  I mean, she

15   led her daughter into situations which, for the daughter

16   in so many ways, were extremely dangerous and extremely

17   harmful.  Again, it's not an excuse, it's not a

18   justification, and under the law she of course must be

19   punished.

20         The moral is off the charts, your Honor.

21   There's no question about it.  I think everyone who

22   knows about this case has been shocked that a mother can

23   do this.  I want to acknowledge that and somewhat set

24   that aside and look at the criminal though.

25         Under the law the court is --

1          THE COURT:  Well, my job is to sentence in

2     accordance with the sentencing statute.  So let's set

3     aside the term moral for the moment.

4          MR. MOIR:  All right.

5          THE COURT:  Let's look at what is the relevant

6     consideration which is a just sentence.  Deal with it in

7     that term.

8          MR. MOIR:  The only reason I bring up the

9     moral, your Honor, is that absolutely anybody I've

10    talked to about this case has said, oh, my God, how can

11    a mother do that?  And that really to a great degree is

12    --

13         THE COURT:  Yeah, but this sentence is not

14    going to be about sexual promiscuity, alcohol and drug

15    abuse.  This is going to be a sentence based on the

16    counts of conviction and the victimization that was

17    reflected in those counts of conviction.  And the

18    primary hurdle for you is not to -- I don't think you

19    can separate out the concept of a just sentence from

20    what you call the criminality.  Set aside morality, but

21    just sentence requires me to take into account the

22    seriousness of the wrongs that have been done here.

23         MR. MOIR:  I agree, your Honor, and I

24    certainly don't say that you should not consider that.

25         As the court knows so well, punishment that's

1   to be imposed is to be sufficient but not greater than

2   necessary to comply with the purposes of sentencing.

3         Having said that, my central argument in this

4   is that of course there's no doubt that Lisa Biron's

5   actions were highly criminal.  They deserve punishment.

6   Again, she abdicated responsibility.  But what is the

7   appropriate punishment?  As the court has noted, the

8   state has requested a sentence of a hundred years.  And

9   as I think the court has pointed out as well, that's a

10  life sentence.  Many sentences less than that would in

11  effect be a life sentence.  And so the question is --

12        THE COURT:  Well, if I were going to impose a

13  hundred-year sentence, I would simply impose a life

14  sentence.

15        MR. MOIR:  And I think that would probably be

16  appropriate because a hundred-year sentence, we're

17  dealing with almost old testament lifespans at that

18  point.  Doesn't make a lot of sense.

19        But the first thing I'd like to look at, your

20  Honor, is what the defendant did in this case.  What

21  were the charges.  What did she do.

22        As the court knows, the main count number one

23  is transporting your child to Canada.  Staying in a

24  hotel for three days.  Her daughter having sex, sex for

25  the first time with this gentleman Kevin up there who

 1    testified.  Prior to that he was sort of her online

 2    boyfriend, virtual boyfriend, then the real boyfriend.

 3    And during the course of that time Ms. Biron transported

 4    her up for this purpose, and then when up there takes

 5    three videos and one still picture which the court saw.

 6         THE COURT:  You want to deal with this in an

 7    atomistic way, but you tell me whether my take on this

 8    is right or not.  My take on this is that your client

 9    used the victim as bait for her own personal sexual

10    gratification.  She used it as a way to lure young men

11    into having sex with her, and by using her child as an

12    object, an inhuman object to exploit so that she could

13    pursue her interest in sexual gratification with young

14    men.  That's my take having sat through the trial.  Is

15    that wrong?

16         MR. MOIR:  I think we have lots of different

17    interpretations, your Honor.  I'm not saying --

18    obviously that's the court's interpretation of this.  I

19    find what happened, again, as pointed out in the

20    evaluation that was provided, something that was quite a

21    bit less conscious or premeditated than that.

22         THE COURT:  Well, it is true that she,

23    according to the reports, led a very sexually

24    promiscuous lifestyle as a young woman, and she wanted

25    to get back to that.  And the way she could get back to

1    it as a 40-year-old woman who is interested in having

2    sex with 19, 20-year-old boys is to place an

3    advertisement on Craig's List for have sex with a, what

4    was it, 38-year-old woman and her 19-year-old roommate.

5    That looks like a lure to young men.  Come to my house

6    so that we can have sex, and you can have sex with the

7    19-year-old roommate while you're there.  That's why I'm

8    thinking this.  She proposes going up to Canada.  And

9    she has sex with the boy in the room.  Isn't that what

10   this was all about?

11         MR. MOIR:  You see, I don't think it was so

12   conscious and so planned and premeditated.  The way I

13   look at it, your Honor, and I think it was pointed out

14   in my sentencing memo as well as in the psychological

15   evaluation, where Ms. Biron had been attempting to lead

16   a good life.  She had abandoned that prior life and for

17   ten years managed to hold things together.  I suggest to

18   the court it was an incredibly fragile structure she put

19   together.  And then when her husband leaves, she has the

20   problems, stressors in her life, and once she starts

21   drinking, she starts going down the rabbit hole.  And I

22   don't think what was happening there were a lot of

23   things that were conscious.  I think that she was doing

24   this, there's no question about it, all those things you

25   talk about, but I don't think it was like, oh, let me

1   hold my daughter out here as bait so I can, I don't

2   think it was that conscious.

3         THE COURT:  Well, I think your expert does not

4   in any way suggest that she suffers from any kind of

5   psychological disorder that prevented her from being

6   able to make rational and informed calculations.  I do

7   agree with you, however, that she was -- she committed

8   these crimes during a period of extraordinary stress in

9   her life.  She had been abandoned by her husband.  She

10  had, was experiencing extraordinary financial

11  difficulty.  She lapsed into drug use and alcohol use,

12  and these crimes followed that descent.  And I will also

13  acknowledge that she had a period of about a decade in

14  which she was extremely religiously observant and as far

15  as we can tell not engaging in any criminal activity

16  during that ten-year period.  And this series of events

17  follow from that.  I will acknowledge all of that.  But

18  frankly I can't see much in there that really suggests

19  anything mitigating about the conduct.

20        MR. MOIR:  Well, as I've indicated to the

21  court before when I started off, I'm not trying to offer

22  this to justify or excuse.

23        THE COURT:  No, and I appreciate that.

24        MR. MOIR:  It really isn't, because there is

25  no justification or excuse.  What I'm trying to do is

1   put it in some larger concept.  Because the court said,

2   we're looking at this holistically.  I know you're

3   looking at sentences, but I'm looking at the person as

4   well to try to maybe understand a little bit.  And so

5   I'm not trying to break these out, you know, bit by bit,

6   because I think if we look at the whole picture with

7   that understanding at least, I think that would lead us

8   to what would be a just sentence in the case.

9        If I could just go on.  The court knows that

10   the videotapes that were taken up in Canada were all

11   very brief, and I think even the government agrees never

12   were meant for distribution.  Same goes with the --

13        THE COURT:  Can you refresh my recollection as

14   to, I agree with you that there's no evidence that they

15   were distributed over the Internet, that they were sold,

16   that they were intended for mass viewing, none of that

17   that I'm aware of.  I do recall testimony about them

18   being shown to individuals with whom she was either

19   wanting to have sex or trying to develop a sexual

20   relationship.  Can you refresh my memory about that?

21        MR. MOIR:  Yes.  I believe the person you're

22   talking about is Brandon Ore who testified in the case.

23   He was already involved in a sexual relationship with

24   the daughter, and he testified that at one point he was

25   shown I believe one of the videos.  And that's because

1   it had a, I'll put it, quote, a comic noise that came

2   off, and that's why it was shown.  And it was --

3          THE COURT:  Your point is she was just taking

4   these for her own personal purposes.

5          MR. MOIR:  Even as it says in the

6   psychological evaluation, it was done as a sort of

7   warped memento.  That's really what I would call it.

8   That's how it was explained.  Because if you wanted to

9   create a porno, so to speak, your Honor, you're not

10  going to do a 34-second clip of, you know, of the action

11  going on and one can hear the laughter, and I suggest

12  you can hear the drunkenness too going on.  These things

13  were just little clips made for whatever perverse

14  purpose.  But the purpose was again, not to distribute,

15  not to sell, not to post on the Internet, nothing like

16  that.  They were kept as a memento of some sort.  And

17  the same goes for all the videos, your Honor.  And so

18  when I look at this, I say all right, had she not taken

19  the videos, let's say she did everything else but the

20  camera never came out in any of these situations, she

21  would have committed a number of federal crimes right

22  there.  She certainly would have with the

23  transportation.  No question about that.  She certainly

24  would have had a sexual assault with her own actions.

25  Those kind of things.  And if I look at those, and I put

this in my sentencing memorandum, if you took away the
videos which of course are the bulk of the offenses
here, where would we have ended up?  We certainly
wouldn't be ending up at a life sentence.  Under the way
I quickly calculate under the guidelines, we'd probably
be looking more like 10 or 12 years, the worst case
scenario on those.

THE COURT:  Well, under the guidelines, but
that doesn't take into account the crimes she has
committed in this particular case.

MR. MOIR:  I understand.  But all I'm trying
to make the point here, your Honor, that these videos
that were made were all very brief, none meant for
distribution, none for commercial activities, nothing
like that.  And it is those videos, those crimes that
were committed, take this from a 10, 12-year sentence
and go up to, as the government would like, a hundred-
year sentence or a life sentence, it's those things
which I think you total them altogether are maybe five
minutes, again were not meant for distribution, nothing
else but sort of a strange memento.

The reason I'm pointing this out, your Honor,
is that I am asking a 15-year sentence.  And what that
does is takes those videos there and adds on, I would
submit, at least three or four years on to the

    1   underlying offenses for the videos, if the court

    2   understands what I'm saying here.

    3            THE COURT:  I understand what you're saying.

    4   But I also, as I don't accept the government's

    5   mechanistic approach which seems to calculate the

    6   hundred years by trying to view each count of conviction

    7   with blinders on, I also don't accept your view that I

    8   should look at the, each offense in kind of a mechanical

    9   fashion in light of what the elements of that offense

   10   are, and in short, the inconsequential of the making of

   11   the videos are.  To me that's almost beside the point

   12   here.  We look at, I believe I'm entitled to consider

   13   the course of conduct for which the defendant was

   14   convicted here.  And in considering what a just sentence

   15   is, I need to consider what it is she did.  And that's

   16   what, to me, what she did, and if you think this

   17   inference is unsustainable from this record or that it's

   18   improper for me to consider it this way, you need to

   19   tell me.  But what she did was embark on a pattern of

   20   conduct in which to satisfy her own interest in having

   21   sex with young men, she chose to use her vulnerable

   22   daughter and exploit her by engaging in -- having her

   23   engage in sexual acts with other men and filming those

   24   acts in a way that used her to achieve an end for her,

   25   Ms. Biron, which is just sexual gratification.  She

1   wanted to have sex with young men and this was the way

2   she figured out how she could do it, and she was willing

3   to do what was necessary to achieve those ends.

4           Let me ask the prosecutor.  Am I

5   misunderstanding what this case is all about from your

6   perspective?

7           MS. FITZGIBBON:  Your Honor, I think you have

8   a large part of it and I think there's even more because

9   of course there's also the defendant's own sexual

10  assault of her daughter.

11          THE COURT:  Well, I don't want to diminish

12  that, but in my mind, that again is part of the

13  recruitment effort to use her -- what I think is going

14  on here, in the defendant's history, you don't have

15  history of her showing interest in molesting teenage

16  girls, and you don't have evidence showing she has

17  involvement in lesbian sex except to the extent it's

18  involved in group sex.  The primary driver of all this

19  seems to be, to me, wanting to use her daughter, make

20  child pornography with her daughter, take her up to

21  Canada, have sex with young men, so that she, Ms. Biron,

22  can have sex with young men.

23          MS. FITZGIBBON:  Yes, your Honor, we would

24  agree that yes, that she totally objectified this child

25  in her own hedonistic pleasure and a way to be around

1    19, 18, 20-year-old young men, absolutely.

2         THE COURT:  Okay.  You will get a chance.  Go

3    ahead.

4         MR. MOIR:  I'm not disagreeing with the

5    court's interpretation.  The court could see it this

6    way.  The one thing that comes out, though, is if you

7    look at the videos that were taken, they were not made

8    in furtherance of the end as the court points out.  They

9    were incidental to that.  If she wants to have sex with

10   men, I think if the courts looks at the facts of this

11   case, those videos had nothing to do with recruiting

12   men, getting men in the house, anything like that.  As

13   the court points out, Craig's List, yes, that had a lot

14   to do with it.  The PSR talks about a lot of those

15   things.  But the videos that were taken here were

16   completely incidental to all that.  They weren't used as

17   a lure or anything like that.  That's not to say they're

18   not crimes, of course they are, that's what she was

19   convicted of.  But I'm just trying to put these videos

20   themselves in context because in effect the creation of

21   all those videos, those are the things that make the

22   sentence in the case, under the guidelines, so

23   astronomical.

24        THE COURT:  Not under the statutory scheme.

25   It's the taking her across the line to Canada that makes

1   it eligible for a life sentence.

2          MR. MOIR:  It does, it does, but if you look

3   at the minimum on that, that minimum is less, it's ten

4   to life versus the other one which is 15 to 30.  I'm

5   trying to put the videos in context here, your Honor.

6   They were not the lures.  They had nothing to do with

7   that.  They were again -- you saw them.  You saw how

8   they were short, they were drunken, they were -- I

9   shouldn't use the word jokey, but they were, if you look

10  at that, and as bad as they are, that's the point they

11  were made.  It's like some drunken kids with an iPhone.

12         THE COURT:  Well, the ones in Canada were.

13         MR. MOIR:  Yes.

14         THE COURT:  The one of her having oral sex

15  with her daughter wasn't.  That wasn't jokey.

16         MR. MOIR:  I don't disagree with that.  In any

17  event, your Honor, looking at 2G2.1, which is where we

18  were looking under this as far as sentencing guidelines,

19  that does cover a wide range of offenses.  It covers not

20  only sexual exploitation of children but also sex

21  trafficking in children, production of sexually explicit

22  depictions of minors for importation.  I mean, the

23  heartland of that is looking at those in the business of

24  producing child pornography for profit, for commercial

25  and for distribution.  I agree --

1          THE COURT:  We don't have that here.  I'm not

2     sentencing her as a person who's trying to engage in the

3     production of child pornography for profit.

4          MR. MOIR:  Right.

5          THE COURT:  I'm not considering that at all.

6          MR. MOIR:  And what I'm stating this for is

7     that a maximum sentence should be reserved for, again,

8     the worst possible variation of the crime and the most

9     dangerous offenders.  I'm not --

10          THE COURT:  I guess I'm having trouble seeing

11     why this isn't one of the worst possible variations of

12     the crime given the betrayal of trust that was involved.

13          MR. MOIR:  It is a betrayal of trust, your

14     Honor, there's no question about it, and no question

15     damage is done.  I'm not disagreeing with the court on

16     that.  But every case like this is going to have,

17     whether it's a stranger or a mother or anything else, is

18     going to have those elements involved.

19          THE COURT:  You see, when being victimized by

20     her mother under circumstances that leaves her feeling

21     guilty for her own victimization, you get at the heart

22     of what this crime is all about and why it is so

23     egregiously wrong and why a just sentence calls for a

24     very substantial period of incarceration.  It isn't

25     because she was going to go into the business of

 1   producing videos for profit to sell on the Internet.  It

 2   was that she was willing to use her daughter as an

 3   object to achieve sexual gratification for herself and

 4   committed these crimes to that end, in a way that

 5   betrayed a fundamental trust and left her daughter

 6   extraordinarily harmed and feeling guilty for her on

 7   victimization.  That's the harm.

 8         MR. MOIR:  I don't disagree that's the harm.

 9   But the question then comes down to, we have a person

10   who, as the court knows, has no criminal history, is

11   looking at a prison sentence, even what I'm requesting

12   of course which is the statutory minimum, of 15 years,

13   which is an incredibly substantial period of time.  And

14   I don't pretend to speak for the victim here.  I don't.

15   I don't have any contact with her.  I have heard via the

16   court what her position is here.  But if we're worried

17   about further harm to the victim by this defendant, even

18   under 15 years she will have long been an adult and

19   there can't be any harm, further harm caused by this

20   mother to her daughter.  I don't think there's any

21   evidence here, your Honor, that this defendant poses a

22   harm to other people out on the streets.  In fact, with

23   supervision and with counseling, with this kind of thing

24   which certainly supervision will be required, reporting

25   all those things, I submit that she will not be a danger

1    to the community.

2            Obviously the court has other things to

3    consider when we're talking about sentencing.

4    Seriousness of the offense, respect for the law, those

5    kind of things.  The way I'm looking at this, your

6    Honor, yes, it's serious, serious, serious.  A 15-year

7    sentence is extremely serious, particularly somebody who

8    has never been to court before, never been to jail

9    before.

10            I guess I'm submitting at the end of the day,

11   your Honor, that under the sentencing provisions of

12   U.S.C Section 3553(a), that a 15-year sentence in this

13   case is sufficient and it is not greater than necessary

14   to achieve the purposes of sentencing.  That's my

15   argument.  Thank you.

16            THE COURT:  You want to respond?

17            MS. FITZGIBBON:  Yes, your Honor.  I do think

18   that there's been an attempt to minimize and in even

19   using the term jokey with these films.  There's nothing

20   jokey about these films and --

21            THE COURT:  I hope you understand, I fully

22   understand that I think he is referring to the fact that

23   while they were the, the victim was in the film, there

24   were various times where they were laughing over things

25   that were somewhat embarrassing to them while they were

1    making the film, and that's all that -- I know that Mr.

2    Moir isn't in any way trying to suggest that this was

3    lighthearted or anything else.

4         MS. FITZGIBBON:  And Mr. Moir may not be but

5    the testimony you heard at trial was the defendant

6    definitely did laugh about them, and she laughed about

7    them on numerous occasions.  She laughed about them when

8    she is showing them to other people.  When she showed

9    them to Brandon Ore, she particularly pointed out that

10   embarrassing moment the child has on the video and made

11   him laugh.

12        When Mr. Hardy, the self-admitted Crip

13   testified, he said that he heard her showing it and

14   laughing.

15        So, not only did she objectify her daughter in

16   the creation of the film, then she repeatedly used them

17   to get -- because they just continued to amuse her.  And

18   I would suggest, your Honor, and just for the record,

19   there were clips shown to the jury for certain, we

20   narrowed that evidence as appropriate for presentation

21   to the jury, I don't have off the top of my head the

22   exact minute for each of those videos, but they were not

23   as short as shown to that jury.  And Count Seven is a

24   seven-minute long video.  You have seen many cases

25   prosecuted here where the clips are much, much shorter.

1    Seven minutes in child pornography is a very long video.

2              THE COURT:  I don't attach any special

3    significance to the length of the clips.  You want to

4    respond to his argument -- one of his arguments is that

5    the principal purpose driving the lengthy sentences for

6    production is to try to get at people who are

7    commercially exploiting child pornography for financial

8    gain, and this isn't one of those cases he argues, and

9    therefore it is inappropriate to treat it as among the

10   more serious kinds of child pornography manufacturing

11   cases one can have.  Would you -- I suggested a response

12   to that.  The response to that is because of the

13   betrayal of trust here and the damage done to the victim

14   by her own mother exploiting her for personal sexual

15   gratification, that the damage here is particularly

16   egregious and does make this one of the more serious

17   types of child pornography production offenses one can

18   have, even though there was no intent to commercially

19   exploit.  Do you have any additional response that you

20   want to offer on that?

21             MS. FITZGIBBON:  I would say in addition to

22   that and in addition to the harm, yes, your Honor.  Not

23   only, even notwithstanding no commercial distribution,

24   this is one of the worst cases this court has ever seen,

25   at least in my 15 years of prosecuting child --

1          THE COURT:  Well, I mean, Judge McAuliffe

2     recently sentenced someone who was a bus driver of

3     people who were developmentally disabled I believe.

4          MS. FITZGIBBON:  Yes, your Honor.

5          THE COURT:  And were sexually abusing them and

6     making films of that.  That arguably tops this one in

7     terms of the, just the complete egregiousness of the

8     offense, but this certainly is -- and I had one with you

9     where you were arguing for a much lower sentence of

10    someone who exchanged sexual abuse of their own child

11    videos with another pedophile in discussions where they

12    would come together and go to Vermont to go to a

13    shopping mall to kidnap a child and abuse them, and you

14    asked for a lower sentence, much lower sentence in that

15    case than this one.

16         MS. FITZGIBBON:  On that other pedophile,

17    there were both evidentiary issues as well as other

18    concerns and different statutory sentences in play at

19    the time.  But in this case, your Honor, and I'm asking

20    you to look at not just the episodes, it's bad enough

21    the episodes of child pornography here, but the

22    overwhelming picture that you've been presented, and

23    even your Honor doesn't still have all of the

24    information that could have been presented with regard

25    to the --

1          THE COURT:  Well, if you think I should have

2     more information than I have, you should give it to me.

3          MS. FITZGIBBON:  All I'm saying, your Honor,

4     is at some point there had to be a stop.  There was an

5     overwhelming house of danger and depravity that was

6     getting worse each day, starting with Brandon Ore who

7     came to visit and was told, your Honor very correctly

8     pointed out, he was told you can come back and have sex

9     if you bring a friend.  He was used to bring more young

10    men into that house.

11         So there's the ongoing harm that's getting

12    worse every day.  More drugs, more alcohol, more

13    dangerous people.

14         THE COURT:  One thing that is -- that we

15    haven't mentioned that in my mind was quite upsetting

16    during the course of the trial were the defendant's

17    recorded telephone calls at the prison in which it was

18    suggesting, she was suggesting in those calls, again,

19    trying to shift blame to her own daughter for the abuse

20    that she inflicted on her daughter.  Is that a

21    legitimate factor that I can consider in sentencing the

22    defendant?

23         MS. FITZGIBBON:  Absolutely.  And it's in our

24    sentencing memorandum, yes, that it was -- at one point

25    there's even a statement with expletives that it's not

1    my fault, it's her fault, she met that kid in Canada.

2    Well, in fact, the victim did meet the young boy on

3    Skype, and when Ms. Biron discovered it, then she had to

4    engage in a sexual relationship.  And as she told in the

5    psychologist report, it was her idea, let's go to

6    Canada, and she related to other friends, so we took

7    ourselves up to Canada.  She met this young 19-year-old

8    and decided she wanted a sexual relationship with him as

9    well, and let's bring the child up there and engage in

10   this child pornography production.

11            So yeah, that wasn't the only phone call we

12   played for you at trial.  And even after the commission,

13   this is I wasn't criminally responsible, I didn't intend

14   anything.  Well, she picked up a camera and walked

15   around.  That clip includes a narration of the room, I

16   mean, we showed a smaller clip, your Honor, but that

17   film is here we are in Canada, here's the room, here's

18   the drugs, here's the booze.  I mean --

19            THE COURT:  That attempt to shift blame even

20   after she had been arrested and the existence of

21   overwhelming evidence of her guilt, to continue to try

22   to place blame on the victim for her own victimization

23   of the child is really quite troubling to me.

24            MS. FITZGIBBON:  Yes, your Honor, and I note

25   that I think we didn't touch on this, but the acceptance

1    of responsibility argument was --

2         THE COURT:  I think you must have abandoned

3    that because you didn't pursue it.

4         MS. FITZGIBBON:  Yes.  Because you're right,

5    there has never been an acceptance at all of the

6    criminal responsibility.  In fact, there's been a

7    shifting to the victim herself during the course of

8    this.  And there was also the, you know, I also think

9    the court should very much take into consideration the

10   young people drawn into this crime.  Now, Brandon Ore

11   and Kevin Watson, 18 and 19 years old respectively, so

12   they are technically adults, and they are not without

13   some criminal culpability here, but they are lured into

14   a world of drugs, drinking, and becoming part of one of

15   the worst felonies possible, creating child pornography.

16        THE COURT:  I'm not sure that I would increase

17   the defendant's sentence length because she was involved

18   with other adults even though they were young adults.  I

19   agree that, while I don't know what the laws are in

20   Canada with respect to alcohol, but clearly she was

21   providing access and places where drugs and alcohol

22   could be consumed by people who couldn't legally do

23   that.  But to me I'm not sure that it would be

24   appropriate to give a longer sentence because these

25   adults, although young adults, were involved with her in

1    these activities.

2         MS. FITZGIBBON:  I would ask, though, your

3    Honor, that though you have identified the primary harm

4    here, the complete and utter abandonment and trust and

5    the criminal exploitation of this child, that when you

6    are considering a sentence under the protection of the

7    public and other factors to take into account, it's very

8    worth noting the kind of lifestyle, the exact

9    circumstances that was going on at the Biron residence

10   during that time.  That was a house that daily was full

11   of strange men, anonymous men coming and going, alcohol,

12   drugs, a loaded weapon, and a child in the house at the

13   time.  I mean, she was creating a very dangerous

14   situation.  As she tells the psychologist, the guys show

15   up, announce themselves as Crips.  She says get out, but

16   then says, all right, come in, and then engages in a

17   four-way sex act with them while the child is in the

18   house.  That's a danger to the community going on.  You

19   have Crips walking into the house where you have drugs,

20   a loaded weapon, and this kind of criminal activity

21   taking place.

22        THE COURT:  Again, I'm not sure that would

23   affect my sentencing judgment in any substantial way.

24   But in your memorandum there are many other additional

25   pieces of evidence regarding her involvement with the --

1   of the victim with sex with multiple men, and I think

2   that exploitation of the victim clearly suggests that

3   this conduct was not a product of isolated poorly

4   thought out spontaneous action.  This was part of a

5   deep-seated pattern in which the defendant engaged in a

6   number of carefully planned acts to, again, to pursue

7   her own interest in sexual gratification through sex

8   with young men by using her daughter as a lure to

9   attract them and to have sex with them when she

10  otherwise wouldn't have been able to attract them to

11  have sex with them.  That seems to be what the case is

12  primarily about.

13          MS. FITZGIBBON:  I believe her words were,

14  your Honor, to the therapist, it was like a hunt.  It

15  was fun.  Yes.

16          THE COURT:  All right.  Thank you.  Did you

17  want to present, I'm going to have to -- I want to play

18  the victim impact statement.  Is there any additional

19  evidence that you want to present?

20          MR. MOIR:  No, actually, I would stand upon

21  the arguments that are made in the sentencing memorandum

22  and I think that's sufficient.

23          THE COURT:  All right.  Thank you.  Have we

24  been able to set that up to play?

25          THE CLERK:  I think so, your Honor.

1          THE COURT:  Okay.

2          MS. FITZGIBBON:  It will just take a moment,

3    your Honor.

4          THE COURT:  Vinny, can you help her.  She's

5    not able to connect to our system.

6          THE CLERK:  Sure, your Honor, I'm just making

7    sure we have the sound up all the way.

8          (Pause.)

9          THE COURT:  This is going to take a while, so

10   why don't we take a little pressure off of you by taking

11   a break, and when you get it functioning, maybe we can

12   bring in a different laptop that has a more powerful

13   sound card in it or something.  The laptop itself should

14   be able to broadcast at a higher volume than that.

15         MR. CHIAVARAS:  Your Honor, it is, but the

16   audio itself is very low.

17         THE COURT:  It was poorly made you mean?

18         MR. CHIAVARAS:  Yes, the audio on the video

19   itself is low.  So if we can, I'd like to try to hook it

20   up to a different input in our court system and that

21   might --

22         THE COURT:  Let's take a short break and we'll

23   come back when it's ready to go.

24         (Recess taken.)

25         (Victim impact statement being

1          played.)

2          THE COURT:  All right, Ms. Biron, you have an

3   opportunity to speak if you want to.  You don't have to

4   say anything.  I won't hold it against you if you don't.

5   If there is anything you want to say, I'll be happy to

6   hear it.  Did you want to say anything?

7          MR. MOIR:  She as a brief statement, your

8   Honor.

9          THE DEFENDANT:  Thank you, your Honor.  In

10  July of 2011 my world crashed and I fell apart.  Dr.

11  Burnes called it a synergistic meltdown with regression.

12  I still don't understand it and I can't explain it.  I

13  was completely out of control and drinking about a half

14  gallon of whiskey every other day.  I have failed as a

15  Christian and as a Christian mom.  Being separated from

16  my daughter is the greatest pain that I have ever felt.

17  Baby, I am so sorry.

18         THE COURT:  All right.  Did anybody want to

19  say anything else before I impose sentence?

20         MS. FITZGIBBON:  No, your Honor.

21         THE COURT:  Let me just review with the

22  probation officer.  Count One is ten years to life.

23  Counts Two through Seven are 15 years to 30.

24         PROBATION OFFICER:  That's correct, your

25  Honor.

1          THE COURT:  And Count Eight is what?

2          PROBATION OFFICER:  Zero to 10 years.

3          THE COURT:  Ten max, okay.  All right, I need

4     to say that I'm going to give a sentence of 40 years

5     here, and let me explain my thinking.

6          First, I am unpersuaded by the defendant's

7     arguments for a variance.  I respect counsel and I

8     commend counsel here who has been appointed to represent

9     the defendant.  I think you have performed your duties

10    admirably.  You've been of help to the court and I

11    couldn't ask for more from you.  But I am ultimately not

12    persuaded by the arguments that you have presented here.

13         I find very little in the defendant's

14    background to be worthy of mitigation here.  I recognize

15    that she had drug and alcohol problems.  I recognize

16    that she was experiencing great stress in her life.  And

17    I know you didn't argue that those were excuses.  But

18    you were presenting them in part in support of an

19    argument for a variance.  And I don't believe that they

20    were present to a degree that would in any way support a

21    variance here.

22         As I said, I think that this is an

23    extraordinarily egregious pattern of criminal behavior,

24    and I can think of very few patterns of behavior that

25    are more serious than that.  I think the damage that you

    1   have done to your daughter is incalculable.  I think the

    2   indifference that you showed her is shocking to me.

    3   That you were willing to exploit her for your own

    4   personal sexual gratification is shocking and it makes

    5   your crime so serious and requiring such a lengthy

    6   sentence.

    7          So, I am not persuaded by any of the arguments

    8   for variance.  I recognize that this is not a case that

    9   involves commercial distribution of pornography, but I

   10   believe that it is otherwise an extraordinarily serious

   11   course of criminal conduct that does require a very

   12   substantial period of incarceration.

   13          In looking at the sentencing statute my

   14   primary concern in this case is achieving a sentence

   15   that is a just sentence.  And a sentence of 40 years is

   16   equal, in my view, and not greater than necessary to

   17   achieve the purposes of the sentencing statute in

   18   arriving at a just sentence.  I simply cannot support

   19   the view that any sentence less than 40 years would do

   20   justice to this course of criminal conduct.

   21          I understand the government's point, that a

   22   sentence of longer than 40 years should be required.  In

   23   practical terms I think the government would acknowledge

   24   there's not much practical difference between a 40-year

   25   and a hundred-year sentence in this case.  The defendant

is 43 I believe.  Even with good time credit she will be
well into her seventies before she would be eligible for
release.  And I respect the fact that a life sentence
could be asked for here and could be given.

I'm not imposing a life sentence and I'm
varying from that life sentence primarily for one
reason.  And that is I believe that it's important that
the victim in this case know that I have heard her.  In
my view she has been so seriously harmed by her mother.
So seriously damaged.  She has so much work to do to
recover from that victimization that we need to be
sensitive to things that may aid in that process.  And I
think, having watched this video, I think it's important
that she know that the judge heard her.  She's at an age
where she feels that it's important to be heard.  She
wanted to address me.  She wanted me to hear her.  And I
want her to know that I heard her.  Because I think that
will be helpful to her in her rehabilitation.  Over time
I hope she will come to see the truth, which is that her
mother is the victimizer and she is a completely
innocent victim.  But I want right now to help her deal
with that guilt, and I want her right now to know that I
take her concerns seriously, and to some extent I have
tried to address those concerns.  Now, I'm not willing
to cede the responsibility I have to the public to

1  insure that a just sentence is imposed in this case.  In

2  other cases where victims, minor victims have expressed

3  requests for leniency, if you will remember the case of

4  the Internet gamer, what was the game, World of Warcraft

5  case, there the child victim wanted to have a continued

6  relationship with the defendant who was taking her, had

7  her kidnapped to abuse her, and I would not impose a

8  lighter sentence there because it was quite clear to me

9  that I would be harming her by doing so.  So I'm not

10  ceding responsibility to the victim here.  I'm

11  recognizing that my principal responsibility in

12  sentencing is to insure that the public interest in a

13  just sentence is vindicated.  That society is protected

14  from the defendant.  That the general deterrent

15  considerations that underlie the sentencing statute are

16  enforced.  But I do think on the margin, in a case like

17  this, a victim's interest should be considered in my

18  judgment and I recognize it can be debated.  Showing her

19  that I am taking into account her concerns to this small

20  degree will in my judgment be beneficial to her.

21          And so for that reason I am going to vary from

22  the life sentence called for by the guidelines and

23  instead impose a sentence of 40 years, which is

24  480 months?

25          PROBATION OFFICER:  That's correct, your

1    Honor.

2           THE COURT:  Does anybody need me to explain

3    further my sentence in this case?

4           MS. FITZGIBBON:  No, your Honor.

5           MR. MOIR:  No, your Honor.

6           THE COURT:  All right.  Let me read the

7    proposed sentence:

8           Pursuant to the Sentencing Reform Act of 1984

9    it is the judgment of the court the defendant Lisa Ann

10   Biron is hereby committed to the custody of the Bureau

11   of Prisons, to be in prison for a term of 480 months on

12   -- Count One is the life sentence count?

13          PROBATION OFFICER:  Yes, your Honor.

14          THE COURT:  480 months on Count One.  And

15   360 months on Counts Two through Seven.  Those are

16   30-year counts?

17          PROBATION OFFICER:  Yes.

18          THE COURT:  To run concurrent, all this is to

19   run concurrent.

20          PROBATION OFFICER:  Yes, your Honor.

21          THE COURT:  And 10 years on --

22          PROBATION OFFICER:  120 months on Count Eight.

23          THE COURT:  120 months on Count Eight.

24          PROBATION OFFICER:  Yes.

25          THE COURT:  All such terms to run

1   concurrently.  This produces a total sentence of

2   40 years.

3            Much of the rest of this sentence is required

4   that I impose, even though I recognize practically there

5   will not be any substantial likelihood of release under

6   these conditions, but in the event that the defendant

7   were to be released on supervised release, the defendant

8   shall be placed on supervised release for a term of life

9   on each of Counts One through Eight, all such terms to

10  run concurrently.

11           Within 72 hours of release from the custody of

12  the Bureau of Prisons the defendant shall report in

13  person to the probation office in the district to which

14  the defendant is released.

15           While on supervised release the defendant

16  shall not commit another federal, state or local crime,

17  shall comply with the standard conditions that have been

18  adopted by this court, and shall comply with the

19  following additional conditions:

20           The defendant shall not illegally possess a

21  controlled substance.

22           The defendant shall not possess a firearm,

23  destructive device or any other dangerous weapon.

24           The defendant shall submit to DNA collection.

25           The defendant shall refrain from any unlawful

1    use of a controlled substance.

2           The defendant shall submit to one drug test

3    within 15 days of placement on supervision and at least

4    two periodic drug tests thereafter, not to exceed 72

5    drug tests per year of supervision.

6           The defendant is required to register

7    initially and to keep this registration current in each

8    jurisdiction where the defendant resides, works and

9    attends school.

10          In addition, for initial registration purposes

11   only, the defendant must register in the jurisdiction

12   where she's convicted if she does not reside in the

13   jurisdiction.  The defendant must initially register

14   before completing imprisonment.

15          The defendant shall pay any financial penalty

16   that is imposed by this judgment and that remains unpaid

17   at the commencement of the term of supervision.

18          The defendant shall comply with the following

19   special conditions:

20          The defendant shall participate in a program

21   of mental health treatment as directed by the probation

22   officer until such time as the defendant is released

23   from the program by the probation officer.  The

24   defendant shall pay for the cost of treatment to the

25   extent she's able as determined by the probation

1    officer.

2          The defendant shall participate in a sex

3    offender assessment as directed by the supervising

4    officer.

5          The defendant must participate in a

6    specialized sex offender treatment program.  The

7    defendant shall pay for the cost of treatment to the

8    extent she is able as determined by the probation

9    officer.

10          The defendant must submit to polygraph

11    examination as a containment strategy for the management

12    of sex offenders.

13          The defendant may not use sexually oriented

14    telephone numbers or services.

15          The defendant shall not directly or indirectly

16    contact the victim or any persons under the age of 18

17    except in the presence of a responsible adult who is

18    aware of the nature of the defendant's background and

19    current offense and who has been approved by the

20    probation officer.

21          The defendant shall neither possess nor have

22    under her control any material depicting sexually

23    explicit conduct as that term is defined in 18 U.S.C

24    Section 2256(2) involving adults or children.  This

25    includes but is not limited to any matter obtained

1    through access to any computer or any material linked to

2    computer access devices.

3          The defendant may not loiter within 100 yards

4    of any schoolyard, playground, swimming pool, arcade or

5    any other such place frequented by children.

6          The defendant shall consent to a third-party

7    disclosure to any employer, potential employer,

8    community service site, or other interested party as

9    determined by the probation officer of any computer-

10   related restrictions that are imposed.

11          The defendant is barred from the use of the

12   Internet and all other media devices with interactive

13   computer service as defined in 42 U.S.C Section 230(f)

14   without the prior approval of the probation officer.

15          The defendant shall consent to and cooperate

16   with unannounced examinations of any computer owned or

17   controlled by the defendant which may result in

18   retrieval and copying of all data from the computer and

19   any internal or external peripherals and may involve

20   removal of such equipment for the purpose of conducting

21   a more thorough inspection.

22          The defendant shall submit her person,

23   residence, office or vehicle to a search conducted by a

24   U.S. probation officer in a reasonable time and in a

25   reasonable manner based upon reasonable suspicion that

contraband or evidence of a violation of condition of
release may exist.  Failure to submit to a search may be
grounds for revocation.  The defendant shall warn any
other residents that the premises may be subject to
searches pursuant to this condition.

The defendant shall maintain a complete
current inventory of her computer access including but
not limited to any bills pertaining to computer access,
telephone bills used for modem access, or other charges
accrued in the use of a computer.

The defendant shall submit a monthly record of
computer use and bills to the probation officer and
shall provide the probation officer with any online
screen names or passwords she uses.

The defendant shall not use any software
designed for the purpose of encryption or wiping
computer disk spaces and/or drive.

The defendant shall consent to the
installation of a system that will enable the probation
officer or its designee to monitor computer use on any
computer owned or controlled by the defendant.  The
defendant shall pay for the cost of installation of such
system to the extent she is able as determined by the
probation officer.

The defendant shall pay to the United States a

1    special assessment of $800 that shall be due in full

2    immediately.

3         The court finds that the defendant does not

4    have the ability to pay a fine, the court will waive the

5    fine in this case.

6         The court recommends that the defendant be

7    permitted to participate in a sex offender treatment

8    program while incarcerated if eligible.

9         The defendant is remanded to the custody of

10   the United States Marshal.

11        I note that to the extent I am permitted to do

12   so, I would impose the same 40-year sentence regardless

13   of how I resolved any objections that the defendant made

14   to the guideline calculation here.  As far as I can see,

15   none of those objections, no matter how I had resolved

16   them, would have affected my sentencing judgment in this

17   case, that a sentence of 40 years is equal to and not

18   greater than necessary to achieve the purposes set forth

19   in the sentencing statute.

20        Are there any objections to this sentence

21   other than those previously raised?

22        MS. FITZGIBBON:  No, your Honor.

23        MR. MOIR:  Only the ones I previously raised

24   and the ones that are contained in my sentencing

25   memorandum.

1          THE COURT:  Well, have I failed to address

2     anything in your sentencing memorandum because I'm happy

3     to do so now if you'd like me to?

4          MR. MOIR:  I believe you've covered them, your

5     Honor.

6          THE COURT:  If I did inadvertently omit it, I

7     want to assure you I've read the sentencing memorandum,

8     I found your arguments for variance in that memorandum

9     unpersuasive.  To the extent I haven't commented on

10    them, it's just through inadvertence and I'm not being

11    asked to do so further here.

12         MR. MOIR:  I'm not asking so.

13         THE COURT:  Okay.  Anything else?  Okay.

14    Thank you.

15         I notify you that you have 14 days from the

16    date of the judgment to appeal your conviction and

17    sentence.  If you don't file an appeal within 14 days,

18    you will lose the right to appeal.  If you want to

19    appeal, consult with your attorney and direct him to

20    file a notice of appeal on your behalf.  Or if you

21    prefer, you can ask the clerk's office for help.  But

22    any notice of appeal does have to be filed within

23    14 days or you lose your right to appeal.  And I impose

24    the sentencing judgment as I have read it.  Thank you.

25              (Adjourned 4:25 p.m.)

1

2

3                        C E R T I F I C A T E

4

5            I, Sandra L. Bailey, do hereby certify that

6    the foregoing transcript is a true and accurate

7    transcription of the within proceedings, to the best of

8    my knowledge, skill, ability and belief.

9

10

11   Submitted: 9/12/13

12                        **SANDRA L. BAILEY, LCR, CM, CRR**

13                        LICENSED COURT REPORTER, NO. 15

14                        STATE OF NEW HAMPSHIRE

15

16

17

18

19

20

21

22

23

24

25